# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

PUEBLO OF POJOAQUE, a federally recognized
Indian Tribe: JOSEPH M. TALACHY, Governor
of the Pueblo of Pojoaque,

Plaintiffs,

vs.

STATE OF NEW MEXICO, SUSANA
MARTINEZ, JEREMIAH RITCHIE, JEFFERY S.
LANDERS, SALVATORE MANIACI,
PAULETTE BECKER, ROBERT M. DOUGHTY
III, CARL E. LONDENE and JOHN DOES I –V,

Defendants.

NO.:_____

**COMPLAINT**

**[Failure To Conclude Compact
Negotiations in Good Faith, 25 U.S.C.
§ 2710(d); Declaratory Judgment and
Injunctive Relief; Violation of Civil
Rights, 42 U.S.C. § 1983; Pendant
Claim of Tortious Interference with
Existing Contractual Relationships]**

For its Complaint, the PUEBLO OF POJOAQUE, a federally recognized Indian Tribe, a
sovereign tribal government ("Pojoaque" or "the Pueblo") and JOSEPH M. TALACHY on his
own behalf and on behalf of the enrolled members of the Pueblo, allege as follows:

## NATURE OF ACTION

1.      This is an action by the Pueblo of Pojoaque ("Pueblo") and by Joseph M. Talachy
on his own behalf and on behalf of the 482 enrolled members of the Pueblo, seeking redress for
two (2) related but distinct disputes. First, for the State of New Mexico's ("State") failure to
conclude negotiations in good faith resulting in a tribal-state compact for the regulation of Class
III gaming activities on the Pueblo's Indian lands. Second, for the actions and pronouncements
taken by Defendants Susana Martinez, Jeremiah Ritchie, Jeffery S. Landers, Salvatore Maniaci,
Paulette Becker, Robert M. Doughty III, Carl E. Londene and John Does I–V (collectively

referred to as "Individual Defendants ") under color of state law to deprive, and to conspire to deprive the federal right of the Pueblo and its members to be free of state jurisdiction over activities that occur on the Pueblo lands. A pendant state law claim, for tortious interference with contractual relations is also brought by Plaintiffs.

2.      The Pueblo and the State previously negotiated a Class III gaming compact that expired on June 30, 2015. The Pueblo formally requested that the State enter into a compact regarding the Pueblo's Class III gaming activities on its Indian lands beyond the expiration of the current compact. More than 180 days have expired since the Pueblo made its initial request. Accordingly, the Pueblo now seeks a determination by this Court that the State has failed to conclude negotiations in good faith. With that determination, the Court has jurisdiction to invoke IGRA's remedies that will result in a negotiated compact, or submission of last best offers to a mediator ("baseball arbitration"), and/or procedures promulgated by the Secretary of the Interior to govern the Pueblo's Class III gaming activities.

3.      The New Mexico Compact Negotiation Act, NMSA 1978, §§11-13A-1 to 11-13A-5 (1999), provides that if a tribe requests a compact or amendment that is identical to a compact or amendment previously approved by the legislature, the Governor ***shall*** approve and sign the compact or compact amendment.  The State has rejected compact language proposed by the Pueblo for the asserted reason that the Compact Negotiation Act prevents it from considering the Pueblo's proposed compact language because any agreement with the Pueblo would apply to other compacted tribes, which is contrary to IGRA's requirement that the State negotiate in good faith. IGRA provides for sovereign-to-sovereign negotiations and accordingly, the imposition of a form compact violates IGRA. Applying state law in a manner that prevents the State from

2

negotiating terms to accommodate the unique circumstances of each tribe violates IGRA.

4.     The most glaring demonstration of the State's failure to negotiate in good faith is its continuing demand and insistence that the Pueblo pay a tax on its "net win" or gross gaming revenue, resulting in a substantial percentage of the Pueblo's critical governmental revenue being deposited directly into the State's General Fund. The State's illegal tax on tribal gaming revenue has been an issue of contention between the Pueblo and the State since 1997.  The Pueblo is willing to pay for actual and reasonable costs incurred by the State to fulfill its regulatory role under the compact, and is willing to pay for appropriate mitigation of impacts to the surrounding community. Although compacts agreed upon in 1997 and 2001 included language suggesting the Pueblo's revenue-sharing payments to the State were in exchange for provisions protecting its gaming facility from competition ("exclusivity"), the Pueblo has made it clear to the State that it is not seeking any form of "exclusivity" in any new or amended tribal-state compact. Rather than correct the illegal taxation schemes of prior State administrations, the State instead demands that an increased gaming tax on net win or gross gaming revenue be included in any negotiated compact, and demands that the Pueblo accept illusory exclusivity provisions. Such demand by the State is evidence of bad faith, providing sufficient basis to implement the remedial provisions of IGRA.

5.     Another glaring demonstration of the State's failure to negotiate in good faith is the demand that the compact include numerous provisions that are not directly related to the licensing or regulation of Class III gaming.  IGRA limits the topics that may be discussed in compact negotiations to issues directly related to the operation of Class III gaming. 25 U.S.C. § 2710(d)(3)(C). Taken together or in isolation, these provisions establish the State's failure to

conclude negotiations in good faith.

6.     New Mexico further insists upon dispute resolution provisions that are enforceable by the State as against the Pueblo but not enforceable by the Pueblo as against the State. The State refuses to consider the Pueblo's proposals that make the agreement mutually enforceable. The State's demand that the Pueblo accept a dispute resolution provision that only allows the State to enforce the Compact as against the Pueblo establishes the State's failure to conclude negotiations in good faith.

7.     IGRA requires the State to negotiate in good faith whenever a tribe identifies a parcel of its Indian lands over which it exercises jurisdiction. Yet the State demands that the Pueblo agree to only three (3) gaming operations. Such a demand further establishes the State's failure to conclude negotiations in good faith.

8.     The State's jurisdiction over gaming activities on the Pueblo's Indian lands terminated at midnight on June 30, 2015. The State's established policy and practice is to wrongfully assert State jurisdiction over gaming activities on the Pueblo's Indian lands and deprive all individual enrolled members of the Pueblo, as well as all employees and agents of the Pueblo the federal right to conduct activities on the Pueblo's Indian lands free from the exercise and reach of the State's jurisdiction. Individual Defendants knowingly deprive, and conspire to deprive Plaintiff Talachy and all individual enrolled members of the Pueblo of such federal rights. These actions constitute a violation of the Supremacy Clause of the United States Constitution, federal civil rights statutes and the pendant state law action of tortious interference with contractual rights.

9.     The Pueblo is seeking a compact that enables it to achieve IGRA's objectives of

tribal economic development, tribal self-sufficiency, and strong tribal government.  The Pueblo

seeks a compact that protects the essential governmental services and programs now in place, the

funds needed for future services and programs, the 1,500 jobs within the Pueblo, and its $43

million payroll. The State's failure to conclude compact negotiations in good faith places those

services, programs, jobs and payroll in jeopardy.  The Pueblo will not acquiesce to the State's

illegal demands. The Pueblo and its members are entitled to a compact that complies with and

furthers the objective of IGRA. Accordingly, the Pueblo seeks redress in this Court to implement

IGRA's remedial provisions.

### JURISDICTION AND VENUE

10.     The District Court has federal subject matter jurisdiction pursuant to 28 U.S.C. §

1331 (federal question jurisdiction) and 28 U.S.C. § 1362 (jurisdiction over actions brought by

Indian tribes arising under the Constitution, laws, or treaties of the United States), as well as its

inherent jurisdiction to hear claims for violation of the Supremacy Clause of the United States

Constitution. Specifically, this federal subject matter jurisdiction against the State of New

Mexico is pursuant to the IGRA, 25 U.S.C. § 2710(d)(7)(a)(i), which states:

> The United States district courts shall have jurisdiction over any cause of action
> initiated by an Indian tribe arising from the failure of a State to enter into
> negotiations with the Indian tribe for the purpose of entering into a Tribal-State
> compact under [§ 2710(d)(3)] or to conduct such negotiations in good faith.

