IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PUEBLO OF POJOAQUE, a federally
recognized Indian Tribe; and JOSEPH M.
TALACHY, Governor of the Pueblo of
Pojoaque,

          Plaintiffs,

vs.                                                                                  No. CIV 15-0625 JB/GBW

STATE OF NEW MEXICO, SUSANA
MARTINEZ, JEREMIAH RITCHIE,
JEFFERY S. LANDERS[1], SALVATORE
MANIACI, PAULETTE BECKER,
ROBERT M. DOUGHTY III, CARL E.
LONDENE and JOHN DOES I-IV,

          Defendants,

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for Order to Show

Cause Re Civil Contempt, filed November 19, 2015 (Doc. 53)("Motion").  The Court held a

hearing on December 29, 2015.  The primary issue is whether the Defendants[2] violated the

Honorable Robert C. Brack, District Judge for the District of New Mexico's Preliminary

---

[1]The Plaintiffs named Defendant Jeffrey S. Landers as "Jeffery S. Landers" in their Complaint.  See Complaint ¶ 19, at 7.  The Defendants corrected the spelling in the New Mexico Gaming Control Board Defendants' Response to Plaintiffs' Motion for Order to Show Cause re Civil Contempt at 1, filed December 7, 2015 (Doc. 62)("Response").   The Court will leave the incorrect spelling in the caption, but use the correct version in the text of its Memorandum Opinion and Order.

[2]The Plaintiffs pursue civil contempt proceedings against Defendants Jeffrey Landers, Salvatore Maniaci, Paulette Becker, Robert M. Doughty III, and Carle E. Londene, because they do not have "clear and convincing evidence that Defendants Susana Martinez and Jeremiah Ritchie participated in the actions that constitute civil contempt."  Motion at 1 n.1.  The Plaintiffs reserve their right, however, to pursue civil contempt proceedings against Martinez and Ritchie.

Injunction, filed September 27, 2015 (Doc. 32)("Judge Brack's PI")[3], that prohibits the Defendants from "threaten[ing]" the Plaintiffs' gaming contractors, by deferring action on license[4] applications for vendors doing business with Plaintiff Pueblo of Pojoaque. This issue requires the Court to consider: (i) whether the Plaintiffs must demonstrate that they have sustained actual damages; and (ii) whether the deferrals "threaten" the vendors, as Judge Brack's PI uses that term. The Court concludes that the Defendants' deferrals do not violate Judge Brack's PI. First, the Plaintiffs need not demonstrate that they have sustained actual losses, but evidence of any losses would help them to establish that the deferrals qualify as threats. Second, the Court determines that the deferrals do not fit within the definition of "threaten" that Judge Brack's PI provides. Although the Defendants may tread close to the line that Judge Brack had in mind, the Plaintiffs have not shown by clear-and-convincing evidence that the Defendants have violated the language of Judge Brack's PI -- which the Plaintiffs drafted. The Court thus denies the Plaintiffs' Motion.

## FINDINGS OF FACT

Pursuant to rule 52(a)(2) of the Federal Rules of Civil Procedure, the Court will make formal findings of fact and conclusions of law to support its disposition of the Motion. See Fed. R. Civ. P. 52(a)(2), 65(d)(1). The Court divides its findings of fact into two sections. First, the Court will introduce the parties. Second, the Court will outline the timeline of events in this

---

[3] Judge Brack issued a Memorandum Opinion and Order at the same time as his Preliminary Injunction. See Memorandum Opinion and Order, filed October 7, 2015 (Doc. 31)("Judge Brack's MOO").

[4] The Court refers to "license" applications for the sake of simplicity. The parties do not describe the applications at issue with specificity, but they appear to include license applications and license renewal applications, under N.M. Stat. Ann. §§ 60-2E-14-19 and individual applications for a certification of finding of suitability under N.M. Stat. Ann. § 60-2E-20.

case.

1.   **The Parties.**

1.      Pojoaque Pueblo is a federally recognized Indian Tribe and a "sovereign tribal government" north of Santa Fe, New Mexico.  Complaint ¶ 1, at 1, filed July 18, 2015 (Doc. 1)[5]; Visit and Play, Pueblo of Pojoaque, http://pojoaque.org/visit/ (last visited Jan.12, 2016)(using identical language).  See Motion at 1.

2.      Pojoaque Pueblo operates two gaming facilities, the Buffalo Thunder Resort & Casino and the Cities of Gold Hotel & Casino, on its Indian lands.  See Complaint ¶ 14, at 7; Gaming, Pueblo of Pojoaque, http://pojoaque.org/visit/gaming/ (last visited Jan.12, 2016).

3.      Plaintiff Joseph M. Talachy is Pojoaque Pueblo's Governor.  See Complaint ¶ 15, at 7.

4.      Defendant State of New Mexico is a sovereign state government.  See Complaint ¶ 16, at 7.

5.      Defendant Jeffrey S. Landers is the Chairman of the New Mexico Gaming Control Board.  See Complaint ¶ 19, at 7.

6.      Defendants Jeffrey S. Landers, Salvatore Maniaci, Paulette Becker, Robert M. Doughty III, and Carl E. Lawrence (collectively, the "Gaming Board") are Members of the New Mexico Gaming Control Board.  See Complaint ¶¶ 15-23, at 7-8.

7.      Defendant Susana Martinez is the Governor of New Mexico and a Member of the New Mexico Gaming Control Board.  See Complaint ¶ 17, at 7.

8.      Defendant Jeremiah Ritchie is Martinez' Deputy Chief of Staff and primary negotiator, and is also a Member of the New Mexico Gaming Control Board.  See Complaint ¶

---

[5]The Court cites to the Complaint only for facts that the parties do not dispute.

18, at 7.

> **2.**   **The Timeline of Events Preceding Judge Brack's PI.**

9.      Judge Brack ably summarized the facts of this matter in his MOO.  See Judge Brack's MOO at 2-9.  In short, the Gaming Board and Pojoaque Pueblo are involved in a dispute over taxation and the state's authority to regulate Indian gaming.  See Complaint ¶¶ 51-52, at 17-18.

10.      Pojoaque Pueblo argues that the Gaming Control Board is attempting to coerce it to agree to regulation and increased tax rates by "threatening those with employment and business relationships with the Pueblo," including its gaming contractors.  Complaint ¶ 68, at 21.

11.      On June 30, 2015, the Gaming Board issued a public statement that a United States Attorney decision allowing Pojoaque Pueblo's casinos to remain in operation "provides no protection to banks, credit card vendors, gaming machine vendors, advertisers, bondholders, and others that are now doing business with an illegal gambling enterprise."  Judge Brack's MOO at 4.

12.      On July 15, 2015, the Gaming Board held a closed meeting, announced their determination that Pojoaque Pueblo's casinos were operating illegally, and "placed in abeyance approval of any license application or renewal for the Pueblo's vendors."  Judge Brack's MOO at 4.

