# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

PUEBLO OF POJOAQUE, a federally recognized
Indian Tribe; and JOSEPH M. TALACHY, Governor
of the Pueblo of Pojoaque,

     Plaintiffs,

vs.                                  No. CIV 15-0625 JB/GBW

STATE OF NEW MEXICO, SUSANA
MARTINEZ, JEREMIAH RITCHIE, JEFFERY
S. LANDERS[1], SALVATORE MANIACI,
PAULETTE BECKER, ROBERT M. DOUGHTY
III, CARL E. LONDENE and JOHN DOES I-V,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Defendants Susana Martinez, Jeremiah

Ritchie, Jeffrey S. Landers, Salvatore Maniaci, Paulette Becker, Robert M. Doughty III, and Carl

E. Londone's Motion to Dismiss Count IV on the Basis of Qualified Immunity, filed December

4, 2015 (Doc. 60)("Qualified Immunity Motion"); (ii) Defendants Susana Martinez, Jeremiah

Ritchie, Jeffry [sic] S. Landers, Salvatore Maniaci, Paulette Becker, Robert M. Doughty III, and

Carl E. Londene's Motion for Stay of Discovery Pending Qualified Immunity Rulings, filed

December 4, 2015 (Doc. 61)("Motion to Stay Discovery"); (iii) the Defendants' Motion to Stay

---

[1]The Plaintiffs named Defendant Jeffrey S. Landers as "Jeffery S. Landers" in their
Complaint [Failure To Conclude Compact Negotiations in Good Faith, 25 U.S.C. § 2710(d);
Declaratory Judgment and Injunctive Relief; Violation of Civil Rights, 42 U.S.C. § 1983;
Pendant Claim of Tortious Interference with Existing Contractual Relationships] ¶ 19, at 7, filed
July 18, 2015 (Doc. 1). The Defendants corrected the spelling in the New Mexico Gaming
Control Board Defendants' Response to Plaintiffs' Motion for Order to Show Cause re Civil
Contempt, filed December 7, 2015 (Doc. 62). The Court will leave the incorrect spelling in the
caption, but use the correct version in the Memorandum Opinion and Order's text.

or Suspend the Court's October 7, 2015 Preliminary Injunction, filed December 18, 2015 (Doc. 64)("Motion to Stay Injunction"); (iv) the Defendants' Motion to Reconsider and Either Vacate or Modify the Court's October 7, 2015 Preliminary Injunction, and for Relief Pursuant to Fed. R. Civ. P. 62.1, filed December 18, 2015 (Doc. 65)("Motion to Reconsider Injunction"); (v) Defendant State of New Mexico's Motion to Modify October 7, 2015 Preliminary Injunction and to Dismiss Defendant State of New Mexico Based on the State's Eleventh Amendment Sovereign Immunity, filed December 22, 2015 (Doc. 69)("Sovereign Immunity Motion"); (vi) the Defendants' Motion to Dismiss Counts III and IV of the Plaintiffs' Complaint, filed December 22, 2015 (Doc. 71)("Motion to Dismiss Counts III and IV"); (vii) the Defendants' Motion to Dismiss Count II of Plaintiffs' Complaint, filed December 22, 2015 (Doc. 72)("Motion to Dismiss Count II"); (viii) the Defendants' Motion to Dismiss Count V of Plaintiffs' Complaint, filed December 22, 2015 (Doc. 73)("Motion to Dismiss Count V"); (ix) the Pueblo's Motion to Stay Proceedings Pending Defendants' Interlocutory Appeal of Order Issuing Preliminary Injunction, filed February 17, 2016 (Doc. 93)("Motion to Stay Proceedings"); and (x) the Pueblo's Motion for Leave to Submit Supplemental Brief in Support of Pueblo's Motion to Stay Proceedings Pending Defendants' Interlocutory Appeal of Order Issuing Preliminary Injunction, filed March 29, 2016 (Doc. 111)("Supplemental Briefing Motion"). The Court held a hearing on the Qualified Immunity Motion and Motion to Stay Discovery on January 12, 2016. The Court held a hearing on the Sovereign Immunity Motion, the Motion to Stay Discovery, the Motion to Reconsider Injunction, the Motion to Dismiss Counts III and IV, the Motion to Dismiss Count II, and the Motion to Dismiss Count V on March 2, 2016. The Court held a hearing on the Motion to Stay Proceedings and Supplemental Briefing Motion on April 22, 2016.

The primary issues are: (i) whether the Defendants' interlocutory appeal of the Court's October 7, 2015, preliminary injunction, divests the Court of its jurisdiction over the present motions; (ii) whether Defendants Susana Martinez, Jeremiah Ritchie, Jeffrey S. Landers, Salvatore Maniaci, Paulette Becker, Robert M. Doughty III, and Carl E. Londone (collectively, the "Individual Defendants"), violated Plaintiff Pueblo of Pojoaque's federal rights by taking a series of actions under color of state law against non-Indian, state-licensed gaming manufacturer vendors -- thereby potentially affecting Pojoaque Pueblo's ability to do business with such vendors -- based on the Individual Defendants' determination that the vendors violated New Mexico law in supplying equipment to or receiving proceeds from gaming enterprises that the Pojoaque Pueblo allegedly conducted on its tribal lands in the absence of a compact with Defendant State of New Mexico, as the Indian Gaming Regulatory Act of 1988, 25 U.S.C. §§ 2701-2721 ("IGRA"), requires; (iii) whether the Individual Defendants are entitled to qualified immunity with respect to Count IV, and whether discovery should be stayed pending the Court's ruling on the qualified immunity defense; (iv) whether Defendant State of New Mexico is entitled to dismissal of all Counts on the basis of sovereign immunity; (v) whether the Individual Defendants are entitled to immunity from the Plaintiffs' claim for tortious interference with contractual relations; and (vi) whether the Court should stay, suspend, vacate or modify Judge Brack's October 7, 2015, preliminary injunction enjoining the Defendants "from taking any action that threatens, revokes, conditions, modifies, fines, or otherwise punishes or takes enforcement against any licensee in good standing with the New Mexico Gaming Control Board based wholly or in part on grounds that such licensee is conducting business with the Pueblo."

## FACTUAL BACKGROUND

This action arises out of New Mexico and Pojoaque Pueblo's failure to negotiate a state-tribal gaming compact pursuant to IGRA § 2710(d), and an ensuing dispute as to New Mexico's authority to regulate non-Indian gaming activities in New Mexico -- regulations which are motivated by, and have an indirect impact on, the Pojoaque Pueblo's gaming operations, notwithstanding the absence of a compact. The material facts of this case are undisputed. See, e.g., Qualified Immunity Motion at 5-7 (listing, without disputing, the Plaintiffs' factual allegations).

Pojoaque Pueblo is a federally recognized Indian Tribe with 482 enrolled members located in northern New Mexico. See Complaint [Failure To Conclude Compact Negotiations in Good Faith, 25 U.S.C. § 2710(d); Declaratory Judgment and Injunctive Relief; Violation of Civil Rights, 42 U.S.C. § 1983; Pendant Claim of Tortious Interference with Existing Contractual Relationships] ¶ 1, at 1, filed July 18, 2015 (Doc. 1). The Pojoaque Pueblo operates two gaming facilities on its Indian lands: the Buffalo Thunder Resort & Casino and the Cities of Gold Hotel & Casino. See Complaint ¶ 14, at 7; Pueblo of Pojoaque, *http://pojoaque.org/visit/gaming/* (last visited September 20, 2016). Plaintiff Joseph M. Talachy is Governor of the Pojoaque Pueblo. See Complaint ¶ 15, at 7.

New Mexico is a sovereign state government. See Complaint ¶ 16, at 7. Landers, Maniaci, Becker, Doughty, and Londene (collectively, the "Gaming Board Members") are Members of the New Mexico Gaming Control Board. Complaint ¶¶ 19-23, at 7-8. Landers also serves as the Chairman of the Gaming Board. See Complaint ¶ 19, at 7. Martinez, the Governor

of New Mexico, appointed each Gaming Board member.[2]  See Complaint ¶¶ 17, at 7; id. at ¶¶ 19-23, at 7-8.  Ritchie serves as Martinez' Deputy Chief of Staff and primary compact negotiator.[3]  See Complaint ¶ 18, at 7.

On July 19, 2005, New Mexico and Pojoaque Pueblo executed a Class III gaming compact[4] pursuant to IGRA, 25 U.S.C. §§ 2710(d), permitting the operation of casino-style gaming on Pojoaque Pueblo's tribal lands, see 25 U.S.C. § 2703(8).  See Complaint ¶ 46, at 16.  Before the compact's expiration on June 30, 2015, the Pojoaque Pueblo formally requested that New Mexico enter into a new agreement.  See Complaint ¶ 2, at 2.  Talks were unsuccessful, however, and on December 13, 2013, the Pojoaque Pueblo filed suit against the State for failing to negotiate a compact under IGRA in good faith.  See Complaint ¶ 55, at 19.  New Mexico promptly asserted sovereign immunity under the Eleventh Amendment to the Constitution of the United States of America as an affirmative defense, and accordingly, the Honorable James A. Parker, Senior United States District Judge for the United States District Court for the District of New Mexico, dismissed the lawsuit on March 3, 2014.  See Complaint ¶ 56, at 19; Pueblo of

---

[2]In its Memorandum Opinion and Order, 2016 U.S. Dist. LEXIS 72413 (D.N.M. 2016)(Browning, J.), disposing of the Plaintiffs' Motion for Order to Show Cause Re Civil Contempt, filed April 21, 2016, (Doc. 115), the Court incorrectly noted that Martinez is a "Member of the New Mexico Gaming Control Board."  2016 U.S. Dist. LEXIS 72413, at *4.  The Court corrects that statement to say that Martinez is not a Gaming Board member.

[3]In its Memorandum Opinion and Order, 2016 U.S. Dist. LEXIS 72413 (D.N.M. 2016)(Browning, J.), disposing of the Plaintiffs' Motion for Order to Show Cause Re Civil Contempt, filed April 21, 2016, (Doc. 115), the Court incorrectly noted that Ritchie is a "Member of the New Mexico Gaming Control Board."  2016 U.S. Dist. LEXIS 72413, at *4.  The Court corrects that statement to say that Ritchie is not a Gaming Board member.

[4]IGRA, 25 U.S.C. §§ 2701-2721, "divides gaming into three (3) classes whereby regulatory oversight varies depending on the type of activity."  Complaint ¶ 26, at 9.  Class III gaming includes slot machines and house-banked table games, which are subject to stricter regulatory requirements.  See Complaint ¶ 26 at 9.

Pojoaque v. New Mexico, 2014 U.S. Dist. LEXIS 188665 (D.N.M. 2014)(Parker, J.).

After Judge Parker dismissed Pojoaque Pueblo's suit against New Mexico for failure to negotiate a compact in good faith, the Pojoaque Pueblo submitted a proposal for Class III gaming to the United States Secretary of the Interior pursuant to IGRA, 25 U.S.C. § 2710(d)(7)(B), and 25 C.F.R. Part 291. The remedial scheme in 25 U.S.C. § 2710(d)(7)(B) empowers the Secretary of the Interior to promulgate procedures for Class III gaming if a state refuses to agree to a compact. See 25 U.S.C. § 2710(d)(7)(B)(vii). The Secretary may initiate such procedures once a federal court makes a determination that a state acted in bad faith in failing to negotiate a compact. See 25 U.S.C. § 2710(d)(7)(B)(iv)-(v). However, this remedial scheme is effectively neutralized by the fact that a state may assert sovereign immunity as an affirmative defense to such a suit. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 47 (1994)(holding that Congress had no authority to subject states to suit by Indian tribes for negotiating in bad faith under IGRA). To resolve this issue, the Interior Secretary created the regulations in 25 C.F.R. Part 291 to provide tribes with an alternate path to obtain Class III gaming procedures. These regulations provide that, where "[a] State and an Indian tribe are unable to voluntarily agree to a compact" and "[t]he state has asserted its immunity from suit brought by an Indian tribe," 25 C.F.R. Part 291.1, then a tribe "may use the Secretarial Procedures to obtain permission to operate Class III gaming without the State's consent," New Mexico v. Dep't of Interior, 2014 U.S. Dist. LEXIS 184655, at *5 (D.N.M. 2014)(Parker, J.), on appeal 14-2222.

On August 7, 2014, New Mexico filed a lawsuit against the United States of America challenging the Secretary of the Interior's authority to promulgate the regulations in 25 C.F.R. Part 291. See New Mexico v. Dep't of Interior, 2014 U.S. Dist. LEXIS 184655. On October 17, 2014, Judge Parker granted summary judgment to the State and enjoined the United States from

taking action to enforce 25 C.F.R. Part 291.  <u>New Mexico v. Dep't of Interior</u>, 2014 U.S. Dist. LEXIS 184655, at \*43.  An appeal to the Tenth Circuit Court of Appeals is pending.  <u>See</u> <u>New Mexico v. Dep't of the Interior</u>, 14-2222.

On November 3, 2014, the Pojoaque Pueblo informed New Mexico of its renewed desire to negotiate a compact to govern its Class III gaming operations past the June 30, 2015, termination of the current state-tribal agreement.  <u>See</u> Complaint ¶ 60, at 19.  New Mexico and Pojoaque Pueblo representatives subsequently met on several occasions to negotiate a new compact; however, talks again were unsuccessful, and New Mexico and the Pojoaque Pueblo never reached an agreement.  <u>See</u> Complaint ¶¶ 62-64, at 19-20.

On February 26, 2015, Becker, on the Gaming Board's behalf, requested to perform the Gaming Board's routine annual compliance review of Pojoaque Pueblo's gaming operations on November 3-5, 2015.  <u>See</u> Complaint ¶ 65, at 20.  On May 6, 2015, however, Becker notified the Pojoaque Pueblo by letter of the Gaming Board's intention to conduct an earlier compliance review in advance of the compact's expiration.  <u>See</u> Complaint ¶ 65-66, at 20.  In the letter, Becker requested that the Pojoaque Pueblo provide "[a]ny and all contract[s] with Class III Gaming Machine Manufacturers, including [any] Lease, Purchase and Service Agreements."  Complaint ¶ 66, at 20.  Pursuant to its obligations under the outstanding compact, the Pojoaque Pueblo produced the requested vendor contracts on June 24, 2015.  <u>See</u> Complaint ¶ 66, at 20.

The Class III gaming compact between New Mexico and Pojoaque Pueblo expired at midnight on June 30, 2015.  <u>See</u> Complaint ¶ 69, at 21.  Earlier that day, the United States Attorney for the District of New Mexico, Damon P. Martinez, issued a letter to Talachy stating that, once the compact expired, "[c]ontinued gaming operations by the Pueblo . . . would violate federal law."  Letter From Damon P. Martinez to Joseph M. Talachy Regarding Expiration of

Pojoaque Pueblo's Class III Gaming Compact with New Mexico (dated June 30, 2015), at 1, filed October 1, 2015 (Doc. 28-3)("U.S. Attorney's Letter"). Notwithstanding this pronouncement, the U.S. Attorney's Letter indicated that Mr. Martinez would "exercise [] discretion to withhold enforcement action against the Pueblo" during the pendency of the appeal challenging Judge Parker's ruling that the Secretarial Procedures in 25 C.F.R. Part 291 are invalid, see New Mexico v. Dep't of the Interior, 14-2222. U.S. Attorney's Letter at 1. Mr. Martinez expressly conditioned his decision on Pojoaque Pueblo agreeing to maintain the status quo of its gaming operations as the expiring compact outlines and on the Pojoaque Pueblo placing in trust funds that it would otherwise pay to New Mexico under the compact. See U.S. Attorney's Letter at 1. The U.S. Attorney's Letter stipulated that it did not "create any rights, substantive or procedural, enforceable at law or in equity by any party in any matter, civil or criminal . . . ." U.S. Attorney's Letter at 1.

That same day, on June 30, 2015, the Gaming Board issued a public statement that Mr. Martinez' decision to allow the Pojoaque Pueblo's casinos to remain in operation "provides no protection to banks, credit card vendors, gaming machine vendors, advertisers, bondholders, and others that are now doing business with an illegal gambling enterprise." Complaint ¶ 68, at 21. Shortly thereafter, on July 15, 2015, the Gaming Board held a closed meeting to discuss tribal gaming compliance issues. See Complaint ¶ 73, at 22. Following the meeting, the Gaming Board announced that it had determined that the Pojoaque Pueblo's casinos were operating illegally in the absence of a Class III gaming compact and "placed in abeyance approval of any license application or renewal for the Pueblo's vendors." Complaint ¶ 73, at 22. The Gaming Board did not place any other vendors' applications in abeyance. See Complaint ¶ 73, at 22.

# PROCEDURAL BACKGROUND

The Plaintiffs commenced this action on July 18, 2015. <u>See</u> Complaint at 1. The Complaint seeks redress for two principal claims: (i) that New Mexico failed to conclude compact negotiations in good faith for the regulation of Class III gaming activities on the Plaintiffs' lands in violation of 25 U.S.C. § 2710(d); and (ii) that the Individual Defendants conspired under color of state law to "deprive the federal right of the Pueblo and its members to be free of state jurisdiction over activities that occur on the Pueblo lands." Complaint ¶ 1, at 1-2. The Plaintiffs also bring a pendent state law claim for tortious interference with contractual relations. <u>See</u> Complaint ¶ 1, at 2. The Plaintiffs allege that New Mexico "wrongfully assert[ed] State jurisdiction over gaming activities on the Pueblo's Indian lands" in the absence of a Class III gaming compact, thereby violating the Supremacy Clause of the Constitution of the United States and federal civil rights statutes. Complaint ¶ 8, at 4. The Plaintiffs seek extensive declaratory relief, an injunction preventing New Mexico from interfering with their vendors, the appointment of a mediator to facilitate negotiations, $50,000,000 per year in money damages, attorney's fees, and "such other relief as may be just and equitable, including ancillary relief." Complaint ¶¶ A-W, at 37-40. The case was assigned to the Honorable Robert C. Brack, United States District Judge for the United States District Court for the District of New Mexico. <u>See</u> Notice of Case Reassignment to District Judge Robert C. Brack as Trial Judge, filed September 10, 2015 (Doc. 19 [text-only-entry])(reassigning the case from the Honorable Steven C. Yarbrough, United States Magistrate Judge).

On September 9, 2015, the Gaming Board sent letters to the Pojoaque Pueblo's gaming manufacturer vendors. <u>See</u> Letter From Donovan Lieurance to Manufacturer Licensee (dated September 9, 2015), at 1, filed September 25, 2015 (Doc. 23-14)("Vendor Letter"). The Vendor

Letter informed the vendors that Mr. Martinez has determined that the Pojoaque Pueblo's continued gaming operations past the June 30, 2015, expiration of its gaming compact with New Mexico violates federal law. See Vendor Letter at 1 (referencing and attaching the U.S. Attorney's Letter). The Vendor Letter indicates that the Gaming Board intended to conduct an audit of the vendors' records to ensure compliance with New Mexico law and the Gaming Board's regulations. See Vendor Letter at 1. To that end, the Gaming Board demanded production of the vendors' communications and business records with respect to sixteen casinos and tribal gaming operations, including the Pojoaque Pueblo's Class III operations at Buffalo Thunder Resort & Casino and Cities of Gold Casino. See Vendor Letter at 3-4.

On September 25, 2015, the Gaming Board "issued State Citations to all of the vendors doing business with the Pueblo." Second Supplemental Declaration of Terrence "Mitch" Bailey[5] ¶ 5, at 2 (executed October 1, 2015), filed October 01, 2015 (Doc. 30)("Bailey Decl."). Each citation includes similar language charging the vendors with violating "New Mexico Gaming laws, rules and regulations, minimum internal controls or New Mexico Bingo and Raffle act [sic]" as a consequence of doing business with the Pojoaque Pueblo's casinos. Bailey Decl. ¶ 6.a-c, at 2-4.

The Plaintiffs promptly moved for a temporary restraining order and/or a preliminary injunction on September 25, 2015. See Pueblo of Pojoaque's Motion for Temporary Restraining Order and/or Preliminary Injunction, filed September 25, 2015 (Doc. 23)("PI Motion"). In the PI Motion, the Plaintiffs frame the Gaming Board's recent issuance of letters and citations to the Pojoaque Pueblo's vendors as an attempt at asserting "jurisdiction over gaming activities on the

---

[5]Terrence "Mitch" Bailey is the Executive Director of Gaming Operations of Pojoaque Pueblo's gaming enterprises at Buffalo Thunder Resort & Casino, and Cities of Gold Casino. See Bailey Decl. ¶ 1, at 1. Bailey is not a party to this action.

Pueblo's Indian lands," PI Motion at 13, despite that New Mexico's jurisdiction over such activities "ended on June 30, 2015 when the Compact expired," PI Motion at 14. In the Plaintiffs' view, the Gaming Board's actions are "a throw-back to one of the darkest times in the history of the European conquest, when the pueblos were required to pay a tribute tax, whereby the Spanish confiscated the pueblo's maize and other resources . . . ." PI Motion at 3. The Plaintiffs therefore sought redress from Judge Brack to "force the State to recognize the modern federal policies of tribal self-sufficiency and tribal self-governance." PI Motion at 3 (citation omitted). To that end, the Plaintiffs sought to prohibit the Defendants "from taking any action that threatens, revokes, conditions, modifies, fines, or otherwise punishes or takes enforcement against any licensee in good standing with the New Mexico Gaming Control Board [] based wholly or in part on grounds that such licensee is conducting business with the Pueblo." PI Motion at 1.

In their response to the PI Motion, the Defendants stressed that the Gaming Board did "not engage[] in any regulatory actions against Plaintiffs . . . ." State Defendants' Response to Plaintiffs' Request for Temporary Restraining Order at 3, filed October 1, 2015 (Doc. 28)("PI Motion Response"). The Defendants pointed out that no direct enforcement action was threatened against Pojoaque Pueblo; rather, the Gaming Board's actions at best "threatened regulatory consequences to third parties with 'employment and business relationships with the Pueblo.'" PI Motion Response at 13. The Defendants stated that, in any event, vendors "have not been instructed . . . that they cannot conduct business with the Pueblo." PI Motion Response at 4. The Defendants further argued that, as stipulated in the U.S. Attorney's Letter, Pojoaque Pueblo's continued Class III gaming operations after the expiration of its compact with New Mexico violates federal law. PI Motion Response at 16 (citation omitted). Thus, according to

the Defendants, because New Mexico law requires the Gaming Board to regulate third parties that do business with gaming entities who are operating in violation of federal law, the Gaming Board has a statutory duty to regulate Pojoaque Pueblo's vendors.  See PI Motion Response at 19.

Judge Brack held a hearing on the PI Motion on October 2, 2015.  See Transcript of Preliminary Injunction Order Hearing held on October 2, 2015 (Doc. 38)("PI Hearing").  At the hearing, Plaintiffs' counsel, Scott Crowell, argued extensively about Pojoaque Pueblo's "right to be free from state jurisdiction over its gaming activities absent a tribal-state compact," see PI Hearing at 82:9-18, and the requirements for issuance of a preliminary injunction, especially irreparable harm, see, e.g., PI Hearing at 36:18-25, 37:1-25, 38:1-4.  In response, the Defendants' counsel, Jerry A. Walz, repeatedly reiterated that New Mexico had no intention of barring vendors from continuing to do business with Pojoaque Pueblo.  See, e.g., PI Hearing at 57:7-9 ("[N]obody's been ordered that they cannot do business with the Pueblo of Pojoaque").  The Plaintiffs' counsel countered that New Mexico had "assert[ed] jurisdiction over the tribe's gaming activities in the form of threatening vendors regarding their licenses to do business with other entities in the state over which they [] have jurisdiction."  PI Hearing at 37:16-19.  The consequence of this action, the Plaintiffs argued, would be to deter vendors from dealing with Pojoaque Pueblo, thereby "shut[ting] off a source of revenue [] upon which all of the tribe's governmental operations . . . very heavily rely."  See PI Motion at 37:21-24.

On October 7, 2015, Judge Brack granted the preliminary injunction, adopting the proposed language in the Plaintiffs' PI Motion.  See 2015 U.S. Dist. LEXIS 178096, at *33 ("Judge Brack's MOO").  Judge Brack's MOO is critical of the Defendants' collective actions:

> Defendants' protestations that the regulation of vendors doing business with the Pueblo does not constitute regulation of the Pueblo's gaming activities are

disingenuous and inconsistent with the record. Defendants' actions are based, quite clearly, on Defendants' own determination that the post-June 30, 2015 Class III gaming at the Pueblo is illegal -- a determination that the Defendants, just as clearly, are without jurisdiction or authority to make.

Judge Brack's MOO at *28. Determining that the Plaintiffs had established a likelihood of irreparable harm in the absence of preliminary relief, Judge Brack observed:

> Defendants' harassment and threatening conduct directed at the vendors is a thinly disguised attempt to accomplish indirectly that which Defendants know they are without authority or jurisdiction to accomplish directly. Defendants' contention that the enforcement actions against the vendors do not harm the Pueblo is also disingenuous. The undisputed evidence establishes that the Pueblo will lose significant revenue and its Casinos may shut down due to Defendants' intimidation of the Pueblo's vendors.

Judge Brack's MOO at *29. Accordingly, Judge Brack granted the PI Motion, ordering that "Defendants are enjoined from taking any action that threatens, revokes, conditions, modifies, fines, or otherwise punishes or takes enforcement against any licensee in good standing with the New Mexico Gaming Control Board based wholly or in part on grounds that such licensee is conducting business with the Pueblo." Preliminary Injunction by District Judge Robert C. Brack at 1, filed October 7, 2015 (Doc. 32). Further, Judge Brack concluded that the public interest would be served by the preliminary injunction "maintaining the status quo for the duration of the appeal in New Mexico v. Department of the Interior[, 14-2222] and for 30 days thereafter." Judge Brack's MOO at *32-33.

The Gaming Board held its first formal public meeting following Judge Brack's issuance of the preliminary injunction on October 21, 2015. See 2016 U.S. Dist. LEXIS 72413, at *10 ("Contempt MOO"). At the meeting, the Gaming Board considered a total of twenty-nine applications[6] by vendors for "gaming license" renewals and "certification[s] of finding[s] of

---

[6]In its Contempt MOO disposing of the Plaintiffs' Motion for Order to Show Cause Re Civil Contempt, filed November 19, 2015 (Doc. 53)("Contempt Motion"), the Court noted that

"[t]he Gaming Board [] approved thirty-four out of thirty-six applications for companies not doing business with Pojoaque Pueblo." Contempt MOO at * 12. The Court referred to the Contempt Motion for this calculation, noting that the Gaming Board did not dispute the Pojoaque Pueblo's calculation in its response. See Contempt MOO at 12. The Contempt Motion concludes, however -- although not explicitly -- that the Gaming Board approved twenty-one out of thirty-six applications:

> To summarize, the [Gaming Board] approved all of the thirty-six (36) applications for consideration at the October 21, 2015 meeting with the exception of one (1) application for a company not doing business with the gaming operations of the Pueblo being deferred for a limited one-month period and one (1) application for a company not doing business with the gaming operations of the Pueblo being subject to an unexplained no-vote; and thirteen (13) applications for business and principles or officers of companies doing business with the gaming operations of the Pueblo being deferred without a date for future consideration.

Contempt Motion ¶ 7, at 7. Unfortunately, this does not end the matter. The numbers in the Contempt Motion to reach this calculation -- upon which the Court relied -- do not support the conclusion that twenty-one out of thirty-six applications were approved. See Contempt Motion ¶¶ 4-6, at 6-7. The Contempt Motion states the following:

> [T]he [Gaming Board] had on its agenda ten (10) gaming licenses renewals . . . . Five (5) of the six (6) renewals for companies not doing business with the Pueblo were approved. One (1) of the six (6) renewals for companies not doing business with the Pueblo was deferred . . . . The four (4) renewals for companies doing business with the Pueblo were deferred . . . .

Contempt Motion ¶ 4, at 6. See also Contempt MOO at *10 (citing the same numbers).

> [T]he [Gaming Board] had on its agenda ten (10) new applications for a certification of finding of suitability . . . . The seven (7) applications for individual principals or officers of companies not doing business with the Pueblo were approved. The three (3) applications for principals or officers of companies doing business with the Pueblo were deferred . . . .

Contempt Motion ¶ 5, at 6-7. See also Contempt MOO at *10-11 (citing the same numbers). Finally, the Gaming Board

> had on its agenda nine (9) renewal applications for certifications of findings of suitability . . . . Six (6) of the seven (7) applications for individual principals or officers of companies not doing business with the Pueblo were approved . . . . [N]o vote was taken on one (1) of the seven (7) applications for individual principals or officers of companies not doing business with the Pueblo. The two (2) applications for principals or officers of companies doing business with the Pueblo were deferred . . . .

suitability." Contempt MOO at *10-12. With respect to companies not doing business with Pojoaque Pueblo, the Gaming Board approved eighteen applications,[7] deferred one application for a one-month period, and took no vote on one application. See Contempt MOO at *12. The Gaming Board deferred all nine applications[8] -- without a date set for future consideration -- by companies doing business with Pojoaque Pueblo. See Contempt MOO at *12.

As a result of the Gaming Board's actions at its October 21, 2015, meeting, the Plaintiffs moved the Court on November 19, 2015, to: (i) "issue an Order to Show Cause" for the Gaming Board Defendants to "appear and present evidence as to why [they] should not be held in civil contempt of court for violating the Preliminary Injunction issued by [Judge Brack]"; (ii) impose sanctions on the Gaming Board Defendants upon a finding of civil contempt; and (iii) award the Plaintiffs attorney's fees and costs. Motion for Order to Show Cause Re Civil Contempt, filed November 19, 2015 (Doc. 53)("Contempt Motion"). The Plaintiffs argued that the Gaming Board had violated the preliminary injunction by "deferring license decisions on all applications for persons or companies doing business with the Pueblo." Contempt Motion at 2. In the Plaintiffs' view, the Gaming Board's actions were new attempts at "asserting jurisdiction over

---

Contempt Motion ¶ 6, at 7. See also Contempt MOO at *11-12 (citing the same numbers). These numbers indicate that a total of twenty-nine applications -- not thirty-six -- were considered at the meeting. With respect to companies not doing business with Pojoaque Pueblo, eighteen applications -- not thirty-four or twenty-one -- were approved, one was deferred, and one was not voted on. Nine applications -- not thirteen -- were submitted by companies doing business with Pojoaque Pueblo, and all nine were deferred.