This federal subject matter against the Individual Defendants is pursuant to the Civil Rights

Statutes, 42 U.S.C. §§ 1983 and 1985. The federal questions at issue provide for a proper claim

to be made and for injunctive and other appropriate relief to be awarded under the Declaratory

Judgment Act, 28 U.S.C. §§ 2201 and 2202. The District Court has subject matter jurisdiction

over the claims for tortious interference under the doctrine of pendant jurisdiction and 28 U.S.C. § 1367.

11.    Solely relating to the Pueblo's claims against New Mexico for failure to conclude compact negotiations in good faith under IGRA, the State has the discretion to consent or to not consent to the jurisdiction of this Court per its immunity from suit vested in the Eleventh Amendment to the United States Constitution. Unless and until the State asserts Eleventh Amendment immunity as an affirmative defense, this court possesses subject matter jurisdiction to redress the Pueblo's grievances.

12.    Plaintiff Talachy is a "person" with standing to bring claims for violations of 42 U.S.C. §§ 1983 and 1985. The individual members of the Pueblo are "persons" with standing to bring claims for violations of 42 U.S.C. §§ 1983 and 1985. The Individual Defendants Martinez, Ritchie, Landers, Maniaci, Becker, Dought, Londene, and Does I-V are state officials, agents or employees, and are being sued both under 42 USC §§ 1983 and 1985 and pleading in the alternative, in both their official and personal capacities.

13.    Venue is proper in the United States District Court for the District of New Mexico pursuant to 28 U.S.C. § 1391.  The Pueblo is located and does business in such District, the Plaintiff and Individual Defendants reside in the District, the State is located in the District and nearly all of the underlying acts and omissions are based on events, persons and entities that have been or are currently located in this District.

**PARTIES**

14.    Plaintiff, the Pueblo, is a federally recognized Indian Tribe possessing authority over its Indian lands and its membership, with its Indian lands located within the external

boundaries of the State of New Mexico. The Pueblo's gaming facilities are located on its Indian lands.

15.     Plaintiff, Joseph M. Talachy, is a person who is the Governor of the Pueblo of Pojoaque. The claims filed against the Individual Defendants are made in Plaintiff Talachy's personal capacity and on behalf of the 482 enrolled members of the Pueblo, who are persons in the context of 42 U.S.C. §§ 1983 and 1985.

16.      Defendant, State of New Mexico, is a dependent sovereign state government, a body politic within the constitutional framework of the United States of America.

17.     Defendant, Susana Martinez, is a person who serves as the Governor of the State of New Mexico. The claims for injunctive relief brought against her are alleged in her official capacity. The claims for money damages are brought against her in her personal capacity. All allegations against her are made under color of state law.

18.     Defendant, Jeremiah Ritchie, is a person who serves as the Deputy Chief of Staff and primary negotiator for the Governor of the State of New Mexico. The claims for injunctive relief brought against him are alleged in his official capacity. The claims for money damages are brought against him in his personal capacity. All allegations against him are made under color of state law.

19.     Defendant, Jeffery S. Landers, is a person who serves as the Chairman of the New Mexico Gambling Control Board appointed by Governor Martinez in July 2012. The claims for injunctive relief brought against him are alleged in his official capacity. The claims for money damages are brought against him in his personal capacity. All allegations against him are made under color of state law.

20.     Defendant, Salvatore Maniaci, is a person who serves as a Member of the New Mexico Gambling Control Board appointed by Governor Martinez in May 2013. The claims for injunctive relief brought against him are alleged in his official capacity. The claims for money damages are brought against him in his personal capacity. All allegations against him are made under color of state law.

21.     Defendant, Paulette Becker, is a person who serves as a Member of the New Mexico Gambling Control Board, appointed by Governor Martinez in November 2012, and is designated as the Interim State Gaming Representative under those tribal-state gaming compacts that are in effect. The claims for injunctive relief brought against her are alleged in her official capacity. The claims for money damages are brought against her in her personal capacity. All allegations against her are made under color of state law.

22.     Defendant, Robert M. Doughty III, is a person who serves as a Member of the New Mexico Gambling Control Board appointed by Governor Martinez in March 2011. The claims for injunctive relief brought against him are alleged in his official capacity. The claims for money damages are brought against him in his personal capacity. All allegations against him are made under color of state law.

23.     Defendant Carl E. Londene, is a person who serves as a Member of the New Mexico Gaming Control Board appointed by Governor Martinez in August 2011. The claims for injunctive relief brought against him are alleged in his official capacity. The claims for money damages are brought against him in his personal capacity. All allegations against him are made under color of state law.

24.     Defendants John Doe I-V, are persons who work within the Governor's Office of

the State of New Mexico or work in an agency of the State of New Mexico. The claims for injunctive relief brought against them are alleged in their official capacities. The claims for money damages are brought against them in their personal capacities. All allegations against them are made under color of state law.

## STATEMENT OF THE CASE
### The Indian Gaming Regulatory Act of 1988

25.     The intent of IGRA is to provide "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702. Congress passed IGRA in the aftermath of the Supreme Court's decision that states lacked jurisdiction to prohibit gaming on tribal lands. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987).  As to Class III gaming activities, IGRA intended "to create consensual agreement between two sovereign governments," by requiring the participation of the states and the tribes in the compacting process. *See* 134 CONG. REC. 24,024-25 (1988) (Statement of Sen. Inouye).

26.     Indian gaming is the most highly regulated form of gaming in the United States. IGRA divides gaming into three (3) classes whereby regulatory oversight varies depending upon the type of activity.  Tribes are the primary regulators of Class I gaming (traditional games). The Tribes in conjunction with the Federal government regulate Class II gaming (including bingo, electronically aided bingo, pull tabs and player-banked poker). Class III gaming (including slot machines and house-banked table games), however, is allowed only if three (3) conditions are met: (1) the governing body of the Tribe and the National Indian Gaming Commission approve an ordinance for the regulation of such gaming; (2) the state permits such gaming "for any purpose by any person, organization or entity;" and (3) either (a) the Tribe and the State enter

into a Compact that is approved by the Secretary of the Interior, 25 U.S.C. § 2710(d)(3), or (b)

the Tribe has secured procedures promulgated by the Secretary of the Interior pursuant to 25

U.S.C. § 2710(d)(7)(B)(vii) or 25 C.F.R. Part 291, or (c) the circumstances warrant the Tribe

pursuing self-help remedies. *See Spokane Tribe v. United States*, 139 F.3d 1297 (9th Cir. 1998).

    27.    IGRA provides that any Indian tribe having jurisdiction over the Indian lands

upon which a Class III gaming activity is conducted, or is to be conducted, shall request the state

in which such lands are located to enter into negotiations for the purpose of concluding a Tribal-

State Compact governing the conduct of gaming activities. Upon receiving such a request, the

State shall negotiate with the Indian tribe in good faith to enter into such a compact. 25 U.S.C. §

2710(d)(3)(A).