13.      The Gaming Board did not place any other vendors' applications in abeyance.  See Judge Brack's MOO at 4.

14.      The Plaintiffs initiated this case on July 18, 2015.  See Complaint, filed July 18, 2015 (Doc. 1).

15.      The Complaint raises three primary claims: (i) that the State of New Mexico

failed to conclude compact negotiations with the Plaintiffs for the regulation of Class III gaming activities[6] on their lands, in violation of 25 U.S.C. § 2710(d); (ii) that the individual Defendants conspired under color of state law to "deprive the federal right of the Pueblo and its members to be free of state jurisdiction over activities that occur on the Pueblo lands," under 42 U.S.C. § 1983; and (iii) that the Defendants tortuously interfered with existing contractual relationships between the Plaintiffs and various third parties.  Complaint ¶ 1, at 1-2.

16.     The Plaintiffs allege that, despite its lack of jurisdiction, the State of New Mexico is attempting to tax and regulate their gaming activities.  See Complaint ¶ 70, at 21.

17.     They seek extensive declaratory relief, an injunction preventing the state from interfering with their vendors, the appointment of a mediator to facilitate negotiations, money damages of fifty million dollars per year, attorney's fees, and "such other relief as may be just and equitable, including ancillary relief."  Complaint ¶¶ A-W, at 37-40.

18.     On September 9, 2015, the Gaming Board sent letters to Pojoaque Pueblo's vendors asserting that the tribe was conducting illegal gaming operations, informing the vendors of a government audit, and demanding the production of their communications and business records with respect to Pojoaque Pueblo's operations.  See Judge Brack's MOO at 6.

19.     On September 25, 2015, the Gaming Board "issued citations to all the vendors doing business with the Pueblo Casinos."  Judge Brack's MOO at 6-7.

20.     On September 25, 2015, the Plaintiffs moved for a temporary restraining order and/or a preliminary injunction.  See Pueblo of Pojoaque's Motion for Temporary Restraining Order and/or Preliminary Injunction, filed September 25, 2015 (Doc. 23)("TRO Motion").

---

[6]The Indian Gaming Regulatory Act of 1988, 25 U.S.C. §§ 2701-2721, "divides gaming into three (3) classes whereby regulatory oversight varies depending on the type of activity." Complaint ¶ 26, at 9.  Class Three gaming includes slot machines and house-banked table games, which are subject to stricter regulatory requirements.  See Complaint ¶ 26, at 9.

21.     In the TRO Motion, the Plaintiffs responded to the Gaming Board's decision to send letters to businesses that provide gaming equipment to the Plaintiffs' gaming facilities. TRO Motion at 1.

22.     The Plaintiffs explained that the letters

(i) assert that the Pueblo is conducting illegal gaming operations; (ii) list various New Mexico state laws, including criminal laws, that are allegedly violated by doing business with an illegal gaming operation; (iii) inform each Vendor that it is being "audited" by the [Gaming Board]; and (iv) demand the production of all communications and business records between the Vendor and the Pueblo.

TRO Motion at 1.  They contended that the Gaming Board's actions "are a throw-back to one of the darkest times in the history of the European conquest, when the pueblos were required to pay a tribute tax, whereby the Spanish confiscated the pueblos' maize and other resources."  TRO Motion at 2.  They thus sought injunctive relief to prevent the state from interfering with or punishing their vendors.  See TRO Motion at 6.  Specifically, they requested "a TRO and/or preliminary injunction prohibiting Defendants from taking any action that threatens, revokes, conditions, modifies, fines, or otherwise punishes or takes enforcement against any licensee in good standing with the [Gaming Board], based wholly or in part on grounds that such licensee is conducting business with the Pueblo."  TRO Motion at 27.

### 3.     Judge Brack's PI.

23.     Judge Brack issued his PI on October 7, 2015.  See Judge Brack's PI at 1; Motion at 5; New Mexico Gaming Control Board Defendants' Response to Plaintiffs' Motion for Order to Show Cause re: Civil Contempt at 1, filed December 7, 2015 (Doc. 62)("Contempt Response").

24.     Judge Brack described the Defendants' collective actions in unfavorable terms:

Defendants' protestations that the regulation of vendors doing business with the Pueblo does not constitute regulation of the Pueblo's gaming activities are

> disingenuous and inconsistent with the record. Defendants' actions are based, quite clearly, on Defendants' own determination that the post-June 30, 2015 Class III gaming at the Pueblo is illegal -- a determination that the Defendants, just as clearly, are without jurisdiction or authority to make.

Judge Brack's MOO at 20. Judge Brack added:

> Defendants' harassment and threatening conduct directed at the vendors is a thinly disguised attempt to accomplish indirectly that which Defendants know they are without authority or jurisdiction to accomplish directly. Defendants' contention that the enforcement actions against the vendors do not harm the Pueblo is also disingenuous. The undisputed evidence establishes that the Pueblo will lose significant revenue and its Casinos may shut down due to Defendants' intimidation of the Pueblo's vendors.

Judge Brack's MOO at 20.

25.    Judge Brack adopted the Plaintiffs' proposed language in his preliminary injunction. See Judge Brack's PI at 1.

**4.      The Timeline of Events Following Judge Brack's PI.**

26.    On October 21, 2015, the Gaming Board held a formal public meeting. See Motion at 6 (stating this fact); Response (not disputing this fact).

27.    At the meeting, the Gaming Board considered ten "gaming license" renewal applications for various gaming vendors. Motion at 6 (stating this fact); Response (not disputing this fact).

28.    The Gaming Board approved five out of six applications for companies that did not do business with Pojoaque Pueblo. See Motion at 6 (stating this fact); Response (not disputing this fact).

29.    The Gaming Board deferred decision on the remaining company to its November, 2015 meeting. See Motion at 6 (stating this fact); Response (not disputing this fact).

30.    The Gaming Board deferred the four remaining applications, for companies doing business with Pojoaque Pueblo, without a date for future consideration. See Motion at 6 (stating

this fact); Response (not disputing this fact).

31.     The Gaming Board also considered ten new applications for a "certification of finding of suitability."  Motion at 6 (stating this fact); Response (not disputing this fact).

32.     The Gaming Board approved the seven applications for individual principals or officers of companies not doing business with Pojoaque Pueblo.  See Motion at 6 (stating this fact); Response (not disputing this fact).

33.     The Gaming Board deferred the applications for individual principals or officers of companies doing business with Pojoaque Pueblo without a date for future consideration.  See Motion at 6 (stating this fact); Response (not disputing this fact).

34.     The Gaming Board then considered nine renewal applications for "certifications of findings of suitability."  Motion at 7 (stating this fact); Response (not disputing this fact).