Based on these data, the Court revises its earlier calculations to reflect that: (i) twenty-nine applications were considered at the meeting; (ii) eighteen applications submitted by companies not doing business with Pojoaque Pueblo were approved; and (iii) all nine applications submitted by companies doing business with Pojoaque Pueblo were deferred.

[7] See Discussion, supra note 6.

[8] See Discussion, supra note 6.

the Pueblo's gaming activities by threatening the licenses of those persons or companies doing business with the Pueblo's gaming operations."  Contempt Motion at 3.

On October 29, 2015, the Defendants appealed Judge Brack's preliminary injunction to the United States Court of Appeals for the Tenth Circuit.  See Notice of Appeal at 1, filed October 29, 2015 (Doc. 40).  On March 3, 2016, the Tenth Circuit set oral argument on the appeal for May 4, 2016.  See Calendar Notice Setting Arguments for 05/04/2016 at 9:00 A.M., filed March 3, 2016 (10348232 [text-only-entry]).  On March 24, 2016, however, the panel assigned to review the matter *sua sponte* ordered that the appeal be abated pending issuance of a decision on the appeal of Judge Parker's opinion invalidating the regulations in 25 C.F.R. Par 291, in New Mexico v. Department of the Interior, 14-2222.  See Tenth Circuit Court of Appeals Order Abating Appeal at 1, filed March 24, 2016 (Doc. 112).

The Court denied the motion on April 21, 2016.  See Contempt MOO at *31.  The Court held that the Gaming Board's license deferrals did not "threaten" the vendor applicants within the meaning of Judge Brack's preliminary injunction.  See Contempt MOO at *32. The Court reasoned that the deferrals would not affect the vendors' continued operations for two reasons:

> First, as the Gaming Board contends, "[i]f there is a conflict or inconsistency between statutes and regulations promulgated by an agency, the language of the statutes shall prevail."  Response at 7 (citing Jones v. Employment Servs. Div. of Human Servs. Dep't, 1980-NMSC-120, ¶ 3, 95 N.M. 97, 619 P.2d 542, 544).  The regulations here are inconsistent with § 60-2E-16(H), so the statute governs the effect on the vendors' licenses. This principle also negates the Plaintiffs' argument that bingo and raffle licensees, which are subject to a regulation with almost identical language, require variances to continue operating after their licenses expire.  See Reply at 9.  Compare N.M. Admin. Code § 15.4.3.16 ("Any licensee that fails to renew its license as required by the act and this rule shall cease the games of chance authorized by the license on the date the license expires."), with N.M. Admin. Code § 15.1.13.11 ("Any licensee that fails to renew its license as required by the act and this rule shall cease the gaming activity authorized by the license on the date the license expires.").

Although the regulations governing bingo and raffle licenses are very similar to

the regulations applicable here, there is no conflicting statute governing bingo and raffle licenses. The rough equivalent of § 60-2E-16(H) for bingo and raffle licenses does not address whether licenses remain valid upon the submission of a renewal application. See N.M. Stat. Ann. § 60-2F-12.

Second, the Gaming Board has established a "pattern of practice" of allowing licenses to remain in effect between the time that a licensee files for a renewal and the time that it approves the renewal. Reply at 8. Defendant Jeffrey Landers has submitted a declaration describing his review of the Gaming Board's licensing records. See Declaration of Jeffrey S. Landers ¶ 3, at 2 (taken December 7, 2015), filed December 7, 2015 (Doc. 62-2)("Landers Declaration"). Landers states that the Gaming Board has "approved a renewal application after the nominal expiration date of an existing license" on approximately thirty occasions between 2003 and 2015. Landers Declaration ¶ 3, at 2. Landers adds that "all" of the licensees "were permitted to continue operating during the period between the expiration date of the existing license and the approval of the renewal application." Landers Declaration ¶ 3, at 2. The Gaming Board also represented during the hearing that this practice "isn't something that the board has done just recently and only in the case of the manufacturers who are doing business with the pueblo. This is something that the board has done as Mr. Landers stated in his declaration over 30 times since 2003." Tr. at 37:14-19 (Bohnhoff). The Plaintiffs' argument that they cannot rely on the Gaming Board's past practice as a defense to an enforcement action is unconvincing. See Reply at 11 ("The Certain Defendants want this Court to believe that . . . a [Gaming Board] track record of defying the applicable statute and its own regulations will be a successful defense[.]"). As discussed above, § 60-2E-16(H) is inconsistent with the regulations that the Gaming Board would use to support an enforcement action. Given this conflict, the statute would govern the dispute, and its language -- that "a license, certification or permit shall continue in effect upon proper payment of the initial and renewal fees" -- would not support an enforcement action here. N.M. Stat. Ann. § 60-2E-16(H).

Moreover, it is likely that any enforcement action -- whether grounded in statutes or regulations, or not -- would be seen as a threat and a violation of Judge Brack's PI. The important thing is that the Gaming Board's practice and representations send a signal to the vendors that it is not going to do anything while Judge Brack's PI is in place. After all, preserving the status quo is the aim of injunctive relief, and at the present time, the vendors are not threatened and do not appear to feel threatened.

2016 U.S. Dist. LEXIS 72413, at *38-41. The Court concluded that:

The Gaming Board must proceed with caution. Although it can defer applications under Judge Brack's PI, its actions may become threats if the vendors start pulling their business from Pojoaque Pueblo. It is true that the situation does not have to get to that point before there is a violation, but right at the moment, the vendors -- who are smart,

savvy business people -- understand what is going on in New Mexico. These gaming vendors are a salty bunch, and not easily scared off from doing business. Moreover, the State of New Mexico has little economic self-interest in ruining the business of all vendors by eventually penalizing them down the road, so the threat, if any, appears not to exist now or in the future. Judge Brack's PI has, for the time being, achieved what he wanted -- maintaining the status quo until the case is over. Until a vendor appears and states that the situation is no longer working, the Court does not think it prudent to take the prophylactic action of contempt that the Plaintiffs suggest.

2016 U.S. Dist. LEXIS 72413, at *45-46.

The Parties have since filed a litany of motions. Since all of the pleadings present overlapping arguments, the Court will discuss only a few of the pleadings that highlight the parties' primary arguments. The Court will discuss the remaining pleadings where relevant in the analysis.

1.     **The Motion to Dismiss Count IV on the Basis of Qualified Immunity.**

On December 4, 2015, the Individual Defendants moved to dismiss Count IV of the Complaint on the basis of qualified immunity. See Qualified Immunity Motion at 1. Count IV seeks money damages for actions that the Individual Defendants allegedly took in their personal capacities under color of state law in violation of 42 U.S.C. §§ 183 and 1985. See Complaint ¶¶ 143-151, at 35-37. The Complaint alleges that the "Individual Defendants knew or should have known that actions purporting to assert jurisdiction of the State over conduct occurring on Pueblo Indian lands wrongfully deprives Plaintiff Talachy and the individual members of their federal right to engage in conduct free from the jurisdiction of the State."[9] Complaint ¶ 145, at 36. The

_____

[9]The Individual Defendants' allegedly wrongful actions, discussed supra, include: (i) requesting information from Pojaque Pueblo regarding its Class III gaming vendors; (ii) stating to the press that Mr. Martinez' decision to withhold enforcement action against Pojaoque Pueblo for conducting Class III gaming without a compact "provides no protection to banks, credit card vendors, gaming machine vendors, bondholders, and others that are now doing business with an illegal gaming enterprise"; (iii) holding a closed meeting and then announcing that Pojoaque Pueblo "is acting illegally in its continued operation of its Class III gaming activities" and "plac[ing] in abeyance approval of any license application or renewal for the Pueblo's vendors"

Plaintiffs submitted a response on December 18, 2015. See Plaintiffs Pueblo of Pojoaque and Joseph M. Talachy's Opposition to Defendants' Susana Martinez, Jeremiah Ritchie, Jeffrey S. Landers, Salvatore Maniaci, Paulette Becker, Robert M. Doughty III, and Carl E. Londene Motion to Dismiss Count IV on the Basis of Qualified Immunity, filed December 18, 2015 (Doc. 66)("Qualified Immunity Motion Response"). The Individual Defendants replied on January 8, 2016. See Individual Defendants' Reply in Support of Their Motion to Dismiss Count IV on the Basis of Qualified Immunity, filed January 8, 2016 (Doc. 79)("Qualified Immunity Motion Reply"). The Court will discuss these pleadings in turn.

### a.      The Qualified Immunity Motion.

The Individual Defendants make two principal arguments in support of their Qualified Immunity Motion. First, they contend that they did not violate any federal constitutional or statutory right by regulating non-Indian, state-licensed gaming manufacturer vendors pursuant to New Mexico's police power. See Qualified Immunity Motion at 8. Second, they argue that, at a minimum, the Plaintiffs have failed to prove that there is a clearly established right under federal law that the Individual Defendants' actions violated. See Qualified Immunity Motion at 18. The Individual Defendants also advance an ancillary argument that Martinez and Ritchie are entitled to dismissal of Count IV on the basis that the Gaming Board, not Martinez or Ritchie, took the actions of which the Pojoaque Pueblo complain. See Qualified Immunity Motion at 21.

---

when "[n]o other applications were placed in abeyance"; and (iv) announcing the Gaming Board's intention to "deny license applications, including renewals of those gaming entities doing business with the State of New Mexico if such entity continues to do business with the Pueblo." Complaint ¶¶ 65-81, at 20-24. The Complaint asserts that these actions "establish a policy, custom and/or practice of wrongfully asserting State jurisdiction over gaming activities on the Pueblo's Indian lands." Complaint ¶ 148, at 36.

i.    **The Individual Defendants' Alleged Violation of Plaintiffs' Federal Rights.**

The Individual Defendants open by contending that the Supremacy Clause, upon which the Plaintiffs ground their claims of violation of a federal right, see Complaint ¶ 8, at 4, is "not a source of any federal rights."  Qualified Immunity Motion at 8 (quoting <u>Golden State Transit Corp. v. Los Angeles</u>, 493 U.S. 103, 107 (1989)(internal quotation marks and citation omitted)). Rather, the Supremacy Clause "secures federal rights by according them priority whenever they come into conflict with state law."  Qualified Immunity Motion at 8 (citations and internal quotation marks omitted).  Thus, according to the Individual Defendants, they have not violated a federal right on that basis, as one does not exist.  <u>See</u> Qualified Immunity Motion at 8.

In any event, the Individual Defendants assert that their actions were "properly taken in connection with the State's legitimate regulation of non-tribal New Mexico gaming activities in the exercise of its police power."  Qualified Immunity Motion at 9 (citation omitted).  <u>See also</u> <u>id</u>. ("[T]he police power of a state 'extends to all matters affecting the public health or the public morals.'")(quoting <u>Stone v. Mississippi</u>, 101 U.S. 814, 818 (1880)).  The Individual Defendants explain that New Mexico law permits gaming in New Mexico only "if conducted in compliance with and pursuant to [New Mexico's Gaming Control Act, N.M.S.A. §§ 60-2E-1 to 60-2E-62] or another State or federal law that expressly permits the activity . . . ."  Qualified Immunity Motion at 9 (citing N.M.S.A. § 60-2E-4)(internal quotation marks omitted).  The Individual Defendants assert that, under the Gaming Control Act, the Gaming Board must license New Mexico gaming vendors.  Qualified Immunity Motion at 10 (citing N.M.S.A. § 60-2E-13).  The Individual Defendants note that the Act subjects licensees to "broad disclosure requirements and to a detailed investigation by the [Gaming Board] . . . ."  Qualified Immunity Motion at 10 (citing N.M.S.A. §§ 60-2E, -14(E), -16(C), -18 to -25).  The Individual Defendants further contend that

a license is a revocable privilege that may be forfeited.  See Qualified Immunity Motion at 10 (citing N.M.S.A. § 60-2E-2(B)).

The Individual Defendants note that, under regulations the Gaming Board promulgated pursuant to the Act, vendor licensees must comply with all "laws and regulations governing the operations of a gaming establishment," and must not "further[], or profit[] from any illegal activity or practice."  Qualified Immunity Motion at 10 (quoting N.M.A.C. § 15.1.10.9(f)).  The Individual Defendants contend that Gaming Board regulations specifically prohibit licensees from "sell[ing] or transfer[ing] a gaming device to any person that could not lawfully own or operate the gaming device."  Qualified Immunity Motion at 10 (quoting N.M.A.C. § 15.1.16.8(B)).  The Individual Defendants also note that it is "unlawful for a manufacturer or distributor to ship a gaming device 'to any destination where possession of gaming devices is illegal.'"  Qualified Immunity Motion at 10 (citing N.M.A.C. § 15.1.16.12(B)).  If the Gaming Board's executive director determines that a licensee has violated one of these regulations or a Gaming Control Act provision, the Gaming Board is empowered to issue an administrative citation.  See Qualified Immunity Motion at 10 (citing  N.M.S.A. § 60-2E-10(D)(3)).

Against this regulatory backdrop, the Individual Defendants assert that the Gaming Board's actions with respect to vendor licensees doing business with Pojoaque Pueblo were a valid exercise of New Mexico's police power.  See Qualified Immunity Motion at 11.  The Gaming Board, they argue, merely acted to "ensure that gaming activities in New Mexico are conducted in accordance with the law . . . ."  Qualified Immunity Motion at 11 (citation omitted). The Individual Defendants contend that, indeed, the Gaming Board was statutorily obligated to act as it did.  See Qualified Immunity Motion at 9 (noting that the Gaming Control Act commands the Gaming Board to "strictly regulate[ gaming activities] to ensure honest and

competitive gaming that is free from criminal and corruptive elements and influences")(quoting N.M.S.A. § 60-2E-2(A)).

Turning to federal law, the Individual Defendants argue that IGRA "neither preempts the State's proper exercise of its police powers nor applies to the actions taken by the Individual Defendants." Qualified Immunity Motion at 11. The Individual Defendants frame the issue by noting the "strong presumption against federal preemption of state law . . . ." Qualified Immunity Motion at 11 (citing Maryland v. Louisiana, 451 U.S. 725, 746 (1981)). See id. at 11-12 (noting that the presumption is especially strong where, as here, "the state law . . . is aimed at promoting the public welfare, safety, and morals")(citation omitted). With that presumption in mind, the Individual Defendants proceed to discuss preemption law at length, moving from a discussion of general preemption principals to specific applications in the Indian law context. See Qualified Immunity Motion at 12-18.

The Individual Defendants first note that preemption occurs only where Congressional intent is "clear and manifest." Qualified Immunity Motion at 12 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, at 230 (1947)). In the present case, they argue, Congress has not clearly manifested its intent to preempt the Individual Defendants' actions. See Qualified Immunity Motion at 12. First, the Individual Defendants contend that "[n]o federal law explicitly preempts the State's authority to regulate gaming within its jurisdiction." Qualified Immunity Motion at 12. Second, they argue that "[f]ederal law does not conflict with the State's regulatory authority over non-Indian licensees conducting gaming within the State and outside tribal lands." Qualified Immunity Motion at 12. And third, they argue that "IGRA cannot be read to occupy the field because IGRA does not apply outside of Indian Country." Qualified Immunity Motion at 12.

Indeed, the Individual Defendants stress, "[e]verything -- literally everything -- in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, and nowhere else."  Qualified Immunity Motion at 12 (quoting Michigan v. Bay Mills Indian Cmty., 134 S. Ct. 2024, 2034 (2014)).  The Individual Defendants argue that it follows that IGRA does not preempt actions taken to enforce New Mexico's gaming laws outside of Indian lands.  See Qualified Immunity Motion at 13 (citation omitted).  The Individual Defendants rely heavily on the Supreme Court of New Mexico's opinion in Srader v. Verant, 1998-NMSC-025, 964 P.2d 82, for this important distinction.  See Qualified Immunity Motion at 13-14.  There, the Supreme Court of New Mexico considered whether New Mexico officials could "enforce New Mexico's anti-gambling laws by [] prevent[ing] the flow of gambling money between financial institutions, gamblers, and tribal casinos operating without a compact."  Qualified Immunity Motion at 13 (citing Srader v. Verant, 1998-NMSC-025, ¶ 86, 964 P.2d at 86).  The Individual Defendants argue that the Court held that IGRA preempted New Mexico from enforcing its anti-gambling laws on tribal lands.  See Qualified Immunity Motion at 13 (citing Srader v. Verant, 1998-NMSC-025, ¶ 88, 964 P.2d at 88).  The Individual Defendants contend, however, that the Supreme Court of New Mexico held that, absent a compact, "it was the responsibility of the government [] to determine if New Mexico's existing gaming or other laws were being violated outside of the reservation."  Qualified Immunity Motion at 13 (quoting Srader v. Verant, 1998-NMSC-025, ¶ 16, 964 P.2d at 88).

The Individual Defendants' position -- both in this motion and throughout their pleadings -- hinges on the distinction that the Supreme Court of New Mexico made in Srader v. Verant. The Individual Defendants stress that they have not taken any direct regulatory action towards Pojoaque Pueblo "nor have they asserted their authority on Pueblo lands."  Qualified Immunity

Motion at 14.  They argue that the Gaming Board has not regulated Pojoaque Pueblo at all -- it has regulated only non-Indian, state-licensed vendors.  Qualified Immunity Motion at 14.  As to Pojoaque Pueblo, the Gaming Board has, consistent with <u>Srader v. Verant</u>, merely acted on its obligation to "enforce State law against licensees conducting business with illegal gaming enterprises, including illegal enterprises operating on tribal land."  Qualified Immunity Motion at 14.

The Individual Defendants further contend that it is immaterial whether the Gaming Board's regulatory actions have indirect impacts on Pojoaque Pueblo's gaming operations.  <u>See</u> Qualified Immunity Motion at 14.  The Individual Defendants discuss a number of cases where the Supreme Court of the United States of America and the Tenth Circuit upheld "off-Indian country seizure of cigarettes pursuant to state law despite the effect of these seizures on the tribe."  Qualified Immunity Motion at 14-16 (citation omitted).  In fact, they note, the Supreme Court has held that, when "state interests outside the reservation are implicated, States may regulate the activities even of tribe members on tribal land." Qualified Immunity Motion at 15-16 (quoting <u>Nevada v. Hicks</u>, 533 U.S. 353, 362 (2001)).  In the Individual Defendants' view, significant state interests are implicated here; however, according to the Individual Defendants "the State has limited its regulatory reach to non-tribal members acting outside of tribal lands." Qualified Immunity Motion at 16.

In light of the above arguments, the Individual Defendants contend that the Plaintiffs' allegation that the Gaming Board acted beyond the scope of its authority in determining that Pojoaque Pueblo is operating its gaming operations illegally in the absence of a Class III compact, <u>see</u> Complaint ¶ 7, at 1, is "obviously incorrect."  Qualified Immunity Motion at 16.  In short,

> [i]f the State properly may take action against the licenses of non-Indian manufacturers in connection with their dealings with off-reservation non-Indian gaming operators, it follows that it may make determinations about the illegality of the Pueblo's and thus the Vendors' conduct in accordance with [N.M. Stat. Ann. § 60-2E-4] and [N.M. Admin. Code § 15.1.10.9(f)].

Qualified Immunity Motion at 16. The Individual Defendants concede that the United States has "exclusive jurisdiction over criminal prosecutions of violations of State gambling laws . . . ." Qualified Immunity Motion at 16 (quoting 18 U.S.C. § 1166(d)). The Individual Defendants argue, however, that New Mexico has not "criminally prosecut[ed] anyone, let alone the Pueblo." Qualified Immunity Motion at 16. Certainly, they assert, New Mexico is empowered to "decide whether the Pueblo's gaming operations are lawful -- something the State must do in order to enforce its own law . . . ." Qualified Immunity Motion at 16-17.

The Individual Defendants conclude this line of argumentation by positing that, even if the Gaming Board's issuance of citations to the vendors was just an indirect attempt to regulate Pojoaque Pueblo's gaming operations, as Judge Brack argued in his preliminary injunction opinion, the "Supreme Court [has] recognized . . . that a state is within its rights to assert 'leverage' to enforce its laws against an Indian tribe that is conducting illegal gaming." Qualified Immunity Motion at 17 (quoting Michigan v. Bay Mills Indian Cmty., 134 S. Ct. at 2035). In Michigan v. Bay Mills Indian Cmty. -- upon which the Individual Defendants rely heavily in all of their pleadings -- the Supreme Court explained that, although federal law may preempt a state from acting directly against a tribe that is gaming illegally, "the state's ability to assert its authority indirectly by enforcing its law on its own lands remains 'capacious.'" Qualified Immunity Motion at 17 (quoting Michigan v. Bay Mills Indian Cmty., 134 S. C. at 2034).

**Whether the Allegedly Violated Federal Right was Clearly Established.**

Turning to the other inquiry of qualified immunity analysis, the Individual Defendants argue that the "Plaintiffs cannot show that there is a clearly established right under federal law that they allege the Individual Defendants violated." Qualified Immunity Motion at 18. For this inquiry, they reason, the Plaintiffs "'must show legal authority which makes it apparent that in the light of pre-existing law a reasonable official . . . would have known that' the specific conduct at issue violated Plaintiffs' constitutional rights." Qualified Immunity Motion at 19 (quoting <u>Green v. Post</u>, 574 F.3d 1294, 1300 (10th Cir. 2009)). The Individual Defendants contend that the Plaintiffs, however, "have no authority to support the proposition that the alleged illegality of [the Individual Defendants'] actions is clearly established." Qualified Immunity Motion at 20.

In the Complaint, the Plaintiffs assert that the "Individual Defendants knew or should have known that actions purporting to assert jurisdiction of the State over conduct occurring on Pueblo Indian lands wrongfully deprives Plaintiff Talachy and the individual members of the Pueblo of their federal right to engage in conduct free from the Jurisdiction of the State." Complaint ¶ 145, at 36. The Individual Defendants note that the Plaintiffs do not support this allegation by "cit[ing any] case holding, or even suggesting, that a tribe or its officials have a right enforceable in an action under Section 1983 or 1985 to be free from state jurisdiction in these circumstances." Qualified Immunity Motion at 20. Moreover, they argue that no authority supports the proposition that, "even if the state laws being enforced by the Defendants were preempted -- which they are not -- application of state law to third-party vendors (not to Plaintiffs) would violate any right held by Plaintiffs." Qualified Immunity Motion at 20.

In short, the Individual Defendants argue that it is not clearly established that the Gaming

Board's "actions taken against non-Pueblo entities with regard to their ability to contract with non-Pueblo gaming operations are barred by any federal law, much less that they rise to the level of a right protectable under Section 1983." Qualified Immunity Motion at 20. Thus, they contend that, even assuming "the Individual Defendants wrongfully interfered with the Pueblo's tribal sovereignty, [they] are nevertheless entitled to qualified immunity because the right allegedly being violated by the Individual Defendants is not supported by clearly established law." Qualified Immunity Motion at 21.

### iii.  <u>Count IV as to Martinez and Ritchie</u>.

The Individual Defendants conclude by arguing that Martinez and Ritchie are entitled to dismissal of Count IV for the additional reason that "the actions of which Plaintiffs complain are not actions taken by either Governor Martinez or Ritchie." Qualified Immunity Motion at 21. The Individual Defendants note that the Tenth Circuit "requires a plaintiff to demonstrate that the defendant before the court is responsible for the constitutional deprivation at issue." Qualified Immunity Motion at 21 (citations omitted). However, all but one of the "allegations that the Plaintiffs complain of in their Complaint and subsequent pleadings are allegations of wrongdoing by [the Gaming Board] . . . ." Qualified Immunity Motion at 22. According to the individual Defendants, the only wrongdoing attributed to Martinez is her June 30, 2015, statement that the U.S. Attorney's Letter "provides no protection to banks, credit card vendors, gaming machine vendors, advertisers, bondholders, and others that are now doing business with an illegal gambling enterprise." Qualified Immunity Motion at 22 (quoting Complaint ¶ 68, at 21). The only allegation against Ritchie is a derivative claim that he "made or caused to be made" similar "official pronouncements." Qualified Immunity Motion at 22 (quoting Complaint ¶ 72, at 22).

These allegations, the Individual Defendants contend, do not establish that Martinez or

Ritchie "personally participated in the alleged constitutional violations, or acquiesced in the alleged wrongdoing." Qualified Immunity Motion at 22 (citation omitted). The Individual Defendants cite a recent case decided by the United States District Court for the District of Arizona involving letters written by the Arizona Governor and Attorney General to the Arizona Department of Gaming "reciting their views regarding the illegality of the [Tohono O'odham Nation's gaming] actions." Qualified Immunity Motion at 22 (citing Tohono O'odham Nation v. Ducey, 2015 U.S. Dist. LEXIS 124979, at *15-18 (D. Ariz. 2015)(Campbell, J.). There, the court held that the letters "influenced the [Arizona Department of Gaming's] decision to deny the tribe's gaming certification . . . ." Qualified Immunity Motion at 22. Yet the officials' "indirect involvement was insufficient to subject [them] to individual liability under Ex parte Young[, 209 U.S. 123 (1908),] because neither the governor nor the attorney general took 'actual enforcement action' against the tribe." Qualified Immunity Motion at 22-23 (quoting Tohono O'odham Nation v. Ducey, 2015 U.S. Dist. LEXIS 124979, at *16-18).

The Individual Defendants ask the Court to apply the same standard here. See Qualified Immunity Motion at 23. In their view, Martinez and Ritchie took no "actual enforcement action" against Pojoaque Pueblo. See Qualified Immunity Motion at 23 (citation omitted). The Individual Defendants contend that there is certainly "no clearly established authority that would have alerted Governor Martinez and Ritchie that any warning to the Vendors of potential enforcement action against them would violate the Pueblo's federal rights." Qualified Immunity Motion at 23. Thus, the Individual Defendants argue that Martinez and Ritchie are entitled to qualified immunity for this additional reason. See Qualified Immunity Motion at 23.

**b.** **The Plaintiffs' Response.**

Plaintiffs Pojoaque Pueblo and Talachy raise three primary arguments in opposition to

the Individual Defendants' motion to dismiss Count IV on the basis of qualified immunity. First, they contend that Pojoaque Pueblo's federal right to be free from New Mexico's jurisdiction over its gaming operations is clearly established, and that the Individual Defendants knew or should have known that their actions violated those rights. See Qualified Immunity Motion Response at 4. Second, they argue that the Complaint's allegations against Martinez and Ritchie are sufficient to keep both Defendants in the case and subject to further discovery. See Qualified Immunity Motion at 7. Finally, they argue that because this litigation will proceed on the merits regardless of the Court's disposition as to the qualified immunity defense, the policies underlying that defense are immaterial to this action. See Qualified Immunity Motion at 11.

### i. Clarity of the Law Regarding State Jurisdiction Over Tribal Gaming.

The Plaintiffs begin by characterizing the Qualified Immunity Motion as "a poorly veiled attempt to re-litigate . . . the preliminary injunction motion, which was granted in Plaintiffs' favor after full briefing and a hearing." Qualified Immunity Motion Response at 5. Further, the Plaintiffs contend they are "not required to defeat the qualified immunity defense on the merits at this juncture in the litigation." Qualified Immunity Motion Response at 6. Rather, according to the Plaintiffs "[t]he Pueblo merely needs to demonstrate that it has presented a plausible claim that a clearly-established federal right has been violated by the [Individual Defendants], and that it would be 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Qualified Immunity Motion Response at 6. See id. at 4-5 (noting that the Court previously denied a motion to dismiss on qualified immunity grounds because the complaint alleged a "plausible" cause of action even though "there was not a precise appellate court case on point")(citing Hunt v. Central Cosol. School District, 951 F. Supp. 2d 1136, 1233-34)(2013)(Browning, J.). The Plaintiffs argue that the very fact that Judge Brack granted the

Plaintiffs a preliminary injunction, based on a finding of a substantial likelihood that the Plaintiffs would prevail on the merits, illustrates a plausible claim that defeats this motion. See Qualified Immunity Motion Response at 5.

The Plaintiffs rely heavily on Judge Brack's MOO, arguing that that Judge Brack found that a clearly-established federal right was violated by the Individual Defendants and that his reasoning "compels denial of [the] Motion to Dismiss." Qualified Immunity Motion Response at 6. Specifically, the Plaintiffs cite to Judge Brack's admonition that the Individual Defendants' actions are "'based, quite clearly, on Defendants' own determination that the post-June 30, 2015 Class III gaming at the Pueblo is illegal -- a determination that the Defendants, just as clearly, are without jurisdiction or authority to make.'" Qualified Immunity Motion Response at 6 (quoting Judge Brack's MOO at *28)(citations omitted). The Plaintiffs also portray Judge Brack's MOO as concluding that the Individual Defendants "'know' that they have stepped over the line in their attempt to assert state jurisdiction over the Pueblo's gaming." Qualified Immunity Motion Response at 6. They note that Judge Brack found that the "Defendants' harassment and threatening conduct directed at the vendors is a thinly disguised attempt to accomplish indirectly that which the defendants know they are without authority or jurisdiction to accomplish directly." Qualified Immunity Motion Response at 6 (quoting Judge Brack's MOO at *29)(emphasis added).

Thus, the Plaintiffs argue that the reasoning in Judge Brack's MOO defeats both prongs of qualified immunity analysis -- that the Individual Defendants violated a federal right and that they knowingly violated that right. See Qualified Immunity Motion Response at 6. As a result, according to the Plaintiffs, the Qualified Immunity Motion "falls far short of establishing 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

entitle him to relief.'"   Qualified Immunity Motion Response at 7 (quoting <u>Petersen v. Jensen</u>, 371 F.3d 1199, 1201 (10th Cir. 2004))(reciting the standard of review for a motion to dismiss).