    28.    In promoting the goal of tribal self-determination, IGRA has built-in measures to

preserve gaming revenues as a **tribal asset** during compact negotiations. An approved compact

permits the State and the Tribe to jointly develop a regulatory scheme to govern Class III

gaming; however, IGRA sets forth the scope of negotiated provisions that may be contained in

compacts. IGRA does not authorize Tribal-State Compacts for Class III gaming to contain

provisions outside the restrictions in 25 U.S.C. § 2710(d)(3)(C) (emphasis added), which

provide:

        (C) Any Tribal-State Compact negotiated under subparagraph (A) may include provisions
        relating to—

            (i) the application of the criminal and civil laws and regulations of the
            Indian tribe or the State that are directly related to, and necessary for, the
            licensing and regulation of such activity;

            (ii) the allocation of criminal and civil jurisdiction between the State and
            the Indian tribe necessary for the enforcement of such laws and
            regulations;

(iii) the assessment by the State of such activities in such amounts as are *necessary to defray the costs of regulating such activity*;

(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

(v) remedies for breach of contract;

(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

(vii) any other subjects that are *directly related to the operation of gaming activities*.

29.     Consistent with those purposes, IGRA specifically withholds from State and local government the power to impose "a tax, fee, charge or other assessment upon an Indian tribe . . . to engage in Class III activity." 25 U.S.C. § 2710(d)(4) and Pub. L. 100-497 Indian Gaming Regulatory Act Senate Report (Indian Committee), S. REP. No. 100-446, at 18 (1998). Moreover, IGRA prohibits any state from refusing to enter into negotiation for Class III gaming "based upon the lack of authority in such state, or its political subdivisions, to impose such a tax, fee, charge or other assessment." 25 U.S.C. § 2710(d)(4).

30.     Thus, IGRA requires that with respect to the Tribe paying funds to the State, the amounts must be only what is necessary to cover costs to the State in regulating the Class III gaming activity.  While the Tribe and the State may negotiate over other subjects that are directly related to the operation of gaming activities, any other subject cannot impose a tax, fee, charge or other assessment upon the Tribe as a requirement for the Tribe to be able to conduct Class III gaming activity.

31.     IGRA provides that a Tribe may file an action in federal court to implement IGRA's remedial provisions if more than 180 days have elapsed since the Tribe's request to the State to enter into compact negotiations. The burden is on the State to prove that it negotiated in

good faith. If the Court finds that the State has failed to negotiate in good faith, the Court shall order the parties to conclude compact negotiations in 60 days. If the two (2) governments fail to conclude a compact within that 60 day period, the Court shall appoint a mediator who shall choose the last best offer submitted by the Tribe or by the State.  If the State fails to consent to the compact selected by the Mediator, the Court shall notify the Secretary of the Interior who shall promulgate procedures consistent with the Mediator's selection, which procedures will then govern the Tribe's Class III gaming activities in lieu of a Tribal-State Compact. 25 U.S.C. § 2710(d)(7).

### Brief History of the Pueblo of Pojoaque/ New Mexico Compacts

32.     The course of negotiations between the State and the Tribes, Pueblos and Nations within New Mexico, including Pojoaque, over the gambling issue has been lengthy and litigious. See *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546 (10th Cir. 1997) (tracing the history of earlier negotiations and litigation).

### The 1995 Compact

33.     The Pueblo executed a Tribal-State Compact with the State of New Mexico on February 13, 1995. The Compact was affirmatively approved by the Department of the Interior on March 15, 1995. In its approval letter, the Department expressly noted that the revenue sharing agreement was in exchange for certain limitations on commercial gaming but allowing for nine (9) fraternity, veterans, and non-profit facilities to continue to operate a limited number of electronic gaming devices and four (4) horse tracks to operate gaming devices every day that live or simulcast horse racing occurs. The Compact provided for 3% to 5% of gross revenue to be paid to the State, with 40% of such payment ear-marked for local government to be used to

mitigate the impact of the tribal gaming facility on the local community.

34.     The 1995 Compact, even though executed by the Governor of New Mexico and affirmatively approved by the Department of the Interior, was not ratified by the New Mexico Legislature. The State litigated the question and the New Mexico Supreme Court ruled that legislative approval was necessary to bind the State to the terms of the Compact, thus voiding the compacts. *State ex rel. Clark v. Johnson*, 1995-NMSC-048, 904 P.2d 11 (1995); *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546 (10th Cir. 1997).

**The 1997 Compact**

35.     At the opening of the 1997 legislative session, the Pueblo and other New Mexico tribes faced the threat of closure of their gaming facilities unless the State Legislature approved new and legally valid compacts. The Legislature's response was to narrowly adopt two (2) state statutes setting out an approved form of a standard compact and mandatory separate revenue-sharing agreement ("RSA"). The form RSA contained in NMSA 1978, §11-13-2 (1997), authorized the state governor to enter into a compact with only those tribes which have executed an RSA in the form set forth in that Section. The RSA required a tribe to pay the state 16% of its total "net win" from gaming machines. Additionally, the compact terms imposed a significant regulatory fee. At the same time, the State authorized a significant expansion of non-Indian gaming by allowing for the operation of 300 electronic gaming devices at horse tracks, a state lottery, the operation of 15 electronic gaming devices by 250 fraternal, veterans, or other nonprofit membership organizations, and gaming by nonprofit tax exempt organizations for fundraising purposes.

36.     The Pueblo and the other gaming tribes in New Mexico entered into a compact

13

and mandatory RSA in the form approved by the Legislature. The Pueblo executed the 1997 Compact and RSA on September 9, 1997. These documents were, in turn, submitted to the Secretary of the Interior for his approval pursuant to the IGRA.

37.     IGRA authorizes the Secretary to approve or, under certain specified conditions, disapprove any Tribal-State Compact. 25 U.S.C. § 2710(d)(8). Rather than exercising this authority, however, the Secretary chose to take no official action and allow the compacts to go into effect by operation of law. *See* 25 U.S.C. § 2710(d)(8)(C).

38.     The Secretary notified the Pueblo of its decision in a letter dated August 23, 1997, which expressed concern that the revenue sharing provisions may be unlawful under IGRA, specifically noting that he "questions whether the limited exclusivity provided the Pueblo meets the standards" required under IGRA. The Secretary pointed out "the Compact does not provide substantial exclusivity. Indeed, the Compact seems to expand non-Indian gaming by allowing for a state lottery, the operation of a large number of electronic gaming devices by fraternal, veterans, or other nonprofit membership organizations, gaming by nonprofit tax exempt organizations for fundraising purposes, and the operation of electronic gaming devices at horse tracks every day that live or simulcast horseracing occurs."

39.     The Secretary's letter explained that the Department of Interior's point of view was "that the payment required pursuant to the Revenue Sharing Agreement resembles more a fee or assessment imposed by the State on the Pueblo as a condition to engage in Class III gaming activities rather than a bargained-for payment for a valuable privilege, and thus appears to violate Section 11(d)(4) of IGRA, 25 U.S.C. § 2710(d)(4)." The Department was also concerned with the regulatory fee structure in the compact.                                    .

40. The Secretary's view that the revenue sharing was in actuality a fee imposed by the State as a condition for tribes to engage in gaming is further supported by NMSA 1978, § 11-13-2 (1997), which provides, "Execution of an Indian gaming compact is conditioned upon execution of a revenue-sharing agreement." This New Mexico statute has never been repealed.

41. The Pueblo along with other gaming tribes challenged the fees in the 1997 compacts which resulted in litigation with the State over the validity and interpretation of the RSA and the 1997 compacts. *New Mexico v. Jicarilla Apache Tribe*, No. CIV 00-851 BB/LFG, 2000 U.S. Dist. LEXIS 20666 (D. N.M. 2000). That litigation was not resolved by final judgment, but instead was settled through execution of the 2001 Compacts.