35.     The Gaming Board approved six applications for individual principals or officers of companies not doing business with Pojoaque Pueblo.  See Motion at 6 (stating this fact); Response (not disputing this fact).

36.     The Gaming Board took no vote on one of the seven applications without explanation.  See Motion at 6 (stating this fact); Response (not disputing this fact).

37.     The Gaming Board deferred the two applications for individual principals or officers of companies doing business with Pojoaque Pueblo without a date for future consideration.  See Motion at 6 (stating this fact); Response (not disputing this fact).

38.     The Gaming Board thus approved thirty-four out of thirty-six applications for companies not doing business with Pojoaque Pueblo.  See Motion at 6 (stating this fact); Response (not disputing this fact).  The Gaming Board deferred one such application for a one-month period and subjected the other "to an unexplained no-vote."  Motion at 6.  It deferred all

thirteen applications for companies doing business with Pojoaque Pueblo without a date for future consideration.  See Motion at 6; Response (not disputing this fact).

39.     On October 26, 2015, the Gaming Board's counsel, Henry M. Bonhoff, explained via email to Scott Crowell, Pojoaque Pueblo's counsel, that the deferrals did not violate Judge Brack's PI:

> For several reasons, the Defendants do not view the Board's deferral action as being inconsistent with Judge Brack's preliminary injunction . . . .  First, initially, you should be aware that at its September meeting the Board in fact approved key licenses for individuals associated with manufacturers that have been identified as doing business with the Pojoaque Pueblo's gaming operators. Second, the Board did not discuss, and instead simply voted to approve, Mr. Landers' motion to defer action on the remaining applications of the manufacturers and other associated individuals. Third, the deferral action does not affect the vendors' ability to continue doing business. Instead, upon submission of the renewal application a license stays in place until such time as the Board takes formal action to vote on the renewal application. The Board in fact will take no action against the manufacturers and the associated individuals based on their dealings with the Pueblo while the current version of the preliminary injunction remains in place. Third, Judge Brack did not order the Board to approve the license renewal applications, only to not take any action that threatens, revokes, conditions, modifies, fines, or otherwise punishes or takes enforcement against any licensee. The Board has done none of those things. Fourth, to the Board's knowledge based on correspondence received by the Board's staff from the manufacturer's representatives, the manufacturers are continuing to do business with the Pueblo. The Board's staff has received no correspondence or other communication from any manufacturer advising that it has stopped doing business with the Pueblo based on the Board's deferral. In fact, the Board's staff has received notification from one of the manufacturers advising that it shipped gaming devices to the Pueblo's gaming operators following the October 21 Board meeting. Respectfully, any claim of violation of the October 7 injunction is unfounded.

Motion at 8 (quoting Email from Hank Bohnhoff, Rodey, Dickason, Sloan, Akin & Robb, P.A., to Scott Crowell, Crowell Law Offices (dated October 26, 2015), filed November 19, 20156 (Doc. 53-10)(emphasis added).

40.     The Plaintiffs replied that: (i) they could not identify any key license approvals carried out at the Gaming Board's September hearing; and (ii) they did not agree that the licenses

would stay in place while the Gaming Board deferred action on them.  See Motion at 8-9.

41.     The Gaming Board responded that: (i) it approved two licenses at its August 19, 2015 meeting; and (ii) that, under N.M. Stat. Ann. § 20-2E-16(H), a license "shall continue in effect upon proper payment of the initial and renewal fees, subject to the power of the board to revoke, suspend, condition or limit licenses . . . ."  Motion at 9.

42.     On October 27, 2015, Landers testified before the New Mexico State Legislature's Indian Affairs Committee.  See Motion at 9.

43.     Landers stated that the Gaming Board had deferred licenses for companies and individuals doing business with Pojoaque Pueblo's gaming operations, and that the licenses would remain deferred so long Judge Brack's PI is in effect.  See Motion at 9.

44.     On October 29, 2015, the Defendants appealed Judge Brack's PI to the United States Court of Appeals for the Tenth Circuit.  See Notice of Appeal, filed October 29, 2015 (Doc. 40).

45.     On November 4, 2015, the Gaming Board's counsel, Mr. Bonhoff, clarified his October 26, 2015 email:

> [Y]ou had asked what is the authority for the licensee to continue doing business while the renewal application has been deferred.  Under NMSA 1978, section 60-2E-16(H), "After issuance, a license . . . shall continue in effect upon proper payment of the initial and renewal fees, subject to the power of the board to revoke, suspend, condition or limit licenses . . . ."  This provision permits a licensed manufacturer to continue to operate under its existing license until such time as the board votes on the merits of the renewal application.

Motion at 9 (quoting Email from Hank Bohnhoff, Rodey, Dickason, Sloan, Akin & Robb, P.A., to Scott Crowell, Crowell Law Offices (dated November 4, 2015), filed November 19, 2015 (Doc. 53-10)).

46.     The Gaming Board held another meeting on November 18, 2015.  See Motion at

9.

47.    At this meeting, the Gaming Board discussed the possibility that several bingo licenses would expire before it could vote on renewal applications.  See Motion at 10.

48.    The Gaming Board granted a variance to all entities that timely filed renewal applications, allowing them to operate after their bingo licenses expired.  See Motion at 10.

## PROCEDURAL BACKGROUND

1.    The Plaintiffs filed the Motion on November 19, 2015.  See Motion at 1.  They request that the Court "issue an Order to Show Cause" for "Certain Defendants"[7] to "appear and present evidence as to why" they should not be held in civil contempt of court for violating Judge Brack's PI.  Motion at 1.  They also ask that the Court "impose sanctions in an amount necessary to compel Certain Defendants to comply with the Preliminary Injunction," and award them attorney's fees and costs.  Motion at 2.

2.    The Plaintiffs argue that the Gaming Board violated Judge Brack's PI by "deferring license decisions on all applications for persons or companies doing business with the Pueblo."  Motion at 2.

3.    The Plaintiffs first explain that the Gaming Board deferred thirteen license applications for their vendors, while simultaneously approving thirty-four applications from other businesses.  See Motion at 7.

4.    Second, the Plaintiffs contend that the Gaming Board's deferral decision affected their vendors' ability to do business.  See Motion at 7-9.  They reiterate their arguments that N.M. Stat. Ann. § 20-2E-16(H) does not allow them to continue operations merely because the Gaming Board has not yet addressed the merits of their applications.  See Motion at 9-10.  They

--------

[7]The Court uses "Gaming Board" instead of "Certain Defendants" to refer to the relevant Defendants to avoid confusion in future opinions.

note that the Gaming Board had to pass a variance to allow bingo licensees to continue operations after license expiration.  See Motion at 10.  They also examine the relevant Gaming Board regulations, noting one that states that "[n]o licensee shall engage in any gaming activity unless the licensee has received a renewed license from the board."  Motion at 13 (quoting NMRA § 15.1.13.11).  They add that the "regulations do not allow for a licensee to continue to do business after the expiration of the annual term of its license."  Motion at 14.