**ii.**      <u>**The Allegations Against Defendants Martinez and Ritchie**</u>.

The Plaintiffs next argue that the Complaint's allegations against Martinez and Ritchie "are sufficient, on their own, to survive the Motion to Dismiss."   Qualified Immunity Motion Response at 7.   The Plaintiffs argue that Martinez' and Ritchie's statements to the public -- statements which the Individual Defendants do not dispute they made -- constitute "threats to licensees doing business with the Pueblo, and are part of the State's unlawful attempt to assert jurisdiction over the Pueblo's gaming activities."   Qualified Immunity Motion Response at 7-8. The Plaintiffs again refer to Judge Brack's MOO, which "expressly identified the press statements . . . as part of the actions that caused him to conclude that 'Plaintiffs have established that the Individual Defendants are attempting to enforce state gaming regulations on the Pueblo's Indian lands in the absence of a tribal-state compact.'"   Qualified Immunity Motion Response at 8 (quoting Judge Brack's MOO at *22).   It is immaterial, the Plaintiffs argue, whether the Gaming Board members "engaged in more frequent and concrete examples of threatening behavior . . . ."   Qualified Immunity Motion Response at 8.

In fact, the Plaintiffs contend that the Individual Defendants have refused to provide key information that is likely to further substantiate the Complaint's allegations against Martinez and Ritchie.   <u>See</u> Qualified Immunity Motion Response at 8.   Specifically, the Plaintiffs argue that certain correspondence between the Governor's Office and the Gaming Board "will likely reveal additional manifestations of misconduct" by Martinez and/or Ritchie, or "provide evidence of a conspiracy between officials in the Governor's Office and the [Gaming Board]."   Qualified Immunity Motion Response at 8.   The Plaintiffs note that their requests for this correspondence

have been pending since September, 2015, yet the Individual Defendants have made only excuses and delayed production. See Qualified Immunity Motion Response at 9-10. In light of these circumstances, the Plaintiffs appeal to the Court to delay consideration of the Qualified Immunity Motion to allow an opportunity for the Plaintiffs to discover facts material to the qualified immunity issue. See Qualified Immunity Motion Response at 9-10 (citation omitted).

Finally, the Plaintiffs argue that the facts in Tohono O'odham Nation v. Ducey – which the Individual Defendants cite as analogous to this case's facts -- are "critically distinguishable." Qualified Immunity Motion Response at 10. There, the Arizona Governor and Attorney General wrote letters to the Arizona Department of Gaming regarding enforcement action against vendors dealing with the Tohono O'odham Nation. See Qualified Immunity Motion Response at 10 (citing Tohono O'odham Nation v. Ducey, 2015 U.S. Dist. LEXIS 124979, at *5). Yet here, Martinez and Ritchie made public threats and "intended to assert jurisdiction over the Pueblo's gaming activities . . . ." Qualified Immunity Motion Response at 10. The Plaintiffs view this factual difference as an important distinction warranting keeping Martinez and Ritchie in the case.

### iii. Qualified Immunity and Claims for Prospective Equitable Relief.

The Plaintiffs devote a sizeable portion of their Response to arguing that that "qualified immunity is not available as a defense to claims seeking prospective equitable relief." See Qualified Immunity Motion Response at 11-13. The Plaintiffs cite numerous cases with holdings to that effect. See Qualified Immunity Motion Response at 11-13. The Plaintiffs further note that none of the cases relied on which the Individual Defendants rely were "brought in the context of defeating a claim for prospective equitable relief;" thus, the Plaintiffs contend, those cases have no relevance to Counts II and III of the Plaintiffs' Complaint, which seek prospective

equitable relief.  <u>See</u> Qualified Immunity Motion Response at 13.

The point of this line of analysis, it seems, is that the Court should deny the Qualified Immunity Motion, because the litigation will still proceed against the Individual Defendants regardless whether Count IV stands.  <u>See</u> Qualified Immunity Motion Response at 11. Consequently, according to the Plaintiffs, the Individual Defendants will still be "subject to the same burdens of litigation, including discovery . . . ."  Qualified Immunity Motion Response at 11.  The Plaintiffs contend that such discovery, particularly with respect to Counts II and III, will involve the development of matters that are necessary to the Individual Defendants' qualified immunity defense.  <u>See</u> Qualified Immunity Motion Response at 13.  Thus, the Plaintiffs argue that the Court should "decline . . . to definitively rule on this issue in the context of a motion to dismiss."  <u>See</u> Qualified Immunity Motion Response at 13 (citations omitted).

c.      **<u>The Individual Defendants' Reply</u>.**

The Individual Defendants' Reply first addresses the Plaintiffs' argument that the Court should deny the Qualified Immunity Motion because it is too early in the litigation to consider this defense.  <u>See</u> Qualified Immunity Motion Reply at 2.  The Individual Defendants note that the Tenth Circuit, and the Court's precedent counsels that the Court should resolve qualified immunity "at the earliest possible stage in litigation."  Qualified Immunity Motion Reply at 2 (quoting <u>Albright v. Rodriguez</u>, 51 F.3d 1531, 1534 (10th Cir. 1995)).  <u>See id</u>. (noting that the Court has stressed that, "to avoid unnecessary exposure to burdensome discovery, the preferred practice is for the government officials to move to dismiss the action based on qualified immunity before discovery is ordered")(quoting <u>Saenz v. Lovington Mui. Sch. Dist.</u>, 2015 U.S. Dist. LEXIS 55175, *11 (D.N.M. 2015)(Browning, J.)).  The Individual Defendants also note that the Supreme Court, the Tenth Circuit, and the Court and have all held that "qualified

immunity properly can be granted in the context of a motion to dismiss." Qualified Immunity Motion Reply at 2 (citations omitted).

Turning to the qualified immunity analysis' merits, the Individual Defendants argue that the Plaintiffs wholly fail to address the Individual Defendants' central thesis: that qualified immunity is warranted, because New Mexico can "enforce its gaming laws and regulations against non-Indian gaming manufacturers in connection with their dealings with non-Indian gaming operators off tribal lands without violating the Pueblo's clearly established federal rights." Qualified Immunity Motion Reply at 4. Rather, the Plaintiffs contend that they must simply show that they have "presented a plausible claim that a clearly-established federal right has been violated . . . ." Qualified Immunity Motion Reply at 4. This, the Individual Defendants argue, confuses the factual pleading standard under <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), with the two-part legal theory required for a qualified immunity defense. <u>See</u> Qualified Immunity Motion Reply at 4. The Individual Defendants note that Tenth Circuit precedent requires more than mere allegations that a defendant has violated a clearly established legal right; rather, the "'plaintiff must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited.'" Qualified Immunity Motion Reply at 4 (quoting <u>Hannula v. Lakewood</u>, 907 F.2d 129, 131 (10th Cir. 1990)). Thus, a "plausible" violation of a clearly established federal right is insufficient; the Plaintiffs must illustrate a specific connection between the actions of which they complained complained and the allegedly violated federal right. <u>See</u> Qualified Immunity Motion Reply at 5.

The Individual Defendants next argue that the Plaintiffs' appeal to Judge Brack's analysis in the preliminary injunction as "conclusive on this issue" is improper. Qualified Immunity

Motion Reply at 5. The PI Motion, they note, "did not address the issue of whether the Individual Defendants' actions violated Plaintiffs' federal rights (as opposed to more generally violating federal law), or whether those rights were clearly established." Qualified Immunity Motion Reply at 5. Judge Brack's findings based on the PI Motion are therefore inapposite. See Qualified Immunity Motion Reply at 5.

In any event, the Individual Defendants argue that the conclusions in Judge Brack's MOO are simply not binding on the Court in considering the Qualified Immunity Motion. See Qualified Immunity Motion Reply at 6. The Individual Defendants note that the Supreme Court has stated that "'the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at the trial on the merits.'" Qualified Immunity Motion Reply at 6 (quoting Navajo Health Found. v. Burwell, 100 F. Supp. 3d 1122, 1126 (D.N.M. 2015)(Browning, J.)(quoting Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009)(quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)). Further, the Tenth Circuit has held that a preliminary injunction ruling is not applicable to a court's disposition of a motion to dismiss or motion for summary judgment. See Qualified Immunity Motion Reply at 6 (citing Chanute v. Williams Natural Gas Co., 955 F.2d 641, 649 (10th Cir. 2009) overruled on other grounds by Systemcare, In. v. Wang Labs. Corp., 117 F.3d 1137 (10th Cir. 1997); Berrigan v. Sigler, 499 F.2d 514, 518 (D.C. Cir. 1974); Am Ass'n of Disabilities v. Herrera, 690 F. Supp. 2d 1183, 1211 (D.N.M. 2010)(Browning, J.)). This is because of the "'limited purpose' of a preliminary injunction 'and given the haste that is often necessary' to effectuate the purpose of a preliminary injunction, which is 'customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.'" Qualified Immunity Motion Reply at 6-7 (quoting Univ. of Tex. v. Camenisch, 451 U.S. at 395).

Importantly here,

> [t]he Individual Defendants did not have adequate opportunity to brief, and Judge Brack therefore did not have the benefit of their analysis of, the complicated and core questions of whether the Individual Defendants' exercise of the State's police power was preempted by IGRA, or whether IGRA even reaches actions taken off-reservation.

Qualified Immunity Motion Reply at 7. Consequently, according to the Individual Defendants, Judge Brack simply "accepted as correct Plaintiffs' contention that IGRA applied to and preempted the Individual Defendants' ability to act against non-Indians off tribal lands." Qualified Immunity Motion Reply at 7-8. Additionally, according to the Individual Defendants, "the issue of whether there was a violation of a clearly established federal right (as opposed to a more general violation of federal law) was not addressed at all in connection with the preliminary injunction." Qualified Immunity Motion Reply at 8.

Notwithstanding the above, the Individual Defendants argue that Judge Brack "made findings and conclusions regarding Plaintiffs' likelihood of success on the merits, not a decision on the merits." Qualified Immunity Motion Reply at 8. The Individual Defendants posit that the preliminary and temporary nature of the preliminary injunction order mean that it is "neither binding nor persuasive authority." Qualified Immunity Motion Reply at 8.

Moving to the violation prong of qualified immunity analysis, the Individual Defendants argue that the Plaintiffs have failed to establish that the Individual Defendants violated federal law, because no federal law preempts New Mexico's exercise of its "authority to enforce its gaming laws in the manner alleged in the Complaint." See Qualified Immunity Motion Reply at 8-9. As in the Qualified Immunity Motion, the Individual Defendants explain that: (i) there is no explicit preemption language in IGRA; (ii) federal law does not conflict with New Mexico's "regulatory authority over non-Indian licensees conducting gaming within the State and outside

tribal lands"; and (iii) "IGRA does not occupy the field because it does not apply outside of tribal lands . . . ." Qualified Immunity Motion Reply at 9. Thus, neither "IGRA nor any other federal law preempts [New Mexico's] police powers in this manner." Qualified Immunity Motion Reply at 9.

With respect to the clearly established prong, the Individual Defendants argue that the Plaintiffs still fail to establish a violation of a clearly established right. See Qualified Immunity Motion Reply at 9. The Plaintiffs, they contend, "have not and cannot identify in IGRA or any other federal statute an 'unambiguously conferred right' that supports their Section 1983/1985 claim." Qualified Immunity Motion Reply at 9. Indeed, according to the Individual Defendants, the Plaintiffs fail to "identify a single 'Supreme Court or Tenth Circuit decision on point, or [show that] the clearly established weight of authority from other courts [] have found the law to be as the [P]laintiffs maintain[].'" Qualified Immunity Motion Reply at 10 (quoting Green v. Post, 574 F.3d 1294, 1300 (10th Cir. 2009)). Instead, the Plaintiffs simply allege that the Individual Defendants are "wrongfully asserting State jurisdiction over gaming activities on the Pueblo's Indian lands." Qualified Immunity Motion Reply at 10 (quoting Complaint ¶ 148, at 36). The Individual Defendants argue that this cursory allegation provides "no authority that, even if the state laws being enforced . . . were preempted -- which they are not -- application of state law to third-party vendors (not to Plaintiffs) would violate any clearly established federal right held by Plaintiffs." Qualified Immunity Motion Reply at 10. Consequently, according to the Individual Defendants, "Count IV fails to state a claim upon which relief can be granted." Qualified Immunity Motion Reply at 9.

Finally, the Individual Defendants advance the argument that Martinez and Ritchie are entitled to dismissal, because "they are alleged to have done nothing but make statements about

the potential legal consequences faced by non-Indian vendors continuing to do business with the Pueblo's illegal gaming operation after the expiration of the compact."  Qualified Immunity Motion Reply at 10.  The Individual Defendants argue that the Plaintiffs' attempt to distinguish Tohono O'odham Nation v. Ducey on the basis that the statements in that case were made privately, not publicly, is immaterial.  See Qualified Immunity Motion Reply at 11.  The important issue, they argue, is "the fact that the officials in Tohono (and Governor Martinez and Ritchie here), 'have not written directly to the Nation or otherwise directly threatened enforcement of the law against the nation.'"  Qualified Immunity Motion Reply at 11 (quoting Tohono O'odham Nation v. Ducey, 2015 U.S. Dist. LEXIS 124979, at *18).  Moreover, the Individual Defendants argue that the Court has previously rejected the Plaintiffs' request for additional discovery to potentially uncover additional evidence of wrongdoing on Martinez and Ritchie's part.  See Qualified Immunity Motion Reply at 11 (citing Saenz v. Lovington Mun. Sch. Dist., 2015 U.S. Dist. LEXIS 55175 (D.N.M. 2015)(Browning, J.)).  There, the Court explained, in the context of a motion to dismiss, "'the Court will consider all factual allegations as true. Additional discovery would not assist Saenz in responding to the MTD, because the Court would not consider additional discovery.'"  Qualified Immunity Motion Reply at 11-12 (quoting Saenz v. Lovington Mun. Sch. Dist., 2015 U.S. Dist. LEXIS 55175, at *25-26).  Thus, the Individual Defendants contend that the Court should deny the Plaintiffs' request for additional discovery, and dismiss Count IV as against Martinez and Ritchie.  See Qualified Immunity Motion Reply at 12.

      **2.**      **The Motion for Stay of Discovery Pending Qualified Immunity Rulings.**

Contemporaneously with their Qualified Immunity Motion, the Individual Defendants moved the Court on December 4, 2015, for a "stay of discovery pending a ruling on their motion

to dismiss." Motion to Stay Discovery at 1. The Plaintiffs submitted a response on December 18, 2015. <u>See</u> Plaintiffs Pueblo of Pojoaque and Joseph M. Talachy's Opposition to Defendants' Susana Martinez, Jeremiah Ritchie, Jeffrey S. Landers, Salvatore Maniaci, Paulette Becker, Robert M. Doughty III, and Carl E. Londene Motion to Stay Discovery Pending Qualified Immunity Rulings at 1, filed December 18, 2015 (Doc. 67)("Motion to Stay Discovery Response"). The Individual Defendants replied on January 8, 2016. <u>See</u> Defendants Susana Martinez, Jeremiah Ritchie, Jeffrey S. Landers, Salvatore Maniaci, Paulette Becker, Robert M. Doughty III, and Carl E. Londene's Reply in Support of Their Motion For Stay of Discovery Pending Qualified Immunity Rulings at 1, filed December 8, 2016 (Doc. 81)(" Motion to Stay Discovery Reply"). The Court discusses these pleadings in turn.

### a. **The Motion To Stay Discovery.**

The Individual Defendants argue that a stay of discovery is warranted in light of the policies underlying the qualified immunity defense. <u>See</u> Motion to Stay Discovery at 2. The defense, they argue, is "'meant to give government officials a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery.'" Motion to Stay Discovery at 2 (quoting <u>Behrens v. Pelletier</u>, 516 U.S. 299, 208 (1996)). The Individual Defendants note that "'the Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" Motion to Stay Discovery at 2 (quoting <u>Albright v. Rodriguez</u>, 51 F.3d 1531, 1534 (10th Cir. 1995)). Thus, they argue that once a qualified immunity defense has been raised, "'discovery should not be allowed.'" Motion to Stay Discovery at 2 (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818-19 (1982)). Given these principles, the Individual Defendants argue that a stay of discovery is appropriate in this case. <u>See</u> Motion to Stay Discovery at 2.

b.      **The Plaintiffs' Response.**

The Plaintiffs argue that the policy rationale underlying the principle that qualified immunity issues should be resolved at the "earliest possible stage in litigation," see Motion to Stay Discovery at 2 (citation omitted), do not apply to the present litigation.  See Motion to Stay Discovery Response at 2.  Specifically, the Plaintiffs argue the policy urging early resolution of qualified immunity issues is "grounded on the notion that an immune official should not be forced to endure the burdens of the litigation."  Motion to Stay Discovery Response at 2 (citing Anderson v. Creighton, 483 U.S. 635, 646 n.6 (1987)).  Yet here, the Plaintiffs note, "that justification is inapplicable [] because the Defendant Officials will remain in, and be burdened by this litigation regardless of whether Count IV is dismissed."  Motion to Stay Discovery Response at 3.  See id. (Distinguishing the cases cited by the Individual Defendants because none involve "additional claims for prospective equitable relief").

Finally, the Plaintiffs argue that the ultimate resolution of the Qualified Immunity Motion will require additional discovery.  See Motion to Stay Discovery Response at 3.  The Plaintiffs note that the Supreme Court in Anderson v. Creighton observed that "the discovery of facts material to the issue of qualified immunity may be necessary before a court's consideration of a qualified immunity defense may be resolved."  Motion to Stay Discovery Response at 4 (citing 483 U.S. at 646 n.6).  As a result, the Plaintiffs argue that the issue of qualified immunity should not be resolved this early in the litigation.  See Motion to Stay Discovery Response at 4.

c.      **The Individual Defendants' Reply.**

The Individual Defendants first emphasize that qualified immunity defenses should be resolved at the "'earliest possible stage in the litigation.'"  Motion to Stay Discovery Reply at 2. The Individual Defendants argue that this is true even where, as here, there are multiple claims,

not all of which can be disposed of on qualified immunity grounds.  See Motion to Stay Discovery Reply at 2.  The Individual Defendants cite Saenz v. Lovington Muni. Sch. Dist., 2015 U.S. Dist. LEXIS 55175 (D.N.M. 2015)(Browning, J.), where the Court granted a stay on qualified immunity grounds despite the fact that the complaint alleged multiple claims outside the scope of that defense.  See Motion to Stay Discovery Reply at 2.  Thus, the Individual Defendants argue that the policy rationale for staying discovery in this context is "particularly applicable to the Individual Defendants."  Motion to Stay Discovery Reply at 3 (citing Harlow v. Fitzgerald, 457 U.S. at 817).

The Individual Defendants also contend that the Plaintiffs' argument that additional discovery should be permitted to bolster their claims has previously been considered an rejected by the Court.  See Motion to Stay Discovery Reply at 3.  The Individual Defendants cite the Court's decision in Saenz v. Lovington Muni. Sch. Dist., which explained that "the Court will consider all factual allegations as true. Additional discovery would not assist Saenz in responding . . . because the Court would not consider additional discovery."  Motion to Stay Discovery Reply at 3 (quoting 2015 U.S. Dist. LEXIS 55175, at *25-26).  The Individual Defendants stress the Court's pronouncement in that case that, "'[o]nce the qualified immunity defense has been raised, the Court must not let a plaintiff use discovery as a fishing expedition to flesh out the merits of his claim.'"  Motion to Stay Discovery Reply at 3-4 (quoting Saenz v. Lovington Muni. Sch. Dist., 2015 U.S. Dist. LEXIS 55175, at *26).  Considering this analysis, the Individual Defendants argue that the "Plaintiffs have no legitimate reason to conduct discovery on the Individual Defendants' qualified immunity defense."  Motion to Stay Discovery Reply at 4.

### 3.    The Motion to Dismiss Count II of the Complaint.

On December 22, 2015, the Individual Defendants moved to dismiss Count II of the Complaint.  See Motion to Dismiss Count II at 1.  Count II, brought by Talachy in his "personal capacity and on behalf of the enrolled members of the Pueblo," alleges that the Individual Defendants violated the Plaintiffs' "right, based on the Supremacy Clause, to engage in activity on the Pueblo's Indian lands in a manner that is free from state interference." Complaint ¶ 133, at 34.  Talachy seeks a declaratory relief and an injunction barring the "Individual Defendants from taking any action on licenses issued by the [Gaming Board] based on the licensed entity conducting business with the Pueblo" and "from taking any official action, or refraining to take any official action that is based upon the legal status of gaming activity occurring on the Pueblo's Indian lands."  Complaint ¶¶ D-K.  The Plaintiffs submitted a response on January 25, 2016.  See Response in Opposition to State Defendants' Motion to Dismiss Count II of the Plaintiffs [sic] Complaint at 1, filed January 25, 2016 (Doc. 86)("Motion to Dismiss Count II Response").  The Individual Defendants replied on February 23, 2016.  See Defendants' Reply in Support of Their Motion to Dismiss Count II of Plaintiffs' Complaint, filed February 23, 2016 (Doc. 97)("Motion to Dismiss Count II Reply").  The Court will discuss these pleadings briefly, as the arguments made therein are largely duplicative of the parties' earlier filings.

### a.    The Motion to Dismiss Count II.

The Defendants make four arguments in support of their Motion to Dismiss Count II. First, the Individual Defendants note that the Supremacy Clause, upon which Count II is explicitly based, is "'not a source of any federal rights'; it 'secures federal rights by according them priority whenever they come in conflict with state law.'"  Motion to Dismiss Count II at 6 (quoting Golden State Transit Corp v. Los Angeles, 493 U.S. 103, 107 (1989)).  Accordingly, the

Individual Defendants contend that, "because the Supremacy Clause does not support a private right of action, Count II fails to state a claim as a matter of law and should be dismissed." Motion to Dismiss Count II at 6.

Second, the Individual Defendants argue that Count II fails to allege facts that would support a claim that the Individual Defendants violated the Plaintiffs' federal rights, since "no federal law prevents the State of New Mexico from exercising its authority to enforce its gaming laws in the manner alleged in Plaintiffs' Complaint." Motion to Dismiss Count II at 7. The Individual Defendants largely replicate the arguments in their Qualified Immunity Motion, discussed supra, about the exercise of New Mexico's police powers, the lack of federal preemption of those powers, and the immateriality of the indirect impacts of the Gaming Board's regulations' on Pojoaque Pueblo's gaming operations. See Motion to Dismiss Count II at 7-11.

Third, the Individual Defendants contend that Talachy is an improper plaintiff to bring Count II of the complaint, as he is not a "sovereign[], and therefore [has] no rights of sovereigns to engage in gaming 'free from state interference.'" Motion to Dismiss Count II at 11. The Individual Defendants assert that, in the context of a 42 U.S.C. § 1983 claim, "individual tribal officials and members have no independent ownership interest in the [Pueblo's gaming operations]; they are tribal officers and members attempting to obtain immunity from state laws based upon the sovereign status of the tribe." Motion to Dismiss Count II at 11-12 (citing Winnebago Tribe v. Kline, 297 F. Supp. 2d 1291, 1298 (D. Kan. 2004)(internal quotation marks omitted)). Thus, they argue, Talachy, as an individual tribal official, has no "no independent rights, derived from the Pueblo's claimed sovereignty rights, that he may vindicate on behalf of himself, other tribal members, or the Pueblo itself." Motion to Dismiss Count II at 12 (citation omitted).

Finally, the Individual Defendants argue that Martinez and Ritchie are entitled to dismissal for additional reason that "the actions of which Plaintiffs complain are not actions taken by either Governor Martinez or Ritchie." Motion to Dismiss Count II at 12. The Individual Defendants largely repeat the arguments in their Qualified Immunity Motion, discussed supra.

### b. The Plaintiffs' Response.

The Plaintiffs open by disputing the Individual Defendants' contention that Count II fails to state a cause of action because the Supremacy Clause is not a source of rights. See Motion to Dismiss Count II Response at 2. The Plaintiffs concede that the Supremacy Clause does not create a private right of action, but counter that the "Supreme Court has recently affirmed and recognized the existence of the cause of action set forth in Count II in Armstrong v. Exceptional Child Ctr., Inc.[, 135 S. Ct. 1378 (2015)]." Motion to Dismiss Count II Response at 2. The Plaintiffs note that there, the Supreme Court held that "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." 135 S. Ct. at 1384 (citing Ex parte Young, 209 U.S. at 155-156). The Plaintiffs argue that the Court should apply this analysis to find that Count II presents a cognizable claim brought pursuant to the Court's equitable power. See Motion to Dismiss Count II Response at 4.

The Plaintiffs' remaining arguments are largely duplicative of their earlier filings. First, the Plaintiffs argue that the Individual Defendants' actions are preempted by federal law. See Motion to Dismiss Count II Response at 5. The Plaintiffs refer to and incorporate the preemption arguments in their Motion to Reconsider Response, discussed supra. Next, the Plaintiffs contend that Talachy has standing to bring Count II. The Plaintiffs refer to and incorporate the standing arguments in their Motion to Dismiss Counts III and IV Response,

discussed <u>supra</u>. Finally, the Plaintiffs argue that "the allegations against Governor Martinez and Mr. Ritchie are sufficient, on their own, to survive the Motion to Dismiss." Motion to Dismiss Count II Response at 8. The Plaintiffs replicate the same arguments in their Qualified Immunity Motion Response, discussed <u>supra</u>.

        c.       **The Individual Defendants' Reply.**

Beginning with the Supremacy Clause issue, the Individual Defendants argue that the Plaintiffs' contention that Count II states a cognizable claim pursuant to the Court's equitable power is inaccurate. <u>See</u> Motion to Dismiss Count II Reply at 2. Instead, they argue, Count II is "explicitly 'based on the Supremacy Clause,'" not on the Court's equitable power. Motion to Dismiss Count II Reply at 2 (quoting Complaint ¶ 133, at 34).

With respect to the preemption issue, the Individual Defendants refer to and incorporate their lengthier analysis in their Qualified Immunity Motion and Motion to Reconsider Reply, discussed <u>supra</u>. The Individual Defendants add that "'Tribes do not have supersovereign authority to interfere with another jurisdiction's right to enforce laws within its borders.'" Motion to Dismiss Count II Reply at 3 (quoting <u>Muscogee (Creek) Nation v. Pruitt</u>, 699 F.3d 1159, 1182 n.11 (10th Cir. 2012)).

The Individual Defendants argue next that Talachy has no standing to bring Count II. Motion to Dismiss Count II Reply at 3. The Individual Defendants refer to and incorporate the arguments made in their Motion to Dismiss Counts III and IV Reply, discussed <u>supra</u>.

Finally, with respect to the allegations against Martinez and Ritchie, the Individual Defendants extend the argument that both individuals are entitled to dismissal, as there is an "absence of fairly direct connection" between their actions and the Gaming Board's actions. <u>See</u> Motion to Dismiss Count II Reply at 4 (citation and internal quotation marks omitted). The

Individual Defendants' arguments largely resemble the arguments in their Qualified Immunity Motion Reply, discussed supra.

### 4. The Motion to Dismiss Count V of the Complaint.

On December 22, 2015, the Defendants moved to dismiss Count V of the Complaint. See Motion to Dismiss Count V at 1. Count V seeks unspecified relief against New Mexico and all of the Individual Defendants based on the Individual Defendants' alleged tortious interference with existing contract relations as "recognized by the courts of the State of New Mexico." Complaint ¶ 153. The Plaintiffs submitted a response on January 25, 2016. See Response to State Defendants' Motion to Dismiss Count V of Plaintiffs [sic] Complaint at 1, filed January 25, 2016 (Doc. 89)("Motion to Dismiss Count V Response"). The Defendants replied on February 23, 2016. See Defendants' Reply in Support of their Motion to Dismiss Count V of Plaintiffs' Complaint at 1, filed February 23, 2016 (Doc. 95)("Motion to Dismiss Count V Reply"). The Court discusses these pleadings in turn.

### a. The Motion to Dismiss Count V.

The Defendants make two main arguments in support of their Motion to Dismiss Count V. First, the Defendants argue that New Mexico is "immune from suit in federal court pursuant to the Eleventh Amendment to the United States Constitution." Motion to Dismiss Count V at 1. The Defendants note that New Mexico has not waived its Eleventh Amendment immunity in this case. See Motion to Dismiss Count V at 3.

Second, the Defendants argue that, pursuant to the New Mexico Tort Claims Act, N.M.S.A §§ 41-4-1 to -30 ("the NMTCA"), New Mexico and its employees are "immune from liability under state tort liability." Motion to Dismiss Count V at 1. The Defendants note that, under the NMTCA, "[a] governmental entity and any public employee while acting within the

scope of duty are granted immunity from liability for any tort except as waived by the New Mexico Religious Freedom Restoration Act and by Sections 41-4-5 through 41-4-12 N.M.S.A. 1978." Motion to Dismiss Count V at 1 (quoting N.M.S.A §§ 41-4-4). In turn, the Defendants note that "scope of dut[ies]" as used in the NMTCA encompasses "any duties that a public employee is requested, required or authorized to perform by the governmental entity, regardless of the time or place of performance." Motion to Dismiss Count V at 2 (quoting N.M.S.A §§ 41-4-3(G)). The Defendants argue that the Complaint's allegations concern "actions taken by the Individual Defendants within the scope of their duties, as that term is used in the NMTCA." Motion to Dismiss Count V at 2. Thus, the Defendants argue that the Defendants are not liable under Count V, as "intentional tort liability, including liability for tortious interference with contract, is not waived by the NMTCA." Motion to Dismiss Count V at 2 (citing El Dorado Utils., Inc. v. Eldorado Area Water and Sanitation Dist., 2005-NMCA-036, ¶¶ 24-25). Accordingly, the Defendants argue that Count V should be dismissed, as the Defendants have not waived their immunity under the NMTCA. See Motion to Dismiss Count V at 3.

      **b.**      **The Plaintiffs' Response.**

In response to the Defendants' Motion to Dismiss Count V, the Plaintiffs agree to the dismissal of Count V "by reason of the State's assertion of Eleventh Amendment immunity." Motion to Dismiss Count V Response at 2. The Plaintiffs "concur[] with the Defendants that under these circumstances, this Court lacks jurisdiction to hear Count V." Motion to Dismiss Count V Response at 2.