### 1999 & the Prelude to the 2001 Compact

42. By 1999, within two (2) years of agreeing to the 1997 Compacts, six (6) racetracks were operating and as well as 300 electronic non-Indian gaming devices per racetrack.

43. In 1999 the State Legislature passed the Compact Negotiation Act and tribes immediately requested to negotiate new compacts. New Mexico Compact Negotiation Act, NMSA 1978, §§ 11-13A-1 to 11-13A-5 (1999). The next set of compacts was only entered into after failed arbitration, litigation, and consent decrees.

### The 2001 Compact

44. In 2001, the State dismissed claims against several tribes that had refused to pay the fees under the 1997 Compact when they agreed to sign new compacts with the State. With some modest exception, the 2001 Compact provided for an 8% tax on net win, or gross gaming revenue. In 2001, the maximum permitted gaming devices per race track was increased from 300 (in the 1999 compacts) to 600 with up to 150 transfers allowable from other tracks.

45.     The Pueblo initially refused to execute the 2001 Compact, but acquiesced to the State's demands in 2005. Within three (3) years of executing the 2001 Compact, four (4) non-Indian racinos were operating with a total of 1,815 slot machines.

46.     The Pueblo of Pojoaque-New Mexico Class III Gaming Compact, executed on July 19, 2005, went into effect on August 25, 2005, and ended at midnight June 30, 2015. Although executed in 2005, the compact is still the form "2001 Compact".

**The 2007 Compact Amendments**

47.     In 2007, the State agreed to extend the term of the 2001 Compact for those tribes that agreed to an increase of the tax on net win to a range of 9.25% to 10.75% of net win, or gross gaming revenue, while acquiescing to an increase in non-Indian gaming activity in the State.  The 2007 amendments limit tribal gaming facilities to two (2) within each gaming tribe's lands [except for Laguna Pueblo, which may have three (3) gaming facilities].  In return for the tribe's increased revenue sharing payments, the 2007 amendments limit racetracks to six (6) in the State [the existing tracks limited to 600 gaming machines each with the option to lease machines from other tracks].  There are no limits on the number of lottery distributors in the State; no limits on the number of nonprofit gaming facilities [although in 2001 the number of nonprofit operators was near 56 with 15 machines each; the 2007 amendments do not limit the number of machines in the future].  In other words, the gaming tax increased while the alleged "exclusivity" to the tribes diminished.

48.     The Pueblo did not agree to the terms of the 2007 Compact in part based upon fundamental fairness and economics as the 2007 amendments limited each tribe to two (2) gaming facilities with the exception of the Pueblo of Laguna.  The 2007 Compact would have

forced the Pueblo to close established gaming facilities and prohibited the construction and opening of Buffalo Thunder Resort for which the Pueblo had negotiated and secured $245 million in bonds. The State failed to accommodate the Pueblo's current and future gaming operations.

49.     State law provides that if a request for negotiation of a compact or amendment is made, and the proposed compact or amendment is identical to a compact or amendment previously approved by the legislature except for the name of the compacting Tribe and the names of the persons to execute the compact or amendment on behalf of the Tribe and on behalf of the State, the governor *shall approve* and sign the compact or amendment on behalf of the State without submitting the compact to the New Mexico Legislature for approval pursuant to the provisions of this section.  A compact or amendment signed by the governor pursuant to this subsection is deemed approved by the legislature.  *See* NMSA 1978, § 11-13A-4(J) (1999).

50.     In executing the 2007 Compact, the State impeded its ability to negotiate in good faith with the Pueblo by altering the Compact Negotiation Act to place a six (6) month limit for tribes to sign, thereby punishing those tribes that signed the 2001 Compact and relied upon the Compact Negotiation Act.

**The 2015 Compact**

51.     In April 2015, the State entered into a new Class III Gaming Compact to four (4) tribes that agreed to an increase of the tax on net win to a range of 8.75% to 10.75% of net win, or gross gaming revenue, while acquiescing to an increase in non-Indian gaming activity in the State ("2015 form Compact"). For one of those Tribes, the Jicarilla Apache Nation, its remote location provides for a marginal operation, therefore an anticipated lower tax rate than it was

paying under the 2001 Compact when the 2015. A fifth tribe that is not currently conducting gaming on its Indian lands, the Pueblo of Jemez, also signed on to the 2015 form Compact. For three (3) of the tribes, however, the tax rate would increase under the 2015 form Compact. In other words, the gaming tax increased while the alleged "exclusivity" to the tribes diminished for tribes that signed onto the 2015 Form Compact. The Pueblo of Pojoaque would incur significant increase in the tax rate if it were to sign on the 2015 form Compact.

52. By January 1, 2015, the gaming industry in New Mexico contained 160 non-Indian businesses and non-profits, including 58 veterans' and fraternal organizations (each of which may operate up to 15 gaming machines – currently 688 gaming machines total), five (5) racetracks (each of which may operate up to 750 gaming machines – currently 2,886 gaming machines total), 98 licensed bingo and raffle operators, and the State Lottery which is offered at approximately 1,100 retail locations across the State and 60 bars and restaurants, 27 tribally-owned and operated casinos, and the capacity for additional non-Indian gaming by the award of a new racino license. The Pueblo of Nambe is now building its first casino within less than a half mile (walking distance) from Buffalo Thunder, the Pueblo's $250 million destination resort. It is scheduled to open in the fall of 2015.

53. On June 9, 2015, the Department of the Interior informed the State and the five (5) tribes signing on to the 2015 form Compact that it was not affirmatively approving the submitted compacts because it was troubled by the revenue sharing rates, such that the compacts only went into effect as "deemed approved."

54. Pojoaque did not agree to the terms of the 2015 form Compact.

55. Alleging that the State's tactics and positions regarding what was to become the

2015 form Compact violates federal law, on December 13, 2013, Pojoaque filed a lawsuit against the State for failure to negotiate a compact under IGRA in good faith.

56.    On February 25, 2014, the State asserted Eleventh Amendment immunity as an affirmative defense to the Pueblo's Complaint, and accordingly, the lawsuit was dismissed on March 3, 2014.

57.    Thereafter, the Pueblo sought relief with the United States Department of the Interior pursuant to 25 C.F.R. Part 291.

58.    On August 7, 2014, the State of New Mexico filed a lawsuit against the United States alleging that the Department of the Interior lacks the authority to promulgate the regulations set forth in 25 C.F.R. Part 291.

59.    On October 17, 2014, the District Court granted summary judgment in favor of the State, enjoining the United States from taking action pursuant to 25 C.F.R. Part 291. An appeal to the United States Court of Appeals for the Tenth Circuit is pending.

**Renewed Request for Negotiations under IGRA**

60.    On November 3, 2014 the Pueblo notified the State of a new request to negotiate amendments to the 2001 Compact or a new compact to govern the Pueblo's Class III gaming beyond the June 30, 2015 expiration date of the 2001 Compact.

61.    On January 23, 2015, the Pueblo renewed and reaffirmed its outstanding request for compact negotiations.

62.    More than 180 days have elapsed since the Pueblo notified the State of its new request to negotiate amendments to the 2001 Compact or a new compact to govern the Pueblo's Class III gaming activities on its Indian lands beyond the June 30, 2015 expiration date of the

2001 Compact.

63.     Since November 3, 2014, representatives of the State and the Pueblo have met on several occasions in the context of negotiating a new compact. The State's demands regarding the critical issues have not changed.

64.     From the new request for a compact on November 3, 2014 and consistently thereafter, the Pueblo has informed the State that it does **not** seek exclusivity and that the Pueblo seeks a compact which strictly comports with the policies and plain language of IGRA.