5.     Third, the Plaintiffs assert that the Gaming Board's approval of a single application for one of their vendors at the Gaming Board's September meeting only confirms their point, as it occurred before Judge Brack's PI.  See Motion at 11-12.  They add that Landers' public testimony that the Gaming Board would defer all vendor applications as long as Judge Brack's PI is in effect rebuts the Gaming Board's argument.  See Motion at 12.

6.     The Plaintiffs also attack the Gaming Board's point that "the Board did not discuss, and instead simply voted to approve, Mr. Landers' motion to defer action" on their vendors licenses on the same basis.  Motion at 12.  They note that the public testimony "suggests that, at some point in time, the discussion amongst and decision by the Certain Defendants did take place."  Motion at 12.

7.     Fifth, although the Plaintiffs concede that Judge Brack's PI did not require the Gaming Board to approve its vendors' licensing applications, they disagree on the meaning of "threatens."  Motion at 15.  They contend that "threaten" should be defined to include the deferral actions:

> The Merriam Webster Dictionary defines "threaten" to mean "to say that you will harm someone or do something unpleasant or unwanted especially in order to make someone do what you want" or "to give signs of warning" or " to hang over dangerously."  See merriam-webster.com.  [N]ot approving an application for the sole reason that the applicant has a business relationship with the Pueblo is clearly a threat to the applicant.

- 12 -

Motion at 15.

8.      Finally, the Plaintiffs contend that the Gaming Board's lack of direct contact with the licensees is irrelevant, because it "is not a requirement of the Preliminary Injunction, and it does not excuse the Certain Defendants' violation of the Preliminary Injunction."  Motion at 16.

9.      The Plaintiffs request that the Court fine the Gaming Board $25,000.00 per day, from November 18, 2015 until it takes action on the vendors' license applications.  See Motion at 16.  They clarify that they seek the contempt finding before they "suffer[] actual harm," and that they are not yet seeking compensatory sanctions.  Motion at 17.

**3.      The Gaming Board's Response.**

10.     The Gaming Board responded on December 7, 2015.  See New Mexico Gaming Control Board Defendants' Response to Plaintiffs' Motion for Order to Show Cause re Civil Contempt, filed December 7, 2015 (Doc. 62)("Response").   The Gaming Board makes four primary arguments to counter the Motion.  See Response at 2.

11.     First, it contends that Judge Brack's PI neither prohibits it from deferring applications nor mandates that it immediately renew pending applications.  See Response at 2.  It notes that Judge Brack's PI does not "clearly and unambiguously" bar it from deferring decisions.  Response at 8 (citing FTC v. Kuykendall, 371 F.3d 745, 754 (10th Cir. 2004)).

12.     Second, the Gaming Board asserts that the deferrals are not "enforcement action, which is the general category of conduct that is the focus of the order."  Response at 2.  It states that it has neither changed the vendors' status by revoking or modifying licenses nor otherwise punished the licensee by imposing fines.  See Response at 8.  It concludes that "[a] postponement of taking action cannot be equated with taking action."  Response at 8.

13.     Third, the Gaming Board contends that the deferrals are justified, "given that the

- 13 -

Board's authority to enforce New Mexico's gaming statutes and regulations against non-Indian manufacturers in connection with their dealings with non-Indian racetrack casinos and non-profit fraternal and veteran's organizations off tribal lands remains in sharp dispute." Response at 2. It suggests that Judge Brack "clearly erred" in granting his PI. Response at 8.

14.     Fourth, the Gaming Board maintains that the deferral actions did not amount to a "threat," because no party or vendor "feels threatened." Response at 9. It notes that even the Plaintiffs do not assert that the deferrals present a threat. See Response at 9. It thus concludes that the Plaintiffs have not suffered any injury, "even assuming solely for the sake of argument that the Board's deferral decisions amounted to a technical violation of the October 7 order." Response at 9.

15.     Fifth, the Gaming Board argues that the Plaintiffs would be equally threatened even if their applications were approved, rendering this dispute a "meaningless exercise." Response at 2. It notes that, if the preliminary injunction is lifted, "the Board properly could revoke any new or renewed licenses and certifications, or variances as the Plaintiffs urge, just as easily as it could refuse to approve the currently-deferred applications." Response at 10.

16.     The Gaming Board also seeks to support its argument that the deferrals will not threaten the vendors' ability to do business. See Response at 5-7. It again notes that § 60-2E-16(H) provides: "After issuance, a license, certification or permit shall continue in effect upon proper payment of the initial and renewal fees, subject to the power of the board to revoke, suspend, condition or limit licenses, certifications and permits." Response at 5 (quoting N.M. Stat. Ann. § 60-2E-16(H)). The Gaming Board explains that it "historically has construed and applied this statute to permit licenses, certifications and permits to remain in effect past their nominal expiration date, pending Board action on a pending renewal application." Response at

6.  It concedes that this language "can be construed" to conflict with N.M. Admin. Code §§ 15.1.13.11 and 15.1.13.12, but states that it "has construed and applied [its regulations] to be consistent with the statute."  Response at 6.  The Gaming Board emphasizes that if the licensee "has applied for renewal in a timely manner, it will not be penalized by the fact that the Board has not taken action, or deferred action, on or before the license expiration date."  Response at 6-7.  It notes that the Court should defer to its interpretation of the statute it administers and grant precedence to the statute when it conflicts with any regulations.  See Response at 5-7 (citing Quynh Truong v. Allstate Ins. Co., 2010-NMSC-009, 227 P.3d at 82, and Jones v. Employment Servs. Div., 1980-NMSC-120, ¶ 3, 619 P.2d at 544).

  **4.** **The Plaintiffs' Reply**.

  17. The Plaintiffs replied on December 21, 2015.  See Reply Brief in Support of Motion for Order to Show Cause Why Certain Defendants Should not be Held in Civil Contempt for Violation of Preliminary Injunction, filed December 21, 2015 (Doc. 68)("Reply").  The Plaintiffs make four primary arguments in their Reply.  See Reply at 2.

  18. First, the Plaintiffs contend that actual damages is not an element of civil contempt.  See Reply at 6.  They note that courts using contempt orders to compel compliance may impose fines that have no relationship with compensation.  See Reply at 7-8 (citing United States v. United Mine Workers of America, 330 U.S. 258, 304 (1947), and Hart's Rocky Mountain Retreat, Inc. v. Gayhart, No. CIV.A 1:06CV01235 WDM, 2007 WL 2491856, at *2 (D. Colo. Aug. 29, 2007)(Miller, J.)).  They conclude that "a party does not get a free pass to defy a court order by asserting that no one has yet actually suffered injury as a result of its defiance."  Reply at 8.