      **c.**      **The Defendants' Reply.**

The Defendants' reply simply reiterates that "it is uncontested that Count V of the Complaint should be dismissed." Motion to Dismiss Count V Reply at 1.

## LAW REGARDING A DISTRICT COURT'S JURISDICTION WHILE MATTERS ARE ON APPEAL

A district court does not have jurisdiction over issues involved in matters pending appellate review. See Lancaster v. Indep. School Dist. No. 5, 149 F.3d at 1237; McKissick v. Yuen, 618 F.3d 1177, 1196 (10th Cir. 2010). See also 20 James Wm. Moore, Moore's Federal Practice § 303.32(2)(a), at 303-74 (3d ed. 2012)(explaining that a district court "cannot alter the status of a case as it rests before a circuit court" on appeal). Conversely, the district court retains jurisdiction over collateral matters, those being matters not involved in the appeal. See Garcia v. Burlington N.R. Co., 818 F.2d at 721; Avendano v. Smith, 2011 U.S. Dist. LEXIS 126945, at *4 (citing McKissick v. Yuen, 618 F.3d at 1196). The Court has ruled that certain matters are definitively collateral, including the decision to award attorneys' fees, and correcting a clerical error in an order or judgment. See Avendano v. Smith, 2011 U.S. Dist. LEXIS 126945, at *4; Guidance Endontics, LLC v. Dentsply Intern., Inc., 2011 U.S. Dist. LEXIS 37491, at *3.

A matter is collateral if it involves different claims against different parties than those claims and parties in a matter pending appellate review. See Int'l Paper Co. v. Whitson, 595 F.2d 559, 561-62 (10th Cir. 1979)). In Int'l Paper Co. v. Whitson, a defendant asserted that the district court did not have jurisdiction to enter judgment against one defendant's cross-claims while the district court's judgment as to the cross-claimant in the same case was on appeal. See 595 F.2d at 561-62. The Tenth Circuit cited the "general rule [that] . . . filing of a notice of appeal divests the trial court of jurisdiction . . . with respect to any matters involved in the appeal" in explaining that the cross-claims were collateral, because they involved different parties and different claims than those on appeal. Int'l Paper Co. v. Whitson, 595 F.2d at 561-62. Thus, cross-claims were "not involved in the appeal by [the plaintiffs]" and were within the district court's jurisdiction. 595 F.2d at 562.

In the same respect, a motion for a preliminary injunction which involves the same issues as those in a matter pending appeal is not a collateral matter and is beyond the district court's jurisdiction. See Int'l Bus. Mach. Corp. v. Johnson, 355 F.App'x. 454 (2d Cir. 2009). The United States Court of Appeals for the Second Circuit has addressed this issue with particularity. See Int'l Bus. Mach. Corp. v. Johnson, 355 F.App'x. at 454. In Int'l Bus. Mach. Corp. v. Johnson, the Second Circuit ruled on a district court's jurisdiction over a second motion for a preliminary injunction, while the moving party's appeal from the district court's prior denial of the same motion was pending review. See 355 F.App'x. at 455-56. Because the second motion presented the same issues and arose from the same facts as those in the motion on appeal, the Second Circuit found that the appeal divested the district court of its jurisdiction. See Int'l Bus. Mach. Corp. v. Johnson, 355 F.App'x. at 455-56 ("An interlocutory appeal from the denial of preliminary injunctive relief divests the court . . . of jurisdiction with regard to questions raised and decided upon the interlocutory order appealed from."). The Second Circuit explained: "[T]he relevant issues were on appeal before [the Second Circuit], [thus,] the district court was correct in not allowing a second preliminary injunction motion that would have re-argued those issues before the district court as well." Int'l Bus. Mach. Corp. v. Johnson, 355 F.App'x. at 455-56. A district court, therefore, has no jurisdiction over a motion for a preliminary injunction which requests the same relief and involves the same issues as a matter awaiting appellate review. See Int'l Bus. Mach. Corp. v. Johnson, 355 F.App'x. at 455-56.

In the Tenth Circuit, one district court has also found that its jurisdiction was divested over a preliminary injunction which involved issues pending appeal. In Mountain Solutions, Inc. v. State Corp. Comm'n of State of Kan., 982 F. Supp 812 (D. Kan. 1997)(Van Bebber, J.), the plaintiffs had requested preliminary and permanent injunctive relief in district court. See 982

F.Supp. at 816. After the district court denied the plaintiffs' request for preliminary injunctive relief, the plaintiffs filed an interlocutory appeal of that order.  <u>See</u> <u>Mountain Solutions, Inc. v. State Corp. Comm'n of State of Kan.</u>, 982 F. Supp. at 815  Before the Tenth Circuit ruled on the plaintiffs' appeal, the defendants brought a motion for partial summary judgment, moving the court to deny the plaintiffs' request for permanent injunctive relief.  <u>See</u> <u>Mountain Solutions, Inc. v. State Corp. Comm'n of State of Kan.</u>, 982 F. Supp. at 814-15.  The relief that the plaintiffs requested in their motion for a preliminary injunction and that which the defendants' motion requested the district court to grant was identical -- the parties raised the same legal arguments and requested the same relief.  <u>See</u> <u>Mountain Solutions, Inc. v. State Corp. Comm'n of State of Kan.</u>, 982 F. Supp. at 816.  In both the plaintiffs' and defendants' motions, the facts were not in dispute; rather, the parties disagreed only upon the district court's interpretation of the applicable law.  <u>See</u> <u>Mountain Solutions, Inc. v. State Corp. Comm'n of State of Kan.</u>, 982 F. Supp. at 816.  Although the district court noted that normally it would have jurisdiction to proceed on the merits of a case notwithstanding an interlocutory appeal, and a motion for partial summary judgment would appear to go to the merits of a case, the district court nonetheless found that the plaintiffs' appeal had divested it of its jurisdiction.  <u>See</u> <u>Mountain Solutions, Inc. v. State Corp. Comm'n of State of Kan.</u>, 982 F. Supp. at 815-16.  Because the legal issues and arguments in the partial summary judgment motion were "identical to those the court addressed in denying plaintiffs a preliminary injunction," the district court ruled that it did not have jurisdiction while appellate review was pending of the plaintiff's motion.  <u>Mountain Solutions, Inc. v. State Corp. Comm'n of State of Kan.</u>, 982 F. Supp. at 816.  The district court distinguished other cases where courts had made rulings during a pending appeal on the grounds that "the merits upon which the district courts were empowered to proceed did not involve the same issues pending on

appeal." <u>Mountain Solutions, Inc. v. State Corp. Comm'n of State of Kan</u>., 982 F. Supp. at 815. Thus, where a motion presents the same legal issues as those which are on appeal, a district court has no jurisdiction over the matters on appeal until the appellate court has ruled. <u>See</u> 982 F. Supp. at 816 (citing <u>Int'l Paper Co. v. Whitson</u> 595 F.2d at 561-62.)).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." <u>Mobley v. McCormick</u>, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.). The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. <u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); <u>Smith v. United States</u>, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing <u>Moore v. Guthrie</u>, 438 F.3d 1036, 1039 (10th Cir. 2006)(McKay, J.)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678 (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis omitted). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(McConnell, J.)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions. First, a defendant can argue an affirmative defense on a motion to dismiss where the defendant asserts an immunity

defense -- the courts handle these cases differently than other motions to dismiss.  See Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009));  Robbins v. Oklahoma, 519 F.3d 1242.  Second, the defendant can raise the defense on a motion to dismiss where the facts establishing the affirmative defense are apparent on the face of the complaint.  See Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").  The defense of limitations is the affirmative defense that the complaint's uncontroverted facts is most likely to establish.  See 5 Charles Alan Wright et al., Federal Practice & Procedure: Civil § 1277, at 643 (3d ed. 2004). If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See Rohner v. Union P. R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955)(Wallace, J.);  Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945)(Phillips, J.);  Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).

The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute.  The Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(Major, J.)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, the plaintiff must plead facts establishing an exception to the affirmative defense).  It appears that, from case law in several Courts of Appeals, the plaintiff may avoid this problem altogether -- at least at the

motion-to-dismiss stage -- by refraining from pleading specific or identifiable dates.  See

Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007)(Niemeyer, J.);  Hollander v.

Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006)(Ripple, J.).  Although the Tenth Circuit has not

squarely addressed this practice, the Court has permitted this practice.  See Anderson Living

Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188 (D.N.M. 2014)(Browning, J.).

## LAW REGARDING PREEMPTION

Article VI, clause 2, of the Constitution provides that the laws of the United States "shall

be the Supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the

Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Consistent with the Supremacy Clause,

the Supreme Court of the United States has "long recognized that state laws that conflict with

federal law are 'without effect.'"  Altria Grp., Inc. v. Good, 555 U.S. 70, 75 (2008)(quoting

Maryland v. Louisiana., 451 U.S. 725, 746 (1981)).  The Supreme Court has summarized the

situations in which preemption is likely to be found:

> Pre-emption may be either expressed or implied, and is compelled whether
> Congress' command is explicitly stated in the statute's language or implicitly
> contained in its structure and purpose.  Absent explicit pre-emptive language, we
> have recognized at least two types of implied pre-emption:  field pre-emption,
> where the scheme of federal regulation is so pervasive as to make reasonable the
> inference that Congress left no room for the States to supplement it, and conflict
> pre-emption, where compliance with both federal and state regulations is a
> physical impossibility, or where state law stands as an obstacle to the
> accomplishment and execution of the full purposes and objectives of Congress.

Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. 88, 98 (1992)(citations omitted).

Preemption may be express or implied.  See Gade v. Nat'l Solid Wastes Mgmt. Assoc.,

505 U.S. at 98.  When faced with express preemption -- where a statute expressly states that it

preempts certain areas of state law -- a court must determine the scope of the preemption that

Congress intended.  See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)(stating that "the

purpose of Congress is the ultimate touch-stone in every pre-emption case").  "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose."  Altria Grp., Inc. v. Good, 555 U.S. at 77.  When the text of a preemption clause is susceptible to more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption."  Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005).  Preemption arguments are analyzed under rule 12(b)(1).  See Cedars-Sinai Med. Center v. Nat'l League of Postmasters of U.S., 497 F.3d 972, 975 (9th Cir. 2007)(applying rule 12(b)(1) when reviewing motion to dismiss asserting preemption defense).

Addressing express preemption requires a court to determine the scope of the preemption. That task entails scrutinizing the preempting words in light of two presumptions.  First,

> [i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

Medtronic, Inc. v. Lohr, 518 U.S. at 485 (citations omitted)(internal quotation marks omitted).

Second, "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case."

Medtronic, Inc. v. Lohr, 518 U.S. at 485 (citations omitted)(internal quotation marks omitted).

> Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it. Also relevant, however, is the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.

Medtronic, Inc. v. Lohr, 518 U.S. at 486 (citations omitted)(internal quotation marks omitted).

In one of its most recent express preemption decisions, see Bruesewitz v. Wyeth, LLC, 562 U.S. 223 (2011), the Supreme Court concluded that the National Childhood Vaccine Injury Act, 42 U.S.C.A. §§ 300aa-11(c)(1), 300aa-13(a)(1)(A), preempted all design-defect claims that

the plaintiffs seeking compensation brought against vaccine manufacturers for injury or death that certain vaccine side effects caused.  See 562 U.S. at 230.  The Supreme Court noted that Congress passed this act to "stabilize the vaccine market and facilitate compensation." Bruesewitz v. Wyeth, LLC, 562 U.S. at 228.  The Supreme Court pointed out that this federal statutory scheme provided for "[f]ast, informal adjudication," allowing "[c]laimants who show that a listed injury first manifested itself at the appropriate time are prima facie entitled to compensation."  Bruesewitz v. Wyeth, LLC, 562 U.S. at 228.  Additionally,

> [a] claimant may also recover for unlisted side effects, and for listed side effects that occur at times other than those specified in the Table, but for those the claimant must prove causation.  Unlike in tort suits, claimants under the Act are not required to show that the administered vaccine was defectively manufactured, labeled, or designed.

562 U.S. at 228-229 (footnote omitted).  The Supreme Court also noted that the statutory scheme had relatively favorable remedy provisions.  See 562 U.S. at 229.  "The quid pro quo for this, designed to stabilize the vaccine market, was the provision of significant tort-liability protections for vaccine manufacturers," such as limiting the availability of punitive damages and expressly eliminating liability for a vaccine's unavoidable, adverse side effects. 562 U.S. at 229.  The statutory text at issue in Bruesewitz v. Wyeth, LLC was as follows:

> No vaccine manufacturer shall be liable in a civil action for damages arising from a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988, if the injury or death resulted from side effects that were unavoidable even though the vaccine was properly prepared and was accompanied by proper directions and warnings.

562 U.S. at 230 (quoting 42 U.S.C. § 300aa-22(b)(1)).  The Supreme Court emphasized the use of the word "unavoidable" in reaching its conclusion that the statute preempted design defect claims resulting from unavoidable side effects.  562 U.S. at 231-232.  The Supreme Court also found it persuasive that the statutory text directly mentioned other aspects of product liability

law. See 562 U.S. at 232-233.

Implied conflict preemption is found when it is impossible for a private party to comply with both state and federal requirements, see English v. General Elec. Co., 496 U.S. 72, 78-79 (1990), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67 (1941).  "Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." Hines v. Davidowitz, 312 U.S. at 67 (citing Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)).

The Supreme Court, in the past, found that implied preemption may take the form of "obstacle" preemption.  Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000) (holding that preemption is appropriate where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); Pharm. Research and Mfrs. of Am. v. Walsh, 538 U.S. 644, 679 (2003)(Thomas, J., concurring)("Obstacle pre-emption turns on whether the goals of the federal statute are frustrated by the effect of the state law.").  The Supreme Court instructed that, in obstacle preemption cases, "there is no federal pre-emption in vacuo, without a constitutional text or a federal statute to assert it." P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 503 (1988). See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98. A reviewing court must still "examine the explicit statutory language and the structure and purpose of the statute." Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990).  In 2000, the Supreme Court decided Geier v. Am. Honda Motor Co., 529 U.S. 861 (2000), which held, by a five-to-four vote, that a federal regulation which permitted, but did not require, airbags to be installed in passenger vehicles

preempted claims that a car was defective because it lacked an airbag. See 529 U.S. at 874. The majority found: "The rule of state tort law for which petitioners argue would stand as an 'obstacle' to the accomplishment of [the federal regulation's] objective. And the statute foresees the application of ordinary principles of pre-emption in cases of actual conflict. Hence, the tort action is pre-empted." 529 U.S. at 886. Justice Stevens, in his dissenting opinion, expressed a desire to eliminate obstacle preemption. He argued that the presumption against preemption

> serves as a limiting principle that prevents federal judges from running amok with our potentially boundless (and perhaps inadequately considered) doctrine of implied conflict pre-emption based on frustration of purposes -- i.e., that state law is pre-empted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Geier v. Am. Honda Motor Co., 529 U.S. at 907-08 (Stevens, J., dissenting).

The Supreme Court has now begun to back away from finding implied preemption based on an alleged conflict with the purposes underlying federal regulations. In 2003, the Supreme Court issued a unanimous decision in Sprietsma v. Mercury Marine, 537 U.S. 51 (2003), rejecting implied conflict preemption of state law claims that a boat engine was defective because it lacked a propeller guard. In 2008, in Altria Group. Inc. v. Good, the Supreme Court rejected the plaintiffs' obstacle-preemption claim that the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331-41, preempted a similar state act, Maine's Unfair Practices Act, Me. Rev. Stat. Ann., Tit. 5, § 207 (2008), because it presented an obstacle to the Federal Trade Commission's longstanding policy of encouraging consumers to rely on representations of tar and nicotine content based on an approved methodology. See 555 U.S. at 90. In 2009, in Wyeth v. Levine, 555 U.S. 555 (2009), six Justices of the Supreme Court, including Justices Breyer and Kennedy, who joined in the majority decision in Geier v. Am. Honda Motor Co., rejected the plaintiff's two implied preemption arguments -- impossibility preemption and

obstacle preemption.  See Wyeth v. Levine, 555 U.S. at 581.  The Supreme Court held that

> "it is not impossible for Wyeth to comply with its state and federal law obligations and that Levine's common-law claims do not stand as an obstacle to the accomplishment of Congress' purposes in the [Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. §§ 301, 321, 331-337, 341-350, 361-364, and 381-399; 21 C.F.R. § 201.80(e)]").

Wyeth v. Levine, 555 U.S. at 581.  In so ruling, Justice Stevens, writing for the majority, narrowly limited Geier v. Am. Honda Motor Co. to its facts, finding that the decision in that case was based on the "complex and extensive" history of the substantive regulation at issue.  555 U.S. at 566.  The Supreme Court rejected obstacle preemption, stating: "If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history."  555 U.S. at 609.  Justice Stevens quoted Justice O'Connor's explanation in Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141 (1989): "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them."  Wyeth v. Levine, 555 U.S. at 575 (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. at 166-67).

Of particular import for the current status of implied obstacle preemption is Justice Thomas' concurring opinion in Wyeth v. Levine, in which he wrote:

> I write separately, however, because I cannot join the majority's implicit endorsement of far-reaching implied pre-emption doctrines. In particular, I have become increasingly skeptical of this Court's "purposes and objectives" pre-emption jurisprudence. Under this approach, the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law. Because implied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution, I concur only in the judgment.

555 U.S. at 583 (Thomas, J., concurring in the judgment). Justice Thomas stressed his concern:

> Under the vague and potentially boundless doctrine of purposes and objectives pre-emption . . . the Court has pre-empted state law based on its interpretation of broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law . . . Congressional and agency musings, however, do not satisfy the Art. I, § 7 requirements for enactment of federal law and, therefore, do not pre-empt state law under the Supremacy Clause.

555 U.S. at 587. Justice Thomas emphasized that, when analyzing the preemptive effect of federal statutes or regulations, "[e]vidence of pre-emptive purpose must be sought in the text and structure of the provision at issue" to comply with the Constitution. 555 U.S. at 588 (citing CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993)). Justice Thomas, writing for the five-to-four majority in PLIVA, Inc. v. Mensing, 564 U.S. 604 (2011), recently concluded, however, that conflict preemption required the preemption of inconsistent state laws on generic drug labeling that conflicted with the respective federal law, because it was impossible to comply with both. See 564 U.S. at 617-618. The Supreme Court sought to reconcile Wyeth v. Levine, however, recognizing that the respective statutory schemes in each case was distinguishable. See PLIVA, Inc. v. Mensing, 564 U.S. at 626 ("It is beyond dispute that the federal statutes and regulations that apply to brand-name drug manufacturers are meaningfully different than those that apply to generic drug manufacturers.").

Moreover, the Supreme Court has put renewed emphasis on the presumption against preemption. See Wyeth v. Levine, 555 U.S. at 565 n.3. "In areas of traditional state regulation, [the Supreme Court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest." Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005)(internal quotation marks omitted). If confronted with two plausible interpretations of a statute, the court has "a duty to accept the reading that disfavors pre-

emption." <u>Bates v. Dow Agrosciences, LLC</u>, 544 U.S. at 449. <u>See</u> <u>Wyeth v. Levine</u>, 555 U.S. at 565; <u>Cipollone v. Liggett Grp., Inc.</u>, 505 U.S. 504, 518 (1992)(plurality opinion).

In <u>Arizona v. United States</u>, 132 S. Ct. 2492 (2012), the Supreme Court once again emphasized the importance of clear Congressional intent when applying obstacle preemption. The Supreme Court struck down provisions of an Arizona immigration law that would penalize aliens who sought, or engaged in, unauthorized employment, because it "would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens." 132 S. Ct. at 2505. With Justice Kagan taking no part in the consideration or decision of the case, writing for a five-to-three majority, which included Chief Justice Roberts and Justices Ginsburg, Breyer, and Sotomayor, Justice Kennedy wrote: "The correct instruction to draw from the text, structure, and history of [the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1101] is that Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment." 132 S. Ct. at 2505. The Supreme Court ruled that Congressional intent was clear; Congress had considered and rejected penalizing aliens who sought unauthorized employment. <u>See</u> 132 S. Ct. at 2504. Federal immigration law therefore preempted the Arizona law that would have penalized aliens seeking unauthorized employment, because it would have created a penalty that Congress had clearly and intentionally omitted. <u>See</u> 132 S. Ct. at 2505.

The Tenth Circuit has recognized federal preemption of state law in three categories: (i) when a federal statute expressly preempts state law ("express preemption"); (ii) where Congress intends to occupy a field ("field preemption"); and (iii) to the extent that a state law conflicts with a federal law ("conflict preemption"). <u>Colo. Dept. of Pub. Health and Env't., Hazardous Materials and Waste Mgmt. Div. v. United States</u>, 693 F.3d 1214, 1222 (10th Cir. 2012). As the

defendant in <u>Colo. Dept. of Pub. Health and Env't., Hazardous Materials and Waste Mgmt. Div.</u> <u>v. United States</u>, the United States invoked only conflict preemption to dismiss Colorado's claims against it; the Tenth Circuit therefore did not address field preemption in this area. <u>See</u> 693 F.3d at 1222. "To avoid conflict preemption, 'it is not enough to say that the ultimate goal of both federal and state law is the same. A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal." <u>Chamber of Commerce v.</u> <u>Edmondson</u>, 594 F.3d 742, 769 (10th Cir. 2010)(quoting <u>Int'l Paper Co. v. Ouellette</u>, 479 U.S. 481, 494 (1987)(alterations, citation omitted)). In <u>Colo. Dept. of Pub. Health and Env't.,</u> <u>Hazardous Materials and Waste Mgmt. Div. v. United States</u>, the state of Colorado created a schedule for the United States to follow in the destruction of hazardous waste stored in the state, in an attempt to prohibit the storage of hazardous waste within the state. <u>See</u> 693 F.3d at 1223. The Tenth Circuit held that the state statute creating this schedule was in conflict with a statute Congress passed, mandating a deadline for the destruction of the materials. <u>See</u> 693 F.3d at 1224. The Tenth Circuit reasoned that allowing Colorado to set a deadline for the destruction of the materials would impede the flexibility Congress had intended in its deadline. <u>See</u> 693 F.3d at 1224. Because the Colorado deadline would interfere with the that method Congress had intended for the disposal of the waste, the Tenth Circuit found that the state law was in conflict with the federal law, and therefore, that the federal law preempted Colorado's schedule. <u>See</u> 693 F.3d at 1224.

## <u>LAW REGARDING 42 U.S.C. § 1983</u>

Section 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall

be liable to the party injured in an action at law, suit in equity, or other proper
proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or federal statute. See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 did create any substantive rights, but merely enforces existing constitutional and federal statutory rights . . ."). Section 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights. To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988). The Court has noted:

> [A] plaintiff must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a "person" (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Public School Dist., 716 F.Supp.2d 1052, 1063 (D.N.M. 2010)(Browning, J.)(quoting Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)). The Supreme Court has made clear, that in alleging a § 1983 action against a government agent in the agent's individual capacity, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676.

## LAW REGARDING 42 U.S.C. § 1985(3)

Claims under 42 U.S.C. § 1985 are less common than claims under § 1983.  Section 1985 pertains to the prohibition of conspiracies which interfere with civil rights.  See 42 U.S.C. § 1985.  The Supreme Court recognizes "five broad classes of conspiratorial activity" that § 1985 prohibits.  Kush v. Rutledge, 460 U.S. 719, 724 (1983).  "Three of the five broad categories . . . relate to institutions and processes of the Federal Government." Kush v. Rutledge, 460 U.S. at 724.  The fourth and fifth classes of § 1985 claims apply to conspiracies to "obstruct the course of justice in state courts" and to "go in disguise on the highway or in the premises of another." Kush v. Rutledge, 460 U.S. at 724 (internal quotation marks omitted).  Both of these latter categories require an "intent to deprive their victims of the equal protections of the laws," which means that there must be some "racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspiratorial action." Kush v. Rutledge, 460 U.S. at 724, 726 (internal quotation marks omitted). See Campbell v. Amax Coal Co., 610 F.2d 701, 702 (10th Cir. 1979)("[I]n the absence of allegations of class based or racial discriminatory animus, the complaint fails to state a claim under § 1985.").

To succeed on a § 1985 claim, a plaintiff must prove a conspiracy. See Dixon v. City of Lawton, Okla., 898 F.2d 1443, 1447 (10th Cir. 1990).  To state a valid claim for conspiracy, "a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants." Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 533 (10th Cir. 1998)(discussing conspiracy under § 1983).  "[M]ere conclusory allegations with no supporting factual averments are insufficient; the pleadings must specifically present facts tending to show agreement and concerted action." Sooner Prods. Co. v. McBride, 708 F.2d 510, 512 (10th Cir. 1983)(discussing conspiracy under § 1983).

The Tenth Circuit has held that it is error to "precondition consideration of a plaintiff's §

1985(3) claim upon the finding of § 1983 liability." Dixon v. City of Lawton, Okla., 898 F.2d at

1447 (10th Cir. 1990).

> Although neither § 1983 nor § 1985(3) create any substantive rights, a § 1983
> claim generally describes a substantive violation of a right secured by the
> Constitution or laws, whereas a § 1985(3) claim generally describes a conspiracy
> of two or more persons for the purpose of depriving of another of equal protection
> of the laws or equal privileges and immunities under the laws.

Dixon v. City of Lawton, Okla., 898 F.2d at 1447.

To state a claim under § 1985(3), a plaintiff must show: (i) a conspiracy, motivated by

racially discriminatory animus; (ii) to deprive the plaintiff of equal protection or equal

protections of the laws; (iii) an act in furtherance of the conspiracy; and (iv) an injury or

deprivation resulting therefrom. See Paris v. Sw. Bell Tel. Co., 94 F. App'x 810, 815 (10th Cir.

2004)(unpublished); Tilton v. Richardson, 6 F.3d 683, 686 (10th Cir. 1993). "Conclusory

allegations that the defendants acted in concert or conspired, without specific factual allegations

to support such assertions, are insufficient to state a claim under § 1985(3)." Martinez v.

Martinez, 2010 U.S. Dist. LEXIS 38109, 2010 WL 1608884, at *12 (citing Merritt v. Hawk, 153

F. Supp. 2d 1216, 1225 (D. Colo. 2001)).

The Tenth Circuit has stated that § 1985(3) was intended "to provide redress for victims

of conspiracies impelled by a commingling of racial and political motives." Brown v. Reardon,

770 F.2d 896, 907 (10th Cir. 1985). "[I]n the absence of allegations of class based or racial

discriminatory animus, the complaint fails to state a claim under § 1985." Campbell v. Amax

Coal Co., 610 F.2d at 702. The Tenth Circuit has consistently dismissed § 1985(3) claims

devoid of racial, discriminatory animus. For example, in Paris v. Sw. Bell Tel. Co., the Tenth

Circuit held that the plaintiff's hostile-work-environment claim failed, because she did not show

racial discriminatory animus on the part of the alleged conspirators. See 94 F. App'x at 815.

In Martinez v. Martinez, the plaintiff alleged that M. Martinez, her ex-husband, Lynda Latta, her ex-husband's attorney, and the Honorable Elizabeth Whitefield, the judge who presided over the Martinezes' divorce in state court, conspired against her to deprive her of her rights guaranteed under the Equal Protection Clause.  See 2010 U.S. Dist. LEXIS 38109, 2010 WL 1608884, at *1, *26.  The Court noted:

The entirety of the constitutional claims appear to be these:

> 14. In the Court's Defendant 4's [i.e., Judge Whitefield's] ruling to dismiss this case against Plaintiff first of all is a violation of Federal Rule 60(b)(4) because the Court lacked jurisdiction over the subject matter and that dismissal, for lack of prosecution, which conduct was done as a state actor under color of law by [Judge Whitefield] and in conspiracy with [Ms. Latta] on behalf of [M. Martinez], to achieve these ends. [Ms. Latta] is included in this legal process, entered into knowingly and fraudulently to achieve the illegitimate end of depriving Plaintiff of her due civil rights by [Judge Whitefield's] void ruling, which rights are afforded by USC 42 §§ 1983 and 1985(3) to a fair hearing of the property as she has attempted to litigate for these last years.

> 15. [Ms. Latta and Judge Whitefield] are participants with [M. Martinez] and have conspired to keep Plaintiff at bay in obtaining her rights to this undivided property by engaging improper courts and attempts to harass and exhaust Plaintiff of her financial resources . . . .

> 17. The Fourteenth Amendment states thus: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property without due process of law . . . And further in the Fifth Amendment "the Bill of Rights protects against abuse of government -- the 'double jeopardy' clause seems to be applied here, because Plaintiff's same former case 95-2963 was voluntarily dismissed by Plaintiff without prejudice in 2003, and resurrected from the dead improperly by [M. Martinez, Ms. Latta, and Judge Whitefield] on August 28, 2007 by Motion.

> . . .

> 18. [Judge Whitefield] attempts to adjudicate a new dismissal of this same closed case by dismissing it again against Plaintiff for lack of prosecution and would attempt by doing so, to take away her right to adjudicate it elsewhere -- this would be a gross violation for Plaintiff from [Judge Whitefield] and finds into the double

jeopardy type of thinking easily -- a double dismissal, one legitimate by Plaintiff and one illegitimate (reopened by Defendants by Motion) after this dismissal, and done (the second) with intention by [M. Martinez and Ms. Latta] and especially with the power of [Judge Whitefield], to attempt to deprive Plaintiff of her due process rights of hearing and eliminating her possibility to adjudicate her claim because [Judge Whitefield's] ruling would then be the second dismissal on the basis of lack of prosecution which then adjudicates a case and it could not be brought again by this Plaintiff.