65.     On February 26, 2015, the New Mexico Gaming Control Board ("NMGCB" or "the Board"), through Individual Defendant Becker, requested to perform its normal and routine annual compliance review on November 3-5, 2015.  Much to the Pueblo's surprise and for the first time in its relationship with the NMGCB, the Pueblo received a second request from Individual Defendant Becker, to perform a secondary and earlier compliance review in May 2015.

66.     In furtherance of its conspiracy, on May 6, 2015, for the first time in its relationship with the NMGCB, Individual Defendant Becker requested the Pueblo provide "[a]ny and all contract [sic] with Class III Gaming Machine Manufacturers, including and [sic] Lease, Purchase and Service Agreements." at the time of its compliance review. Pursuant to its document production obligations under the 2001 Compact, the Pueblo provided the requested vendor contracts on June 24, 2015.

## Individual Defendants Actions since the June 30, 2015
## Termination of the Tribal/State Compact

67.     On June 30, 2015, the United States Attorney for the District of New Mexico and the National Indian Gaming Commission issued letters expressing that, as an exercise of

discretion, upon the Pueblo's agreement to certain defined commitments, neither agency will bring enforcement actions against the Pueblo in order to allow the Pueblo and the United States to conclude litigation initiated by the State surrounding the compacting process and the Secretary of the Interior's authority to issue Class III gaming procedures.

68.     On that same day, Individual Defendant Martinez caused statements to be made to the press attributed to her threatening those with employment and business relationships with the Pueblo : "[a]dditionally, the U.S. Attorney's decision provides no protection to banks, credit card vendors, gaming machine vendors advertisers, bondholders, and others that are now doing business with an illegal gambling enterprise."

69.     When the    2001   Tribal-State   Class III    Gaming  Compact  between the Pueblo and the State terminated at midnight, June 30, 2015, any and all jurisdiction that the State had over gaming activities conducted on the Pueblo's Indian lands was terminated along with the Compact. Matters regarding gaming activities are the exclusive province of the Pueblo and the United States.  Congress, in the enactment of IGRA, only allows state jurisdiction over a tribe's gaming activities to the limited extent that is agreed upon in a tribal-state compact in effect.  NMSA 1978, § 60-2E-4 (1997).

70.     Despite the State's lack of jurisdiction over gaming activities, the administrative branch of the State of New Mexico has established a policy, custom and practice of wrongfully asserting State jurisdiction over gaming activities on the Pueblo's Indian lands and depriving all individual enrolled members of the Pueblo, as well as all employees and agents of the Pueblo of their federal right to conduct activities on the Pueblo's Indian lands free from the exercise and reach of the State's jurisdiction.

71.     Individual Defendants knowingly deprive, and conspire to deprive all individual enrolled members of the Pueblo, as well as all employees and agents of the Pueblo of the federal right to conduct activities on the Pueblo's Indian lands free from the exercise and reach of the State's jurisdiction.

72.     Individual Defendants Martinez and Ritchie, under the color of state law, have made or caused to be made official pronouncements that anyone doing business with the Pueblo, including gaming vendors, do so at the risk of retaliation and of the State interfering with such business. Such actions are a deprivation of the civil rights of Plaintiff Talachy and the enrolled members of the Pueblo. Such actions constitute tortious interference with contractual affairs.

73.     On July 15, 2015, the New Mexico Gaming Control Board, through the Individual Defendants, held a closed meeting to discuss "various compliance issues" related to "Tribal Gaming Matters under the 2001 Tribal-State Gaming Compact" in violation of the New Mexico Open Meetings Act.  Following the closed meeting, Individual Defendants announced that they had determined the Pueblo is acting illegally in its continued operation of its Class III gaming activities and placed in abeyance approval of any license application or renewal for the Pueblo's vendors.  No other vendor applications were placed in abeyance.

74.     Based upon the demand of the NMGCB to produce vendor contracts, individual Defendants were aware of all vendor applications that they would seek to take action against, and that such action would be intended to terminate or otherwise interfere with such contracts and to prevent the establishment of new vendor contracts.

75.     Individual Defendants Landers, Maniaci, Becker, Doughty, Londene and John Does I–V announced that they intend to deny license applications, including renewals of those

gaming entities doing business in the State of New Mexico if such entity continues to do business with the Pueblo. Nothing in the state Gaming Control Act gives the NMGCB or Individual Defendants any jurisdiction over non-compacted tribal gaming. Such actions are a deprivation of the civil rights of Plaintiff Talachy and the enrolled members of the Pueblo. Such actions constitute tortious interference with contractual affairs.

76.     The actions of Individual Defendants Landers, Maniaci, Becker, Doughty, Londene and John Does I–V are not predicated on a licensee's violation of New Mexico State law, but rather on their own self-serving determination that the Pueblo has violated federal law, a determination which Individual Defendants have no authority to make. Congress created a federal regulatory regime that completely occupies the field of Class III gaming regulation. Because IGRA does not permit States to make unilateral decisions regarding Indian tribes' eligibility to engage in gaming, any state law and state actions purporting to exercise such authority is preempted.                                                                      .

77.     Individual Defendants have knowledge that the Pueblo's wholly-owned business entities have existing contractual relationships with the major vendors and/or suppliers of gaming equipment in the gaming industry.                                                        .

78.     Individual Defendants actions will cause, or in the alternative are intended to cause, those major vendors and/or suppliers of gaming equipment in the gaming industry to cease providing services and replacement equipment, which is in breach of the contracts between the Pueblo's wholly-owned business entities and such vendors and/or suppliers.              .

79.     Individual Defendants played an active and substantial part in causing the Pueblo to lose the intended benefits of such contracts. But for the wrongful acts of Individual

Defendants, the contracts would not be breached.                                    .

80.     The breaches of contracts caused by the actions of the Individual Defendants will cause the Pueblo's gaming facilities to sustain substantial losses in revenue, resulting in substantial layoffs, and millions of dollars in lost revenue, placing the Pueblo in breach of financial agreements, reductions in essential government services to the Pueblo's membership including law enforcement, health care, housing, social services, education and basic infrastructure, cause a major economic downturn for the economy of the entire Pojoaque Valley region, and possibly forcing the closure of the Pueblo's gaming facilities.

81.     Individual Defendants induced the breach of contract without justification or privilege. Individual Defendants have no jurisdiction over conduct occurring on the Pueblo's lands. Individual Defendants actions are taken to further their conspiracy to force the Pueblo to acquiesce to the Governor Martinez' demands that the Pueblo execute a compact that contains terms that are illegal and not the product of good faith negotiations under IGRA.

82.     In his personal capacity and in his capacity acting on behalf of the enrolled members of the Pueblo, Plaintiff Talachy's claims for injunctive relief under 42 U.S.C. § 1983, the actions and pronouncements set forth in ¶¶ 65-81 are alleged to have been taken by the Individual Defendants in their official capacity, under color of state law.

83.     In his personal capacity and in his capacity acting on behalf of the enrolled members of the Pueblo, Plaintiff Talachy's claims for damages under 42 U.S.C. § 1983, the actions and pronouncements set forth in ¶¶ 65-81 are alleged, in the alternative, to have been taken by the Individual Defendants in their personal capacity, under color of state law.

**Illegal Tax on Gaming Revenue**

84.     The Pueblo is agreeable to paying for the actual, necessary and reasonable costs of the State's performance of its agreed-upon duty and obligations under a tribal-state gaming compact for the regulation of Class III games.  The Pueblo is also agreeable to paying for the actual necessary and reasonable cost of mitigating any adverse impacts directly related to the operation of a Class III gaming facility, or otherwise to cause such mitigation measures to be implemented: but the State demands more.