  19. Second, the Plaintiffs dispute the Gaming Board's argument that the licenses'

- 15 -

expiration will have no legal effect.  <u>See</u> Reply at 6-8.  They attack the Gaming Board's distinction between bingo and raffles and other gaming activities, noting that it actually has more control over bingo and raffle license expiration than it does over other gaming license expirations.  <u>See</u> Reply at 6.  They describe the Gaming Board's promise to treat the deferrals as valid licenses as "an interesting confession," noting that the Gaming Board has apparently violated unambiguous statutory language "dozens of times."  Reply at 7 (arguing that cases requiring deference to agency interpretations do not apply to unambiguous statutes).  They also explain that the Gaming Board could have mooted the issue by granting a variance, but has declined to do so.  <u>See</u> Reply at 7.

20.     Third, the Plaintiffs again argue that the deferrals are a threat.  <u>See</u> Reply at 8. They note that, even if the Gaming Board acted in good faith, "willingness or good faith is not an element of civil contempt."  Reply at 9.  They add that the Gaming Board "continue[s] to attempt to do indirectly what [it] cannot do directly."  Reply at 8.

21.     Fourth, the Plaintiffs attack the Gaming Board's argument that Judge Brack's PI was the result of clear error.  <u>See</u> Reply at 13.  They note:

> [A]n order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings.  This is true without regard even for the constitutionality of the Act under which the order is issued.

Reply at 10 (quoting <u>United States v. United Mine Workers of America</u>, 330 U.S. at 293).  This defiance, they say, supports an "ever-increasing fine for each day Certain Defendants continue to defy this Court's Preliminary Injunction."  Reply at 10.

**5.      The Hearing.**

22.     The Court held a hearing on the Motion on December 29, 2015.  <u>See</u> Transcript of

Hearing (taken December 29, 2015)("Tr.").[8]  The Court opened the hearing by summarizing its

inclination:

> [T]he language was carefully crafted.  And I'm concerned about holding anybody
> in contempt given that language.  I understand what the pueblo is saying that
> actual damages is not a prong of civil contempt.  I agree with that. [B]ut I do think
> in this particular situation before we turn these deferrals into threats it may need a
> little bit more . . . .  Because that's a bit of a leap and it may need the leap of some
> evidentiary damages that are occurring, because of the state's action.  So I'm not
> inclined to grant civil contempt this morning against the defendants that the
> pueblo has moved against.

Tr. at 2:19-3:6 (Court).  The Court cautioned the Gaming Board, however, that it was "playing a

little bit with fire" and that, "if you continue down this path, the pueblo may be able to show that

your deferrals have become threat[s]."  Tr. at 3:14-22 (Court).

23.     The Plaintiffs began by conceding that they drafted the wording in Judge Brack's

PI.  See Tr. at 5:18-25 (Court, Crowell).  They nonetheless argued that they filed the TRO

Motion because the Gaming Board had issued deferrals, and that Judge Brack thus understood

the word "threaten" to include deferrals.  Tr. at 6:10-7:1 (Court, Crowell).  They pointed the

Court to page four of Judge Brack's MOO, which states that the Individual Defendants "placed

in abeyance approval of any license application or renewal for the Pueblo's vendors."  Tr. at 8:5-

18 (Crowell)(quoting Judge Brack's MOO at 4).  They asserted that Judge Brack was reacting to

the Gaming Board's original decision to defer action on vendor's applications and therefore

"understood deferral action to be a threat to the licensee."  Tr. at 8:25-9:2 (Crowell).

24.     The Plaintiffs stated, in response to the Court's suggestion that the deferrals

merely preserved the status quo, that the Gaming Board should deny licensing applications "if

there is a reason . . . not based on the fact that they're doing business with the pueblo."  Tr. at

---

[8]The Court's citations to the transcripts of any hearings refer to the court reporter's
original, unedited versions.  Any final versions may contain slightly different page and/or line
numbers.

15:4-16 (Court, Crowell).  They explained the distinction: "What Judge Brack I believe enjoined and what the pueblo takes issue with is the New Mexico gaming control board using its licensing processes to exercise the state[']s jurisdiction over the pueblo's gaming activities."  Tr. at 15:16-21 (Crowell).  They emphasized that waiting for statements that specific vendors feel threatened would be counterproductive and would result in lost business opportunities and jobs.  See Tr. at 17:18-25 (Crowell); id. at 19:14-18 ("[I]f you go to a vendor and say please give us a declaration that says these actions are a threat to your license, they may go back and say well that's enough to push us over that threshold we should stop doing business.").

25.     The Gaming Board argued that its earlier deferrals, taken before Judge Brack's PI, did not prompt the preliminary injunction.  See Tr. at 24:20-26:7 (Bohnhoff).  It explained that it used the earlier deferrals to conduct an audit to "determine what was being done and then determine what enforcement action, if any, would need to be taken."  Tr. at 26:8-18 (Bohnhoff).  The later deferrals, it noted, were "not for the purpose of taking some future enforcement action but rather [were] deferred pending the resolution of the litigation."  Tr. at 26:18-21 (Bohnhoff).  It added that the Plaintiffs likely moved for a preliminary injunction in response to its decision to issue citations to vendors continuing to do business with the Plaintiffs.  See Tr. at 28:6-14 (Bohnhoff).  The Gaming Board continued that at least one vendor, Aristocrat Gaming Technologies, shipped machines to Pojoaque Pueblo despite the deferrals.  See Tr. at 31:24-32:7 (Bohnhoff).  It also argued that, even assuming that actual damages are not an element of civil contempt, the Court should still consider the violation's consequences "to make a determination as to what you're going to do about that violation."  Tr. at 32:23-33:20 (Bohnhoff).   The Gaming Board rejected the Court's suggestion that the Plaintiffs could show actual damages and cause for civil contempt if they had evidence of actual threats, arguing instead that "then the

question for the Court would not be contempt enforcement but rather . . . does the preliminary injunction need to be amended." Tr. at 35:10-14 (Bohnhoff).

26.     The Gaming Board also addressed the Court's concern about its interpretation of its governing statute.  See Tr. at 36:13-21.  It asserted that it "interpreted the regulations to be consistent with the statute" and did so "over 30 times since 2003." Tr. at 37:9-19 (Bohnhoff).

27.     The Court then clarified a procedural point with the Plaintiffs.  See Tr. at 44:23-44:10 (Court).  The Plaintiffs confirmed that, although they worded the Motion to request an order to show cause, "we believe that we could dispense with that and go directly to issuing an order of contempt." Tr. at 45:11-18 (Crowell).  They added that they were not even aware of the citations when they moved for a preliminary injunction.  See Tr. at 51:1-4 (Crowell).  They again emphasized that the Gaming Board was attempting to send "a message to the vendors that what we do with your licenses is contingent upon what you do with the pueblo, and that is a threat." Tr. at 62:4-6 (Crowell).