2010 U.S. Dist. LEXIS 38109, at **24-25 (alterations in original).  The Court dismissed the §

1985 claim, reasoning that the plaintiff "makes no allegation of discriminatory animus by [the

defendants]" and that "there is nothing more than a conclusory allegation of conspiracy, lacking

any underlying facts."  2010 U.S. Dist. LEXIS 38109, at *27. The Court noted that "[n]o alleged

facts touch on any individual's race, political or religious affiliation, or any other categorization

against which the Defendants might hold a discriminate animus."  2010 U.S. Dist. LEXIS 38109,

at *27.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise

their discretion and the related public interest in encouraging the vigorous exercise of official

authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects

federal and state officials from liability for discretionary functions, and from 'the unwarranted

demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City

of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28,

2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court

deems it "untenable to draw a distinction for purposes of immunity law between suits brought

against state officials under § 1983 and suits brought directly under the Constitution against

federal officials."  Butz v. Economou, 438 U.S. 478, 504 (1978).  "The qualified immunity

analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil

War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled

on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics
> Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from
> government officials who have violated her constitutional or statutory rights. But
> to ensure that fear of liability will not "unduly inhibit officials in the discharge of
> their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials
> may claim qualified immunity; so long as they have not violated a "clearly
> established" right, they are shielded from personal liability, Harlow v. Fitzgerald,
> 457 U.S. 800, 818 . . . (1982). That means a court can often avoid ruling on the
> plaintiff's claim that a particular right exists. If prior case law has not clearly
> settled the right, and so given officials fair notice of it, the court can simply
> dismiss the claim for money damages. The court need never decide whether the
> plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."

Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227

(1991)(per curiam)). "If qualified immunity is to mean anything, it must mean that public

employees who are just doing their jobs are generally immune from suit." Lewis v. Tripp, 604

F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457

U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken

beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.

Saucier v. Katz, 533 U.S. 194, 205 (2001). When a defendant asserts qualified immunity, the

plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or

statutory rights; and (ii) that the right was clearly established at the time of the alleged

misconduct. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

1.      **Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense. In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. The Supreme Court also noted that, while no longer mandatory, the protocol that Saucier v. Katz outlined -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial. See Pearson v. Callahan, 555 U.S. at 241. In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise." 555 U.S. at 237. The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted)(internal quotation marks omitted). See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily"). Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails. See Cannon v. City & Cty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-707. See Kerns v. Bader, 663 F.3d at 1181.[10] "Courts should think carefully before expending

---

[10] In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation)

question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:

Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . . The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added). The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials

were not liable for constitutional violations where they reasonably believed that their conduct was constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975). In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving . . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37). See Camreta v. Greene, 563 U.S. at 707 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").[11]  The Tenth Circuit will remand a case to the district court for

---

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 OHIO ST. J. CRIM. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[11] In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

> While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.  [563 U.S. at 707].  As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."  It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on

further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

## 2. **Clearly Established Rights in the Qualified Immunity Analysis.**

To determine whether a right was clearly established, a court must consider whether the

---

that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff.  The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012). In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 S. Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S. Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565.  The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are

sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Ashcroft v. al-Kidd, 563 U.S.  at 741.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741).  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."  Anderson v. Creighton, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  Ashcroft v. al-Kidd, 563 U.S. at 742.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference."  663 F.3d at 1188 (emphasis in original).  In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").

"[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law." Casey v. City of Fed. Heights, 509 F.3d at 1284. Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

## LAW REGARDING STAYS

A court has broad discretion in managing its docket, which includes decisions regarding issuing stays for all or part of a proceeding. See Clinton v. Jones, 520 U.S. 681, 706 (1997)(citing Landis v. N. Am. Co., 299 U.S. 248, 254 (1936)("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket.").

> [T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.

Landis v. N. Am. Co., 299 U.S. at 254-55. Recognizing that district courts must exercise moderation in issuing stays, the Supreme Court of the United States has noted that there are no strict rules for the district court to apply, because "[s]uch a formula . . . is too mechanical and narrow." Landis v. N. Am. Co., 299 U.S. at 255.

The party seeking a stay generally faces a difficult burden. See Clinton v. Jones, 520 U.S. at 708 ("The proponent of a stay bears the burden of establishing its need."); S2 Automation LLC v. Micron Technology, Inc., 2012 U.S. Dist. LEXIS 107962, at *2 (D.N.M. 2012)(Browning, J.)(citing Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d 1477, 1484 (10th Cir. 1983)). "In particular, where a movant seeks relief that would delay court proceedings by other litigants he must make a strong showing of necessity because the relief would severely affect the rights of others." Commodity Futures Trading

Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d at 1484. "The underlying principle clearly is that '[t]he right to proceed in court should not be denied except under the most extreme circumstances.'" Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d at 1484 (quoting Klein v. Adams & Peck, 436 F.2d 337, 339 (2d Cir.1971)).

The Tenth Circuit has acknowledged a district court's discretion in issuing discovery stays. In Cole v. Ruidoso Mun. Sch., 43 F.3d 1373 (10th Cir. 1994), the defendants argued "that they had an absolute right to a stay of discovery" after they filed a motion for qualified immunity, and appealed to the Tenth Circuit because the district court imposed conditions on the stay. 43 F.3d at 1386. The Tenth Circuit rebuffed the strict rules that the defendants suggested:

> As a general rule, discovery rulings are within the broad discretion of the trial court. The trial court's decision on discovery matters will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.

43 F.3d at 1386.

Whether to issue a discovery stay depends greatly on the facts and progress in each case. In S2 Automation LLC v. Micron Technology, Inc., the Court granted in part and denied in part the motion to stay discovery, extend pretrial deadlines, vacate trial setting and for protective order. See 2012 U.S. Dist. LEXIS 107962, at *1. The Court denied the motion to the extent it requested a discovery stay, because "[u]ltimately, a stay is unnecessary." S2 Automation LLC v. Micron Technology, Inc., 2012 U.S. Dist. LEXIS 107962, at *3. The parties had made "significant progress on the disputed matters," and the Court had "issued rulings on many of the motions that Micron Technology contended needed to be resolved before the case proceeded." S2 Automation LLC v. Micron Technology, Inc., 2012 U.S. Dist. LEXIS 107962, at *3. Instead of granting the discovery stay, the Court extended deadlines that it had previously set in the case

based on the case's increasing complexity.  See S2 Automation LLC v. Micron Technology, Inc., 2012 U.S. Dist. LEXIS 107962, at *3.  In Walker v. THI of N.M. at Hobbs Ctr., 2011 WL 2728326 (D.N.M. 2011)(Browning, J.), the Court evaluated whether to stay deposition discovery until thirty days after it ruled on the motions to dismiss two of the defendants, which would determine whether those defendants would remain in the suit and participate in discovery.  See 2011 WL2728326, at *1.  The plaintiffs argued that the Court had already extended discovery deadlines and that issuing a stay would require rescheduling deadlines. See Walker v. THI of N.M. at Hobbs Ctr., 2011 WL2728326, at *1.  The Court denied the motion to stay, because it did "not see a benefit to staying discovery."  Walker v. THI of N.M. at Hobbs Ctr., 2011 WL2728326, at *2.  The Court noted that counsel for the two defendants who were subject to the motions to dismiss had already indicated that they would not participate in deposition discovery. See Walker v. THI of N.M. at Hobbs Ctr., 2011 WL2728326, at *2.  "There is thus no benefit to staying deposition discovery, and staying deposition discovery would further delay the case." Walker v. THI of N.M. at Hobbs Ctr., 275 F.R.D. 332, 2011 WL2728326, at *2.

**LAW REGARDING ELEVENTH AMENDMENT IMMUNITY**

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  The Supreme Court has construed Eleventh Amendment immunity to prohibit federal courts from entertaining suits against states brought by their own citizens or citizens of another state without their consent.  See Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304 (1990).  State agencies and state officials are likewise provided immunity as "an arm of the state."  Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274, 280-81 (1977).

Exceptions to a state's Eleventh Amendment immunity are few. See, e.g., Ex parte Young, 209 U.S. 123 (Recognizing exception for suits challenging the constitutionality of a state official's actions). A state may, however, voluntarily waive its immunity. See Edelman v. Jordan, 415 U.S. 651, 673 (1974). Congress may also abrogate Eleventh Amendment immunity pursuant to Section 5 of the Fourteenth Amendment to the Constitution of the United States, where the statute explicitly manifests Congress' intent to do so. See Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976). Congress did not, however, abrogate Eleventh Amendment immunity when enacting 42 U.S.C. § 1983. See Quern v. Jordan, 440 U.S. 332, 340 (1979). Consequently, Eleventh Amendment immunity extends to defendants under that statute, and claims against the state pursuant to § 1983 in the federal courts are barred as a matter of law.

Although not properly characterized as an exception to a state's Eleventh Amendment immunity, the doctrine announced in Ex parte Young, 209 U.S. at 28, allows for suits against state officials under certain circumstances. See Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior, 160 F.3d 602, 607-08 (10th Cir. 1998)("The Ex parte Young doctrine is not actually an exception to Eleventh Amendment state immunity because it applies only when the lawsuit involves an action against state officials, not against the state."). In Ex parte Young, the Supreme Court held that the Eleventh Amendment bar generally does not apply to state officials defending suit in federal court which seeks only prospective relief from violations of federal law. Ex parte Young, 209 U.S. at 28. The Ex parte Young doctrine allows suit to proceed against defendant state officials if the following requirements are met: (i) the plaintiffs are suing state officials rather the state itself; (ii) the plaintiffs have alleged a non-frivolous violation of federal law; (iii) the plaintiffs seek prospective equitable relief rather than retroactive monetary relief from the state treasury; and (iv) the suit does not implicate special sovereignty interests. See

<u>Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior</u>, 160 F.3d at 609 (10th Cir. 1998).

## **LAW REGARDING THE NMTCA**

The New Mexico Legislature enacted the NMTCA, because it recognized "the inherent

unfair and inequitable results which occur in the strict application of the doctrine of sovereign

immunity."  N.M.S.A. § 41-4-2(A).  The New Mexico Legislature also recognized, however,

> that while a private party may readily be held liable for his torts within the chosen
> ambit of his activity, the area within which the government has the power to act
> for the public good is almost without limit, and therefore government should not
> have the duty to do everything that might be done.

N.M.S.A. § 41-4-2(A).  As a result, it is "declared to be the public policy of New Mexico that

governmental entities and public employees shall only be liable within the limitations of the Tort

Claims Act and in accordance with the principles established in that act."  N.M.S.A. § 41-4-2(A).

The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent

person's standard of care in the performance of that duty."  N.M.S.A. § 41-4-2(C).

The NMTCA is the

> exclusive remedy against a governmental entity or public employee for any tort
> for which immunity has been waived under the Tort Claims Act and no other
> claim, civil action or proceeding for damages, by reason of the same occurrence,
> may be brought against a governmental entity or against the public employee or
> his estate whose act or omission gave rise to the suit or claim.

N.M.S.A. § 41-4-17(A).  A plaintiff may not sue a New Mexico governmental entity, or its

employees or agents, unless the plaintiff's cause of action fits within one of the exceptions to

immunity that the NMTCA grants.  <u>See</u> <u>Begay v. State</u>, 1985-NMCA-117, 723 P.2d 252, 255

("Consent to be sued may not be implied, but must come within one of the exceptions to

immunity under the Tort Claims Act."), <u>rev'd on other grounds by</u> <u>Smialek v. Begay</u>, 1986-

NMSC-049, 721 P.2d 1306.  A plaintiff also may not sue a governmental entity or its employees

for a damage or damages claim arising out of violations of rights under the New Mexico

Constitution unless the NMTCA contains a waiver of immunity. See Barreras v. N.M. Corr. Dep't, 2003-NMCA-027, ¶ 24, 62 P.3d 770, 776 ("In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act."); Chavez v. City of Albuquerque, 1998-NMCA-004, ¶ 8, 952 P.2d 474 (noting that a plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against a city or its employees or agents unless the NMTCA waives immunity); Rubio v. Carlsbad Mun. Sch. Dist., 1987-NMCA-127, ¶ 13, 744 P.2d 919, 922 (holding that no waiver of immunity exists for damages arising out of alleged educational malpractice claim against a school board); Begay v. State, 1985-NMCA-117, ¶ 14, 723 P.2d 252 (finding that no waiver exists in NMTCA for damages asserted against the State of New Mexico under Article II, § 11 of the New Mexico Constitution). "Thus, if no specific waiver can be found in the NMTCA, a plaintiff's complaint [for damages] against the governmental entity or its employees must be dismissed." Salazar v. City of Albuquerque, 2013 U.S. Dist. LEXIS 128341, at *24 (D.N.M. 2013)(Browning, J.)(citing Begay v. State, 1985-NMCA-117, 723 P.2d 252).

## LAW REGARDING PRELIMINARY INJUNCTIONS.

"It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal." Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)(internal quotation marks omitted). To show that the extreme remedy of a preliminary injunction should issue, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law." N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984). Before a district court

may issue a preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure, the movant must make four showings: (i) that the movant is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to the movant if the court does not issue the preliminary injunction "outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits." Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992). See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 19 (2008)("Winter")("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." (citing Munaf v. Geren, 553 U.S. 674, 688-89 (2008))). The movant bears the burden of demonstrating all four prongs' satisfaction. See Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972).

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held . . . .'" Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)). In that vein, the Tenth Circuit has identified the following three specifically disfavored preliminary injunctions: (i) "preliminary injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning injunctions that compel, rather than prohibit, activity on the part of the enjoined party; and (iii) "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 977 (10th Cir. 2004))(internal quotation marks omitted). Accord Westar Energy, Inc. v. Lake, 552

F.3d 1215, 1224 (10th Cir. 2009)(citing <u>O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft</u>, 389 F.3d at 975). With respect to preliminary injunctions that will change the status quo, "the movant has an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued." <u>Salt Lake Tribune Publ'g Co. v. AT&T Corp.</u>, 320 F.3d 1081, 1099 (10th Cir. 2003)(quoting <u>SCFC ILC, Inc. v. Visa USA, Inc.</u>, 936 F.2d 1096, 1098-99 (10th Cir. 1991))(internal quotation marks omitted).

"[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction . . . ." <u>United States ex rel. Rahman v. Oncology Assocs.</u>, 198 F.3d 489, 495-96 (4th Cir. 1999)(citing <u>Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.</u>, 527 U.S. 308, 324-25 (1999)). <u>See</u> <u>Gelco Corp. v. Coniston Partners</u>, 811 F.2d 414, 418-20 (8th Cir. 1987)(finding that a preliminary injunction should not issue where a remedy of money damages was available). Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy. <u>See</u>, <u>e.g.</u>, <u>De Beers Consol. Mines v. United States</u>, 325 U.S. 212, 219-23 (1945); <u>Reebok Int'l, Ltd. v. Marnatech Enters., Inc.</u>, 970 F.2d 552, 559-60 (9th Cir. 1992).

## <u>LAW REGARDING MOTIONS TO RECONSIDER INTERLOCUTORY ORDERS</u>

Except where the Federal Rules of Civil Procedure specify, motions to reconsider fall into three categories:

> (i) a motion to reconsider filed within [twenty-eight] days of the entry of judgment is treated as a motion to alter or amend the judgment under rule 59(e); (ii) a motion to reconsider filed more than [twenty-eight] days after judgment is considered a motion for relief from judgment under rule 60(b); and (iii) a motion to reconsider any order that is not final is a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion. <u>See</u> <u>Price v. Philpot</u>, 420 F.3d 1158, 1167 & n.9 (10th Cir. 2005).

Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.).  See Price v. Philpot, 420 F.3d at 1167; Computerized Thermal Imaging, Inc. v. Bloomberg. L.P., 312 F.3d 1292, 1296 (10th Cir. 2002).

Considerable confusion exists among the bar regarding the proper standard for a district court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, i.e., an order that a district court issues while the case is ongoing, as distinguished from a final judgment.  This confusion originates from the fact that the Federal Rules of Civil Procedure do not mention motions to reconsider, let alone set forth a specific procedure for filing them or a standard for analyzing them.  A loose conflation in terminology in Servants of the Paraclete v. Does, which refers to rule 59(e) motions -- "motion[s] to alter or amend a judgment" -- as "motions to reconsider," compounded that baseline confusion. Fed. R. Civ. P. 59(e) (emphasis added); Servants of the Paraclete v. Does, 204 F.3d at 1005.

Final judgments are different from interlocutory orders.  See Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order from which an appeal lies.")(emphasis added).  In addition to ripening the case for appeal, see 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts . . . ."), the entry of final judgment narrows the district court's formerly plenary jurisdiction over the case in three ways.  First, for the first twenty-eight days after the entry of judgment, when the court can entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that of the Court of Appeals.  See Fed. R. App. P. 4(a)(4)(B).  Even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case.  See Fed. R. App. P. 4(a)(4)(B).  Second, after twenty-eight days, when the court may consider motions under rule 60, if a party has filed a

notice of appeal, the Court of Appeals' jurisdiction trumps the district court's, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion. Third, after twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments. First, when a case is not appealed, there is an interest in finality. The parties and the lawyers expect to go home, quit obsessing about the dispute, and put the case behind them, and the final judgment -- especially once the twenty-eight day window of robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely. Second, when a case is appealed, there is the need for a clean jurisdictional handoff from the district court to the Court of Appeals. "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decisionmaking -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case. The "touchstone document" for this jurisdictional handoff is the notice of appeal, not the final judgment, see Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." (citations omitted)); Garcia v. Burlington N.R. Co., 818 F.2d 713, 721 (10th Cir.

1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals. The district court is thus divested of jurisdiction. Any subsequent action by it is null and void." (citations omitted)); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166, 1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction.")(citations omitted), but, because the final judgment starts the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules and the Tenth Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-long period of potentially overlapping trial-and appellate-court jurisdiction that immediately follows the entry of final judgment, see Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting that post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").

Basically, rather than suddenly divesting the district court of all jurisdiction over the case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit, or even requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules set forth a jurisdiction phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days. In defining the "limited review" that rule 59(e) allows a district court to conduct in the 28-day flux period, the Tenth Circuit, in Servants of the Paraclete v. Does, incorporated traditional law-of-the-case grounds -- the same grounds that inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e). See United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998)(departing from the law of the case doctrine in three exceptionally narrow circumstances: "(1) when the

evidence in a subsequent trial is substantially different; (2) when controlling authority has

subsequently made a contrary decision of the law applicable to such issues; or (3) when the

decision was clearly erroneous and would work a manifest injustice")(citation omitted); <u>Servants</u>

<u>of the Paraclete v. Does</u>, 204 F.3d at 1012 (incorporating those grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a

district court reconsiders one of its own interlocutory orders. The Federal Rules do not

specifically mention motions to reconsider interlocutory orders, but rule 54(b) makes the

following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim,
> counterclaim, crossclaim, or third-party claim -- or when multiple parties are
> involved, the court may direct entry of a final judgment as to one or more, but
> fewer than all, claims or parties only if the court expressly determines that there is
> no just reason for delay.  Otherwise, <u>any order or other decision</u>, however
> designated, <u>that adjudicates fewer than all the claims</u> or the rights and liabilities of
> fewer than all the parties does not end the action as to any of the claims or parties
> and <u>may be revised at any time before the entry of a judgment</u> adjudicating all the
> claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphases added). Rule 54(b) thus (i) provides that a district court can

freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district

court's ability to do so, other than that it must do so "before the entry of judgment."  Fed. R. Civ.

P. 54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b)

provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders."

<u>Been v. O.K. Indus.</u>, 495 F.3d at 1225.  In the Tenth Circuit, "law of the case doctrine has <u>no</u>

bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one

judge to another."  <u>Rimbert v. Eli Lilly & Co.</u>, 647 F.3d 1247, 1252 (10th Cir. 2011)(emphasis

added)(citing <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225).   In this context, "the doctrine is

merely a 'presumption, one whose strength varies with the circumstances.'" Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir. 1995)). In short, a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order. It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors. Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'")(citation omitted). First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges. How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue. A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction, than when the prior ruling is, e.g., a short discovery ruling. The Court should also look, not to the overall thoroughness of the prior ruling, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges. A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks

the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling. See 18B Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman & Catherine T. Struve, Federal Practice & Procedure § 4478.1 (2d ed.) ("Stability becomes increasingly important as the proceeding nears final disposition . . . . Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling."). For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the motion for protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does grounds. The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court should always apply a deferential standard of review. The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling was harmless, or the party moving for reconsideration waived their right to appeal the alleged error by not raising the appropriate argument. Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard. After all, if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by "restricting its review" is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration. The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling, and should try to prevent that party from having to bear the same impositions again. Basically, even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion that produces the earlier ruling, it should analyze the motion in a different way -- one focused on reducing the litigation burdens of the party opposing reconsideration. For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an

evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing.  If the party loses and the Court denies the injunction, however, and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time the Court considered the motion.

In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production, and not of persuasion.  The Court analyzes motions to reconsider by picking up where it left off in the prior ruling -- not by starting anew.  Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling.  Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly refute both the counterarguments and evidence that the opposing party used to win the prior ruling and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider.  Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally.  The deck is stacked against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the Court to his or her way of thinking.

<u>**ANALYSIS**</u>

**I.    THE DEFENDANTS' INTERLOCUTORY APPEAL DOES NOT DIVEST THE COURT OF ALL OF ITS JURISDICTION.**

The Plaintiffs contend that the Defendants' interlocutory appeal of Judge Brack's October 29, 2015, order granting the Plaintiffs a preliminary injunction divests the Court of its jurisdiction over the matter.  <u>See</u> Motion to Stay Proceedings at 2.  The Defendants counter that the Court has jurisdiction to proceed on the merits, because interlocutory appeals of preliminary injunctions present an exception to the complete divestiture rule.  <u>See</u> Motion to Stay Proceedings Response at 3.  Because the Court's jurisdiction is a prior question to its disposition of the merits, the Court will address this issue first.

"Generally speaking, the filing of an interlocutory appeal divests the district court of jurisdiction."  <u>Anderson Living Trust v. WPX Energy Prod., LLC</u>, 308 F.R.D. 410, 436 n.15 (D.N.M. 2015)(Browning, J.).  The Tenth Circuit has explained that "[t]he filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."  <u>Stewart v. Donges</u>, 915 F.2d 572, 574 (10th Cir. 1990).  As a result, "when an interlocutory appeal is taken, the district court retains jurisdiction to proceed with matters not involved in that appeal."  <u>Garcia v. Burlington N.R. Co.</u>, 818 F.2d 713, 721 (10th Cir. 1987).  <u>See</u> <u>Stewart v. Donges</u>, 915 F.2d at 576 (explaining that "the divestiture of jurisdiction brought about by the defendant's filing of a notice of appeal is virtually complete . . .").  The court can regain jurisdiction only by taking the "affirmative step of certifying the appeal as frivolous or forfeited, and until that step is taken it simply lacks jurisdiction to proceed with the trial."  <u>Stewart v. Donges</u>, 915 F.2d at 577-578.  This requirement avoids "'confusion or waste of time resulting

from having the same issues before two courts at the same time.'"  Stewart v. Donges, 915 F.2d at 578 (quoting United States v. Salerno, 868 F.2d 524, 540 (2d Cir.)).

Because the district court retains jurisdiction over only "peripheral matters unrelated to the disputed right," application of the complete divestiture rule turns on the nature of the defense that is the subject of the appeal.  Stewart v. Donges, 915 F.2d at 576.  In Stewart v. Donges, the Tenth Circuit discussed the complete divestiture rule in the context of an appeal from a qualified immunity ruling.  See 915 F.2d at 576.  The Tenth Circuit distinguished between interlocutory appeals challenging discrete issues and those that relate to the entire action:

> In contrast to some interlocutory appeals under 28 U.S.C. § 1292(b) that challenge discrete orders that can be carved out and isolated from the remainder of the case, a motion to dismiss the entire proceeding based on a defense of double jeopardy or qualified immunity cannot be so isolated.  If the defense is valid, then no part of the action should proceed against the defendant.  In that regard, an interlocutory appeal from an order refusing to dismiss on double jeopardy or qualified immunity grounds relates to the entire action and, therefore, it divests the district court of jurisdiction to proceed with any part of the action against an appealing defendant.

915 F.2d at 576.  Applying the divestiture rule, the Tenth Circuit vacated a trial on the merits that the district court held during the pendency of an interlocutory appeal from a denial of a motion for summary judgment based on qualified immunity, reasoning that the district court "made no certification that the defendants' appeal . . . was frivolous or forfeited."  915 F.2d at 579.

These principles are well-established, yet there are exceptions to the general rule of divestiture.  See Free Speech v. Fed. Election Comm'n, 720 F.3d 788 (10th Cir. 2013).  In Free Speech v. Fed. Election Comm'n, the Tenth Circuit considered whether to affirm the district court's grant of a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure that the defendants had filed during the pendency of an appeal from a denial of a motion for a preliminary injunction.  See 720 F.3d at 791.  At the outset, the Tenth Circuit noted

that "'[o]rdinarily an interlocutory injunction appeal . . . does not defeat the power of the trial court to proceed further with the case.'" <u>Free Speech v. Fed. Election Comm'n</u>, 720 F.3d at 791 (quoting 16 C. Wright, A. Miller, E. Cooper, Federal Practice and Procedure § 3921.2 ("Wright & Miller")). The Tenth Circuit acknowledged the general rule that an interlocutory appeal normally "divests the district court of jurisdiction," but reasoned that, "in an appeal from an order granting or denying a preliminary injunction, a district court may nevertheless proceed to determine the action on the merits." <u>Free Speech v. Fed. Election Comm'n</u>, 720 F.3d at 791 (citing <u>United States v. Price</u>, 688 F.2d 204, 215 (3d Cir. 1982)(internal quotation marks omitted)). The Tenth Circuit explained that "'[t]he desirability of prompt trial-court action in injunction cases justifies trial-court consideration of issues that may be open in the court of appeals.'" <u>Free Speech v. Fed. Election Comm'n</u>, 720 F.3d at 791-92 (quoting Wright & Miller § 3921.2). The Tenth Circuit highlighted a motion to dismiss for failure to state a claim as a "good illustration" of the exception for preliminary injunction appeals:

> Although a court of appeals may determine whether a claim has been stated as part of the interlocutory appeal, a district court nonetheless retains jurisdiction to dismiss for failure to state a claim pending appeal. [] This power is desirable "both in the interest of expeditious disposition and in the face of uncertainty as to the extent to which the court of appeals will exercise its power."

<u>Free Speech v. Fed. Election Comm'n</u>, 720 F.3d at 791-92 (quoting Wright & Miller § 3921.2). Applying this exception, the district court granted the motion to dismiss while the preliminary injunction appeal was pending. <u>See</u> <u>Free Speech v. Fed. Election Comm'n</u>, 720 F.3d at 792. The Tenth Circuit affirmed, despite that the issues in the motion to dismiss were "identical" to those raised in the preliminary injunction ruling. <u>Free Speech v. Fed. Election Comm'n</u>, 720 F.3d at 792.

The Plaintiffs argue that the Tenth Circuit's analysis in Stewart v. Donges is dispositive of the Court's jurisdiction to decide the present motions on the merits. They argue that, because "no party has sought this Court's certification that Defendants' appeal is frivolous . . . this Court is divested of jurisdiction." Motion to Stay Proceedings Reply at 2. See Stewart v. Donges, 915 F.2d at 577-578 (stating that a court can regain jurisdiction only by "certifying the appeal as frivolous or forfeited"). The Plaintiffs summarily dismiss Free Speech v. Fed. Election Comm'n, arguing that the case is an "anomaly, with a peculiar procedural posture, [which] does not provide this Court with any guidance or authority to disregard the rigid rule set forth in Donges and its progeny." Motion to Stay Proceedings Reply at 3-4.

The Plaintiffs' arguments are unavailing. The Tenth Circuit's decision in Free Speech v. Fed. Election Comm'n is on point. Here, as there, the Defendants have moved to dismiss the complaint while an interlocutory appeal from Judge Brack's October 29, 2015, order granting the Plaintiffs a preliminary injunction is pending at the Tenth Circuit. See Notice of Appeal at 1. In Free Speech v. Fed. Election Comm'n, the Tenth Circuit stated that, in the context of "an appeal from an order granting or denying a preliminary injunction, a district court may [] proceed to determine the action on the merits." 720 F.3d at 791. Moreover, the Tenth Circuit specifically couched its analysis in terms of a district court "retain[ing] jurisdiction to dismiss for failure to state a claim pending appeal." Free Speech v. Fed. Election Comm'n, 720 F.3d at 791-92 (quoting Wright & Miller § 3921.2). This reasoning is applicable to the present case, where the Court has been asked to decide four motions to dismiss while an interlocutory appeal is pending.

Nonetheless, the Plaintiffs press that Stewart v. Donges remains good law, because Free Speech v. Fed. Election Comm'n "does not even address Donges, much less overrule Donges." Motion to Stay Proceedings Reply at 2. This fact may well be, but it is immaterial. In Stewart v.

<u>Donges</u>, the Tenth Circuit's analysis of divestiture was limited to interlocutory appeals from the rejection of a double jeopardy or qualified immunity defense.  <u>See</u> 915 F.2d at 576 (citation omitted).  The Tenth Circuit reasoned that such appeals divest the district court of jurisdiction, because double jeopardy and qualified immunity "relate[] to the entire action" and therefore "cannot be so isolated" from the remainder of the case.  915 F.2d at 576 (citation omitted).  By contrast, the Tenth Circuit reasoned in <u>Free Speech v. Fed. Election Comm'n</u> that "[t]he desirability of prompt trial-court action in injunction cases justifies trial-court consideration of issues that may be open in the court of appeals."  720 F.3d at 791-92 (citation and internal quotation marks omitted).  Thus, in <u>Free Speech v. Fed. Election Comm'n</u> the Tenth Circuit recognized an exception to divestiture by taking into account the unique nature of injunctions; whether <u>Stewart v. Donges</u> is good law, which it is, is irrelevant here, because the Tenth Circuit's reasoning in that case was based on entirely different considerations.  In short, both cases can be good law; <u>Stewart v. Donges</u> is simply inapplicable to the present case.  <u>See</u> <u>Colorado v. Idarado Mining Co.</u>, 916 F.2d 1486, 1490 n.2 (10th Cir. 1990)(limiting <u>Stewart v. Donges</u> to double jeopardy and qualified immunity defenses).

Given the above analysis of controlling Tenth Circuit precedent, the Court concludes that the Defendants' interlocutory appeal of Judge Brack's preliminary injunction does not divest the Court of jurisdiction to "proceed to determine the action on the merits."  <u>Free Speech v. Fed. Election Comm'n</u>, 720 F.3d at 791.  Accordingly, the Court denies the Plaintiffs' Motion to Stay Proceedings.