85.     Through its offer of the 2015 form Compact, the State demands that the Pueblo's revenue sharing to the State increase by an effective rate of 32.5% from its present 8% to an amount at or above 8.75% of net win until 2018 and then gradually increasing to an amount at or above 10.5 % over the 23-year life of the compact, and offers no substantial or meaningful benefit to the Pueblo to provide consideration for, or otherwise justify, the proposed tax.

86.     The Pueblo has informed the State that it is not seeking any exclusivity in the terms of the tribal-state compact and, accordingly, is not willing to pay any fee to the State in exchange for exclusivity.

87.     The Pueblo submitted a compact for the State's consideration that does not include any provisions for exclusivity and does not include any provisions for the Pueblo to pay a percentage of its gaming revenue to the State.

88.     The State fails to substantively respond to the Pueblo's position that it is not seeking exclusivity and instead, continues to demand that the Pueblo pay the State's increased fees and accept the illusory exclusivity as noted in a Term Sheet offered back to the Pueblo (date).  Although there may be tribes in New Mexico that agreed to pay gaming revenue to the

State in exchange for restraints on state-sponsored gaming, the Pueblo's gaming facilities operate in a mature, local market in which exclusivity does not constitute a meaningful concession by the State that provides substantial benefit to the Pueblo commensurate to the fees demanded by the State.

89.     The State insists that if it were to forego exclusivity and revenue sharing with the Pueblo, such term must then be offered to every gaming tribe.  Placing a pre-condition on getting a compact is prohibited by IGRA. *See Mashantucket Pequot v. Connecticut*, 913 F.2d 1024 (2nd Cir. 1999).

90.     By virtue of state law, the execution of an Indian gaming compact is conditioned upon the execution of a revenue-sharing agreement; thus New Mexico law *explicitly requires* a revenue sharing agreement and the payment of revenue share into the State General Fund in order to have a compact. A non-negotiable, mandatory payment of a percent of gaming net profits from a Tribe directly into the State General Fund for unrestricted use yields public revenue and is a tax.

91.     Pled in the alternative, even if the Pueblo were to ask for exclusivity in exchange for revenue-sharing payments to the State, the gaming market in New Mexico contains 155 non-Indian businesses and non-profits engaged in gaming activities, including 58 veterans' and fraternal organizations (each which may operate up to 15 gaming machines), five (5) racetracks (each which may operate up to 750 gaming machines), 99 licensed bingo and raffle operators, five (5) racinos and not including the State Lottery which is offered at 1,110 retail locations across the State, and 27 tribally-owned and operated casinos, and the capacity for additional gaming by the award of a new racino license (acknowledged by the NMGCB to be "on the

horizon"), the relocation of one or more racinos, and the ability of other tribes to open additional gaming facilities and the posturing for legalization of online gaming. In this environment, the State's commitment to exclusivity is not a meaningful concession that is commensurate with the rate of revenue sharing sought by the State.  Accordingly, even if the Pueblo sought exclusivity, the rate sought by the State constitutes an illegal tax on gaming revenue, prohibited by IGRA.

92.    Extension of the term of the compact is not a meaningful concession that justifies any revenue-sharing provisions of any compact, and the value of the concession is not commensurate with the amount of revenue sharing demanded by the State.

93.    Throughout the course of negotiations, the State has cut state business taxes 24 times and lowered the corporate tax rate by 22% from 7.6% to 5.9%, yet proposed to increase taxes on the Pueblo by an effective rate of 32.5% from its present value of 8% to an amount at or above 8.75% of net win until 2018 and then gradually increasing to an amount at or above 10.5% for the remaining 23-year life of the compact.   To request a reduction would necessitate reopening other tribal-state gaming compacts.

94.    The State demands an increase in the fees to be paid to the State's General Fund for regulatory costs.

95.    In fiscal year 2014, the Annual Budget of the New Mexico Gaming Control Board was $5,577,900. The Board received $135,677,807 in Gaming Taxes and Tribal Revenue Sharing Paid into the State's General Fund.   The Office of the State Gaming Representative ("OSGR") monitors compliance of the Tribal-State Gaming Compacts. The OSGR consists of the State Gaming Representative and the Tribal Clerk. Fourteen Tribes generated nearly of $70,000,000 in revenue sharing and regulatory fees in FY 2014, which were deposited into the

State's General Fund from which the Annual Budget of the NMGCB is appropriated.  The Board makes no budgetary distinction for expenditures on its obligations pursuant to a tribal-state gaming compact.

96.     Although the State may in good faith demand reimbursement or payment of the State's actual and reasonable costs to meet its regulatory oversight duties pursuant to the compact, any payment above that amount constitutes an illegal tax. The State has failed to justify the doubling in fees or to agree to provisions of transparency and accountability to ensure that the fees cover the actual and reasonable costs, and nothing more.

97.     At all times relevant to the negotiations, the State's offers to the Pueblo included demands for large fees that are not related to the cost of regulation, the development of related infrastructure or, payments to non-gaming tribes. Rather, the fees demanded by the State are to be used at the unrestricted discretion of the State.

98.     The proposals made by the State to the Pueblo fail to make any meaningful concession to justify the demanded fees. The State's demands exceed the parameters directly set forth in IGRA and constitute a tax, fee or charge on the Pueblo.  By making such demands, the State fails to meet its obligations of good faith negotiation as set forth in IGRA.

### Demands on Matters Not Directly Related to the Licensing & Regulation of Class III Gaming

99.     IGRA precludes negotiation of terms that have no bearing on the licensing or regulation of Class III gaming activities. According to its plain language, the scope of § 2710(d)(3)(C), set out in ¶ 17 above, is to set forth provisions that may be negotiated and included in Class III gaming compacts.  IGRA limits permissible subjects of negotiation in order to ensure that Tribal-State Gaming compacts cover only those topics that are related to the

conduct of gaming activities, and are consistent with the IGRA's stated purposes. The language and structure of § 2710(d)(3)(C) indicate that it is exhaustive in its list as to what is permitted, as indicated even by its limitation in subparagraph (vii) to those subjects that are "directly related to the operation of gaming activities."

100.    The State demands the inclusion of several provisions that are not directly related to the operation of gaming, including but not limited to requiring the Pueblo: (1) provide certain employment-related benefits; (2) provide certain employment-related grievance processes; (3) impose requirements related to alcohol service, training, and liability coverage; and (4) submit to state court jurisdiction on matters not related to the regulation of gaming, including the transfer of jurisdiction from the Pueblo of Pojoaque Tribal Court to State court.

101.    The State demands that the Pueblo agree to a definition of "Gaming Facility" that is overly broad by extending the definition to non-gaming areas. This is particularly significant to the Pueblo's operation of the Buffalo Thunder Resort, which provides high-quality lodging and numerous non-gaming amenities to its customers.

102.    Taken together or in isolation, these examples of the State's demands to include provisions not directly related to the licensing and regulation of Class III gaming establish the State's failure to conclude negotiations in good faith.

**Dispute Resolution**

103.    New Mexico insists upon dispute resolution provisions that are enforceable by the State as against the Pueblo but not enforceable by the Pueblo as against the State.

104.    The State refuses to consider the Pueblo's proposals that make the agreement mutually enforceable.

105.   The State's demand that the Pueblo accept a dispute resolution provision that only allows the State to enforce the Compact as against the Pueblo and does not allow the Pueblo to enforce the Compact as against the State, establishes the State's failure to conclude negotiations in good faith.

### Limits on the Number of Facilities

106.   IGRA allows a Tribe to request a compact for any parcel of eligible Indian lands over which it exercises jurisdiction. Accordingly, if the Pueblo identified three (3) or more specific parcels in three (3) separate requests, the State would be obligated to negotiate a compact for each parcel.