28.     The Court indicated that it would not rule on the Motion at the hearing, but gave its inclination:

> I still think that probably the wording of the injunction that Judge Brack entered does preclude civil contempt in this particular situation in that deferral itself is not per se a violation.  I . . . am inclined to disagree with the state that deferral cannot become a threat, and so I do think that at some point the deferral could become a threat.  I don't think it's there today.
>
> . . . .
>
> Given my experience with prior injunctions[,] actual damages are not required here.  So I think the state . . . should be very cautious.

Tr. at 65:13-66:8 (Court).

## CONCLUSIONS OF LAW

The Court will outline the generally applicable law surrounding civil contempt.  It will

then analyze the Motion.

      1.     Contempt of court is "the disregard of judicial authority," which a court may punish as "an inherent and integral element of its power."  Enforcement of and Collateral Attack on Injunctions, 11A Fed. Prac. & Proc. Civ. § 2960 (3d ed.).  See Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)("[I]t is firmly established that the power to punish for contempt is inherent in all courts.")(quotations omitted).  It applies to "disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial." Chambers v. NASCO, Inc., 501 U.S. at 44.  Rule 70(e) of the Federal Rules of Civil Procedure recognizes this inherent power, allowing courts to enforce injunctions by "hold[ing] the disobedient party in contempt."  Fed. R. Civ. Proc. 70(e).

      2.     "To prevail in a civil contempt proceeding, the plaintiff has the burden of proving, by clear and convincing evidence, that a valid court order existed, that the defendant had knowledge of the order, and that the defendant disobeyed the order."  Reliance Ins. Co. v. Mast Constr. Co., 159 F.3d 1311, 1315 (10th Cir. 1998)(internal citation omitted).  See Faniola v. Mazda Motor Corp., No. CIV-02-1011 JB/RLP, 2004 WL 1354470, at *3 (D.N.M. Apr. 28, 2004)(Browning, J.).

      3.     The order being enforced must be "clear and unambiguous."  Reliance Ins. Co. v. Mast Const. Co., 84 F.3d 372, 377 (10th Cir. 1996).  "Any ambiguities or omissions in the order will be construed in favor of [the order's target]."  Reliance Ins. Co. v. Mast Const. Co., 84 F.3d at 377.  See Enforcement of Judgment for Specific Relief, 12 Fed. Prac. & Proc. Civ. § 3022 (2d ed.)("[A] party may not be punished for disobeying an order that does not definitely state what it is to do or refrain from doing.").

      4.     Actual notice of a temporary restraining order or injunction is sufficient to support

civil contempt.  See ClearOne Commc'ns, Inc. v. Chiang, 670 F. Supp. 2d 1248, 1281 (D. Utah 2009)(Campbell, J.).

5.      "Civil contempt 'is a severe remedy, and should not be resorted to where there is a fair ground of doubt as to the wrongfulness of defendant's conduct.'"  MAC Corp. of Am. v. Williams Patent Crusher & Pulverizer Co., 767 F.2d 882, 885 (Fed. Cir. 1985)(quoting California Artificial Stone Paving Co. v. Molitor, 113 U.S. 609, 618 (1885)).

6.      The Court will deny the Motion.  First, although the Plaintiffs are not required to demonstrate that they suffered actual damages, such damages would help them to establish that the deferrals constitute threats.  Second, the deferrals do not "threaten" the vendors within Judge Brack's PI's meaning.  The Gaming Board, however, treads perilously close to civil contempt and should take care not to interfere with the Plaintiffs' vendors.

7.      "To prevail in a civil contempt proceeding, the plaintiff has the burden of proving, by clear and convincing evidence, that a valid court order existed, that the defendant had knowledge of the order, and that the defendant disobeyed the order."  Reliance Ins. Co. v. Mast Constr. Co., 159 F.3d at 1315.

8.      The Gaming Board does not dispute that a valid court order exists or that it has knowledge of the order.  See Response at 3 ("Defendants obviously do not deny that the Court issued its October 7, 2015 preliminary injunction decision and order, or what it says, or that they have received copies of it.").  The parties have thus focused their arguments on whether the Gaming Board disobeyed Judge Brack's PI.

9.      The Plaintiffs argue that the Gaming Board has violated the prohibition on "taking any action that threatens . . . any licensee in good standing with the New Mexico Gaming Control Board based wholly or in part on grounds that such licensee is conducting business with

the Pueblo."  Judge Brack's PI at 1.

## I.     THE PLAINTIFFS NEED NOT SHOW ACTUAL HARM FOR THE COURT TO HOLD THE GAMING BOARD IN CIVIL CONTEMPT.

10.     The parties dispute whether the Plaintiffs must show actual harm for the Court to hold the Gaming Board in civil contempt.  The Gaming Board argues that the Plaintiffs are "simply wrong in contending that injury is not part of the civil contempt analysis."  Response at 5.  It cites cases that appear to require a showing of actual damages.  See Response at 5 (citing Reliance Ins. Co. v. Mast Const. Co., 84 F.3d at 377 ("Assuming that Reliance can prove these elements, it must also demonstrate actual damages."), and Gemco Latinoamerica, Inc. v. Seiko Time Corp., 61 F.3d 94, 100 (1st Cir. 1995)("Even though Royal Bank's conduct violated the attachment order . . . Royal Bank is liable in a civil contempt proceeding only for actual damages.")).

11.     The Court sides with the Plaintiffs on this dispute for three primary reasons.  First, the Supreme Court of the United States' opinion in United States v. United Mine Workers of America does not support the Gaming Board's argument.   In United States v. United Mine Workers of America, the Supreme Court explained: "Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained."  330 U.S. at 303.  If the sanctions are intended for compensation, the Supreme Court stated, the "fine must of course be based upon evidence of complainant's actual loss."  330 U.S. at 304.   If the sanctions are intended to coerce compliance, however, the court imposing sanctions may "consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant" -- factors which are not linked to the complainant's damages.  330 U.S. at 304.

12.     Second, other authority supports the Court's conclusion.  The defendants in Hart's Rocky Mountain Retreat, Inc. v. Gayhart, No. CIV.A 1:06CV01235WDM, 2007 WL 2491856 (D. Colo. Aug. 29, 2007)(Miller, J.), argued that "they cannot be held in civil contempt because Plaintiff cannot prove actual damages."  2007 WL 2491856, at *2.  The district court rejected this argument, explaining that, "*if* a court awards compensatory sanctions, such an award must be supported by evidence of actual damages."  2007 WL 2491856, at *2 (emphasis in original).  If a court awards coercive sanctions, on the other hand, actual damages are not a prerequisite.  See 2007 WL 2491856, at *2.  See Glover v. Johnson, 199 F.3d 310, 313 (6th Cir. 1999)("Since the purpose of the sanctions was to produce Appellants' compliance with the district court's lawful order, their nature was clearly coercive . . . .  Appellants' contention that the amount is inappropriate because it fails to match a demonstrated loss by Appellees is therefore misplaced.").