Having established its jurisdiction, the Court turns to the merits.

## II. THE DEFENDANTS' REGULATION OF NON-INDIAN, STATE-LICENSED GAMING MANUFACTURER VENDORS DOES NOT VIOLATE THE PLAINTIFFS' FEDERAL RIGHTS.

The central issue in this litigation is whether the Defendants violated Pojoaque Pueblo's federal rights by taking actions against non-Indian, state-licensed gaming vendors -- potentially impacting Pojoaque Pueblo's ability to do business with such vendors -- based on the Defendants' determination that the vendors violated New Mexico law by supplying equipment to or receiving proceeds from Class III gaming enterprises conducted by Pojoaque Pueblo in the absence of a gaming compact with New Mexico. The Plaintiffs' primary argument is that the Defendants' regulation of these third-party vendors amounts an "assertion of jurisdiction over conduct occurring on Pueblo Indian lands" in violation of Pojoaque Pueblo's "federal right [under IGRA] to engage in conduct free from the jurisdiction of the State." Complaint ¶ 145, at 36. In short, the Plaintiffs contend that IGRA preempts the Defendants' actions. The Plaintiffs also argue that the Defendants' alleged assertion of jurisdiction over Pojoaque Pueblo's gaming activities "constitute[s] a violation of the Supremacy Clause" as well as civil rights statutes, including 42 U.S.C. §§ 1983 and 1985. Complaint ¶ 8, at 4.

The Court's analysis proceeds as follows: First, the Court will discuss the circumstances surrounding IGRA's enactment and its relevant provisions. Second, the Court will examine IGRA's preemptive scope and consider whether IGRA preempts the Defendants' actions here. Finding that the Defendants' actions do not violate IGRA, the Court will consider whether the Plaintiffs have nonetheless stated a claim for relief for violations of the Supremacy Clause and 42 U.S.C. §§ 1983 and 1985. The Court concludes that the Plaintiffs have failed to establish a violation of Pojoaque Pueblo's federal rights under any of these provisions.

## A.    THE INDIAN GAMING REGULATORY ACT.

As sovereign entities, "Indian tribes are subordinate only to the federal government." Texas v. United States, 497 F.3d 491, 493 (5th Cir. 2007)(citing California v. Cabazon Band of Mission Indians, 480 U.S. 202, 207 (1987)).    State laws, however, "may be applied to tribal Indians on their reservations if Congress has expressly so provided."    California v. Cabazon Band of Mission Indians, 480 U.S. at 207.    Thus, "unless and until Congress acts, the tribes retain their historic sovereign authority."    Michigan v. Bay Mills Indian Cmty., 134 S. Ct. at 2030 (internal quotation marks and citation omitted).    In California v. Cabazon Band of Mission Indians, the Supreme Court held that California could not enforce its anti-gambling laws against an Indian tribe, because Congress had not expressly provided for such authority.    See 480 U.S. at 214, 221-22.    In response, Congress enacted IGRA, 25 U.S.C. §§ 2701-2721, to give state governments "a subordinate but significant role in regulating tribal gaming."    Texas v. United States, 497 F.3d at 494.

IGRA divides gaming activities into three classes.    See 25 U.S.C. § 2703(7).    Class I gaming -- "social games solely for prizes of minimal value" -- is subject to exclusive tribal jurisdiction.    25 U.S.C. §§ 2703(6), 2710(a)(1).    Class II gaming -- bingo and non-banked card games[12] -- is subject to the National Indian Gaming Commission's[13] regulatory oversight.    See 25 U.S.C. §§ 2703(7), 2706(b), 2710(a)-(c).    Class III gaming "encompasses all forms of gaming

---

[12]Non-banked card games are "games in which the participants play against only each other; the hose facility (the 'house') has no stake in the outcome."    Fla. House of Representatives v. Crist, 990 So. 2d 1035, 1039 (Fla. 2008)(citing 25 U.S.C. § 2703(7)).

[13]IGRA established the National Indian Gaming Commission as an agency within the Department of the Interior.    See 25 U.S.C. § 2704(a).    The Commission is has the authority to enforce the collection of civil fines, to investigate and audit Indian gaming, and to "promulgate such regulations and guidelines as it deems appropriate to implement the provisions" of IGRA. 25 U.S.C. §2706.

that are not Class I gaming or Class II gaming," including the casino-style gaming at issue in this litigation.  25 U.S.C. § 2703(8).

Under IGRA, Class III gaming is "lawful on Indian lands only if such activities are . . . (C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect."  25 U.S.C. § 2703(8).  Absent a gaming compact, 18 U.S.C. § 1166(a) provides that, "for purposes of Federal law, all State laws pertaining to the licensing, regulation, or prohibition of gambling . . . shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State."  In other words, any Class III gaming on tribal lands which does not comport with state law is a federal crime unless it conducted pursuant to a valid compact with the state under IGRA.  18 U.S.C. § 1166(a).  "[A] tribe cannot conduct class III gaming on its lands without a compact . . . ."  Michigan v. Bay Mills Indian Cmty., 134 S. Ct. at 2035.

However, just because IGRA provides that Class III gaming activities are lawful only if conducted pursuant to a tribal-state compact, "it does not follow that the states have any authority to regulate Class III gaming in the absence of a compact."  Wyandotte Nation v. Sebelius, 337 F. Supp. 2d 1253, 1257 (D. Kan. 2004)(Robinson, J.), vacated and remanded on other grounds, 443 F.3d 1247 (10th Cir. 2006).  Indeed, "the only enforcement provided for in [] IGRA is through the federal government" -- states are granted no authority to enforce IGRA's terms.  Wyandotte Nation v. Sebelius, 337 F. Supp. 2d at 1257.  See 18 U.S.C. § 1166(d) (vesting the United States with "exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable . . . to Indian country [by 18 U.S.C. § 1166(a)]").  Thus, as the Tenth Circuit has observed, "the very structure of [] IGRA permits assertion of state civil or criminal jurisdiction over Indian gaming only when a tribal-state compact has been

reached to regulate class III gaming." United Keetoowah Band of Cherokee Indians v. Oklahoma, 927 F.2d 1170, (10th Cir. 1991)(emphasis in original)(citation omitted).

**B.       IGRA DOES NOT PREEMPT THE DEFENDANTS' ACTIONS.**

The Plaintiffs characterize the Defendants' actions towards gaming vendors dealing with Pojoaque Pueblo after the expiration of its June 30, 2015, Class III gaming compact with New Mexico as a "wrongful[] assert[ion of] State jurisdiction over gaming activities on the Pueblo's Indian lands."  Complaint ¶ 8, at 4.  IGRA preempts these actions, the Plaintiffs argue, because IGRA has a "broad preemptive scope, especially in the context of state regulatory jurisdiction." Motion to Reconsider Injunction Response at 3.  The Defendants counter that IGRA's preemptive scope does not extend to New Mexico's exercise of its police power to regulate non-Indian vendor licensees "with respect to their dealings with non-Indian gaming operators engaged in gaming activities outside Indian lands."  Motion to Reconsider at 15.  The measure of IGRA's preemptive scope is therefore the dispositive issue.

The Court begins its analysis with the "assumption that the historic police powers of the States [are] not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress."  Medtronic, Inc. v. Lohr, 518 U.S. at 485 (citations and internal quotation marks omitted).  Indeed, the Supreme Court recently stated that, "[i]n areas of traditional state regulation, [the Court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest."  Bates v. Dow Agrosciences, LLC, 544 U.S. at 449 (internal quotation marks omitted).  Congress' intent is therefore preemption analysis' "ultimate touchstone."  Medtronic, Inc. v. Lohr, 518 U.S. at 485 (citations and internal quotation marks omitted).  Finally, the Court is mindful that, where there are two plausible

interpretations of a statute, the court has "a duty to accept the reading that disfavors pre-emption." Bates v. Dow Agrosciences, LLC, 544 U.S. at 449.

It is incontrovertible that New Mexico's regulation of gaming activities in the State is an exercise of the State's historic police powers. See Motion to Reconsider Injunction Response at 9 (noting that Pojoaque Pueblo does not dispute "the State's ability to use its police powers to regulate gaming on State lands"). "The police power of a state 'extends to all matters affecting the public health or the public morals.'" Stone v. Mississippi, 101 U.S. at 818. The states have "great latitude under their police powers to legislate as to the protection of [these matters]." Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 756 (1985). Moreover, "a State has a [] sovereign interest in being in control of, and able to apply, its laws throughout its territory." Mashantucket Pequot Tribe v. Town of Ledyard, 722 F.3d 457, 476-77 (2d Cir. 2013). See Srader v. Verant, 1998-NMSC-025, ¶ 11, 16, 964 P.2d at 87, 88 ("firmly assert[ing]" the state's "police power to regulate illegal activity within the territorial boundaries of the State"). Here, New Mexico has enacted various laws to ensure that gaming in the State is "strictly regulated to ensure honest and competitive gaming that is free from criminal and corruptive elements and influences." N.M.S.A. § 60-2E-2(A)). The Gaming Board's actions are consistent with its statutory mandate to ensure that gaming activities in New Mexico are conducted in accordance with these laws. See, e.g., N.M.S.A. § 60-2E-10(D)(3) (empowering the Gaming Board to issue administrative citations to licensees who violate the Gaming Control Act or the Gaming Board's regulations). Thus, because this case implicates New Mexico's historic police powers, the Court assumes that IGRA does not supplant the application of New Mexico law to non-Indian gaming vendors unless Congress has evinced a "clear and manifest" intention preempt state gaming laws. Bates v. Dow Agrosciences, LLC, 544 U.S. at 449.

As discussed at length above, the Tenth Circuit has indicated that congressional intent to preempt state law is "clear and manifest" in three circumstances: (i) when a federal statute expressly preempts state law ("express preemption"); (ii) when Congress intends to occupy a field ("field preemption"); and (iii) to the extent that a state law conflicts with a federal law ("conflict preemption"). Colo. Dept. of Pub. Health and Env't., Hazardous Materials and Waste Mgmt. Div. v. United States, 693 F.3d at 1222. Here, all parties concede -- as they must -- that IGRA is intended "to expressly preempt the field in governance of gaming activities on Indian lands." Motion to Reconsider at 18; Motion to Reconsider Injunction Response at 9. Whether IGRA preempts regulatory actions targeted at non-Indian gaming vendors dealing with non-Indian gaming operators is in dispute. Thus, the Court must determine the scope of the preemption that Congress intended in IGRA. See Medtronic, Inc. v. Lohr, 518 U.S. at 485 (where a statute expressly states that it preempts certain areas of state law, a court must determine the scope of the preemption that Congress intended).

The Defendants argue that "IGRA cannot preempt the State's police power because the Act does not apply outside of Indian country." Motion to Reconsider at 18. The Defendants rely heavily on the distinction by the Supreme Court of New Mexico in Srader v. Verant between actions to enforce state gaming laws on Indian lands -- which IGRA expressly preempts -- and regulatory actions taken outside Indian lands. See 1998-NMSC-025, ¶¶ 12, 13, 964 P.2d at 88. New Mexico law not only permits actions in the latter category, but requires such actions according to the Defendants. See Srader v. Verant, 1998-NMSC-025, ¶ 15, 964 P.2d at 88 (holding that "it was the responsibility of the government [] to determine if New Mexico's existing gaming or other laws were being violated outside of the reservation"). Citing this distinction, the Defendants repeatedly stress that the Gaming Board simply acted to enforce New

Mexico gaming laws outside of the Pojoaque Pueblo's lands -- that it permissibly regulated activity taking place off tribal lands and involving non-tribal entities. See, e.g., Motion to Reconsider at 1-2, 9-10, 15, 17-22, and 24-26. Under this reading, IGRA would preempt only the Gaming Board's direct enforcement action against the Pojoaque Pueblo; characterizing the scenario this way, because the Gaming Board took no such action here, there is no preemption.

The Plaintiffs counter that the pivotal issue is not whether the Gaming Board's actions are executed off-reservation and targeted solely at non-Indian entities. Rather, according to the Plaintiffs, the relevant inquiry for preemption purposes -- that the Supreme Court of New Mexico articulated in Srader v. Verant -- is whether the actions that the Defendants took "clearly and substantially involve, regulate or interfere with gaming." Motion to Reconsider Response at 11 (quoting Srader v. Verant, 1998-NMSC-025, ¶ 10 n.2, 964 P.2d at 87 n.2). States may not exercise jurisdiction in such circumstances, the Plaintiffs contend. See Srader v. Verant, 1998-NMSC-025, ¶ 10 n.2, 964 P.2d at 87 n.2. Furthermore, the Plaintiffs interpret Srader v. Verant as sanctioning only state regulation of violations of gaming laws that occur outside of tribal lands. See Motion to Reconsider Response at 11 (citing 1998-NMSC-025, ¶ 12, 964 P.2d at 88). In the present case, they argue, "the sole basis for the actions and threatened actions against the applicants/licensees is the violation of gaming laws occurring on the Pueblo's Indian lands, not outside of the reservation." Motion to Reconsider Response at 11-12. Under this line of analysis, the Plaintiffs argue, federal law preempts the Gaming Board's actions, because the only "activity at issue in this lawsuit is unquestionably gaming occurring on Indian lands and the sole purpose of the Defendants' actions is to substantially involve, regulate or interfere with that gaming activity." Motion to Reconsider Response at 12. Thus, in the Plaintiffs' view, the Defendants' attempt to distinguish on- and off-reservation activity is immaterial and

"disingenuous." Motion to Reconsider Response at 12. In short, according to the Plaintiffs, on-reservation activity solely drives the Defendants' actions, which clearly have an impact on Pojoaque Pueblo's gaming operations; the Plaintiffs contend that IGRA preempts such actions.

The Court agrees with the Defendants. Congress enacted IGRA in response to California v. Cabazon Band of Mission Indians, which held that "States lacked any regulatory authority over gaming on Indian lands." Michigan v. Bay Mills Indian Comty., 134 S. Ct. at 2034 (citing 480 U.S. at 221-222). As the parties concede and IGRA's legislative history makes evident, "[IGRA] is intended to expressly preempt the field in the governance of gaming activities on Indian lands." S. Rep. No. 100-446, at 6-7 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3076. See Gaming Corp. of America v. Dorsey & Whitney, 88 F.3d 536, 545 (8th Cir. 1996)(noting IGRA's "extraordinary preemptive power" with respect to gaming on Indian lands). IGRA's regulatory scheme therefore acknowledges Indian tribes' "inherent sovereign authority" to self-govern, Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla., 498 U.S. 505, 509 (1991)(citation omitted), subject to "plenary control by Congress" and statutory limitations by the states where Congress so allows, see Michigan v. Bay Mills Indian Comty., 134 S. Ct. at 2030. However, as the Supreme Court recently observed in Michigan v. Bay Mills Indian Comty., "Cabazon left fully intact a State's regulatory power over tribal gaming outside Indian territory -- which . . . is capacious." 134 S. Ct. at 2034. Further, in Seminole Tribe v. Florida, 517 U.S. 44 (1996), the Supreme Court struck down IGRA's abrogation of state sovereign immunity, holding that "[t]he Eleventh Amendment prohibits Congress from making [states] capable of being sued in federal court." 517 U.S. at 76. IGRA and subsequent Supreme Court opinions therefore strike a careful balance between state and tribal interests that aims to preserve each sovereign entity's sphere of influence. See Michigan v. Bay Mills Indian Comty., 134 S.

Ct. at 2034.  The Court's reading of IGRA's preemptive scope must be cognizant of this balance, and take into account the sovereign interests of both New Mexico and Pojoaque Pueblo in the present dispute.

Here, the Plaintiffs cannot isolate any "clear and manifest" Congressional intent in IGRA to preempt the exercise of state regulatory action outside tribal lands, because manifestation of such intent does not exist.  See 25 U.S.C. §§ 2701-2721.  As Justice Kagan wrote for the majority in <u>Michigan v. Bay Mills Indian Cmty.</u>, "[e]verything -- literally everything -- in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, and nowhere else."  134 S. Ct. at 2034.  See <u>Seneca-Cayuga Tribe of Oklahoma v. Nat'l Indian Gaming Comm'n</u>, 327 F.3d 1019, 1032 (10th Cir. 2003)("[T]hrough IGRA, Congress spoke <u>specifically</u> to the federal government's regulatory scheme over certain forms of authorized gambling within Indian country.")(emphasis in original).  Indeed, IGRA's text is littered with provisions explicitly referencing regulation of gaming <u>on</u> Indian lands.  See, <u>e.g.</u>, 25 U.S.C § 2701(5) ("Indian tribes have the exclusive right to regulate gaming activity on Indian lands . . . ."); 25 U.S.C. § 2702(3) ("[The purpose of IGRA is] to declare that the establishment of Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands . . . ."); 25 U.S.C. § 2710(d)(1) ("Class III gaming activities shall be lawful on Indian lands only if . . . (C) conducted in conformance with a Tribal-State compact . . . .").  The Plaintiffs can point to no similar language referencing off-reservation gaming activities. Nothing in IGRA suggests that the Court should give these explicit references to gaming on Indian lands anything but their plain meaning -- literally regulation of gaming activity that occurs within the boundaries of Indian territory.  See <u>United States v. Ron Pair Enterprises, Inc.</u>, 489 U.S. 235, 242 (1989)("[T]he plain meaning of legislation should be conclusive, except in the rare

cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters")(citation and internal quotation marks omitted). Based on this construction, IGRA evinces clear congressional intent to preempt the field of on-reservation gaming regulation -- nothing else.

Applying this construction of the statute, the Defendants' actions are not preempted, because they have taken no regulatory action on Pojoaque Pueblo's tribal lands. Rather, the Defendants have regulated only "non-Indian manufacturers' sales of gaming equipment to non-Indian operators off tribal lands." Motion to Reconsider at 5. Importantly, the Defendants' actions do not prohibit Pojoaque Pueblo from continuing its gaming operations, nor do they prevent vendors from supplying equipment to Pojoaque Pueblo for such operations. See Motion to Reconsider at 5. In fact, notwithstanding the Defendants' actions, Pojoaque Pueblo remains "free to continue those activities on the Pueblo's lands as long as the United States Attorney forbears from enforcing IGRA." Motion to Reconsider Reply at 5.

Nor do New Mexico's gaming laws and regulations target Pojoaque Pueblo or its gaming operations. See Motion to Reconsider Reply at 6. Rather, those laws and regulations apply generally to bar vendors from "participating in, supporting and profiting from gaming operations that are illegal under the laws of any jurisdiction." Motion to Reconsider Reply at 6 (emphasis in original). Specifically, New Mexico law expressly makes it "unlawful for a manufacturer or distributor to ship a gaming device 'to any destination where possession of gaming devices is illegal.'" N.M.A.C. § 15.1.16.12(B)(emphasis added). While it is true that, in this instance, the allegedly illegal gaming operation is being conducted on the Pojoaque Pueblo's lands, "New Mexico would be equally obligated to take the same enforcement measures if one of the State's licensees was supplying gaming equipment to an illegal non-Indian operation in another state."

Motion to Reconsider Reply at 6. There, as here, the enforcement "action would be taken against the supplier, not the operator." Motion to Reconsider Reply at 6.

In response, the Plaintiffs contend that it is significant that the Defendants' actions were motivated solely by the "violation of gaming laws occurring on the Pueblo's Indian lands, not outside of the reservation." Motion to Reconsider Response at 11-12 (emphasis added). They argue that, "'but for' the applicants/licensees doing business with the Pueblo, the Defendants would not have taken or threatened any adverse actions against the applicants/licensees." Motion to Reconsider Response at 13. In short, they contend that the Defendants' motive "was to disrupt the balance of tribal, federal, and state interests intended by Congress in the passage of IGRA." Motion to Reconsider Response at 13. Motive, however, is not the test. IGRA does not preempt "motives" or intention, but rather the exercise of state jurisdiction over tribal gaming activities. See S. Rep. No. 100-446, at 6-7 (1988) ("[IGRA] is intended to expressly preempt the field in the governance of gaming activities on Indian lands"). As discussed above, the Defendants have regulated only non-Indian vendors operating outside of Pojoaque Pueblo's lands -- the motivation behind those regulation does not itself establish an actual regulation of Pojoaque Pueblo.

The Plaintiffs press, however, that the Gaming Board's determination as to the illegality of Pojoaque Pueblo's gaming activities was itself an improper assertion of jurisdiction that IGRA preempts. See Qualified Immunity Motion Response at 6 (referencing Judge Brack's admonition that the Gaming Board was "without jurisdiction or authority" to make this determination)(quoting Judge Brack's MOO at *28)(citations omitted). This position is flawed. First, while it is true that IGRA "place[s] limits on the application of state laws . . . to tribal lands," Alabama v. PCI Gaming Authority, 801 F.3d. 1278, 1300 (11th Cir. 2015)(internal

quotation marks and citation omitted), New Mexico is not applying its state law to determine the legality of Pojoaque Pueblo's gaming activities. Rather, New Mexico is applying its law to state licensees in response to Pojoaque Pueblo's violation of <u>federal</u> law. Under N.M.A.C. § 15.1.10.9(f), state vendor licensees must comply with all "laws and regulations governing the operations of a gaming establishment," and must not "further[], or profit[] from any illegal activity or practice." Here, vendors dealing with Pojoaque Pueblo's gaming establishments after the expiration of its Class III compact with New Mexico are "furthering, or profiting" from Pojoaque Pueblo's illegal practice. Thus, the predicate for the application of New Mexico law to non-Indian vendors is not Pojoaque Pueblo's violation of New Mexico law, but rather the vendors' dealings with Pojoaque Pueblo, which is operating in violation of federal law. Second, IGRA does not abrogate a state's authority to decide whether a tribal gaming operation is unlawful -- it simply preempts their ability to enforce state law against such an operation. Under 18 U.S.C. § 1166(d), "[t]he United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws . . . ." Here, New Mexico is not criminally prosecuting Pojoaque Pueblo, or even state vendor licensees. <u>See</u> Motion to Reconsider at 20. Indeed, New Mexican officials have not even entered Pojoaque Pueblo's lands. <u>See</u> Motion to Reconsider at 20. Rather, New Mexico has merely assessed that Pojoaque Pueblo is violating federal law, and has accordingly taken actions to enforce its own law outside of Indian country. Third, the Defendants have not -- as the Plaintiffs claim -- made a "unilateral determination regarding the legality of gaming on Indian lands." Complaint ¶ 133, at 34. It is unquestionable that Pojoaque Pueblo's continued Class III gaming operations in the absence of a compact with New Mexico is unlawful under IGRA. <u>See</u> 25 U.S.C. § 2710(d)(1)(C) ("Class III gaming activities shall be lawful on Indian lands only if . . . (C) conducted in conformance with a Tribal-

State compact . . . .").  Mr. Martinez has made that determination.  The Court has made that determination.  There is not much determination, if any, left for New Mexico -- or anyone else really -- to make on its own.  Simply, "a tribe cannot conduct class III gaming on its lands without a compact . . . ." <u>Michigan v. Bay Mills Indian Comty.</u>, 134 S. Ct. at 2035. <u>See United States v. 162 Megamania Gambling Devices</u>, 321 F.3d 713, 718 (10th Cir. 2000)("Class III gaming . . . is allowed only where a tribal-state compact is entered.").  Thus, IGRA's text and binding Supreme Court and Tenth Circuit precedent leave no ambiguity as to the illegality of Class III gaming operations without a compact with the state.  Yet here, the Defendants did not even make their own determination about the illegality of Pojoaque Pueblo's operations.  Instead, they relied on the U.S. Attorney's Letter, which stated that, once Pojoaque Pueblo's compact with New Mexico expired, "[c]ontinued gaming operations by the Pueblo . . . would violate federal law."  U.S. Attorney's Letter at 1.  The Defendants expressly based their actions on this statement.  <u>See</u> Vendor Letter at 1 (informing vendors of the findings in the U.S. Attorney's letter).

The Plaintiffs attempt to circumvent all this analysis by minimizing the significance of the distinction between on- and off-reservation regulatory actions.  <u>See</u> Motion to Reconsider Response at 13 ("[R]egardless of how the actions are characterized, it remains clear that the only activity at issue is the on-reservation activity of the Pueblo").  They argue that the test for IGRA preemption is not whether a state regulates Indian lands directly, but whether state actions "'clearly and substantially involve, regulate or interfere with gaming.'"  Motion to Reconsider Response at 11 (quoting <u>Srader v. Verant</u>, 1998-NMSC-025, ¶ 10 n.2, 964 P.2d at 87 n.2).  In short, the Plaintiffs equate on-reservation regulatory impact with direct regulatory action.  <u>See</u> Motion to Reconsider Response at 12 (asserting that it is disingenuous to suggest that the

Defendants' actions "have no impact on the Pueblo's gaming operations"). The Plaintiffs extract this "clear[] and substantial[]" phrase from a footnote in Srader v. Verant, 1998-NMSC-025, ¶ 10 n.2, 964 P.2d at 87 n.2, but cite no cases where the test was actually applied to determine IGRA's preemptive scope. It is doubtful that any exist, given that the test's application would mean that IGRA does not preempt certain state regulatory actions on tribal lands so long as they are not "substantial." Such a result would conflict with IGRA's comprehensive preemption of state regulation of on-reservation tribal gaming, regardless of the regulation's substantiality.

Preliminarily, IGRA's text indicates that IGRA preempts only <u>direct</u> regulation of Indian gaming activity. 25 U.S.C. § 2710(d)(3)(C) specifies that Class III gaming compacts "may include provisions relating to -- (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are <u>directly</u> related to, and necessary for, the licensing and regulation of such activity." (emphasis added). Hence, absent a compact, a state cannot directly enforce its gaming laws on Indian lands. 25 U.S.C. § 2710(d)(3)(C)(i). Because IGRA has no similar provision authorizing enforcement of state law that is only indirectly related to licensing and regulation of gaming on Indian lands, it follows that Congress did not intend to preempt such laws. *Expression unius est excusio alterius.* <u>See</u> <u>Chevron USA Inc. v. Echazabal</u>, 536 U.S. 74, 80 (2002)("'[E]xpressing one item of [an] associated group or series excludes another left unmentioned.'")(quoting <u>United States v. Vonn</u>, 535 U.S. 55, 65 (2002)). Relevant case law interpreting IGRA supports this conclusion. <u>See</u>, <u>e.g.</u>, <u>Gaming Corp. of America v. Dorsey & Whitney</u>, 88 F.3d at 549 (stating IGRA preempts "[a]ny claim which would directly affect or interfere with a tribe's ability to conduct its own licensing process").

Moreover, the cases that the Plaintiffs cite in support of their "indirect impact" argument almost uniformly involve <u>direct</u> state regulation of gaming activities conducted on tribal land.

See, e.g., Am. Legion Post No. 49 v. Hughes, 1994-NMCA-153, ¶ 16, 901 P.2d 186, 191 (N.M. Ct. App. 1994)("The State of New Mexico has no jurisdiction to enforce its gambling laws in Indian Territory.")(emphasis added); Lac du Flambeau Band of Lake Superior Chippewa v. Wisconsin, 473 F. Supp. 645, 646-48 (D. Wisc. 1990)(Hamilton, J.)(noting that, absent a state-tribal compact, "the United States has the exclusive authority to enforce violations of state gambling laws on plaintiffs' reservations")(emphasis added); State ex rel Dewwberry v. Kitzhaber, 313 P.3d 1135, 1140 (Ore. App. 2013)("IGRA is a comprehensive federal statutory scheme for the regulation of gaming on Indian lands that preempts the application of state gaming laws.")(emphasis added). For example, in Wyandotte Nation v. Sebelius, 443 F.3d 1247 (10th Cir. 2006), the State of Kansas "bypass[ed] the federal court system" and sent armed officials to storm, and seize files and the proceeds from, a casino operated by the Wyandotte Nation, which Kansas believed to be operating in violation of state laws. See 443 F.3d at 1251-52. The district court granted the Wyandotte Nation an injunction against the application of Kansas law to the Nation's Indian lands. See Wyandotte Nation v. Sebelius, 443 F.3d at 1253. The Tenth Circuit affirmed the district court's grant of an injunction, reasoning that "Kansas has no authority to enforce its gaming laws on the Shriner Tract." Wyandotte Nation v. Sebelius, 443 F.3d at 1252 (citation omitted)(emphasis added). The Plaintiffs also approvingly cite Alabama v. PCI Gaming Auth., 801 F.3d 1278 (11th Cir. 2015), where the United States Court of Appeals for the Eleventh Circuit affirmed the dismissal of an action by the State of Alabama to enjoin on-reservation casino operations by the Poarch Band of Creek Indians. See 801 F.3d at 1282. Not only is this fact pattern inapposite -- because it involves direct regulation -- but the court explicitly stated that "IGRA does not govern gaming that occurs outside of Indian lands; a state's authority to regulate such gaming is 'capacious.'" See Alabama v. PCI Gaming Auth.,

801 F.3d at 1283 (quoting Michigan v. Bay Mills Indian Comty., 134 S. Ct. at 2024). Moreover, the Eleventh Circuit's analysis has limited persuasive authority, because the Eleventh Circuit expressly declined to decide whether IGRA preempted state law in that context. See Alabama v. PCI Gaming Auth., 801 F.3d at 1286 n.17.

Indeed, even Srader v. Verant -- upon which the Plaintiffs base their indirect impact argument -- is inapposite. There, the Supreme Court of New Mexico drew the same on-/off-reservation distinction that the Court now adopts, and held that, although New Mexico could not exercise jurisdiction over gaming on tribal lands, it had the "authority to enforce New Mexico's laws outside of the reservations" and "the responsibility . . . to determine if New Mexico's existing gaming or other laws were being violated outside of the reservation." Srader v. Verant, 1998-NMSC-025, ¶ 16, 964 P.2d at 88. The Supreme Court of New Mexico did not clarify that New Mexico had this responsibility only up until a certain point -- i.e., it did not state that this responsibility ended once New Mexico's actions "clearly and substantially" interfered with gaming on tribal lands. It simply recognized that New Mexico could "enforce New Mexico's anti-gambling laws by [] prevent[ing] the flow of gambling money between financial institutions, gamblers, and tribal casinos operating without a compact." Qualified Immunity Motion at 13 (citing Srader v. Verant, 1998-NMSC-025, ¶ 5, 964 P.2d at 86). These facts are strikingly similar to the present case.