107.   As an exercise of its sovereignty and self-determination, the Pueblo must have the ability to determine where and to what extent to allow gaming on its existing Indian lands.

108.   Any attempt to arbitrarily restrict or eliminate gaming operations may adversely affect the operations key principal, trigger default by our gaming enterprises, and violate existing Pueblo covenants.

109.   The State demands that the Pueblo agree to limit its number of gaming facilities to three (3), one of which is severely restricted in size and cannot be relocated.

110.   The State offers no meaningful concessions upon which a demand for the limitation for the number of gaming facilities may otherwise be justified under IGRA.

111.   The State's demand violates IGRA and constitutes per se failure to conclude negotiations in good faith.

112.   Pled in the alternative, the State has no legitimate public policy basis to limit the Pueblo to three (3) gaming facilities. The State allows the operation of a large number of gaming

facilities, tribal and non-tribal throughout the State, and the Governor has agreed to allow a the

Navajo Nation to operate five (5) facilities over a large geographic region in the State, including

facilities within only a few miles of existing facilities operated by other tribes. Having no

legitimate public policy basis for limiting the number gaming facilities to three (3), the demand

establishes the State's failure to conclude negotiations in good faith.

### Class II Gaming

113.    IGRA does not allow for the State to have any role in the regulation of Class II

gaming.

114.    The State's proposed language defining "gaming machine" is overbroad such that

could reasonably be read to apply to electronic aids to Class II games.

115.    A definition of "gaming machine" that includes Class II games as Class III games

under the Compact is not allowed under IGRA.

116.    By demanding that the Pueblo accept the State's definition of "gaming machine",

the State fails to meet its obligations of good faith negotiation as set forth in IGRA.

### Demand that the Pueblo Waive Sovereign Immunity
### Beyond Proceeds of Insurance Policies

117.    The Pueblo secures adequate liability insurance commensurate to industry

standards and as a matter of tribal self-governance waives its sovereign immunity from suit for

patron and employee disputes involving matters directly related to the licensing and regulation of

Class III gaming.

118.    The State demands that the Pueblo waive its immunity beyond the proceeds of

such liability insurance and demands that the waiver extend to any patron or employee dispute at

the Gaming Facility without regard to whether the dispute is directly related to gaming or

whether the patron was engaging in gaming activities, or whether the injury occurred at a location where gaming is conducted.

119.    Such demands unreasonably expose the non-gaming assets of the Pueblo, such that it undermines IGRA's purposes of establishing economic self-sufficiency, tribal self-governance and strong tribal government.

120.    The State's demands regarding the overbroad waiver of tribal sovereign immunity establishes the State's failure to conclude negotiations in good faith.

### State Statutory Interference with IGRA's Government-to-Government Negotiation Process

121.    The Compact Negotiation Act provides that if a Tribe requests a compact or an amendment that is identical to a compact or amendment previously approved by the legislature, the Governor **shall** approve and sign the compact or compact amendment. Additionally, State statutes require that a revenue sharing plan be part of any tribal state compact.  NMSA 1978, § 11-13-2 (1997).

122.    The IGRA provides for sovereign-to-sovereign negotiations wherein the State is obligated to negotiate in good faith with an Indian Tribe that requests negotiations for gaming on eligible Indian lands.

123.    The State's demand that a tribe sign a form compact violates legislative intent of IGRA.

124.    The State has rejected compact language proposed by the Pueblo for the asserted reason that the "Compact Negotiation Act" prevents it from considering the Pueblo's concerns as other Gaming Tribes would be able to sign-on to any agreement made between the State and the Pueblo.

125.   The State asserts that the Pueblo must accept and pay substantial fees to the State General Fund for exclusivity because other Tribes have agreed to pay substantial fees to the State General Fund for exclusivity, despite the fact that the Pueblo has made clear it does not seek exclusivity.

126.   Applying State law in a manner that prevents the State from negotiating terms to accommodate the unique circumstances, locations and needs of each Tribe violates the good faith negotiations scheme established by Congress.

## CAUSES OF ACTION

### Count One: Failure to Conclude Tribal-State Compact Negotiations in Good Faith Indian Gaming Regulatory Act 25 U.S.C. 2710(d)

127.   Plaintiff, Pueblo of Pojoaque, incorporates into this claim all the foregoing allegations.

128.   More than 180 days have passed since the Pueblo requested that New Mexico enter into good faith negotiations and no compact has been concluded.

129.   The State of New Mexico has failed to conduct negotiations in a manner that is conducive to reaching a fair agreement for the regulation of Class III gaming on the Pueblo's Indian lands beyond June 30, 2015.

130.   New Mexico's demands regarding the substantive provisions of the compact negotiations are not based on legitimate public policy concerns of the State and are contrary to law.

131.   The State of New Mexico has failed to conclude negotiations in good faith.

### Count Two: Declaratory and Injunctive Relief

132.   Plaintiffs incorporate into this claim all the foregoing allegations.

133.   Plaintiffs have the right, based on the Supremacy Clause to engage in activity on the Pueblo's Indian lands in a manner that is free from state interference except to the limited extent that Congress, in the exercise of the United States' plenary authority over Indian affairs allows. No action of Congress, including IGRA, allows for a State to make a unilateral determination regarding the legality of gaming on Indian lands. No action of Congress, including IGRA, allows for the State to assert jurisdiction over a Tribe's gaming activities, except to the limited extent allowed by a federally approved tribal-state compact, in effect.

134.   Individual Defendants have made a unilateral determination regarding the legality of gaming on the Pueblo's Indian lands despite that fact that no tribal-state compact is in effect. Accordingly, the actions of Individual Defendants unlawfully interfere with the rights of Plaintiff Talachy in his personal capacity and on behalf of the enrolled members of the Pueblo, to engage in activity on the Pueblo's Indian lands in a manner that is free from state interference except to the limited extent that Congress, in the exercise of the United States' plenary authority over Indian affairs allows.

**Count Three: Violation of Civil Rights: Entitlement to Prospective Equitable Relief**

135.   Plaintiff Joseph M. Talachy, in his personal capacity and on behalf of the individual enrolled members of the Pueblo incorporates into this claim all the foregoing allegations.

136.   The actions of the Individual Defendants set forth in this Complaint, for purposes of this Count II are alleged to have been taken in their official capacity, under color of state law.

137.   Plaintiff Talachy, in his personal capacity and on behalf of the individual enrolled members of the Pueblo is a person and persons that have standing to bring claims under 42

U.S.C. §§ 1983 and 1985.

138.    Individual Defendants' actions and pronouncements set forth in ¶¶ 65-81, above, establish a pattern of repeated incidents that establish a policy, custom and/or practice of wrongfully asserting State jurisdiction over gaming activities on the Pueblo's Indian lands.

139.    Individual Defendants possess final decision-making authority to ratify and have ratified illegal actions, which decisions establish a policy, custom and practice of wrongfully asserting State jurisdiction over gaming activities on the Pueblo's Indian lands.

140.    Individual Defendants' actions and pronouncements set forth in ¶¶ 65-81, above are in violation of 42 U.S.C. §§ 1983 and 1985.

141.    The actions of Individual Defendants have caused and/or will cause in the immediate future, major vendors and suppliers of tribal gaming devices to reduce or stop doing business with the Pueblo which will result in tens of millions of dollars in lost governmental revenue every year for the foreseeable future.

142.    Remedies at law in the form of money damages are inadequate. The Pueblo will suffer irreparable harm from which it cannot recover if the Individual Defendants are not enjoined from further acts of asserting jurisdiction over activity conducted on the Pueblo's Indian lands.