13.     Third, the Gaming Board's cited cases are not on point.  The movant in Reliance Ins. Co. v. Mast Const. Co. sought a "compensatory civil contempt judgment" to recover damages for a bank's assistance in enabling its opponents to avoid paying a judgment.  84 F.3d at 376.  The underlying district court order was not concerned with coercing the bank into compliance, as the violations of its order had already occurred and were effectively irreversible.  See 84 F.3d at 377.  Gemco Latinoamerica, Inc. v. Seiko Time Corp. involved a similar scheme to frustrate a court order and a similar request for compensation rather than compliance.  See 61 F.3d at 100.

14.     That civil contempt does not require a showing of actual damages, however, does not mean that actual damages are irrelevant in this dispute.  As discussed above, evidence that the Plaintiffs' vendors balked after receiving deferrals and caused the Plaintiffs actual damages

would tend to show that the Gaming Board threatened the vendors.  A showing of actual damages would thus be helpful evidence rather than a prerequisite.

## II.    THE DEFERRALS DO NOT QUALIFY AS "THREATS" UNDER JUDGE BRACK'S PI.

15.    The deferrals do not qualify as threats under Judge Brack's PI.  First, the deferrals' legal effects will not immediately harm the vendors.  Second, the deferrals do not otherwise constitute threats, because Judge Brack's PI does not expressly include them, they maintain the status quo, and the Plaintiffs have not presented any evidence that their vendors feel threatened.

### A.    THE VENDORS' OPERATIONS WILL NOT AUTOMATICALLY BECOME UNLAWFUL IF THE GAMING BOARD DOES NOT APPROVE THEIR RENEWALS BY THEIR ONE-YEAR ANNIVERSARY.

16.    To determine whether the deferrals threaten the vendors, the Court must understand whether the deferrals affect the vendors' continued operation.  New Mexico's Gaming Control Act, N.M. Stat. Ann. §§ 60-2E-1 to 60-2E-62, governs the Gaming Board's issuance of licenses.  Section 60-2E-16(H) states: "After issuance, a license, certification or permit shall continue in effect upon proper payment of the initial and renewal fees, subject to the power of the board to revoke, suspend, condition or limit licenses, certifications and permits." N.M. Stat. Ann. § 60-2E-16(H).  The Gaming Board has "historically" interpreted this statute "to permit licenses, certifications and permits to remain in effect past their nominal expiration date, pending Board action on a pending renewal application."  Response at 6.

17.    The Gaming Board has also promulgated regulations under the Act.  See N.M. Admin. Code §§ 15.1.1 to 15.1.26.  Two of these provisions are at issue here:

**15.1.13.11 MANDATORY CESSATION OF GAMING ACTIVITY:** No licensee shall engage in any gaming activity unless the licensee has received a renewed license from the board. <u>Any licensee that fails to renew its license as</u>

> required by the act and this rule shall cease the gaming activity authorized by the license on the date the license expires. Engaging in any gaming activity without a renewed license shall subject the licensee to fines and penalties as determined by the board.
>
> **15.1.13.12 RENEWAL LICENSE PERIOD:** All licenses shall expire annually on the anniversary date of the original issuance and will be subject to renewal on an anniversary date basis.

N.M. Admin. Code §§ 15.1.13.11-12 (emphasis added).

18.     These regulations are inconsistent with the Gaming Board's interpretation of § 60-2E-16(H).  Under the Gaming Board's interpretation of the statute, a license continues past its expiration date provided that the licensee pays a renewal fee.  Under the regulations, a license terminates on its expiration date.  Even the Gaming Board concedes that its regulations "can be construed in a manner that is in conflict" with its interpretation.  Response at 6.  The Gaming Board attempts to resolve this problem by interpreting the regulations to mean that, "so long as the licensee has applied for renewal in a timely manner, it will not be penalized by the fact that the Board has not taken action, or deferred action, on or before the license expiration date."  Response at 6-7 (emphasis in original).

19.     Although the statutes and regulations do not create a cohesive legal framework, the Court concludes that the deferrals will not affect the vendors' continued operations for two reasons.

20.     First, as the Gaming Board contends, "[i]f there is a conflict or inconsistency between statutes and regulations promulgated by an agency, the language of the statutes shall prevail."  Response at 7 (citing Jones v. Employment Servs. Div. of Human Servs. Dep't, 1980-NMSC-120, ¶ 3, 619 P.2d 542, 544).  The regulations here are inconsistent with § 60-2E-16(H), so the statute governs the effect on the vendors' licenses.  This principle also negates the Plaintiffs' argument that bingo and raffle licensees, which are subject to a regulation with almost

identical language, require variances to continue operating after their licenses expire.  See Reply at 9.  Compare N.M. Admin. Code § 15.4.3.16 ("Any licensee that fails to renew its license as required by the act and this rule shall cease the games of chance authorized by the license on the date the license expires."), with N.M. Admin. Code § 15.1.13.11 ("Any licensee that fails to renew its license as required by the act and this rule shall cease the gaming activity authorized by the license on the date the license expires.").

21.    Although the regulations governing bingo and raffle licenses are very similar to the regulations applicable here, there is no conflicting statute governing bingo and raffle licenses.  The rough equivalent of § 60-2E-16(H) for bingo and raffle licenses does not address whether licenses remain valid upon the submission of a renewal application.  See N.M. Stat. Ann. § 60-2F-12.

22.    Second, the Gaming Board has established a "pattern of practice" of allowing licenses to remain in effect between the time that a licensee files for a renewal and the time that it approves the renewal.  Reply at 8.  Defendant Jeffrey Landers has submitted a declaration describing his review of the Gaming Board's licensing records.  See Declaration of Jeffrey S. Landers ¶ 3, at 2 (taken December 7, 2015), filed December 7, 2015 (Doc. 62-2)("Landers Declaration").  Landers states that the Gaming Board has "approved a renewal application after the nominal expiration date of an existing license" on approximately thirty occasions between 2003 and 2015.  Landers Declaration ¶ 3, at 2.  Landers adds that "all" of the licensees "were permitted to continue operating during the period between the expiration date of the existing license and the approval of the renewal application."  Landers Declaration ¶ 3, at 2.  The Gaming Board also represented during the hearing that this practice "isn't something that the board has done just recently and only in the case of the manufacturers who are doing business with the

pueblo.  This is something that the board has done as Mr. Landers stated in his declaration over

30 times since 2003."  Tr. at 37:14-19 (Bohnhoff).  The Plaintiffs' argument that they cannot rely

on the Gaming Board's past practice as a defense to an enforcement action is unconvincing.  See

Reply at 11 ("The Certain Defendants want this Court to believe that . . . a [Gaming Board] track

record of defying the applicable statute and its own regulations will be a successful defense[.]").