The Plaintiffs attempt to salvage their indirect impact argument by arguing that IGRA preempts New Mexico's actions because they affect Pojoaque Pueblo's "governance of gaming." See S. Rep. No. 100-446, at 6-7 (stating that IGRA preempts "the field in the governance of gaming activities on Indian lands"). The Plaintiffs cite Mashantucket Pequot Tribe v. Town of Ledyard, where the Second Circuit held that IGRA did not preempt Connecticut from assessing a

tax on non-Indian lessors of slot machines to the Mashantucket Pequot Tribe.  See 722 F.3d at 460.  The tax was not preempted, the Second Circuit reasoned, because it did not affect the Pequot Tribe's "governance of gaming."  Mashantucket Pequot Tribe v. Town of Ledyard, 722 F.3d at 470.  The Plaintiffs argue that, unlike the tax in Mashantucket Pequot Tribe v. Town of Ledyard, the Defendants' actions in the present case "directly affect the Pueblo's governance of gaming on its reservation" and that IGRA therefore preempts those actions.  Motion to Reconsider Response at 14.  Yet, beyond this cursory assertion, the Plaintiffs do not explain how the Defendants' actions have such an effect.  Indeed, the Defendants' actions are unrelated to Pojoaque Pueblo's gaming governance.  Here, New Mexico has regulated transactions between state-licensed vendors and gaming operators at non-Indian gaming facilities in New Mexico. New Mexico is indifferent towards Pojoaque Pueblo's internal governance decisions, because, without a Class III gaming compact, the state has no choice in such matters.  It is unclear how any of the Defendants' actions have any bearing on Pojoaque Pueblo's "governance of gaming."

If anything, New Mexico's authority to enforce its gaming laws and regulations on its own lands is not limited by any ancillary effects on Pojoaque Pueblo's gaming operations.  The Defendants compare the facts of the present litigation to cases in which the Supreme Court and the Tenth Circuit have upheld "off-Indian country seizure of cigarettes pursuant to state law despite the effect of these seizures on the tribe."  Qualified Immunity Motion at 14-16.  See Motion to Reconsider at 23-24.  For example, in Muscogee (Creek) Nation v. Pruitt, the Tenth Circuit considered whether the State of Oklahoma had impermissibly seized, on state land, cigarettes lacking tax stamps being shipped to the Muscogee Nation for sale by Indian dealers. 699 F.3d at 1180.  The Tenth Circuit upheld Oklahoma's actions, explaining that the "ancillary effect of these laws . . . that [the Muscogee Nation's] members cannot buy contraband cigarettes

. . . does not establish a preemption or an infringement of tribal sovereignty claim." Muscogee (Creek) Nation v. Pruitt, 699 F.3d at 1183. See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. at 514 ("States may of course collect the sales tax from cigarette wholesalers, either by seizing unstamped cigarettes off the reservation or by assessing wholesalers who supplied unstamped cigarettes to the tribal stores."). The Court agrees with the Defendants that New Mexico's actions in the present case fall "far short of depriving Indian merchants of the very goods they seek to sell[.]" Motion to Reconsider at 23. Here, New Mexico "is not preventing the manufacturers from continuing to do business with the Pueblo." Motion to Reconsider at 23. The Plaintiffs' only response is that these cases are inapposite, because, unlike in the IGRA context, they do not "involve interference with congressionally-enacted statutes intended for the benefits of tribes . . . ." Motion to Reconsider Response at 16. This distinction is immaterial. If the test for preemption is "clear and substantial" interference with Pojoaque Pueblo's gaming operations -- as the Plaintiffs insist -- it is relevant that the Supreme Court and the Tenth Circuit have found in similar contexts that more substantial interference with tribal interests is permissible.

The foregoing analysis indicates that Congress' "clear and manifest" intent, Medtronic, Inc. v. Lohr, 518 U.S. at 485, is that IGRA expressly preempt only on-reservation gaming regulations. IGRA's text, legislative history, and interpreting case law support this reading. With respect to the text, IGRA refers explicitly only to gaming activities on Indian lands, not without. See, e.g., 25 U.S.C § 2701(5) ("Indian tribes have the exclusive right to regulate gaming activity on Indian lands . . . ."). Nothing in IGRA's language suggests that IGRA preempts a state's regulation of gaming within its own jurisdiction. See 25 U.S.C. §§ 2701-2721. In terms of legislative history, IGRA is intended to "expressly preempt the field in the

governance of gaming activities <u>on</u> Indian lands." S. Rep. No. 100-446, at 6-7 (emphasis added). There is no similar expression of legislative intent to prohibit off-reservation regulations of non-Indian state vendor licensees. Finally, the Supreme Court has clarified that IGRA's express preemption applies only to state laws that directly regulate on-reservation gaming activity -- a state's regulatory power over gaming in its own jurisdiction remains "capacious." <u>Michigan v. Bay Mills Indian Comty.</u>, 134 S. Ct. at 2034.

The same reasoning guides the Court's analysis of the remaining inquiry -- whether IGRA impliedly preempts the actions of which the Plaintiffs complain. <u>See</u> <u>Gade v. Nat'l Solid Wastes Mgmt. Assoc.</u>, 505 U.S. at 98. The Supreme Court has recognized two forms of implied preemption: (i) field preemption, "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it"; and (ii) conflict pre-emption, "where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." <u>Gade v. Nat'l Solid Wastes Mgmt. Assoc.</u>, 505 U.S. at 98. The Court will discuss these two forms of preemption in turn.

The Supreme Court recently stated in <u>Arizona v. United States</u> that, "[w]here Congress occupies an entire field, . . . even complimentary state regulation is impermissible." 132 S. Ct. at 2502. "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." <u>Arizona v. United States</u>, 132 S. Ct. at 2502 (citing <u>Silkwood v. Kerr-McGee Corp.</u>, 464 U.S. 238, 249 (1984)). In short, the "basic premise of field preemption []is that States may not enter, in any respect, an area the Federal Government has reserved for itself . . . ." <u>Arizona v. United States</u>, 132 S. Ct. at 2502. In <u>Arizona v. United States</u>, the Supreme Court considered whether the Immigration Reform and Control Act of 1986,

8 U.S.C. § 1101, preempted an Arizona immigration law that would penalize aliens who sought, or engaged in, unauthorized employment.  See 132 S. Ct. at 2505.  The Supreme Court held that the law was preempted, because Congress had specifically considered and rejected penalizing aliens who sought unauthorized employment.  See Arizona v. United States, 132 S. Ct. at 2504. Thus, the Supreme Court held that Congress clearly "intended to preclude States from 'compliment[ing] the federal law, or enforce[ing] additional or auxiliary regulations.'"  Arizona v. United States, 132 S. Ct. at 2503 (quoting Hines v. Davidowitz, 312 U.S. at 66-67).

Unlike the Immigration Reform and Control Act, IGRA does not evince Congressional intent "to preclude States from compliment[ing] the federal law, or enforce[ing] additional or auxiliary regulations."  Arizona v. United States, 132 S. Ct. at 2503 (citation and internal quotation marks omitted).  IGRA regulates gaming that occurs on Indian lands, which include "any lands title to which is [] held in trust by the United States for the benefit of any Indian tribe . . . and over which an Indian tribe exercises governmental power." 25 U.S.C. § 2703(4)(B). IGRA's preemptive reach does not extend to gaming regulation that occurs outside of Indian Territory; a state's authority to regulate such gaming is "capacious."  Michigan v. Bay Mills Indian Cmty., 134 S. C. at 2034.  Additionally, IGRA does not circumscribe the validity of state laws and regulations that pertain to gaming -- even as applied to tribal lands.  Under 18 USC § 1166(a), in the absence of a gaming compact, "all State laws pertaining to the licensing, regulation, or prohibition of gambling, . . . shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the state."  Had Congress intended to completely preempt the field, it would have abrogated the states' ability to promulgate their own gaming laws and regulations, and not left them intact.  Further, although the United States is vested with "exclusive jurisdiction over criminal prosecutions of violations of State gambling

laws," 18 U.S.C. § 1166(d), IGRA says nothing about civil enforcement of such laws, see 18 U.S.C. § 1166(d); 25 U.S.C. §§ 2701-2721. Had Congress intended to preempt such state enforcement -- particularly against non-Indian state licensees -- it would have so provided. If anything, IGRA's authorization of gaming activities on Indian lands is dependent on the state within which the reservation is located legally sanctioning those activities. See 25 U.S.C. § 2701(5) ("Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is . . . conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity"). If gaming activity on Indian lands is tied to state law, certainly the same law binds third-party vendor licensees. Thus, it is clear that Congress intended to leave much of state gaming law intact; it is difficult to conclude that there is field preemption. Accordingly, the Court concludes that IGRA is not "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98. To the contrary, IGRA appears to anticipate a regulatory scheme where "complimentary state regulation is []permissible." Arizona v. United States, 132 S. Ct. at 2502.

The Court likewise finds that "conflict preemption" does not apply to this case. See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000). Implied conflict preemption occurs where "compliance with both federal and state regulations is a physical impossibility," Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143 (1963), and where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of congress," Hines v. Davidowitz, 312 U.S. at 67. "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." Crosby v. Nat'l Foreign Trade Council, 530 U.S. at 373.

Both impossibility preemption and obstacle preemption are inapplicable here. First, it is not a "physical impossibility" for third-party state licensees to comply with both IGRA and New Mexico law. See Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. at 142-143. There are no conflicting obligations under both sets of laws; in fact, while state-licensed vendors may face New Mexico enforcement action for doing business with an illegal gaming operation, New Mexico does not prohibit them from continuing to do business with that operation if they so choose. New Mexico recognizes that, absent a gaming compact, only the United States can take enforcement action prohibiting such transactions. See 18 U.S.C. § 1166. Second, New Mexico's gaming laws and regulations do not pose an obstacle to the accomplishment of IGRA's objectives. See Hines v. Davidowitz, 312 U.S. at 67. IGRA's purpose is to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). Any obstacle that a state's regulation of third-party licensees within its jurisdiction poses to an Indian tribe's ability to achieve these ends is attenuated at best, especially where those licensees are still permitted to do business with the tribe. More important, Pojoaque Pueblo's illegal operation of Class III gaming facilities in the absence of a valid gaming compact triggered New Mexico's regulatory actions in the present case. To the extent that New Mexico's actions indirectly impacted Pojoaque Pueblo's revenues, those impacts do not stand as an obstacle to IGRA's objectives, because Congress did not intend for Indian tribes to conduct Class III gaming operations without a compact in the first place. See 25 U.S.C. § 2710(d)(1) ("Class III gaming activities shall be lawful on Indian lands only if . . . (C) conducted in conformance with a Tribal-State compact . . . ."). Consequently, New Mexico's regulation of third-party vendor licensees does not pose an obstacle to IGRA's objectives in this context.

Finally, notwithstanding all of the above, the Court is mindful that, where there are two plausible interpretations of a statute, the court has "a duty to accept the reading that disfavors pre-emption." Bates v. Dow Agrosciences, LLC, 544 U.S. at 449. It may well be plausible that IGRA preempts third-party regulations which have an indirect impact on tribal gaming operations. It is, however, at least equally plausible -- more so, in the Court's opinion -- that IGRA's preemptive scope is limited to direct regulations of Indian gaming. Thus, the Court has a "duty to accept" the second interpretation, as the law disfavors preemption. Bates v. Dow Agrosciences, LLC, 544 U.S. at 449.

In sum, IGRA does not preempt New Mexico's regulatory actions with respect to non-Indian, state-licensed vendors doing business with non-Indian gaming operators. Consistent with the policies underlying IGRA's enactment, the Court is mindful of Pojoaque Pueblo's "inherent sovereign authority" and interests. Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla., 498 U.S. at 509. The Court is also mindful, however, of New Mexico's "sovereign interest in being in control of, and able to apply, its laws throughout its territory." Mashantucket Pequot Tribe v. Town of Ledyard, 722 F.3d at 476-77. This case presents questions how to balance and respect these two competing interests. Having considered the statutory text and the weight of authority interpreting IGRA, the Court holds that IGRA is not preemptive of the Defendants' off-reservation regulatory actions. The Defendants have taken no direct action towards Pojoaque Pueblo, nor have they asserted any authority on Pojoaque Pueblo's lands. The Defendants have not regulated Pojoaque Pueblo; they have only regulated New Mexico licensees. IGRA does not preempt these actions.

In the end, this is a fight between two heavy weight sovereigns. Ultimately, New Mexico and Pojoaque Pueblo will have to strike a gaming compact. The Court must keep a steady hand

and not give one side more leverage in negotiating than that to which it is entitled, or take away a party's incentive to negotiate at all by allowing it to win in court what Congress has not given it. If the Court starts putting a thumb on the scale when Congress has not acted, it runs the risk of upsetting the careful balance that Congress has created.

### C. THE DEFENDANTS DID NOT VIOLATE THE PLAINTIFFS' FEDERAL RIGHTS UNDER THE SUPREMACY CLAUSE.

The Plaintiffs argue that New Mexico's alleged assertion of "jurisdiction over gaming activities on the Pueblo's Indian lands . . . constitute[s] a violation of the Supremacy Clause . . . ."  Complaint  ¶ 8, at 4.  Count II of the Complaint seeks declaratory and injunctive relief for violation of the Plaintiffs' "right, based on the Supremacy Clause, to engage in activity on the Pueblo's Indian lands in a manner that is free from state interference."  Complaint ¶ 133, at 34. In response, the Defendants argue that the Supremacy Clause is "'not a source of any federal rights.'"  Qualified Immunity Motion at 8 (citation omitted); Motion to Dismiss Count II at 6 (citation omitted).  Accordingly, the Court must determine whether the Plaintiffs have asserted a cognizable claim for relief under the Supremacy Clause.

The Supremacy Clause, Art. VI, cl. 2., provides that the laws of the United States "shall be the Supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."  The Supreme Court has clarified that the Supremacy Clause "'is not a source of any federal rights'"; it simply "'secures federal rights by according them priority whenever they come into conflict with state law.'"  Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 107 (1989)(quoting Chapman v. Houston Welfare Rights Organization, 441 U.S. 600, 613 (1979)).  The Supremacy Clause "certainly does not create a cause of action." Armstrong v. Exceptional Child Ctr., Inc., 135 S. Ct. at 1383.

Despite this limitation, the Plaintiffs argue that the "Supreme Court has recently affirmed and recognized the existence of the cause of action set forth in Count II in <u>Armstrong v. Exceptional Child Ctr., Inc,</u>." Motion to Dismiss Count II Response at 2. In <u>Armstrong v. Exceptional Child Ctr., Inc.</u>, the Supreme Court observed that, although the Supremacy Clause does not create a private right of action, "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." 135 S. Ct. at 1384 (citing <u>Ex parte Young</u>, 209 U.S. at 155-156). The Supreme Court clarified that equity is a judge-made remedy that is not derived from an implied right of action in the Supremacy clause. <u>See Armstrong v. Exceptional Child Ctr., Inc.</u>, 135 S. Ct. at 1384. The Plaintiffs also cite <u>Tohono O'odham Nation v. Ducey</u>, which held that an equitable cause of action asserting IGRA preemption of state law by virtue of the Supremacy Clause could proceed, because Congress had not evinced an intent to exclude an equitable remedy in IGRA. <u>See</u> 2015 U.S. Dist. LEXIS 124979, at *9-11. The Plaintiffs argue that the "Court should apply <u>Armstrong</u> in the same manner as <u>Tohono O'odohm</u> and come to the same conclusion that Count II is a cognizable claim under <u>Armstrong</u>." Motion to Dismiss Count II Response at 4.

The Court declines this invitation. It is indeed true that

> A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.

<u>Shaw v. Delta Air Lines, Inc.</u>, 463 U.S. 85, 96 n.14 (1983). Count II, as pled, however, is not a cause of action brought pursuant to the Court's equitable power; rather, it is explicitly "based on the Supremacy Clause." Complaint ¶ 133, at 34. Moreover, once the Court decides -- as it has -- that IGRA does not preempt -- expressly, by field, or conflict -- state law, there is no federal/state

law conflict, and the Court need not determine whether federal law is supreme. Federal law is always supreme, but in this case, there is no conflict with state law, and federal law does not preempt state law. If there were a conflict or preemption, federal law would, of course, be the supreme law.

Thus, Count II fails to state a claim that the Defendants have violated Pojoaque Pueblo's federal rights "based on the Supremacy Clause," as one does not exist. Accordingly, the Court grants the Motion to Dismiss Count II.

### D. THE DEFENDANTS DID NOT VIOLATE THE PLAINTIFFS' FEDERAL RIGHTS UNDER 42 U.S.C. § 1983.

The Plaintiffs argue that the Individual Defendants are "wrongfully asserting State jurisdiction over gaming activities on the Pueblo's Indian lands . . . in violation of 42 U.S.C. §[] 1983 . . . ." Complaint ¶¶ 138-140, at 35. Count III of the Complaint seeks prospective equitable relief for this alleged violation. See Complaint ¶ 142, at 35. Count IV seeks money damages for the Individual Defendants' alleged deprivation of Pojoaque Pueblo's and Talachy's "federal right to engage in conduct free from the jurisdiction of the state . . . in violation of 42 U.S.C. §[] 1983." Complaint ¶¶ 143-151. The Individual Defendants counter that, because 42 U.S.C. § 1983 does not "confer any rights," the Court should dismiss Counts and III and IV. Motion to Dismiss Counts III and IV at 8.

Section 1983 "imposes liability on anyone who, under color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution and laws." Blessing v. Freestone, 520 U.S. 329, 340 (1997)(internal quotation marks and citation omitted). The Supreme Court has held that this provision protects "certain rights conferred by federal statutes." Blessing v. Freestone, 520 U.S. at 340 (citing Maine v. Thiboutot, 448 U.S. 1 (1980)). Standing alone, however, § 1983 "does not provide any substantive rights at all." Chapman v. Houston

Welfare Rights Organization, 441 U.S. 600, at 618 (1979). See Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)("[T]hat section is not itself a source of substantive rights"). Rather, § 1983 is "a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." Baker v. McCollan, 443 U.S. at 144 n.3. To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law. See West v. Atkins, 487 U.S. at 48.

Here, Counts III and IV identify no cognizable federal or constitutional rights the Individual Defendants violated. See Complaint ¶¶ 135-151, at 34-37. Count III states that the Individual Defendants "wrongfully assert[ed] State jurisdiction over gaming activities on the Pueblo's Indian lands." Complaint ¶¶ 138, at 35. Count IV states that the Individual Defendants violated the Plaintiffs' "federal right to engage in conduct free from the jurisdiction of the state." Complaint ¶¶ 145, at 36. To the extent these claims can be read to assert a violation of a "right[] based on the Supremacy Clause," Complaint ¶ 133, at 34, that argument is unavailing, because the Supremacy Clause "is not a source of any federal rights," as discussed supra. Golden State Transit Corp. v. Los Angeles, 493 U.S. at 107 (internal quotation marks and citation omitted). Reading Counts III and IV as asserting a violation of federal rights under IGRA is likewise unavailing, because, as discussed supra, IGRA does not preempt the Individual Defendants' actions in this case.[14]

Even assuming that IGRA preempts the Individual Defendants' actions, the Plaintiffs do not identify a federal right that is cognizable under § 1983. The Supreme Court has stressed that

---

[14]In their Motion to Dismiss Counts III and IV Response, the Plaintiffs answer these arguments only by referencing and incorporating their preemption arguments made elsewhere. See Motion to Dismiss Counts III and IV Response at 5.

a plaintiff seeking redress pursuant to § 1983 "must assert the violation of a federal <u>right</u>, not merely a violation of federal <u>law</u>." <u>Blessing v. Freestone</u>, 520 U.S. at 340 (citing <u>Golden State Transit Corp. v. Los Angeles</u>, 493 U.S. at 106)(emphasis in original). This requires evidence of an "unambiguously conferred right . . . ." <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 282 (2002). The Plaintiffs have identified no such unambiguous right that IGRA confers. <u>See</u> Complaint ¶¶ 135-151, at 34-37. Accordingly, Counts III and IV fail to state a cognizable claim under § 1983.

**E.      THE DEFENDANTS DID NOT VIOLATE THE PLAINTIFFS' FEDERAL RIGHTS UNDER 42 U.S.C. § 1985.**

Counts III and IV of the Complaint also assert that the Individual Defendants' actions violated the Plaintiffs' rights under 42 U.S.C. § 1985. <u>See</u> Complaint ¶¶ 140, at 35; <u>id</u>. at ¶ 150, at 36. This allegation is no more compelling than the Plaintiffs' alternative § 1983 claim in Counts III and IV. <u>See</u> Complaint ¶¶ 140, at 35; <u>id</u>. at ¶ 150, at 36.

As with § 1983, the Supreme Court has held that § 1985 "creates no rights." <u>Great Am. Fed. Sav. & Loan Ass'n v. Novotny</u>, 442 U.S. 355, 376 (1979)(emphasis omitted). Section 1985 is a "purely remedial statute, providing a civil cause of action when some otherwise defined federal right -- to equal protection of the laws or equal privileges and immunities under the laws -- is breached by a conspiracy . . . ." <u>Great Am. Fed. Sav. & Loan Ass'n v. Novotny</u>, 442 U.S. at 376. To state a claim for conspiracy under § 1985(3),[15] a plaintiff must allege: (i) that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action"; and (ii) that "the conspiracy aimed at interfering with rights that are

---

[15]The Complaint does not identify the subsection of § 1985 upon which Counts III and IV are based. <u>See</u> Complaint ¶¶ 135-151, at 34-37. As the Individual Defendants aptly point out, "Subsections 1985(1) (preventing an officer of the United States from performing his duties) and 1985(2) (intimidating a party, witness or juror, or otherwise obstructing justice), are plainly inapplicable, leaving only Subsection 1985(3)." Motion to Dismiss Counts III and IV at 6 n.3.

protected against private, as well as official, encroachment." <u>Bray v. Alexandria Women's Health Clinic</u>, 506 U.S. 263, 267-68 (1993)(citations and internal quotation marks omitted omitted).  The Tenth Circuit has "signaled that § 1985(3) requires at least a 'commingling of racial and political motives.'" <u>O'Connor v. St. John's College</u>, 290 Fed. Appx. 137, 141 n.4 (10th Cir. 2008)(quoting <u>Brown v. Reardon</u>, 770 F.2d 896, 907 (10th Cir. 1985)).

Here, the Plaintiffs allege a conspiracy by the Individual Defendants to "force the Pueblo to acquiesce to the [sic] Governor Martinez' demands that the Pueblo execute a compact that contains terms that are illegal and not the product of good faith negotiation under IGRA." Complaint ¶ 81, at 24.  The Plaintiffs do not allege, however, that the conspiracy involved any racial or class-based "invidiously discriminatory animus." <u>Bray v. Alexandria Women's Health Clinic</u>, 506 U.S. at 268 (citation omitted).  The Plaintiffs object to this reading, arguing that "[t]he Complaint clearly alleges that the Individual Defendants conspired to wrongfully assert jurisdiction because of their invidiously discriminatory animus against the Pueblo and its members."  Motion to Dismiss Counts III and IV Response at 6.  Nothing in the Complaint supports this bare assertion.  The Complaint does not allege, much less suggest, any "invidiously discriminatory animus" motivating the Individual Defendants' actions.   Nor does it allege that the Individual Defendants' actions involved a "commingling of racial and political motives," as the Tenth Circuit requires.  <u>O'Connor v. St. John's College</u>, 290 Fed. Appx. at 141 n.4 (citation and internal quotation marks omitted).  Thus, "in the absence of allegations of class based or racial discriminatory animus, the complaint fails to state a claim under § 1985." <u>Campbell v. Amax Coal Co.</u>, 610 F.2d at 702.  Accordingly, the Court dismisses Counts III and IV for failure to state claim that is cognizable pursuant to § 1985.

**III. THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.**

Count IV seeks money damages for the Individual Defendants' alleged wrongful assertion of jurisdiction over Pojoaque Pueblo's gaming activities. See Complaint ¶ 145, at 36. The Plaintiffs argue that the Individual Defendants' actions deprive "Talachy and the individual members [of Pojoaque Pueblo] of their federal right to engage in conduct free from the jurisdiction of the State." Complaint ¶ 145, at 36. The Individual Defendants move to dismiss Count IV on the basis of qualified immunity. See Qualified Immunity Motion at 1. The Court heard oral arguments on the matter on January 12, 2016. See Transcript of Motion Proceedings held on January 12, 2016 (Doc. 91)("QI Hearing"). At the hearing, the Court indicated its intent to grant the Qualified Immunity Motion. See QI Hearing at 116:15-24 ("I'm going to dismiss [Count IV.]"). The Court grants the motion and elaborates on its rationale.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. at 818. This protection applies regardless whether the official's error is a "mistake of law, mistake of fact, or a mistake based on mixed questions of law and fact." Groh v. Ramirez, 540 U.S. at 567 (Kennedy, J., dissenting)(citation omitted). In Saucier v. Katz, the Supreme Court articulated a two-step inquiry for resolving qualified immunity claims: First, a court must decide "whether a constitutional right would have been violated on the facts alleged." 533 U.S. at 201. Second, if there is a violation, a court must decide whether the right at issue was "clearly established" at the time of the alleged misconduct. Saucier v. Katz, 533 U.S. at 201. See Riggins v. Goodman, 572 F.3d at 1107 (outlining the same test). The Supreme Court has since held, however, that although this sequential inquiry is beneficial, it is not mandatory. See Pearson v. Callahan, 555

U.S. at 236. The Supreme Court has stated that, indeed, in cases where "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," the two-step approach may burden courts with "what may seem to be an essentially academic exercise." Pearson v. Callahan, 555 U.S. at 237.

This is not a case where it is "far from obvious whether in fact there is [a constitutional] right" that was violated. Saucier v. Katz, 533 U.S. at 201. In the Court's view, no constitutional right was violated. The Court's discussion of IGRA's preemptive scope, supra, indicates that the Individual Defendants' regulatory actions towards third-party vendor licensees did not violate Pojoaque Pueblo's federal rights under IGRA. As the Court concludes, IGRA does not preempt -- expressly, by field, or conflict -- New Mexico gaming laws as applied to non-Indian entities within New Mexico's jurisdiction. Nor did the Individual Defendants violate Pojoaque Pueblo's rights under the Supremacy Clause, or under 42 U.S.C. §§ 1983 or 1985. Accordingly, no "constitutional right would have been violated on the facts alleged." Saucier v. Katz, 533 U.S. at 201.

Even if, however, the Individual Defendants violated Pojoaque Pueblo's constitutional rights, the Court is not persuaded that those rights were "clearly established" at the time of the Individual Defendants' actions. Saucier v. Katz, 533 U.S. at 201. To be clearly established, the Tenth Circuit requires "legal authority which makes it 'apparent' that 'in the light of pre-existing law' a reasonable official . . . would have known [that the conduct at issue violated the plaintiff's constitutional rights]." Green v. Post, 574 F.3d at 1300 (quoting Moore v. Guthrie, 438 F.3d at 1042). Generally, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923. This burden is a high one for the

plaintiff -- at the time of the challenged conduct, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741). Moreover, the Tenth Circuit recently clarified that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188.

The Individual Defendants contend that the Plaintiffs "have no authority" that the alleged illegality of their actions is clearly established. Qualified Immunity Motion at 20. The Court agrees. The Complaint cites no cases holding that an Indian tribe has a federal right pursuant to IGRA, the Supremacy Clause, or 42 U.S.C. §§ 1983 or 1985 that a state's exercise of jurisdiction over non-Indian vendors dealing with non-Indian gaming operators would violate. See generally Complaint. Nor do the Plaintiffs' subsequent pleadings, reviewed supra, present any authority that the Individual Defendants' actions violated any federal rights in this context. See, e.g., Qualified Immunity Motion Response at 4-7. In short, the Plaintiffs have not established that any "existing precedent [] placed the statutory or constitutional question beyond debate." Reichle v. Howards, 132 S. Ct. at 2093 (internal quotation marks and citation omitted).

In response, the Plaintiffs argue that Judge Brack's MOO held that the Individual Defendants violated a clearly established federal right and that his reasoning "compels denial of [the] Motion to Dismiss." Qualified Immunity Motion Response at 6. The Plaintiffs quote Judge Brack's statement that the Individual Defendants' actions are "'based, quite clearly, on Defendants' own determination that the post-June 30, 2015 Class III gaming at the Pueblo is illegal -- a determination that the Defendants, just as clearly, are without jurisdiction or authority to make.'" Qualified Immunity Motion Response at 6 (quoting Judge Brack's MOO at *28).

This reasoning is flawed. First, "'the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at the trial on the merits.'" Navajo Health Found. v. Burwell, 100 F. Supp. 3d at 1126 (quoting Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 776)(quoting Univ. of Tex. v. Camenisch, 451 U.S. at 395). See Chanute v. Williams Natural Gas Co., 955 F.2d at 649 (stating, in the context of a summary judgment proceeding, that "the district court is not bound by its prior factual findings determined in a preliminary injunction hearing"). Second, Judge Brack's reasoning did not fully account for the Individual Defendants' preemption argument -- the central issue in this case – because the parties did not brief that issue in the PI Motion pleadings. See generally PI Motion (not analyzing preemption); PI Motion Response (same); Supplemental Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction, filed August 28, 2015 (Doc. 27)(same). Thus, his analysis is inapposite to the Qualified Immunity Motion, which hinges on whether IGRA preempts the Individual Defendants' actions. Third, even if Judge Brack is correct that Pojoaque Pueblo's federal rights were violated, this conclusion does not itself clearly establish the illegality of the Individual Defendants' actions, because the conclusion was reached only after those actions took place. As the Tenth Circuit has stressed, the law must have been clearly established at the time of the challenged conduct. See Green v. Post, 574 F.3d at 1300. Finally, the precedent on which Judge Brack relied that was in existence at the time of the challenged conduct did not "place[] the statutory or constitutional question beyond debate." Reichle v. Howards, 132 S. Ct. at 2093 (internal quotation marks and citation omitted). As discussed supra, this case turns on an important distinction between actions to enforce state gaming laws on Indian lands -- which IGRA expressly preempts -- and regulatory actions taken outside Indian lands. See 1998-NMSC-025, ¶ 12, 13, 964 P.2d at 88. The cases on which Judge

Brack relied are inapposite, because they relate to direct state regulation of on-reservation gaming operations. See, e.g., State of Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 690 (1st Cir. 1994)(holding that IGRA preempted Rhode Island's assertion of jurisdiction over lands the United States held in trust for the Narragansett Tribe); Wyandotte Nation v. Sebelius, 443 F.3d at 1252 (holding that IGRA preempted Kansas' ability to enforce its gaming laws on the Wyandotte Nation's lands). These cases could not have put the "constitutional question beyond debate," Reichle v. Howards, 132 S. Ct. at 2093 (internal quotation marks and citation omitted), because they did not involve the precise conduct at issue in the present litigation.