**Count Four: Violation of Civil Rights: Entitlement to an Award of Money Damages**

143.    Plaintiff, Joseph M. Talachy, in his personal capacity and on behalf of the individual enrolled members of the Pueblo incorporates into this claim all the foregoing allegations.

144.    Pleading in the alternative from Count II, the actions of the Individual Defendants

set forth in this Complaint, for purposes of this Count II are alleged to have been taken in their personal capacity, under color of state law.

145.    Individual Defendants knew or should have known that actions purporting to assert jurisdiction of the State over conduct occurring on Pueblo Indian lands wrongfully deprives Plaintiff Talachy and the individual members of the Pueblo their federal right to engage in conduct free from the jurisdiction of the State.

146.    Individual Defendants' conduct is motivated by evil motive or intent, or pleading in the alternative, involves reckless or callous indifference to the federally protected rights of Indians and Indian Tribes such that an award of punitive damages is justified in the circumstances.

147.    Plaintiff Talachy, in his personal capacity and on behalf of the individual enrolled members of the Pueblo is a person and persons that have standing to bring claims under 42 U.S.C. §§ 1983 and 1985.

148.    Individual Defendants' actions and pronouncements set forth in ¶¶ 65-81, above, establish a pattern of repeated incidents that establish a policy, custom and/or practice of wrongfully asserting State jurisdiction over gaming activities on the Pueblo's Indian lands.

149.    Individual Defendants possess final decision-making authority to ratify and have ratified illegal actions, which decisions establish a policy, custom and/or practice of wrongfully asserting State jurisdiction over gaming activities on the Pueblo's Indian lands.

150.    Individual Defendants' actions and pronouncements set forth in ¶¶ 65-81, above are in violation of 42 U.S.C. §§ 1983 and 1985.

151.    The actions of Individual Defendants have caused and/or will cause in the

immediate future major vendors and suppliers of tribal gaming devices to reduce or stop doing business with the Pueblo which would result in tens of millions of dollars in lost governmental revenue every year for the foreseeable future.

**Count Five: Tortious Interference With Existing Contractual Relations.**

152.    All Plaintiffs incorporate into this claim all the foregoing allegations.

153.    The actions taken by Defendants, specifically those actions set forth in ¶¶ 65-81 above establish all of the elements required for the tort recognized by the courts of the State of New Mexico for tortious interference with existing contractual relations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Pueblo of Pojoaque, petitions this Court for an Order:

On Count One:

A.    Declaring that the State has failed to negotiate in good faith and/or failed to conclude negotiations in good faith;

B.    Appointing a Mediator which shall work with the parties for a period of no more than sixty (60) days, and if no agreement is reached, the selection by the Mediator between the last best offers submitted by the parties as compacts to govern the gaming activities on Pueblo tribal lands; and if the State fails to consent to the last best offer selected by the Mediator, to cause the Mediator to notify the Secretary of the Interior of the State's failure to consent and to provide the Secretary with a true and correct copy of the selected last best offer; and

C.    Granting such other relief as may be just and equitable, including ancillary relief.

On Count Two:

D.    Declaring Plaintiffs have the right, based on the Supremacy Clause to be able to

engage in activity on the Pueblo's Indian lands in a manner that is free from state interference except to the limited extent that Congress, in the exercise of the United States' plenary authority over Indian affairs allows.

E.     Declaring that no action of Congress, including IGRA, allows for a State to make a unilateral determination regarding the legality of gaming on Indian lands.

F.     Declaring that no action of Congress, including IGRA, allows for the State to assert jurisdiction over a Tribe's gaming activities, except to the limited extent allowed by a federally approved tribal-state compact, in effect.

G.     Declaring that Individual Defendants have unlawfully made a unilateral determination regarding the legality of gaming on the Pueblo's Indian lands despite that fact that no tribal/state compact is in effect which unlawfully interfere with the rights of Plaintiff Talachy in his personal capacity and on behalf of the enrolled members of the Pueblo, to engage in activity on the Pueblo's Indian lands in a manner that is free from state interference except to the limited extent that Congress, in the exercise of the United States' plenary authority over Indian affairs allows.

H.     Enjoining Individual Defendants from taking any action on licenses issued by the New Mexico Gaming Control Board based on the licensed entity conducting business with the Pueblo of Pojoaque.

I.     Enjoining Individual Defendants from taking any official action, or refraining to take any official action that is based upon the legal status of gaming activity occurring on the Pueblo's Indian lands.

J.     Awarding reasonable attorneys fees and costs.

K.     Granting such other prospective equitable relief as may be just and equitable, including ancillary relief.

On Count Three:

L.     Declaring that the Individual Defendants in their official capacity have deprived and conspired to deprive Plaintiff Joseph M. Talachy in his personal capacity and on behalf of the enrolled members of the Pueblo in violation of federal civil rights statutes including 42 U.S.C. §§ 1983 and 1985.

M.     Enjoining Individual Defendants from taking any action on licenses issued by the New Mexico Gaming Control Board based on the licensed entity conducting business with the Pueblo of Pojoaque.

N.     Enjoining Individual Defendants from taking any official action, or refraining to take any official action that is based upon the legal status of gaming activity occurring on the Pueblo's Indian lands.

O.     Granting such other prospective equitable relief as may be just and equitable, including ancillary relief.

On Count Four:

P.     Declaring that the Individual Defendants in their personal capacity have deprived and conspired to deprive Plaintiff, Joseph M. Talachy, in his personal capacity and on behalf of the enrolled members of the Pueblo in violation of federal civil rights statutes including 42 U.S.C. §§ 1983 and 1985.

Q.     Awarding damages to Plaintiff, Joseph M. Talachy, in his personal capacity and on behalf of the enrolled members of the Pueblo in an amount equal to the lost revenue that is the

result of the actions of the Individual Defendants, not less than the current value of a $50 million loss per year for the next twenty (20) years.

R.      Awarding damages to Plaintiff Talachy, in his personal capacity and on behalf of the enrolled members of the Pueblo in an amount appropriate in these circumstances to punish the Individual Defendants whose wrongful action was intentional or malicious, and to deter Individual Defendants and others from similar extreme conduct, which amount should exceed $500 million.

S.      Awarding attorney fees incurred by Plaintiffs in preparing, filing and prosecuting this action.

T.      Granting such other prospective equitable relief as may be just and equitable, including ancillary relief.

On Count Five:

U.      Declaring that Defendants have tortuously interfered with existing contractual relations of  wholly-owned businesses of  the Plaintiff.

V.      Awarding damages to Plaintiffs in an amount equal to the lost revenue that is the result of the actions of the Individual Defendants, not less than the current value of a $50 million loss per year for the next twenty (20) years.

W.      Granting such other prospective equitable relief as may be just and equitable, including ancillary relief.

DATED: July 18, 2015.

Respectfully Submitted,


/s/ *Steffani A. Cochran*
STEFFANI A. COCHRAN, ESQ

New Mexico State Bar No. 8941*
Chief General Counsel
PUEBLO OF POJOAQUE
Pueblo of Pojoaque Legal Department
58 Cities of Gold Road
Santa Fe, NM 87506
(505) 455-2271
scochran@puebloofpojoaque.org


SCOTT CROWELL
CROWELL LAW OFFICES TRIBAL ADVOCACY
GROUP
Arizona State Bar No. 009654**
1487 W. State Route 89A, Suite 8
Sedona, Arizona 86336
Phone: (425) 802 5369
scottcrowell@hotmail.com

Attorneys for Plaintiffs Pueblo of Pojoaque

*Local counsel
**Non-admitted attorney associating with local counsel