As discussed above, § 60-2E-16(H) is inconsistent with the regulations that the Gaming Board

would use to support an enforcement action.  Given this conflict, the statute would govern the

dispute, and its language -- that "a license, certification or permit shall continue in effect upon

proper payment of the initial and renewal fees" -- would not support an enforcement action here.

N.M. Stat. Ann. § 60-2E-16(H).

        23.     Moreover, it is likely that any enforcement action -- whether grounded in statutes

or regulations, or not -- would be seen as a threat and a violation of Judge Brack's PI.  The

important thing is that the Gaming Board's practice and representations send a signal to the

vendors that it is not going to do anything while Judge Brack's PI is in place.  After all,

preserving the status quo is the aim of injunctive relief, and at the present time, the vendors are

not threatened and do not appear to feel threatened.

                **B.      THE DEFERRALS DO NOT OTHERWISE CONSTITUTE THREATS.**

        24.     The Court concludes that the deferrals do not otherwise constitute threats.  It

recognizes that the deferrals could be threatening even absent any immediate legal impact on the

vendors' operations.  For example, the Gaming Board could use them to "intimidate[e] vendors

with the non-renewal of their applications," Motion at 11, or signal that it will "punish these

contractors down the road," Tr. at 13:23-25 (Court).  The Court nonetheless determines that the

deferrals are not viable threats for three reasons.

25.     First, Judge Brack's PI's language is not sufficiently clear to support a finding of civil contempt for deferrals.  "[A] party may not be punished for disobeying an order that does not definitely state what it is to do or refrain from doing."  Enforcement of Judgment for Specific Relief, 12 Fed. Prac. & Proc. Civ. § 3022 (2d ed.).   Judge Brack's PI uses "clear and unambiguous" language covering other possible actions.   Reliance Ins. Co. v. Mast Const. Co., 84 F.3d at 377.   It specifically prohibits the Gaming Board from "taking any action that threatens, revokes, conditions, modifies, fines, or otherwise punishes or takes enforcement against" licensees under certain conditions. Judge Brack's PI at 1.  "Defers" or "delays" do not appear in this enumerated list.  Judge Brack's PI at 1.  This omission, and the ambiguity over whether "threatens" applies to the deferrals here, must "be construed in favor of [the Gaming Board]."  Reliance Ins. Co. v. Mast Const. Co., 84 F.3d at 377.  This principle is particularly appropriate where, as here, the Plaintiffs drafted the preliminary injunction's language.  See Tr. at 5:18-25 (Court, Crowell).  If the Plaintiffs and Judge Brack were primarily concerned with preventing the Gaming Board from issuing deferrals, they could have specifically prohibited it from doing so, as they prohibited fines or revocation actions.  See Judge Brack's PI at 1.  The Court is thus unwilling to conclude that the deferrals, without more, "threaten" the vendors. Judge Brack's PI at 1.

26.     The Court concludes that, when it reads Judge Brack's MOO, it is concerned whether he would reach the same result that the Court has reached.  The correct exercise for the Court, however, is not to determine what Judge Brack would do or even intended.

27.     Second, the Gaming Board's deferrals were likely intended to preserve the status quo, and, even if that is not the Gaming Board's intent and it has some more nefarious purpose, the effect is to preserve the status quo.  A reasonable person reading Judge Brack's PI could

conclude that the most prudent course of action would be to defer the applications.  See Tr. at 14:16-15:2 (Court).  Although the Plaintiffs "fully encourage" the Gaming Board to deny renewal applications "for a reason not based on the fact that they're doing business with the pueblo," as a practical matter, it would be difficult for the Gaming Board to demonstrate that it denied an application for legitimate reasons.  Tr. at 15:12-16 (Crowell).  To stay clear of trouble with Judge Brack's PI, it may be best to do nothing, although the Court recognizes that anything that the Defendants do may be unpalatable to the Plaintiffs and get them in trouble.

28.     Third, the Court is reluctant to conclude that the deferrals constituted threats in the absence of concrete evidence that the Plaintiffs' vendors feel threatened or are altering their behavior accordingly.  The current Motion seems a bit academic, rather than real world, and if the federal Court is going to hold state officials in contempt and start fining them, it wants to make certain that such extreme and drastic action is necessary and required.  The Court is not convinced that such action -- on the present record -- is necessary to protect the Plaintiffs' interests.

29.     The Gaming Board made its deferral decisions on October 21, 2015.  See Motion at 2.  The Plaintiffs did not file the Motion until November 19, 2015, and the Court did not hear the matter until December 29, 2015.  See Motion at 1; Tr. at 1.  The Plaintiffs have not presented any evidence that contractors felt threatened, or stopped supplying products to their casino.  See Tr. at 7:11-18 (Court); Reply at 6.  The only evidence in the record whether the vendors feel threatened shows that Aristocrat Gaming Technologies, a vendor, shipped products to the Plaintiffs after the Gaming Board issued the deferrals.  See Tr. at 43:4-20 (Bohnhoff); Response at 9 n.2.  The Court does not require the Plaintiffs to show actual damages, but evidence that a vendor ceased business with the Plaintiffs would be strong evidence that the deferrals were

threats, rather than attempts to maintain the status quo or, regardless of intent, at least an effective means of maintaining the status quo and protecting the Plaintiffs' interests in their gaming operations.

30.     The Gaming Board must proceed with caution.  Although it can defer applications under Judge Brack's PI, its actions may become threats if the vendors start pulling their business from Pojoaque Pueblo.  It is true that the situation does not have to get to that point before there is a violation, but right at the moment, the vendors -- who are smart, savvy business people -- understand what is going on in New Mexico.  These gaming vendors are a salty bunch, and not easily scared off from doing business.  Moreover, the State of New Mexico has little economic self-interest in ruining the business of all vendors by eventually penalizing them down the road, so the threat, if any, appears not to exist now or in the future.  Judge Brack's PI has, for the time being, achieved what he wanted -- maintaining the status quo until the case is over.  Until a vendor appears and states that the situation is no longer working, the Court does not think it prudent to take the prophylactic action of contempt that the Plaintiffs suggest.

**IT IS ORDERED** that the Plaintiffs' Motion for Order to Show Cause re Civil Contempt, filed November 19, 2015 (Doc. 53), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Carrie A. Frias
Pueblo of Pojoaque Legal Department
Santa Fe, New Mexico

--and--

- 30 -

Scott Crowell
Steffani Ann Cochran
Crowell Law Office Tribal Advocacy Group, P.L.L.C.
Sedona, Arizona

     *Attorneys for the Plaintiffs*

Henry M. Bohnhoff
Edward Ricco
Krystle A. Thomas
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

     *Attorneys for the Defendants*