At a minimum, the law was not clearly established, because the distinction between on- and off-reservation regulatory actions "might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188. As discussed above, "[e]verything -- literally everything -- in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, and nowhere else." Michigan v. Bay Mills Indian Cmty., 134 S. Ct. at 2034. Give this scope, it is at least arguable that IGRA preempts only direct state regulation of on-reservation gaming activities -- and leaves intact a state's ability to regulate non-Indian gaming vendors within its own jurisdiction. Indeed, the Supreme Court's pronouncement in Michigan v. Bay Mills Indian Cmty. that states retain "capacious" authority to regulate gaming outside of Indian lands suggests that the on-/off-reservation distinction has constitutional significance. 134 S. Ct. at 2034.

In short, the Plaintiffs have failed to demonstrate that the Individual Defendants violated the Plaintiffs' "clearly established" federal rights. Even if the Tenth Circuit concludes that the Individual Defendants' regulation of non-Indian state licensees violates the Plaintiffs' rights -- which it does not -- the Plaintiffs have not demonstrated that existing precedent "placed the statutory or constitutional question beyond debate." Reichle v. Howards, 132 S. Ct. at 2093

(internal quotation marks and citation omitted).  As a result, the Court grants the Individual Defendants' motion to dismiss Count IV on the basis of qualified immunity.

IV.     **THE DEFENDANTS ARE NOT ENTITLED TO A STAY OF DISCOVERY.**

The Individual Defendants move the Court to stay discovery pending the Court's ruling on the Qualified Immunity Motion.  See Motion to Stay Discovery at 1.  They argue that, once a defendant has raised the qualified immunity defense, "'discovery should not be allowed.'" Motion to Stay Discovery at 2 (quoting Harlow v. Fitzgerald, 457 U.S. at 818-19).  The Plaintiffs counter that the policy rationale for resolving qualified immunity issues early in litigation does not apply to the present case.  See Motion to Stay Discovery Response at 2.  At the QI Hearing, held on January 12, 2016, the Court granted the Qualified Immunity Motion and denied the Motion to Stay Discovery.   See QI Hearing at 126:19-21.  The Court elaborates on its reasoning for denying the Motion to Stay Discovery here.

As a general rule, "discovery rulings are within the broad discretion of the trial court." Cole v. Ruidoso Mun. Sch., 43 F.3d at 1386.  This discretion includes the ability to stay all or part of a proceeding "as an incident to [a court's] power to control its own docket." Landis v. N. Am. Co., 299 U.S. at 254.  The Tenth Circuit has cautioned, however, that "[t]he right to proceed in court should not be denied except under the most extreme circumstances."  Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d at 1484 (internal quotation marks and citation omitted).  Indeed, a movant seeking to stay proceedings "must make a strong showing of necessity because the relief would severely affect the rights of others."  Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d at 1484.

Unique policy considerations inform a court's decision to grant or deny a motion to stay discovery in the context of a qualified immunity defense.  See Behrens v. Pelletier, 516 U.S. at

208. The Supreme Court has characterized qualified immunity as giving "government officials a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery." Behrens v. Pelletier, 516 U.S. at 208. As a result, qualified immunity issues should be resolved at the "earliest possible stage in litigation." Albright v. Rodriguez, 51 F.3d at 1534.

Notwithstanding these considerations, whether to issue a discovery stay remains a fact-specific inquiry. For example, the Court has declined to grant a stay where it would ultimately be "unnecessary," because the parties had made "significant progress on the disputed matters," and the Court had "issued rulings on many of the motions" in the case. S2 Automation LLC v. Micron Technology, Inc., 2012 U.S. Dist. LEXIS 107962, at *3. The Court has also denied a motion to stay on the grounds that it simply did "not see a benefit to staying discovery." Walker v. THI of N.M. at Hobbs Ctr., 2011 WL2728326, at *2.

Given the facts and progress of this case, the Court concludes that a stay of discovery would serve no purpose. While it is true that discovery should normally be stayed pending the resolution of a qualified immunity defense, see Harlow v. Fitzgerald, 457 U.S. at 818-19, the point is moot, because the Court granted the Qualified Immunity Motion at the QI Hearing. See QI Hearing at 116:15-24 ("I'm going to dismiss [Count IV.]"). Thus, there is no reason to stay the case pending the Court's ruling, because the Court has already granted the Qualified Immunity Motion. Generally, the stay of discovery is only until the Court rules on the motion for qualified immunity. Here, the Court has already done that. The Individual Defendants may endure discovery going forward, but it will not be on the individual claims against them. And there is no sound reason to stay discovery on the other claims that do not involve them.

Accordingly, in light of the Court's ruling on the Qualified Immunity Motion, the Court exercises its "broad discretion" with respect to discovery rulings, Cole v. Ruidoso Mun. Sch., 43 F.3d at 1386, and denies the Individual Defendants' Motion to Stay Discovery.

## V.    NEW MEXICO IS ENTITLED TO DISMISSAL ON THE BASIS OF ELEVENTH AMENDMENT SOVEREIGN IMMUNITY.

New Mexico is named as a Defendant in this action.  See Complaint ¶ 1, at 1.  The Complaint seeks relief against New Mexico in Count I (for failure to negotiate a Class III gaming compact in good faith), see Complaint ¶ 127-31, at 33, and Count V (tortious interference with existing contract relations), see Complaint ¶ 152-53, at 37.  In their September 25, 2015, PI Motion, the Plaintiffs also sought preliminary injunctive relief against New Mexico pursuant to Counts II, III, and IV.  See PI Motion at 18-20.  Judge Brack's October 7, 2015, preliminary injunction includes New Mexico as an enjoined party.  See Preliminary Injunction by District Judge Robert C. Brack at 1.  New Mexico asserts sovereign immunity as an affirmative defense under the Eleventh Amendment and moves the Court "to remove the State as an enjoined party, and dismiss[] Plaintiffs' Complaint as against the State."  Sovereign Immunity Motion at 1.  See Motion to Dismiss Count V at 3 (seeking to dismiss Count V on sovereign immunity grounds).

The Eleventh Amendment prohibits suits "in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."[16]  U.S. Const. amend. XI.  The Supreme Court has construed this articulation of immunity as establishing that "an unconsenting State is immune from suits brought in federal

_____

[16]The Supreme Court has construed Indian tribes as "foreign states" under the Eleventh Amendment.  See Blatchford v. Native Village of Noatak, 501 U.S. 775, 781 (1991).  In Blatchford v. Native Village of Noatak, the Supreme Court held that states did not consent to suit by Indian tribes simply by entering into the Constitution -- just as they did not surrender immunity from suit by sister states or foreign sovereigns.  501 U.S. at 782.  The Supreme Court reasoned it would be absurd to hold that tribes enjoy immunity against suits by states, while simultaneously finding no reciprocal state immunity against suits by tribes.  See 501 U.S. at 782.

courts by her own citizens as well as by citizens of another state." Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. at 30 (citations and internal quotation marks omitted). This bar to suit is not absolute, however. A state may voluntarily waive its immunity and consent to suit in federal court. See Edelman v. Jordan, 415 U.S. at 673. In certain cases, Congress may also abrogate Eleventh Amendment immunity. See Fitzpatrick v. Bitzer, 427 U.S. at 456. To abrogate the state's immunity, Congress must "unequivocally express[] its intent to abrogate the immunity." Green v. Mansour, 474 U.S. 64, 68 (1985).

In IGRA § 2710(d)(7), Congress provided an "unmistakably clear" statement of its intent to abrogate state sovereign immunity. Seminole Tribe of Fla. v. Florida, 517 U.S. at 56. Section 2710(d)(7)(A)(i) provides that "[t]he United States District courts shall have jurisdiction over (i) any cause of action . . . arising from the failure of a State to enter into negotiations . . . or to conduct such negotiations in good faith." In Seminole Tribe of Fla. v. Florida, however, the Supreme Court held that, "notwithstanding Congress' clear intent to abrogate the States' sovereign immunity, the Indian Commerce Clause does not grant Congress that power, and therefore § 2710(d)(7) cannot grant jurisdiction over a State that does not consent to be sued." 517 U.S. at 47. Thus, the Supreme Court has construed the Eleventh Amendment to bar the bad faith negotiation claim asserted by the Plaintiffs in Count I. See Complaint, ¶ 127-31, at 33. In light of this decision, the parties have stipulated to the dismissal of Count I. See Joint Status Report and Provisional Discovery Plan at 4, filed November 2, 2015 (Doc. 45).

New Mexico is also entitled to sovereign immunity from the remainder of the claims in the Plaintiffs' Complaint. See Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. at 30 ("[A]n unconsenting State is immune from suits"). Congress has not validly abrogated, and New Mexico has not waived, its Eleventh Amendment immunity from these claims. See Sovereign

Immunity Motion at 2 ("The State has not waived its Eleventh Amendment immunity, and instead has asserted it"). And the Plaintiffs do not appear to contest the dismissal of the entire complaint as against New Mexico.[17] See Sovereign Immunity Motion Response at 2-3.

Because New Mexico's assertion of sovereign immunity warrants dismissal of all claims against it, the Court will grant New Mexico's request to modify the October 7, 2015, preliminary injunction and remove New Mexico as an enjoined party, if New Mexico dismisses its appeal and/or the preliminary injunction is remanded to the Court. See Sovereign Immunity Motion at 1. The Supreme Court has stated "every order short of a final decree is subject to reopening at the discretion of the district judge." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 12 (U.S. 1983). The Tenth Circuit has consistently held that "'district courts generally remain free to reconsider their earlier interlocutory orders.'" Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1251 (10th Cir. 2011)(quoting Been v. O.K. Indus., 495 F.3d 1217, 1225 (10th Cir. 2007)). Thus, in the context of rulings revisited prior to entry of final judgment, the district court retains broad discretion to reconsider their orders. See Rimbert v. Eli Lilly & Co., 647 F.3d at 1251 (noting that the Tenth Circuit has declined to apply any limitations to reconsideration of such orders). In the context, however, of the appeal of the preliminary injunction, the Court will

---

[17]In their Sovereign Immunity Motion Response, the Plaintiffs expressly agree to dismissal of Counts I and II as against New Mexico. See Sovereign Immunity Motion Response at 2-3. With respect to Counts III-V, the Plaintiffs incorporate by reference the arguments in their Motion to Dismiss Counts III and IV Response and Motion to Dismiss Count V Response. See Sovereign Immunity Motion Response at 3. A review of the Plaintiffs' Motion to Dismiss Counts III and IV Response reveals no arguments regarding the Plaintiffs' maintenance of Counts III or IV against New Mexico in light of New Mexico's assertion of sovereign immunity. See Motion to Dismiss Counts III and IV Response at 2-6. Dismissal of Counts II and IV as to New Mexico is therefore effectively conceded. The Plaintiffs' Motion to Dismiss Count V Response concedes however, to the dismissal of Count V against New Mexico. See Motion to Dismiss Count V Response at 2 ("[T]he Pueblo concurs with the Defendants that under these circumstances, this Court lacks jurisdiction to hear Count V").

need to have the Defendants dismiss their appeal, and/or the Tenth Circuit remand the order back so that the Court can modify the injunction as it has indicated.

Accordingly, the Court will grant New Mexico's request to modify the October 7, 2015, preliminary injunction and remove New Mexico as an enjoined party, when it has jurisdiction to do so.

## VI.   THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO DISMISSAL OF COUNT V ON THE BASIS OF IMMUNITY UNDER NEW MEXICO LAW.

Count V of the Plaintiffs' Complaint seeks unspecified relief for the Defendants' alleged tortious interference with existing contractual relations.  See Complaint ¶¶ 152-53, at 37.  As discussed supra, New Mexico is entitled to dismissal of all claims against it, including Count V, on the grounds of Eleventh Amendment sovereign immunity.  See Motion to Dismiss Count V at 3.  The Individual Defendants also seek dismissal of Count V on the grounds of immunity under the New Mexico Tort Claims Act, N.M.S.A §§ 41-4-1 to -30 ("the NMTCA").  Motion to Dismiss Count V at 1.

Under the NMTCA, New Mexico and its officers and employees enjoy immunity from state tort liability.  See N.M.S.A §§ 41-4-1 to -30. The NMTCA provides: "A governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived by the New Mexico Religious Freedom Restoration Act [28-22-1 N.M.S.A. 1978] and by Sections 41-4-5 through 41-4-12 N.M.S.A. 1978."  NMTCA § 41-4-4.  The NMTCA defines "[s]cope of duty" to include "any duties that a public employee is requested, required or authorized to perform by the governmental entity, regardless of the time and place of performance."  NMTCA § 41-4-3(G).  According to the Supreme Court of New Mexico, "scope of duties" includes "employees who abuse their officially authorized duties, even

to the extent of some tortious and criminal activity." Celaya v. Hall, 2004-NMSC-005, ¶ 25, 85 P.3d 239.

New Mexico "recognizes a cause of action for tortious interference with contractual relations." El Dorado Utils., Inc. v. Eldorado Area Water and Sanitation Dist., 2005-NMCA-036, ¶ 24, 109 P.3d 305, 310 (citing Kelly v. St. Vincent Hops., 1984-NMCA-130, ¶¶ 25-26, 692 P.2d 1350, 1356). To prevail on a claim for tortious interference, a plaintiff must demonstrate that the defendant "'improperly interfered with the plaintiffs' contractual relations, either through improper means or improper motive.'" Avalon Medical Group II, LLC v. LLP Mortgage, LTD., No. 12-CV-0833 MCA/KBM (D.N.M. 2014)(Armijo, J.)(quoting Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, ¶ 20, 965 P.2d 332, 339)(characterizing the tort as intentional). The MTCA does not waive liability for intentional torts, however. See El Dorado Utils., Inc. v. Eldorado Area Water and Sanitation Dist., 2005-NMCA-036, ¶ 251, 109 P.3d 305, 311. As a result, New Mexico officials cannot be held liable for tortious interference with contractual relations. See El Dorado Utils., Inc. v. Eldorado Area Water and Sanitation Dist., 2005-NMCA-036, ¶ 25, 109 P.3d 305, 311. The Plaintiffs do not dispute this immunity. See Motion to Dismiss Count V Response at 2 ("[C]oncurr[ing] with the Defendants that under these circumstances, this Court lacks jurisdiction to hear Count V[.]"). Accordingly, the Court dismisses Count V of the Complaint.

## VII. THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO AN ORDER SUSPENDING THE PRELIMINARY INJUNCTION.

The Defendants move the Court to stay or suspend Judge Brack's October 7, 2015, preliminary injunction pursuant to Rule 62(c) of the Federal Rules of Civil Procedure and Rule 8(a)(1) of the Federal Rules of Appellate Procedure. See Motion to Stay Injunction at 1. The Defendants argue that Judge Brack's ruling "misapprehended the State's position" and failed to

account for New Mexico's sovereign interest in enforcing its gaming laws outside of tribal lands. See Motion to Stay Injunction at 4. In particular, the Defendants argue that the "preliminary injunction is premised on a clearly erroneous conclusion that IGRA preempts New Mexico's exercise of its police power over state-licensed non-Indian gaming equipment manufacturers dealing with state-licensed non-Indian gaming operators outside Indian lands." Motion to Stay Injunction Reply at 2. In response, the Plaintiffs argue that IGRA preempts the Defendants' actions, that Pojoaque Pueblo's Class III gaming operations are not illegal, and that the Defendants fail to establish error in Judge Brack's ruling. See Motion to Stay Injunction Response at 2-18.

The Court's analysis begins with its authority to stay or suspend a preliminary injunction. Different Rules of Procedure govern district courts' and courts of appeals' power to stay an order pending appeal. See Fed. R. Civ. Proc. 61(c); Fed. R. App. Proc. 8(a). Rule 61(c) of the Federal Rules of Civil Procedure provides: "While an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." In evaluating a motion to stay a preliminary injunction pursuant to Rule 61(c), the Supreme Court has indicated that the district court should balance the following factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Hilton v. Braunskill, 481 U.S. 770, 776 (1987)(citations omitted). Thus, the same factors are considered in the context of a motion to stay a preliminary injunction as in granting a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. See Resolution Trust Corp. v. Cruce, 972 F.2d at 1198 (listing the same four factors). The Tenth Circuit reviews the

district court's weighing of these factors is reviewed for abuse of discretion. See Middle Rio Grande Conservancy Dist. v. Norton, 294 F.3d 1220, 1226 (10th Cir. 2002).

Courts have long recognized that the same legal standards that govern stays of injunctions under Rule 62(c) also govern grants of injunctions pursuant to Rule 65. See, e.g., Hilton v. Braunskill, 481 U.S. at 776 (articulating the same four-part test for stays under Rule 62(c) as grants of injunctions under Rule 65); Accident Fund v. Baerwaldt, 579 F. Supp. 724, 725 (W.D. Mich. 1984)(stating that "the criteria used in deciding whether to grant a Rule 62(c) injunction pending appeal and a preliminary injunction before trial are much the same[.]"). In the context of a Rule 65 motion, the Tenth Circuit has indicated that the "probability of success requirement" is especially rigorous where "a preliminary injunction seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme. . . ." Heideman v. S. Salt Lake City, 348 F.3d 1182, 1189 (10th Cir. 2003)(citation and internal quotation marks omitted). Moreover, the Tenth Circuit has found that, where a claim lacks merit, a court can "short-circuit the factor-weighing process . . . [and] deny[] injunctive relief." Soskin v. Reinerston, 353 F.3d 1242, 1257 (10th Cir. 2004). If a court makes that determination, the Tenth Circuit "can hardly find an abuse of discretion in denying injunctive relief." Soskin v. Reinerston, 353 F.3d at 1257.

The Defendants appeal to the Court to apply the foregoing analytical framework and stay the preliminary injunction, which "was predicated on an erroneous determination of the likelihood of success on the merits. . . ." Motion to Stay Injunction at 2-3. The Defendants argue that likelihood of success should be the controlling factor in the Court's analysis, and that "the injunction should be stayed regardless of any consideration of the three other 'equitable'

factors." Motion to Stay Injunction at 3. The Plaintiffs do not explicitly contest this formulation of the governing legal standards. See Generally Motion to Stay Injunction Response.

The Court has already concluded, supra, that the Plaintiffs are not likely to succeed on the merits of their claim that underlies the preliminary injunction -- that New Mexico violated Pojoaque Pueblo's federal rights. The Court's analysis of IGRA's preemptive scope indicates that the Defendants' off-reservation regulatory actions, directed towards non-Indian vendor licensees dealing with non-Indian gaming operators, did not violate Pojoaque Pueblo's federal rights under IGRA. The Court's analysis also indicates that the Defendants did not violate Pojoaque Pueblo's rights under the Supremacy Clause, or pursuant to 42 U.S.C. §§ 1983 or 1985. Simply put, the Plaintiffs have not made a "strong showing" that they are likely to succeed on the merits of their claim. Hilton v. Braunskill, 481 U.S. at 776. Based on this finding, the Court should "short-circuit the factor-weighing process" and grant the stay. Soskin v. Reinerston, 353 F.3d at 1257.

The Plaintiffs' principal response is that the Defendants improperly determined that Pojoaque Pueblo's Class III gaming in the absence of a compact is illegal. See Motion to Stay Injunction at 2. The Court has already dealt with this argument, supra. Under IGRA, "a tribe cannot conduct class III gaming on its lands without a compact . . . ." Michigan v. Bay Mills Indian Comty., 134 S. Ct. at 2035. See United States v. 162 Megamania Gambling Devices, 321 F.3d 713, 718 (10th Cir. 2000)("Class III gaming . . . is allowed only where a tribal-state compact is entered."). IGRA's text and binding Supreme Court and Tenth Circuit precedent resolve the issue of the illegality of Pojoaque Pueblo's Class II gaming operations in the absence of a compact with New Mexico. Thus, the Defendants did not improperly determine that

Pojoaque Pueblo's operations are illegal, because the illegality of those operations was plainly established by controlling legal authority.

The Plaintiffs contend, however, that, in light of the Supreme Court's holding in Seminole Tribe v. Florida, which found that Congress lacked Constitutional authority to subject non-consenting states to suit by Indian tribes under IGRA, the Court should "reevaluate" IGRA's requirement of a state-tribal compact for Class III gaming activities to be legal on Indian lands. Motion to Stay Injunction Response at 3. The Plaintiffs argue that "Seminole Tribe [] revealed that IGRA was broken," and that the Court should invoke severance doctrine to make the statute comport with Congressional intent. Motion to Stay Injunction Response at 3-4. The Plaintiffs discuss -- at some length -- various Congressional statements that, in the Plaintiffs' view, reveal that Congress would not have intended to criminalize non-compacted Class III gaming absent the ability of a tribe to sue a state for failing to negotiate a compact in good faith. See Motion to Stay Injunction Response at 3-16. The Plaintiffs propose that the Court sever IGRA's requirement that a state be found to have acted in bad faith before IGRA's remedies apply, and add a provision for a mediator to be appointed to select a compact proposed by the tribe. See Motion to Stay Injunction Response at 13-14. In the Plaintiffs' version of the statute, a state would have the choice of either consenting to the tribe's proposed compact or being subjected to secretarial procedures based on the tribe's compact. See Motion to Stay Injunction Response at 13-14. According to the Plaintiffs, if a compact could not be negotiated, tribes would be free to conduct gaming "in a State in which gambling devices are legal." See Motion to Stay Injunction Response at 15.

In effect, the Plaintiffs appeal to the Court to rewrite IGRA so that Pojoaque Pueblo's Class III gaming operations in the absence of a compact are no longer considered "illegal" under

the statute.  <u>See</u> Motion to Stay Injunction Response at 15.  But this request entirely misses the point with respect to the present motion to stay the preliminary injunction.  Severing the allegedly offending language in the statute does nothing to demonstrate the Plaintiffs' likelihood of success on the merits at trial -- it would merely sanction Pojoaque Pueblo's present Class III gaming operations.  Likelihood of success, however, turns on whether the Defendants' regulatory actions violated the Plaintiffs' rights <u>at the time they occurred</u>.  Mid-litigation sanctioning of the Plaintiffs' gaming operations does not demonstrate this; and it certainly does not amount to a "strong showing" that the Plaintiffs are likely to succeed on the merits.  <u>Hilton v. Braunskill</u>, 481 U.S. 770, 776.  If anything, this line of reasoning effectively concedes that the Plaintiffs' current gaming operations are unlawful, which further illustrates that the Plaintiffs are not likely to succeed at trial.

In any event, the Court declines to engage in severance analysis in these circumstances. IGRA contains an express severability clause.  <u>See</u> 25 U.S.C. § 2721.  The Supreme Court has indicated that "the inclusion of such a clause creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision."  <u>Alaska Airlines, Inc., v. Brock</u>, 480 U.S. 678, 686 (1987)(citing <u>INS v. Chadha</u>, 462 U.S. 919, 932 (1983)).  "In such a case, unless there is strong evidence that Congress intended otherwise, the objectionable provision can be excised from the remainder of the statute."  <u>Alaska Airlines, Inc., v. Brock</u>, 480 U.S. at 686.  Once severed, if the statute remains "fully operative as a law" that Congress would likely have enacted, a court "must sustain its remaining provisions." <u>Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.</u>, 561 U.S. 477, 509 (2010).  Here, IGRA remains "fully operative as a law" in the wake of <u>Seminole Tribe v. Florida</u> -- all that decision did was limit the remedies available in the event of failed compact negotiations, but it did not

cripple the operation of the statute.  <u>Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.</u>, 561

U.S. at 509.  Moreover, the fact that Congress has not amended IGRA in the twenty-two years

since <u>Seminole Tribe v. Florida</u> suggests that Congress is satisfied with the functionality of the

statute as it stands, even without the authorization of bad faith suits by tribes against non-

consenting states.  Finally, the Court is mindful that it should not sever "more of the statute than

is necessary."  <u>Alaska Airlines, Inc., v. Brock</u>, 480 U.S. at 684.  The Plaintiffs' proposed

"severance" would result in not only eliminating substantial portions of the statute, but it would

require the Court to effectively write new provisions. The Court is not a legislature; it declines to

write a new statute.

IGRA does not currently have the best means of breaking negotiation impasses, but most

states and tribes are working out compacts, and state and tribal gaming are coexisting with the

suit-against-the-state mechanism missing.  There is no sound reason to toss out the rest of the

statute.  Perfection should not be the enemy of the working. The negotiation process is a bit

messy, but is not so intolerable that the political branches cannot stand the current state.

In light of the above, the Plaintiffs have not made a "strong showing" that they are likely

to succeed on the merits of their claim.  <u>Hilton v. Braunskill</u>, 481 U.S. 770, 776.  Accordingly,

the Court grants the Motion to Stay Injunction.

## VIII.  THE COURT GRANTS IN PART AND DENIES IN PART THE REQUEST TO VACATE AND/OR MODIFY THE PRELIMINARY INJUNCTION

During the pendency of an appeal from a preliminary injunction, a court cannot grant

relief regarding the preliminary injunction that divests the appellate court of its jurisdiction by

eliminating or materially altering the controversy.  <u>See</u> <u>Ortho Pharm. Corp. v. Amgem, Inc.</u>, 887

F.2d 460, 463-464 (3d Cir. 1989).  <u>See</u> <u>Griggs v. Provident Consumer Discount Co.</u>, 459 U.S.

56, 58 (1982)(stating that a district court loses jurisdiction as to those aspects of the case that are

involved in a pending appeal).  A district court therefore has no jurisdiction to vacate or dissolve a preliminary injunction that has been appealed.  See Coastal Corp. v. Tex. E. Corp., 869 F.2d 817, 819-820 (5th Cir. 1989).  In light of these constraints, the Court will deny the Motion to Reconsider Injunction.

Pursuant to Rule 62.1 of the Federal Rules of Civil Procedure, however, the Court indicates that it would dissolve or vacate the preliminary injunction if the Defendants dismiss the appeal and/or the Tenth Circuit remands the case for the Court's consideration.

Accordingly, the Court denies the Motion to Reconsider Injunction without prejudice to be renewed if the appeal is remanded.  The Court grants the request, however, in the Motion to Reconsider Injunction to issue an indicative ruling that it will dissolve or vacate the preliminary injunction if it is remanded for the Court's consideration.

## IX.    THE COURT GRANTS THE SUPPLEMENTAL BRIEFING MOTION.

Because the Court needs as much education as possible on this topic, the Court grants the Supplemental Briefing Motion.

**IT IS ORDERED** that: (i) Defendants Susana Martinez, Jeremiah Ritchie, Jeffrey S. Landers, Salvatore Maniaci, Paulette Becker, Robert M. Doughty III, and Carl E. Londone's Motion to Dismiss Count IV on the Basis of Qualified Immunity, filed December 4, 2015 (Doc. 60), is granted; (ii) Defendants Susana Martinez, Jeremiah Ritchie, Jeffry [sic] S. Landers, Salvatore Maniaci, Paulette Becker, Robert M. Doughty III, and Carl E. Londene's Motion for Stay of Discovery Pending Qualified Immunity Rulings, filed December 4, 2015 (Doc. 61), is denied; (iii) the Defendants' Motion to Stay or Suspend the Court's October 7, 2015 Preliminary Injunction, filed December 18, 2015 (Doc. 64), is granted; (iv) the Defendants' Motion to Reconsider and Either Vacate or Modify the Court's October 7, 2015 Preliminary Injunction, and

for Relief Pursuant to Fed. R. Civ. P. 62.1, filed December 18, 2015 (Doc. 65), is granted in part and denied in part; (v) Defendant State of New Mexico's Motion to Modify October 7, 2015 Preliminary Injunction and to Dismiss Defendant State of New Mexico Based on the State's Eleventh Amendment Sovereign Immunity, filed December 22, 2015 (Doc. 69), is granted in part and denied in part; (vi) the Defendants' Motion to Dismiss Counts III and IV of the Plaintiffs' Complaint, filed December 22, 2015 (Doc. 71), is granted; (vii) the Defendants' Motion to Dismiss Count II of Plaintiffs' Complaint, filed December 22, 2015 (Doc. 72), is granted; (viii) the Defendants' Motion to Dismiss Count V of Plaintiffs' Complaint, filed December 22, 2015 (Doc. 73), is granted; (ix) the Pueblo's Motion to Stay Proceedings Pending Defendants' Interlocutory Appeal of Order Issuing Preliminary Injunction, filed February 17, 2016 (Doc. 93), is denied; and (x) the Pueblo's Motion for Leave to Submit Supplemental Brief in Support of Pueblo's Motion to Stay Proceedings Pending Defendants' Interlocutory Appeal of Order Issuing Preliminary Injunction, filed March 29, 2016 (Doc. 111), is granted. The case is hereby dismissed. The claims against Defendant State of New Mexico are dismissed without prejudice, and the claims against all other Defendants are dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Carrie A. Frias
Pueblo of Pojoaque Legal Department
Santa Fe, New Mexico

--and--

Scott Crowell
Steffani Ann Cochran
Crowell Law Office Tribal Advocacy Group, P.L.L.C.
Sedona, Arizona

*Attorneys for the Plaintiffs*

Henry M. Bohnhoff
Edward Ricco
Krystle A. Thomas
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

*Attorneys for the Defendants*