# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PUEBLO OF POJOAQUE, a federally recognized
Indian Tribe; JOSEPH M. TALACHY, Governor of
the Pueblo of Pojoaque,

      Plaintiffs,

vs.                                                                                    No. CIV 15-0625 JB/GBW

STATE OF NEW MEXICO; SUSANA
MARTINEZ; JEREMIAH RITCHIE; JEFFERY
S. LANDERS; SALVATORE MANIACI;
PAULETTE BECKER; ROBERT M. DOUGHTY;
III; CARL E. LONDENE and JOHN DOES I-V,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Motion to Stay the Order and

Restore the Preliminary Injunction Pending Appeal, filed October 4, 2016 (Doc. 123)("Motion to

Stay MOO"); (ii) the Plaintiffs' Motion for Leave to File Supplemental Brief, filed November 2,

2016 (Doc. 140)("Suppl. Brief Motion"); and (iii) Defendants' Response to Plaintiffs' Motion for

Leave to File Supplemental Brief, filed November 21, 2016 (Doc. 141)("Suppl. Brief Motion

Response").  The Court held hearings on October 27, 2016, and December 9, 2016.  The primary

issues are: (i) whether the Court, pursuant to rule 62(c) of the Federal Rules of Civil Procedure,

should stay the order that it made in its Memorandum Opinion and Order, filed September 30, 2016

(Doc. 118)("Stay MOO"), staying the preliminary injunction that the Honorable Robert C. Brack,

United States District Judge for the United States District Court for the District of New Mexico

entered in his Memorandum Opinion and Order, filed October 7, 2015 (Doc. 31)("PI MOO"),

pending Plaintiff Pueblo of Pojoaque's appeal of that judgment to the United States Court of Appeals

for the Tenth Circuit; (ii) whether, in the alternative, the Court should grant a sixty-day temporary stay of its judgment to allow time for the Tenth Circuit to decide a motion for a stay that Pojoaque Pueblo will assert pursuant to rule 8(a)(1)(A) and (C) of the Federal Rules of Appellate Procedure; (iii) whether the Court should allow Pojoaque Pueblo to file a supplemental brief to address issues that arose during the Court's October 27, 2016, hearing; and (iv) whether, if the Court allows Pojoaque Pueblo a supplemental brief, it should allow the Defendants to file a response to that brief. The Court will grant the Supplemental Brief Motion, allow the Defendants to file a response to the brief attached to the Supplemental Brief Motion, and deny the Motion to Stay MOO.

## **FACTUAL BACKGROUND**

This action arises out of Defendant State of New Mexico and Pojoaque Pueblo's failure to successfully negotiate a state-tribal gaming compact pursuant to the Indian Gaming Regulatory Act of 1988, 25 U.S.C. §§ 2701-2721 ("IGRA"), and a resultant dispute over New Mexico's authority to take regulatory enforcement actions against non-Indian, state-licensed gaming manufacturer vendors doing business with Pojoaque Pueblo's gaming enterprises, despite the absence of a compact.  On October 7, 2015, the Honorable Robert C. Brack, United States District Judge for the United States District Court for the District of New Mexico, issued a preliminary injunction barring the Defendants from taking such regulatory actions, holding that New Mexico lacked "authority or jurisdiction" absent a gaming compact to "harass[] and threaten[]" Pojoaque Pueblo's vendors.  PI MOO at 20. On September 30, 2016, the Court stayed the effects of Judge Brack's preliminary injunction, holding that Pojoaque Pueblo failed to make the requisite "strong showing" that it was likely to succeed on the merits of its claim underlying the injunction.  Stay MOO at 141-44 (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987))(internal quotation marks omitted).  Pojoaque Pueblo promptly moved to stay the Court's judgment and restore the preliminary injunction on October 4, 2016.  See

Motion to Stay MOO at 1.

The Court discussed this case's facts at length in its September 30, 2016, Stay MOO.  See Stay MOO at 4-18.  Because the Court's resolution of Pojoaque Pueblo's Motion to Stay MOO requires a fact-intensive inquiry, however, the Court will again carefully review the events surrounding the present dispute.  Additionally, because the Court grants Pojoaque Pueblo's Supplemental Brief Motion, the Court's discussion of the facts will incorporate facts which that Motion adds to the record.

### 1.    Overview of the Parties.

Pojoaque Pueblo is a federally-recognized Indian Tribe that operates two gaming facilities on its tribal lands: the Buffalo Thunder Resort & Casino and the Cities of Gold Hotel & Casino.  See Complaint [Failure to Conclude Compact Negotiations in Good Faith, 25 U.S.C. § 2710(d); Declaratory Judgment and Injunctive Relief; Violation of Civil Rights, 42 U.S.C § 1983; Pendant Claim of Tortious Interference with Existing Contractual Relationships] ¶ 14, at 7, filed July 18, 2015 (Doc. 1)("Complaint"); Pueblo of Pojoaque, http://pojoaque.org/visit/gaming/ (last visited December 22, 2016).  Plaintiff Joseph M. Talachy is Pojoaque Pueblo's Governor.  See Complaint ¶ 15, at 7.

New Mexico is a sovereign state.  See Complaint ¶ 16, at 7.  Defendants Jeffrey S. Landers, Salvatore Maniaci, Paulette Becker, Robert M. Doughty III, and Carl E. Londone (collectively, the "Gaming Board Members") are Members of the New Mexico Gaming Control Board.  See Complaint ¶¶ 19-23, at 7-8.  Landers also serves as Chairman of the Gaming Board.  See Complaint ¶ 19, at 7.  Defendant Susana Martinez, New Mexico's Governor, appointed each Gaming Board member.  See Complaint ¶ 17, at 7; id. ¶¶ 19-23, at 7-8.  Defendant Jeremiah Ritchie serves as Martinez' Deputy Chief of Staff and primary IGRA compact negotiator.  See Complaint ¶ 18, at 7.

2.     **Events Leading to the June 30, 2015, Expiration of New Mexico and Pojoaque Pueblo's Class III Gaming Compact.**

On July 19, 2005, New Mexico and Pojoaque Pueblo executed a Class III gaming compact[1] pursuant to IGRA § 2710(d), permitting the operation of casino-style gaming operations on Pojoaque Pueblo's tribal lands.  See Complaint ¶ 46, at 16.  Under the terms of the compact, originally drafted in 2001, Pojoaque Pueblo was obligated to pay an "8% tax on net win, or gross gaming revenue," to New Mexico.  Complaint ¶ 44, at 15.  Pojoaque Pueblo at first refused to execute the 2001 Compact, but eventually "acquiesced to the State's demands in 2005."  Complaint ¶ 45, at 16.  In 2007, New Mexico agreed to extend the 2001 compact's term for "tribes that agreed to an increase of the tax on net win to a range of 9.25% to 10.75% of net win, or gross gaming revenue, while acquiescing to an increase in non-Indian gaming activity in the state."  Complaint ¶ 47, at 16.  Notably, the 2007 compact limited a tribe's gaming operations to two gaming facilities within the tribe's lands.  See Complaint ¶ 47, at 16.  The 2007 compact, therefore, increased the gaming tax while simultaneously diminishing the "exclusivity" to tribes operating gaming facilities in the state.  Complaint ¶ 47, at 16. Pojoaque Pueblo did not accede to the 2007 compact, in part because it would have forced Pojoaque Pueblo to "close established gaming facilities" and cease construction on the Buffalo Thunder Resort & Casino.  Complaint ¶ 48, at 16-17.

Before the expiration of New Mexico and Pojoaque Pueblo's outstanding compact on June 30, 2015, Pojoaque Pueblo formally requested that New Mexico enter into a new agreement.  See Complaint ¶ 2, at 2.  Talks were unsuccessful, however, because, similar to the 2007 compact, New

---

[1]As the Court will explain more fully infra, IGRA, 25 U.S.C. §§ 2701-2721, "divides gaming on Indian lands into three classes -- I, II, and III -- and provides a different regulatory scheme for each class."  Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 48 (1996)("Seminole Tribe I").  Class III gaming "includes such things as slot machines, casino games, banked card games, dog racing, and lotteries."  Seminole Tribe I, 517 U.S. at 48 (footnote omitted).  IGRA leaves Class III gaming to "the exclusive jurisdiction of the Indian tribes."  25 U.S.C. § 2710(a)(1).

Mexico proposed terms which increased the "tax on net win to a range of 8.75% to 10.75% of net win, or gross gaming revenue, while acquiescing to an increase in non-Indian gaming activity in the State." Complaint ¶ 51, at 17. As before, Pojoaque Pueblo viewed these terms as increasing the gaming tax while decreasing Pojoaque Pueblo's "exclusivity" in its gaming operations. Complaint ¶ 51, at 18. Accordingly, Pojoaque Pueblo did not agree to the terms of what eventually became New Mexico's 2015 Form Compact. See Complaint ¶ 54, at 18. See generally Tribal-State Class III Gaming Compact (Indian Gaming Compact Between the State of New Mexico and the _____ [sic])(drafted February 2015)("2015 Form Compact").

Believing that New Mexico's "tactics and positions" regarding what later became the 2015 Form Compact violated federal law, on December 13, 2013, Pojoaque Pueblo filed suit against New Mexico for failing to negotiate a compact under IGRA in good faith. Complaint ¶ 55, at 19. New Mexico promptly asserted sovereign immunity under the Eleventh Amendment to the Constitution of the United States of America as an affirmative defense, and, accordingly, the Honorable James A. Parker, Senior United States District Judge for the United States District Court for the District of New Mexico, dismissed the lawsuit on March 3, 2014. See Complaint ¶ 56, at 19; Pueblo of Pojoaque v. New Mexico, 2014 U.S. Dist LEXIS 188665 (D.N.M. 2014)(Parker, J.).

With compact negotiations stalled, Pojoaque Pueblo submitted a proposal for Class III gaming to the United States Secretary of the Interior pursuant to IGRA § 2710(d)(7)(B) and 25 C.F.R. Part 291. See Complaint ¶ 57, at 19. The remedial scheme in IGRA § 2710(d)(7)(B) enables the Interior Secretary to promulgate procedures for Class III gaming if a state refuses to agree to a compact. See 25 U.S.C. § 2710(d)(7)(B)(vii). The Interior Secretary may initiate such procedures once a federal court makes a determination that a state acted in bad faith in failing to negotiate a compact. See 25 U.S.C. § 2710(d)(7)(B)(iv)-(v). A state's ability to assert sovereign immunity as

an affirmative defense to bad faith suits under IGRA, however, effectively neutralizes this remedial scheme.  See Seminole Tribe I, 517 U.S. at 47 (holding that Congress has no authority to subject states to suit by Indian tribes for negotiating in bad faith under IGRA).  To resolve this issue, the Interior Secretary created the regulations in 25 C.F.R. Part 291 to provide tribes with an alternate path to obtain Class III gaming procedures.  These regulations provide that, where "[a] State and an Indian tribe are unable to voluntarily agree to a compact" and "[t]he state has asserted its immunity from suit brought by an Indian tribe," 25 C.F.R. Part 291.1, a tribe "may use the Secretarial Procedures to obtain permission to operate Class III gaming without the State's consent," New Mexico v. Dep't of Interior, 2014 U.S. Dist. LEXIS 184655, at *5 (D.N.M. 2014)(Parker, J.), on appeal 14-2222.

On August 7, 2014, New Mexico filed suit against the United States challenging the Interior Secretary's authority to promulgate the regulations in 25 C.F.R. Part 291.  See New Mexico v. Dep't of Interior, 2014 U.S. Dist. LEXIS 184655.  On October 17, 2014, Judge Parker granted summary judgment to New Mexico and enjoined the United States from taking actions to enforce 25 C.F.R. Part 291.  See New Mexico v. Dep't of Interior, 2014 U.S. Dist. LEXIS 184655, at *43.  An appeal to the Tenth Circuit is pending.  See New Mexico v. Dep't of Interior, 14-2222.

On November 3, 2014, Pojoaque Pueblo informed New Mexico of its renewed desire to negotiate a compact to govern its Class III gaming operations past the June 30, 2015, termination of the extant state-tribal agreement.  See Complaint ¶ 60, at 19.  Pojoaque Pueblo again renewed and reaffirmed this request on January 23, 2015.  See Complaint ¶ 61, at 19.  New Mexico and Pojoaque Pueblo representatives subsequently met on several occasions to negotiate a new compact; however, talks again were unsuccessful, and New Mexico and Pojoaque Pueblo never reached an agreement.  See Complaint ¶¶ 62-64, at 19-20.

On February 26, 2015, Becker, on the Gaming Board's behalf, requested to perform the Gaming Board's routine annual compliance review of Pojoaque Pueblo's gaming operations on November 3-5, 2015.  See Complaint ¶ 65, at 20.  On May 6, 2015, however, Becker notified Pojoaque Pueblo by letter of the Gaming Board's intention to conduct an earlier compliance review in advance of the existing compact's expiration.  See Complaint ¶¶ 65-66, at 20.  In the letter, Becker requested that Pojoaque Pueblo provide "[a]ny and all contract[s] with Class III Gaming Machine Manufacturers, including and [sic] Lease, Purchase and Service Agreements."  Complaint ¶ 66, at 20.  Pursuant to its obligations under the outstanding compact, Pojoaque Pueblo produced the requested vendor contracts.  See Complaint ¶ 66, at 20.

Beginning in April 2015, New Mexico negotiated state-tribal Class III gaming compacts with fifteen pueblos and tribes throughout the state.  See Complaint ¶ 51, at 17-18 (noting that five tribes executed the 2015 Form Compact in April 2015); Plaintiffs' "Proposed" Supplemental Brief at 3, filed November 2, 2016 (Doc. 140-1)("Suppl. Brief")(noting that in total fifteen pueblos and tribes executed the 2015 Form Compact).  The 2015 Form Compact pursuant to which these agreements were executed called for an 8.75 percent to 10.75 percent tax on tribes' and pueblos' net winnings or gross gaming revenue.  See 2015 Form Compact at 25.  As noted above, Pojoaque Pueblo refused to agree to the 2015 Form Compact's revenue sharing terms.  See Complaint ¶ 54, at 18.

Starting in early June 2015, the Interior Secretary posted notices in the Federal Registrar and sent letters to the fifteen pueblos and tribes that executed the 2015 Form Compact explaining that each compact was "deemed approved" -- that is, that the agreements were approved by operation of law.  Suppl. Brief at 3 (referencing, e.g., Letter from Kevin K. Washburn to Danny H. Breuninger Jr. Regarding Approval of Compact Between the State of New Mexico and the Mescalero Apache Tribe (dated June 9, 2015), filed November 2, 2016 (Doc. 140-3)("Mescalero Apache Letter"); Letter from

Kevin K. Washburn to Luis Romero Regarding Approval of Compact Between the State of New Mexico and the Pueblo of Taos (dated July 23, 2015), filed November 2, 2016 (Doc. 140-11)("Taos Pueblo Letter"); Letter from Lawrence S. Roberts to Francisco I. Lujan Regarding Approval of Compact Between the State of New Mexico and the Pueblo of Sandia (dated March 29, 2016), filed November 2, 2016 (Doc. 140-15)("Sandia Pueblo Letter")).  Each letter explained that, pursuant to IGRA § 2710(d)(8)(A) and (B), the Interior Secretary is empowered either to affirmatively approve or to disapprove a state-tribal gaming compact.  See Mescalero Apache Letter at 1; Taos Pueblo Letter at 1; Sandia Pueblo Letter at 1.  In the event that the Interior Secretary neither approves nor disapproves a compact within 45 days of its submission, the letters continued, the compact is deemed approved under IGRA § 2710(d)(8)(C), to the extent that its terms are consistent with IGRA's provisions.  See Mescalero Apache Letter at 1; Taos Pueblo Letter at 1; Sandia Pueblo Letter at 1.  Thus, the letters stated that, because "no action was taken on the 2015 Compact within the 45-day review period," the compacts were "considered approved by operation of law[.]"  Taos Pueblo Letter at 1; Sandia Pueblo Letter at 1.  See Mescalero Apache Letter at 1 (stating the same).

Each letter from the Interior Secretary included some discussion of the 2015 Form Compact's terms.  See Mescalero Apache Letter at 1-3; Taos Pueblo Letter at 2-3; Sandia Pueblo Letter at 1-3. The letters stated that IGRA requires that states engage in good-faith compact negotiations, and that it was the Interior Secretary's understanding that "each of the New Mexico Tribes . . . made an independent determination that adopting the 2015 Compact was in its best interest."  Taos Pueblo Letter at 2; Sandia Pueblo Letter at 1.  See Mescalero Apache Letter at 2 (same).  The letters then proceeded to discuss the 2015 Form Compact's revenue sharing requirements, explaining that such requirements are "closely scrutinize[d]" under a two-prong inquiry: (i) "whether the state has offered meaningful concessions that it was not otherwise required to negotiate"; and (ii) "whether the value

of the concessions provides substantial economic benefits to the tribe to justify the revenue sharing negotiated." Sandia Pueblo Letter at 1-2. <u>See</u> Mescalero Apache Letter at 2 (same); Taos Pueblo Letter at 2 (same). Under the first prong, the letters concluded that the 2015 Form Compact made "meaningful concessions" by allowing the tribes to "continue to receive partial exclusivity over slot machines while maintaining full exclusivity over all other forms of class III gaming under IGRA." Mescalero Apache Letter at 2; Taos Pueblo Letter at 2; Sandia Pueblo Letter at 2. Under the second prong, however, the letters expressed "skeptic[ism] about the overall value of the 2015 Compact's additional claimed concessions." Sandia Pueblo Letter at 2. <u>See</u> Mescalero Apache Letter at 3 (same); Taos Pueblo Letter at 2 (same). Nevertheless, the letters concluded that, "[g]iven the Tribes' unified stance that they will receive substantial economic benefit from the 2015 Compact . . . we take no action on the 2015 Compacts within the 45-day time limit on this issue." Mescalero Apache Letter at 3. <u>See</u> Taos Pueblo Letter at 3 (same); Sandia Pueblo Letter at 2 (same). The Interior Secretary's letter to the Pueblo of Sandia, for example, noted that the Sandia Pueblo "estimates a cost savings of $400,000 per calendar quarter" under the 2015 Form Compact. Sandia Pueblo Letter at 2 n.5 (citation omitted). The Interior Secretary therefore deemed approved the state-tribal gaming compacts. <u>See</u> Mescalero Apache Letter at 3; Taos Pueblo Letter at 3; Sandia Pueblo Letter at 3.

New Mexico and Pojoaque Pueblo's Class III gaming compact expired at midnight on June 30, 2015. <u>See</u> Complaint ¶ 69, at 21. Earlier that day, Damon P. Martinez, United States Attorney for the District of New Mexico, issued a letter to Talachy stating that, once the compact expired, "[c]ontinued gaming operations by the Pueblo . . . would violate federal law." Letter From Damon P. Martinez to Joseph M. Talachy Regarding Expiration of Pojoaque Pueblo's Class III Gaming Compact with New Mexico at 1 (dated June 30, 2015), filed October 1, 2015 (Doc. 28-3)("U.S. Attorney's Letter"). This pronouncement notwithstanding, the U.S. Attorney's Letter indicated that

Mr. Martinez would "exercise [] discretion to withhold enforcement action against the Pueblo" during the pendency of the appeal in New Mexico v. Dep't of Interior, 14-2222, challenging Judge Parker's ruling that the Secretarial Procedures in 25 C.F.R. Part 291 are invalid.  See U.S. Attorney's Letter at 1.  Mr. Martinez expressly conditioned his decision on Pojoaque Pueblo agreeing to maintain the status quo of its gaming operations according to the expiring compact's terms and on Pojoaque Pueblo placing in trust funds that it would otherwise pay to New Mexico under the compact.  See U.S. Attorney's Letter at 1.  The U.S. Attorney's Letter stipulated that it did not "create any rights, substantive or procedural, enforceable at law or in equity by any party in the matter, civil or criminal . . . ."  U.S. Attorney's Letter at 1.

That same day, on June 30, 2015, the Gaming Board issued a public statement that Mr. Martinez' decision to allow Pojoaque Pueblo's casinos to remain in operation "provides no protection to banks, credit card vendors, gaming machine vendors, advertisers, bondholders, and others that are now doing business with an illegal gambling enterprise."  Complaint ¶ 68, at 21. Shortly thereafter, on July 15, 2015, the Gaming Board held a closed meeting to discuss tribal gaming compliance issues.  See Complaint ¶ 73, at 22.  Following the meeting, the Gaming Board announced that it had determined that Pojoaque Pueblo's casinos were operating illegally in the absence of a Class III gaming compact and "placed in abeyance approval of any license application or renewal for the Pueblo's vendors."  Complaint ¶ 73, at 22.  The Gaming Board did not place any other vendors' applications in abeyance.  See Complaint ¶ 73, at 22.

Pojoaque Pueblo asserts that the Gaming Board's actions regarding vendor license applications discouraged vendors from doing business with Pojoaque Pueblo.  See Declaration of Michael Allgeier ¶ 14, at 4 (executed September 25, 2015), filed September 25, 2015 (Doc. 23-9)("Allgeier Decl.").  For example, Pojoaque Pueblo alleges that Scientific Games, Inc., one of its

gaming vendors, suspended the installation of a new casino management system for Pojoaque Pueblo's gaming enterprises pending the Gaming Board's determination whether "Scientific games can continue to do business with the Pueblo."  Allgeier Decl. ¶ 14, at 4.

<div align="center">**PROCEDURAL BACKGROUND**</div>

Pojoaque Pueblo commenced this action on July 18, 2015, seeking redress for two primary claims: (i) that New Mexico failed to conclude compact negotiations in good faith for the regulation of Class III gaming activities on Pojoaque Pueblo's lands, in violation of IGRA § 2710(d); and (ii) that the Individual Defendants -- Martinez, Ritchie, Landers, Maniaci, Becker, Doughty, and Londene -- conspired under color of state law to "deprive the federal right of the Pueblo and its members to be free of state jurisdiction over activities that occur on the Pueblo lands."  Complaint ¶ 1, at 1-2.  Pojoaque Pueblo's theory of the case is that New Mexico has "wrongfully assert[ed] State jurisdiction over gaming activities on the Pueblo's Indian lands" in the absence of a Class III gaming compact, thereby violating the Supremacy Clause of the Constitution of the United States of America and federal civil rights statutes.  Complaint ¶ 8, at 4.  To redress these violations, Pojoaque Pueblo seeks declaratory relief, an injunction preventing New Mexico from interfering with Pojoaque Pueblo's gaming vendors, the appointment of a mediator to facilitate negotiations, $50,000,000.00 per year in money damages, attorney's fees, and "such other relief as may be just and equitable, including ancillary relief."  Complaint ¶¶ A-W, at 37-40.  The case was assigned to Judge Brack.  See Notice of Case Reassignment to District Judge Robert C. Brack as Trial Judge, filed September 10, 2015 (Doc. 19)([text-only-entry]).

The Court divides its discussion of the case's Procedural Background into six parts.  First, the Court will review the Gaming Board's actions following Pojoaque Pueblo's filing of this lawsuit, Judge Brack's issuance of a preliminary injunction prohibiting those actions, and the Defendants'

interlocutory appeal of that preliminary injunction. Second, the Court will discuss the Gaming

Board's actions in the wake of Judge Brack's PI and the Court's opinion holding that those actions

do not violate the PI. Third, the Court will discuss its opinion staying the effects of Judge Brack's PI

and dismissing the case, as well as Pojoaque Pueblo's appeal of that judgment to the Tenth Circuit.

Fourth, the Court will review Pojoaque Pueblo's Motion to Stay the Court's judgment and restore

the preliminary injunction. Fifth, the Court will discuss the Defendants' motion to dismiss their

interlocutory appeal of Judge Brack's preliminary injunction. Sixth, the Court will discuss Pojoaque

Pueblo's Supplemental Brief Motion.

**1.      Judge Brack's Preliminary Injunction.**

On September 9, 2015, the Gaming Board sent letters to Pojoaque Pueblo's gaming vendors.

See Letter From Donovan Lieurance to Manufacturer Licensee at 1 (dated September 9, 2015), filed

September 25, 2015 (Doc. 23-14)("Vendor Letter"). The Vendor Letter informed the vendors that,

on June 30, 2015, Mr. Martinez determined that Pojoaque Pueblo's continued gaming operations

past the expiration of its gaming compact with New Mexico violated federal law. See Vendor Letter

at 1 (referring to and attaching the U.S. Attorney's Letter). In light of these unlawful operations, the

Vendor Letter indicated that the Gaming Board intended to conduct an audit of the vendors' records

to ensure compliance with New Mexico law and the Gaming Board's regulations. See Vendor Letter

at 1. To that end, the Gaming Board demanded production of the vendors' communications with and

business records regarding sixteen casinos and tribal gaming operations, including Pojoaque

Pueblo's Class III operations at Buffalo Thunder Resort & Casino and Cities of Gold Hotel &

Casino. See Vendor Letter at 3-4. Pojoaque Pueblo asserts that, as a result of the Vendor Letter,

Scientific Games refused to provide software and servicing of Pojoaque Pueblo's gaming machines.

See Supplemental Declaration of Terrence "Mitch" Bailey ¶ 9, at 3 (executed September 26, 2015),

filed September 28, 2015 (Doc. 27-1).

Shortly after sending the Vendor Letter, on September 25, 2015, the Gaming Board "issued State Citations to all of the vendors doing business with the Pueblo."   Second Supplemental Declaration of Terrence "Mitch" Bailey[2] ¶ 5, at 2 (executed October 1, 2015), filed October 1, 2015 (Doc. 30)("Bailey Decl.").   Each citation included similar language charging the vendors with violating "New Mexico Gaming laws, rules and regulations, minimum internal controls or New Mexico Bingo and Raffle act [sic]" as a consequence of doing business with Pojoaque Pueblo's casinos.  Bailey Decl. ¶ 6.a-c, at 2-4.

Pojoaque Pueblo promptly moved for a temporary restraining order and/or preliminary injunction on September 25, 2015.  See Pueblo of Pojoaque's Motion for Temporary Restraining Order and/or Preliminary Injunction, filed September 25, 2015 (Doc. 23)("PI Motion").  In Pojoaque Pueblo's view, the Gaming Board's recent issuance of letters and citations to its gaming vendors was an attempt at asserting "jurisdiction over gaming activities on the Pueblo's Indian lands," despite the termination of New Mexico's jurisdiction over such activities "on June 30, 2015 when the Compact expired."  PI Motion at 13-14.  Pojoaque Pueblo accordingly sought to prohibit the Gaming Board "from taking any action that threatens, revokes, conditions, modifies, fines, or otherwise punishes or takes enforcement against any licensee in good standing with the New Mexico Gaming Control Board [] based wholly or in part on grounds that such licensee is conducting business with the Pueblo."  PI Motion at 1.

The Defendants responded on October 1, 2015, contending that the Gaming Board did "not engage[] in any regulatory actions against Plaintiffs . . . ."  State Defendants' Response to Plaintiffs'

---

[2]Terrence "Mitch" Bailey is the Executive Director of Gaming Operations at Pojoaque Pueblo's gaming enterprises at Buffalo Thunder Resort & Casino and Cities of Gold Hotel & Casino.  Bailey Decl. ¶ 1, at 1.  Bailey is not a party to this action.

Request for Temporary Restraining Order at 3, filed October 1, 2015 (Doc. 28)("PI Motion Response"). The Defendants stressed that no direct enforcement action was threatened against Pojoaque Pueblo; rather, the Gaming Board's actions at most "threatened regulatory consequences to third parties with 'employment and business relationships with the Pueblo.'" PI Motion Response at 13. The Defendants reasoned that, in any event, vendors "have not been instructed that they cannot conduct business with the Pueblo." PI Motion Response at 4. The Defendants noted that, further, according to the U.S. Attorney's Letter, Pojoaque Pueblo's continued Class III gaming operations after the expiration of its compact with New Mexico violated federal law. See PI Motion Response at 16 (citation omitted). Accordingly, the Defendants argued, because New Mexico law requires that the Gaming Board regulate third parties doing business with gaming entities operating in violation of federal law, the Gaming Board has a statutory duty to regulate Pojoaque Pueblo's vendors. See PI Motion Response at 19.

Judge Brack held a hearing on the matter On October 2, 2015. See Transcript of Preliminary Injunction Order Hearing held on October 2, 2015, filed October 22, 2015 (Doc. 38)("PI Hearing Tr."). Throughout the hearing, Pojoaque Pueblo argued extensively about its "right to be free from state jurisdiction over its gaming activities absent a tribal-state compact," PI Hearing Tr. at 82:9-18 (Crowell), and the four requirements for the issuance of a preliminary injunction, especially irreparable harm, see, e.g., PI Hearing Tr. at 36:18-25, 37:1-25, 38:1-4 (Crowell). In response, the Defendants repeatedly stated that New Mexico had no intention of barring vendors from continuing to do business with Pojoaque Pueblo. See, e.g., PI Hearing Tr. at 57:7-9 (Walz)("[N]obody's been ordered that they cannot do business with the Pueblo of Pojoaque."). Pojoaque Pueblo countered that New Mexico "assert[ed] jurisdiction over the tribe's gaming activities in the form of threatening vendors regarding their licenses to do business with other entities in the state over which they [] have

jurisdiction."  PI Hearing Tr. at 37:16-19 (Crowell).  The consequence of this action, Pojoaque

Pueblo argued, would be to deter vendors from dealing with Pojoaque Pueblo, thereby "shut[ing] off

a source of revenue [] upon which all of the tribe's governmental operations . . . very heavily rely."

PI Motion at 37:21-24 (Crowell).  Because the issue whether federal law preempts the Defendants'

actions was not briefed by the parties, it was not argued at the hearing.

On October 7, 2015, Judge Brack granted the PI Motion.  See PI MOO at 23.  In issuing the

PI, Judge Brack dismissed the "Defendants' protestations that the regulation of vendors doing

business with the Pueblo does not constitute regulation of the Pueblo's gaming activities" as

"disingenuous and inconsistent with the record." PI MOO at 20.  Rather, Judge Brack reasoned, the

"Defendants' actions are based, quite clearly, on Defendants' own determination that the post-June

30, 2015 Class III gaming at the Pueblo is illegal -- a determination that the Defendants, just as

clearly, are without jurisdiction or authority to make." PI MOO at 20.  Concluding that Pojoaque

Pueblo had established a likelihood of irreparable harm in the absence of preliminary relief, Judge

Brack observed:

> Defendants' harassment and threatening conduct directed at the vendors is a thinly
> disguised attempt to accomplish indirectly that which the Defendants know they are
> without authority or jurisdiction to accomplish directly.  Defendants' contention that
> the enforcement actions against the vendors do not harm the Pueblo is disingenuous.
> The undisputed evidence establishes that the Pueblo will lose significant revenue and
> its Casinos may shut down due to Defendants' intimidation of the Pueblo's vendors.

PI MOO at 20.  Accordingly, Judge Brack adopted the PI Motion's proposed language, and ordered

that the "Defendants are enjoined from taking any action that threatens, revokes, conditions,

modifies, fines, or otherwise punishes or takes enforcement against any licensee in good standing

with the New Mexico Gaming Control Board based wholly or in part on grounds that such licensee

is conducting business with the Pueblo."  Preliminary Injunction at 1, filed October 7, 2015 (Doc.

32).  Judge Brack added that, to serve the public interest, the PI "will remain in effect for 30 days

after the Tenth Circuit Court of Appeals issues its mandate in *New Mexico v. Department of the Interior*, 14-2222." PI MOO at 23.

The Defendants filed an interlocutory appeal of Judge Brack's PI to the Tenth Circuit on October 29, 2015. See Pueblo of Pojoaque v. State of New Mexico, 15-2187, Notice of Appeal at 1, filed October 29, 2015 (Doc. 40). On March 24, 2016, the panel assigned to review the matter sua sponte ordered that the appeal be abated pending the issuance of a decision on the appeal of Judge Parker's opinion invalidating the regulations in 25 C.F.R. Part 291, in New Mexico v. Department of the Interior, 14-2222. See Tenth Circuit Court of Appeals Order Abating Appeal at 1, filed March 24, 2016 (Doc. 112).

**2.      The Court's Contempt Opinion.**

The Gaming Board held its first formal public meeting following Judge Brack's issuance of the PI on October 21, 2015. See Stay MOO at 13. At the meeting, the Gaming Board considered a total of twenty-nine applications by vendors for "gaming license" renewals and "certifications of findings of suitability." Stay MOO at 13-15 (internal footnote, quotation marks, alterations, and citation omitted). Regarding companies not doing business with Pojoaque Pueblo, the Gaming Board approved eighteen applications, deferred one application for a one-month period, and took no vote on one application. See Stay MOO at 15 (internal footnote and citation omitted). The Gaming Board deferred all nine applications -- without a date set for future consideration -- by companies doing business with Pojoaque Pueblo. See Stay MOO at 15 (internal footnote and citation omitted).

On October 29, 2015, this case was reassigned to the Court after the Defendants retained new counsel with a law firm that previously employed Judge Brack, thereby creating a conflict. See Notice of Case Reassignment to District Judge James O. Browning, entered October 29, 2015 (Doc. 42)([text-only-entry]).

- 16 -

As a result of the Gaming Board's actions at its October 21, 2015, meeting, Pojoaque Pueblo moved the Court on November 19, 2015, to: (i) "issue an Order to Show Cause" for the Gaming Board Members to "appear and present evidence as to why [they] should not be held in civil contempt of court for violating the Preliminary Injunction issued by [Judge Brack]"; (ii) impose sanctions on the Gaming Board Members upon a finding of civil contempt; and (iii) award Pojoaque Pueblo attorney's fees and costs.  Motion for Order to Show Cause Re Civil Contempt at 1-2, filed November 19, 2015 (Doc. 53)("Contempt Motion").  Pojoaque Pueblo argued that the Gaming Board violated Judge Brack's PI by "deferring license decisions on all applications for persons or companies doing business with the Pueblo."  Contempt Motion at 2.  In Pojoaque Pueblo's view, the Gaming Board's actions were new attempts at "asserting jurisdiction over the Pueblo's gaming activities by threatening the licenses of those persons or companies doing business with the Pueblo's gaming operations."  Contempt Motion at 3.

The Gaming Board Members, represented by new counsel, responded to the Contempt Motion on December 7, 2015.  See New Mexico Gaming Control Board Defendants' Response to Plaintiffs' Motion for Order to Show Cause Re Civil Contempt at 1, filed December 7, 2015 (Doc. 62)("Contempt Motion Response").  The Gaming Board Members contended that, because New Mexico's "police power to enforce state law regarding non-Indian gaming manufacturers' licenses . . . outside of tribal lands, based on the manufacturers' continued involvement with the Pueblo's now-illegal gaming operations, remains in vigorous litigation," the Gaming Board had "justifiably and properly [] deferred taking action on licenses and certifications of such manufacturers and their personnel, respectively."  Contempt Motion Response at 2-3.  The Gaming Board Members advanced five reasons why the Court should deny the Contempt Motion.  See Contempt Motion Response at 7-10.  First, they argued that Judge Brack's PI "does not 'clearly and unambiguously' . .

. or even implicitly bar the Board from deferring these decisions." Contempt Motion Response at 8. Second, they asserted that the Gaming Board did not take or threaten "license enforcement <u>action</u>" as the PI prohibits, but, rather, that it "simply <u>postponed</u> taking any action."  Contempt Motion Response at 8 (emphases in original).  Third, they contended that Judge Brack "clearly erred" and that, although they would "fully comply with the Preliminary Injunction while it remains in place," they "properly may defer taking action on the licenses and certifications in question."  Contempt Motion Response at 8-9.  Fourth, the Gaming Board Members argued that "the Pueblo cannot establish that it has suffered any injury," because neither Pojoaque Pueblo nor its vendors "feels 'threatened.'"  Contempt Motion Response at 9.  Fifth, and finally, the Gaming Board Members asserted that the Contempt Motion "elevat[es] form over substance," because the Gaming Board already voiced its disagreement with Judge Brack's PI MOO, and, accordingly, "the licensee and certificate holders whose applications were deferred would be just as 'threatened' even if the Board had issued or renewed their licenses and certifications."  Contempt Motion Response at 9-10.

The Court held a hearing on the Contempt Motion on December 29, 2015.  <u>See</u> Transcript of Order to Show Cause Proceedings held on December 29, 2015, filed January 7, 2016 (Doc. 76)("Contempt Hearing Tr.").  The Court stated that it was "not inclined to grant civil contempt," because the Gaming Board's actions did not rise to the level of "threats" under the "carefully crafted" language of Judge Brack's PI.  Contempt Hearing Tr. at 2:19-3:6 (Court).  The Court cautioned, however, that the Gaming Board was "playing a little bit with fire" and that, if the Gaming Board continued "down this path, the pueblo may be able to show that your deferrals have become threat[s]."  Contempt Hearing Tr. at 3:14-22 (Court).  In response, Pojoaque Pueblo contended that it filed the PI Motion because the Gaming Board issued deferrals, and that Judge Brack accordingly understood the word "threaten" to include deferrals.  Contempt Hearing Tr. at

6:10-7:1 (Court, Crowell).   The Gaming Board Members demurred, asserting that the earlier

deferrals, issued before Judge Brack's PI MOO, did not prompt the PI.  See Contempt Hearing Tr. at

24:20-26:7 (Bohnhoff).   The later deferrals, they continued, were "not for the purpose of taking

some future enforcement action but rather [were] deferred pending the resolution of the litigation."

Contempt Hearing Tr. at 26:18-21 (Bohnhoff).   In rejoinder, Pojoaque Pueblo again emphasized that

the Gaming Board was attempting to send "a message to the vendors that what we do with your

licenses is contingent upon what you do with the pueblo, and that is a threat."   Contempt Hearing Tr.

at 62:4-6 (Crowell).   Nonetheless, the Court maintained that, although deferrals could amount to a

threat in certain circumstances, the Gaming Board's actions did not rise to that level.  See Contempt

Hearing Tr. at 65:13-66:8 (Court).

On April 21, 2016, the Court denied the Contempt Motion.  See Memorandum Opinion and

Order at 7, filed April 21, 2016 (Doc. 115)("Contempt MOO").   Consistent with its pronouncements

at the hearing, the Court held that the Gaming Board's license deferrals did not "threaten" the vendor

applicants within the meaning of Judge Brack's PI.  Contempt MOO at 24.  The Court first reasoned

that the deferrals would not immediately harm the vendors, because they would not "affect the

vendors' continued operation."  Contempt MOO at 24.  The Court explained that

> the Gaming Board has established a "pattern of practice" of allowing licenses to
> remain in effect between the time that a licensee files for a renewal and the time that
> it approves the renewal.  Reply at 8.  Defendant Jeffrey Landers has submitted a
> declaration describing his review of the Gaming Board's licensing records. See
> Declaration of Jeffrey S. Landers ¶ 3, at 2 (taken December 7, 2015), filed December
> 7, 2015 (Doc. 62-2)("Landers Declaration").  Landers states that the Gaming Board
> has "approved a renewal application after the nominal expiration date of an existing
> license" on approximately thirty occasions between 2003 and 2015.  Landers
> Declaration ¶ 3, at 2.  Landers adds that "all" of the licensees "were permitted to
> continue operating during the period between the expiration date of the existing
> license and the approval of the renewal application."  Landers Declaration ¶ 3, at 2.
> The Gaming Board also represented during the hearing that this practice "isn't
> something that the board has done just recently and only in the case of the
> manufacturers who are doing business with the pueblo.  This is something that the

> board has done as Mr. Landers stated in his declaration over 30 times since 2003."
> [Contempt Motion] Tr. at 37:14-19 (Bohnhoff). The Plaintiffs' argument that they
> cannot rely on the Gaming Board's past practice as a defense to an enforcement
> action is unconvincing. See Reply at 11 ("The Certain Defendants want this Court to
> believe that . . . a [Gaming Board] track record of defying the applicable statute and
> its own regulations will be a successful defense[.]"). As discussed above, § 60-2E-
> 16(H) is inconsistent with the regulations that the Gaming Board would use to
> support an enforcement action. Given this conflict, the statute would govern the
> dispute, and its language -- that "a license, certification or permit shall continue in
> effect upon proper payment of the initial and renewal fees" -- would not support an
> enforcement action here. N.M. Stat. Ann. § 60-2E-16(H).

Contempt MOO at 26-27. The Court added that

> it is likely that any enforcement action -- whether grounded in statutes or regulations,
> or not -- would be seen as a threat and a violation of Judge Brack's PI. The
> important thing is that the Gaming Board's practice and representations send a signal
> to the vendors that it is not going to do anything while Judge Brack's PI is in place.
> After all, preserving the status quo is the aim of injunctive relief, and at the present
> time, the vendors are not threatened and do not appear to feel threatened.

Contempt MOO at 27. Having concluded that the deferrals would not have any "immediate legal

impact on the vendors' operations," the Court held that the deferrals "do not otherwise constitute

threats," for three reasons. Contempt MOO at 27. First, the Court concluded that "Judge Brack's PI

Language is not sufficiently clear to support a finding of civil contempt for deferrals." Contempt

MOO at 28. Second, the Court concluded that the deferrals "were likely intended to preserve the

status quo," and that, "even if that is not the Gaming Board's intent and it has some more nefarious

purpose, the effect is to preserve the status quo." Contempt MOO at 28. Last, the Court expressed

"reluctan[ce]" to conclude that the deferrals constituted threats in the absence of concrete evidence

that the Plaintiffs' vendors feel threatened or are altering their behavior accordingly." Contempt

MOO at 29.

Although the Court denied the Contempt Motion, it cautioned that "[t]he Gaming Board must

proceed with caution." Contempt MOO at 30. The Court explained that the Gaming Board could

properly defer applications under the PI, but that "its actions may become threats if the vendors start

pulling their business from Pojoaque Pueblo." Contempt MOO at 30. The Court elaborated:

> It is true that the situation does not have to get to that point before there is a violation, but right at the moment, the vendors -- who are smart, savvy business people -- understand what is going on in New Mexico. These gaming vendors are a salty bunch, and not easily scared off from doing business. Moreover, the State of New Mexico has little economic self-interest in ruining the business of all vendors by eventually penalizing them down the road, so the threat, if any, appears not to exist now or in the future.

Contempt MOO at 30. The Court concluded that

> Judge Brack's PI has, for the time being, achieved what he wanted -- maintaining the status quo until the case is over. Until a vendor appears and states that the situation is no longer working, the Court does not think it prudent to take the prophylactic action of contempt that the Plaintiffs suggest.

Contempt MOO at 30.

### 3. The Court's Stay MOO Staying the PI's Effects and Dismissing the Case.

In December 2015 the Defendants filed eight motions raising, for the first time, the question whether federal law preempts the Gaming Board's regulatory enforcement actions against non-Indian, state-licensed gaming vendors. In February 2016, Pojoaque Pueblo moved the Court to stay proceedings pending the Tenth Circuit's resolution of the Defendants' interlocutory appeal of Judge Brack's PI MOO. The Court will briefly review these nine motions and then discuss its September 30, 2016, Stay MOO disposing of these motions and dismissing the case. The Court will then turn to discuss Pojoaque Pueblo's appeal of the Court's Stay MOO to the Tenth Circuit. Finally, the Court will discuss the issue, that the Tenth Circuit raised sua sponte, whether the Court's judgment in its Stay MOO constitutes an appealable final judgment.

#### a. The Qualified Immunity Motion.

On December 4, 2015, the Individual Defendants moved to dismiss the Complaint's Count IV -- which alleges that the Gaming Board's "actions purporting to assert jurisdiction of the State over conduct occurring on Pueblo Indian lands" violate Pojoaque Pueblo's "federal right to engage

in conduct free from the jurisdiction of the state," Complaint ¶ 145, at 36 -- on the basis of qualified immunity, see Defendants Susana Martinez, Jeremiah Ritchie, Jeffrey S. Landers, Salvatore Maniaci, Paulette Becker, Robert M. Doughty III, and Carl E. Londone's Motion to Dismiss Count IV on the Basis of Qualified Immunity, filed December 4, 2015 (Doc. 60)("QI Motion").  The Individual Defendants contend, first, that the Gaming Board's actions do not violate Pojoaque Pueblo's federal rights under IGRA, because IGRA does not preempt regulation of non-Indian, state-licensed gaming manufacturer vendors pursuant to New Mexico's police power.  See QI Motion at 8.  In the Individual Defendants' view, IGRA does not evince "clear and manifest" Congressional intent to preempt such actions, QI Motion at 12 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)(internal quotation marks omitted)), because IGRA applies only to direct regulation of Indian lands, see QI Motion at 12 ("Everything -- literally everything -- in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, and nowhere else.")(quoting Michigan v. Bay Mills Indian Cmty., 134 S. Ct. 2024, 2034 (2014)("Bay Mills")(internal quotation marks omitted)).  Here, the Individual Defendants contend, the Gaming Board has not taken any direct regulatory actions toward Pojoaque Pueblo, nor has it asserted its authority on Pojoaque Pueblo's lands.  See QI Motion at 14 (citing Srader v. Verant, 1998-NMSC-025, ¶ 16, 964 P.2d 82).  The Individual Defendants argue, moreover, that it is irrelevant whether the Gaming Board's actions indirectly impact Pojoaque Pueblo's gaming operations, see QI Motion at 14, and that even indirect attempts to regulate on-reservation gaming are permissible, see QI Motion at 17 (arguing that the "Supreme Court [has] recognized . . . that a state is within its rights to assert 'leverage' to enforce its laws against an Indian tribe that is conducting illegal gaming")(quoting Bay Mills, 134 S. Ct. at 2035).  Regarding qualified immunity analysis' second inquiry, the Individual Defendants argue that, even if the Gaming Board's actions violate Pojoaque Pueblo's federal rights, those rights are not

- 22 -

clearly established.  See QI Motion at 18.

In response to the QI Motion, Pojoaque Pueblo contends that its rights under IGRA to be free from New Mexico's exercise of jurisdiction over its gaming operations is clearly established, and that the Individual Defendants knew or should have known that their actions violated those rights. See Plaintiffs Pueblo of Pojoaque and Joseph M. Talachy's Opposition to Defendants' Susana Martinez, Jeremiah Ritchie, Jeffrey S. Landers, Salvatore Maniaci, Paulette Becker, Robert M. Doughty III, and Carl E. Londene Motion to Dismiss Count IV on the Basis of Qualified Immunity at 4, filed December 18, 2015 (Doc. 66)("QI Motion Response").  Pojoaque Pueblo contends that Judge Brack already concluded in his PI MOO that the Individual Defendants violated Pojoaque Pueblo's clearly established federal rights, and that his reasoning "compels denial of [the] Motion to Dismiss."  QI Motion Response at 6.  Pojoaque Pueblo points to Judge Brack's admonition that the Gaming Board's actions are "based, quite clearly, on Defendants' own determination that the post-June 30, 2015 Class III gaming at the Pueblo is illegal -- a determination that the Defendants, just as clearly, are without jurisdiction or authority to make."  QI Motion Response at 6 (quoting PI MOO at 20)(internal quotation marks omitted).  Pojoaque Pueblo also argues that Judge Brack concluded that the Individual Defendants "'know' that they have stepped over the line in their attempt to assert state jurisdiction over the Pueblo's gaming."  QI Motion Response at 6 (quoting PI MOO at 20).  Thus, Pojoaque Pueblo argues that Judge Brack's reasoning defeats both prongs of qualified immunity analysis -- that the Individual Defendants violated a federal right and that they knowingly violated that right.  See QI Motion Response at 6.

### b.   **The Motion to Stay Discovery.**

Contemporaneously with their QI Motion, the Individual Defendants moved the Court on December 4, 2015, for a "stay of discovery pending a ruling on their motion to dismiss."  Defendants

- 23 -

Susana Martinez, Jeremiah Ritchie, Jeffry [sic] S. Landers, Salvatore Maniaci, Paulette Becker, Robert M. Doughty III, and Carl E. Londene's Motion for Stay of Discovery Pending Qualified Immunity Rulings at 1, filed December 4, 2015 (Doc. 61)("Motion to Stay Discovery").  The Individual Defendants contend that a stay of discovery is warranted in light of the polices underlying the qualified immunity defense, namely, that "government officials [have] a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery."  Motion to Stay Discovery at 2 (quoting Behrens v. Pelletier, 516 U.S. 299, 308 (1996))(internal quotation marks omitted).  Thus, they argue, once a qualified immunity defense has been raised, "discovery should not be allowed."  Motion to Stay Discovery at 2 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982)(internal quotation marks omitted)).

In response, Pojoaque Pueblo contends that the policy rationale underlying the qualified immunity defense does not apply, because "the Defendant Officials will remain in, and be burden by this litigation regardless of whether Count IV is dismissed."  Plaintiffs Pueblo of Pojoaque and Joseph M. Talachy's Opposition to Defendants' Susana Martinez, Jeremiah Ritchie, Jeffrey S. Landers, Salvatore Maniaci, Paulette Becker, Robert M. Doughty III, and Carl E. Londene Motion to Stay Discovery Pending Qualified Immunity Rulings at 3, filed December 18, 2015 (Doc. 67)("Motion to Stay Discovery Response").  Accordingly, Pojoaque Pueblo asserts, the issue of qualified immunity should not be resolved this early in the litigation.  See Motion to Stay Discovery Response at 4.

<div align="center">

**c.**      <u>**The Motion to Stay Judge Brack's PI.**</u>

</div>

On December 18, 2015, the Defendants moved, pursuant to rule 62(c) of the Federal Rules of Civil Procedure and rule 8(a)(1) of the Federal Rules of Appellate Procedure, to stay or suspend Judge Brack's PI pending the resolution of their interlocutory appeal of the PI at the Tenth Circuit.

<div align="center">

- 24 -

</div>

<u>See</u> Defendants' Motion to Stay or Suspend the Court's October 7, 2015 Preliminary Injunction at 1, filed December 18, 2015 (Doc. 64)("Motion to Stay PI").  The Defendants assert that motions to stay injunctions pending appeal are analyzed under the following factors: "(a) the likelihood of success on appeal; (b) the threat of irreparable harm if the stay or injunction is not granted; (c) the absence of harm to opposing parties if the stay of injunction is granted; and (d) any risk of harm to the public interest."  Motion to Stay PI at 2 (citing <u>General Protecht Group, Inc. v. Leviton Mfg. Co.</u>, No. CIV 10-1020 JB/LFG, slip op. at 5 (D.N.M. Dec. 7, 2010)(Browning, J.))(internal quotation marks and citation omitted).  The Defendants argue that likelihood of success is the controlling factor, and that, when a claim fails on the merits, a court should "'short-circuit the factor-weighing process' and must reverse the grant of an injunction regardless of how the other factors might be weighed."  Motion to Stay PI at 3 (quoting <u>Soskin v. Reinertson</u>, 353 F.3d 1242, 1257 (10th Cir. 2004)).

Here, the Defendants contend, Pojoaque Pueblo cannot succeed on the merits of its claim underlying Judge Brack's PI, because New Mexico's regulation of non-Indian gaming activity "is a valid exercise of the State's police power," Motion to Stay PI at 5 (citing <u>Srader v. Verant</u>, 1998-NMSC-025, ¶¶ 11, 16, 964 P.2d 82), and because IGRA does not preempt New Mexico's "authority to regulate gaming within its jurisdiction," Motion to Stay PI at 6.  The Defendants assert that Judge Brack "did not consider this legal analysis" nor did he "address the State's regulatory authority outside of Indian country, which is exceedingly broad."  Motion to Stay PI at 7.  Rather, the Defendants contend, Judge Brack "misapprehended the Defendants' position and concluded that the Board had exerted direct authority over the Pueblo's illegal gaming and on the Pueblo's lands, which the Board clearly has not."  Motion to Stay PI at 7.  Accordingly, Judge Brack "erred in granting a preliminary injunction," the Defendants conclude, "based on the belief that Plaintiffs likely will prevail on the merits of their tribal sovereignty-based claims."  Motion to Stay PI at 10.

Pojoaque Pueblo responded on January 25, 2016, incorporating by reference the preemption arguments that it makes elsewhere in its briefings.  See Response in Opposition to State Defendants' Motion to Stay or Suspend the Court's October 7, 2015 Preliminary Injunction at 2, filed January 25, 2016 (Doc. 90)("Motion to Stay PI Response").  Pojoaque Pueblo also advances a new argument: that the Defendants improperly determined that Pojoaque Pueblo's Class III gaming operations in the absence of a compact is illegal.  See Motion to Stay PI Response at 2.  Pojoaque Pueblo asserts that it "has done everything IGRA requires it to do" and that "[i]t is the State that is acting illegally in violation of its obligations under IGRA."  Motion to Stay PI Response at 3.  Pojoaque Pueblo argues that, in light of the Supreme Court's holding in Seminole Tribe I that Congress lacked Constitutional authority to subject non-consenting states to suit by Indian tribes under IGRA, the Court should "re-evaluate[]" IGRA's requirement that Class III gaming activities on Indian lands are legal only if a state-tribal compact is in effect.  Motion to Stay PI Response at 3.  Pojoaque Pueblo contends that "Seminole Tribe I revealed that IGRA was broken" and that the Court should invoke severance doctrine to make the statute comport with Congressional intent.  Motion to Stay PI Response at 3-4. In Pojoaque Pueblo's view, Congress would not have intended to criminalize Class III gaming conducted without a compact if a tribe did not have the ability to sue a state for failing to negotiate a compact in good faith.  See Motion to Stay PI Response at 3-16.

Accordingly, Pojoaque Pueblo proposes that the Court (i) sever IGRA's requirement that a court must first find that a state acted in bad faith before IGRA's remedial provisions apply; and (ii) modify IGRA's provision for a court-appointed mediator to select one of two compacts that the tribe and the state propose, to allow the mediator to consider only the compact that the tribe proposes. See Motion to Stay PI Response at 13-14.  In Pojoaque Pueblo's version of the statute, a state would be required either to consent to the tribe's proposed compact or to be subject to secretarial

procedures based on the tribe's compact.  See Motion to Stay Injunction Response at 13-14. Pojoaque Pueblo proposes, moreover, that the Court sever IGRA's requirement that a Class III gaming compact must be in effect for such gaming to be lawful.  See Motion to Stay PI Response at 15.  Pojoaque Pueblo's version of the statute, rather, would allow tribes to conduct gaming "in a State in which gambling devices are legal."  Motion to Stay PI Response at 15.  In short, Pojoaque Pueblo proposes that "the Class III provisions of IGRA in their entirety should be struck down, and the Pueblo should be able to govern gaming activities on its Indian lands without regard to IGRA . . . ."  Motion to Stay PI Response at 16.

### d. The Motion to Reconsider Judge Brack's PI.

On December 18, 2015, the Defendants moved, pursuant to rules 54(b), 62(c), and 62.1 of the Federal Rules of Civil Procedure, to reconsider, and either to vacate or to modify Judge Brack's PI, or, in the alternative, to grant "related relief available under Rule 62.1."  Defendants' Motion to Reconsider and Either Vacate or Modify the Court's October 7, 2015 Preliminary Injunction, and for Relief Pursuant to Fed. R. Civ. P. 62.1 at 1, filed December 18, 2015 (Doc. 65)("Motion to Reconsider PI").  The Defendants contend that the Court has "inherent" authority under rule 54(b) to "reconsider and revise any interlocutory order 'at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.'"  Motion to Reconsider PI at 11 (quoting Balla v. Idaho State Bd. of Corrs., 869 F.2d 461, 465 (9th Cir. 1989)).  With respect to modification of a PI, the Defendants note, "a district court is not bound by a strict standard of changed circumstances but is authorized to make any changes in the injunction that are equitable in light of subsequent changes in the facts or the law, or for any other good reason."  Motion to Reconsider PI at 13 (quoting Basic Research, LLC v. Cytodyne Techs., Inc., 2000 U.S. Dist. LEXIS 23454, at *34 (D. Utah 2000)(Kimball, J.).  The Defendants concede, however, that, although rule

62(c) "authorizes a district court, during the pendency of an appeal from a preliminary injunction, to suspend, modify, restore or grant an injunction," the court "generally loses jurisdiction over a proceeding upon the filing of a notice of appeal, at least as to those aspects of the case that are involved in the appeal."  Motion to Reconsider PI at 13 (citing Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982)).  The district court, the Defendants assert, "may not grant relief regarding the preliminary injunction that divests the appellate court of its jurisdiction by eliminating or materially altering the controversy."  Motion to Reconsider PI at 13-14 (citations omitted).  Accordingly, the Defendants reason, "the pendency of the appeal deprives the district court of the jurisdiction it otherwise would possess to vacate or dissolve the preliminary injunction."  Motion to Reconsider PI at 14 (citing Coastal Corp. v. Tex. E. Corp., 869 F.2d 817, 819 (5th Cir. 1989)).  Nevertheless, the Defendants assert that, during an appeal's pendency, the district court may, pursuant to rule 62.1, issue an "indicative ruling" stating "either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue."  Motion to Reconsider PI at 14.  The Defendants contend that such a ruling is appropriate here.  See Motion to Reconsider PI at 26.

Turning to their analysis, the Defendants advance the same arguments that they articulate elsewhere in their briefings regarding the legality of the Gaming Board's actions.  First, the Defendants assert that New Mexico has a "sovereign interest" in enforcing its police powers within its jurisdiction.  Motion to Reconsider PI at 16 (citing Mashantucket Pequot Tribe v. Town of Ledyard, 722 F.3d 457, 476-77 (2d Cir. 2013); Kansas v. United States, 249 F.3d 1213, 1227-28 (10th Cir. 2001).  Second, the Defendants argue that IGRA does not preempt New Mexico's police power, because (i) IGRA does not manifest clear Congressional intent to preempt a state's regulation of non-Indian licensees outside of Indian country, see Motion to Reconsider PI at 17 (citing Rice v.

Santa Fe Elevator Corp., 331 U.S. at 230); (ii) IGRA applies only to regulation of gaming on Indian

lands, and, thus, it is intended only to "expressly preempt the field in the governance of gaming on

Indian lands," Motion to Reconsider PI at 18 (quoting United Keetoowah Band of Cherokee Indians

v. Oklahoma, 927 F.2d 1170, 1179 (10th Cir. 1991)(emphasis omitted); and (iii) New Mexico's

authority to regulate state licensees is not limited by any indirect or ancillary effects of such action

on Pojoaque Pueblo, see Motion to Reconsider PI at 22-26.  For these reasons, the Defendants assert,

Judge Brack "misapprehended the facts and Defendants' position and clearly erred in granting a

preliminary injunction based on the belief that Plaintiffs likely will prevail on the merits of their

tribal sovereignty-based claims."  Motion to Reconsider PI at 25.

        Pojoaque Pueblo responded on January 25, 2016, focusing substantially on the Defendants'

preemption arguments and ignoring the arguments regarding the Court's authority to take action on

Judge Brack's PI.  See Response in Opposition to State Defendants' Motion to Reconsider and

Either Vacate or Modify the Court's October 7, 2015 Preliminary Injunction and for Other Relief

Pursuant to Fed. R. Civ. P. 62.1 at 2-16, filed January 25, 2016 (Doc. 85)("Motion to Reconsider PI

Response").  Pojoaque Pueblo first contends that, in the context of "a state's authority to regulate

activities on tribal lands, courts must apply standards different from those applied in other areas of

federal preemption."   Motion to Reconsider PI Response at 3 (citing Jicarilla Apache Tribe v.

Supron Energy Corp., 728 F.2d 1555, 1570-71 (10th Cir. 1984); Confederated Tribes of Siletz

Indians v. Oregon, 143 F.3d 481, 486 (9th Cir. 1998); Cabazon Band v. Wilson, 37 F.3d 430, 433

(9th Cir. 1994)).  "Applying these different standards," Pojoaque Pueblo argues, "a well-developed

body of case law . . . overwhelmingly finds that [IGRA] has a broad preemptive scope . . . ."  Motion

to Reconsider PI Response at 3.  Pojoaque Pueblo contends that the Tenth Circuit, for example,

holds that "states have no jurisdiction over gaming activities occurring on Indian lands except as

expressly agreed upon in the context of a tribal-state compact."  Motion to Reconsider PI Response at 3 (citing, e.g., Wyandotte Nation v. Sebelius, 443 F.3d 1247 (10th Cir. 2006)).  Pojoaque Pueblo asserts that, under these cases, "the State's jurisdiction over gaming activities that occur on Pueblo Indian lands ended on June 30, 2015 when the Pueblo's existing compact expired."  Motion to Reconsider PI Response at 5-6.

Turning to the Defendants' specific preemption arguments, Pojoaque Pueblo asserts that the Defendants "carefully frame[]" the issue in terms of whether IGRA preempts state regulatory actions "outside of Indian country" while simultaneously conceding that "IGRA is intended to expressly preempt the field in the governance of gaming activities on Indian lands."  Motion to Reconsider PI Response at 9 (emphasis and internal quotation marks omitted).  Pojoaque Pueblo notes that it "does not dispute or take issue with the State's ability to use its police powers to regulate gaming on State lands," but argues that New Mexico's use of its police power to "regulate gaming on Pueblo tribal lands . . . breach[es] the preemptive force of IGRA."  Motion to Reconsider PI Response at 9.  The dispositive question, Pojoaque Pueblo asserts, is whether "actions related to state enforcement of state law 'clearly and substantially involve, regulate, or interfere with gaming.'"  Motion to Reconsider PI Response at 13 (quoting Srader v. Verant, 1998-NMSC-025, ¶ 10 n.2, 964 P.2d 82)(alterations omitted).  Pojoaque Pueblo contends, therefore, that the Defendants' attempted distinction between on- and off-reservation gaming regulation is disingenuous, and "does not change the fact that the actions at issue are the assertion of regulatory jurisdiction over the Pueblo's gaming activities."  Motion to Reconsider PI Response at 13.

### e.   The Sovereign Immunity Motion.

On December 22, 2015, New Mexico asserted sovereign immunity as an affirmative defense under the Eleventh Amendment and moved the Court "to remove the State as an enjoined party, and

dismiss[] Plaintiffs' Complaint as against the State." Defendant State of New Mexico's Motion to
Modify October 7, 2015 Preliminary Injunction and to Dismiss Defendant State of New Mexico
Based on the State's Eleventh Amendment Sovereign Immunity at 1, filed December 22, 2015 (Doc.
69)("Sovereign Immunity Motion"). New Mexico notes that the Supreme Court in Seminole Tribe I
construed the Eleventh Amendment "to bar the bad faith negotiation claim that the Plaintiffs assert"
and that, more generally, the "Eleventh Amendment grants states sovereign immunity from suits
brought in federal court by its own citizens . . . and suits by an Indian tribe." Sovereign Immunity
Motion at 2 (quoting Prairie Band Potawatomi Nation v. Wagnon, 402 F.3d 1015, 1026 (10th Cir.
2005))(internal quotation marks omitted).

     Pojoaque Pueblo, in response, does not contest New Mexico's request that the Court dismiss
the entire Complaint as against New Mexico. See Response to State Defendants' Motion to Modify
October 7, 2015 Preliminary Injunction and to Dismiss Defendants [sic] State of New Mexico Based
on the State's Eleventh Amendment Sovereign Immunity at 2-3, filed January 25, 2016 (Doc.
88)("Sovereign Immunity Motion Response"). Pojoaque Pueblo concedes that, "under these
circumstances, this Court lacks jurisdiction" to hear Pojoaque Pueblo's claims against New Mexico.
Sovereign Immunity Motion Response at 2. Pojoaque Pueblo also does not contest New Mexico's
request that the Court modify Judge Brack's PI and remove New Mexico as an enjoined party. See
Sovereign Immunity Motion Response at 2-3 (stating only that New Mexico "acknowledges that the
modification of the Preliminary Injunction to remove the State as a named party will continue in
effect against the remaining Individual Defendants").

### f.    <u>The Motion to Dismiss Counts III and IV.</u>

     On December 22, 2015, the Individual Defendants moved to dismiss the Complaint's Counts
III and IV, which seek prospective injunctive relief and damages for the Individual Defendants'

alleged "wrongful[] assert[ion] of State jurisdiction over gaming activities on the Pueblo's Indian lands . . . in violation of 42 U.S.C. §§ 1983 and 1985." Complaint ¶¶ 138-142, at 35; id. ¶¶ 143-151, at 35-37.  See Defendants' Motion to Dismiss Counts III and IV of the Plaintiffs' Complaint, filed December 22, 2015 (Doc. 71)("Motion to Dismiss Counts III and IV").  The Individual Defendants assert that "[s]ections 1983 and 1985 do not . . . confer any rights; instead they are merely a vehicle for a plaintiff to bring an action 'against state actors to enforce rights created by federal statutes as well as by the Constitution.'"  Motion to Dismiss Counts III and IV at 8 (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 279 (2002)(citing Maine v. Thiboutot, 448 U.S. 1 (1980)).  The Individual Defendants contend that Counts III and IV do "not identify any federal or constitutional rights that . . . the Individual Defendants violated . . . . Counts III and IV fail to state a claim upon which relief can be granted and should be dismissed."  Motion to Dismiss Counts III and IV at 9.

With respect to the Complaint's § 1983 claim, the Individual Defendants posit two primary reasons why the claim fails to allege a violation of a federal right.  See Motion to Dismiss Counts III and IV at 9.  First, the Individual Defendants assert that there is no violation of federal law, because IGRA does not preempt the Gaming Board's actions.  See Motion to Dismiss Counts III and IV at 9.  Second, the Individual Defendants contend that, even assuming that IGRA preempts the Gaming Board's actions, the Complaint "fail[s] to state a claim under Section 1983 because a mere violation of federal *law* is not sufficient to establish a violation of a federal *right*, as is required for a Section 1983 claim."  Motion to Dismiss Counts III and IV at 10 (citing Gonzaga Univ. v. Doe, 536 U.S. at 283)(emphasis in original).  Regarding the Complaint's § 1985 claim, the Individual Defendants assert that the claim "applies only to conspiracies motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus."  Motion to Dismiss Counts III and IV at 11 (quoting O'Connor v. St. John's Coll., 290 F. App'x 137, 141 n.4 (10th Cir. 2008))(internal

quotation marks omitted).  The Tenth Circuit, the Individual Defendants note, "has signaled that §
1985(3) requires at least a 'commingling of racial and political motives.'"  Motion to Dismiss
Counts III and IV at 11 (quoting O'Connor v. St. John's Coll., 290 F. App'x at 141 n.4)(internal
quotation marks omitted)).  Here, the Individual Defendants contend, the Complaint "makes no
allegation of any racial motivations on the part of the Individual Defendants," and, thus, "Section
1985 is [] simply inapplicable . . . ."  Motion to Dismiss Counts III and IV at 11.

Pojoaque Pueblo responded on January 25, 2016.  See Response in Opposition to State
Defendants' Motion to Dismiss Counts III and IV of Plaintiffs' Complaint at 1, filed January 25,
2016 (Doc. 87)("Motion to Dismiss Counts III and IV Response").  Pojoaque Pueblo first notes that
the dispute regarding Count IV is moot, because the Court already determined that the Individual
Defendants are entitled to qualified immunity as to that Count.  See Motion to Dismiss Counts III
and IV Response at 2.  With respect to Count III, Pojoaque Pueblo incorporates by reference the
arguments from its various briefings regarding IGRA's preemption of the Individual Defendants'
actions.  See Motion to Dismiss Counts III and IV Response at 5.  Finally, specifically addressing
the Individual Defendants' arguments regarding the racial component of § 1985 claims, Pojoaque
Pueblo contends that "[t]he Complaint clearly alleges that the Individual Defendants conspired to
wrongfully assert jurisdiction because of their invidiously discriminatory animus against the Pueblo
and its members."  Motion to Dismiss Counts III and IV Response at 6.  Pojoaque Pueblo asserts that
"[i]t is difficult to comprehend how the Individual Defendants would characterize the allegations in
any other way."  Motion to Dismiss Counts III and IV Response at 6.  Accordingly, Pojoaque Pueblo
asserts, Count III states a claim upon which relief can be granted.  See Motion to Dismiss Counts III
and IV Response at 6.

g.      **The Motion to Dismiss Count II.**

On December 22, 2015, the Individual Defendants moved to dismiss the Complaint's Count II, which alleges a violation of Pojoaque Pueblo's "right, based on the Supremacy Clause, to engage in activity on the Pueblo's Indian lands in a manner that is free form interference." Complaint ¶ 133, at 34. See Defendants' Motion to Dismiss Count II of Plaintiffs' Complaint, filed December 22, 2015 (Doc. 72)("Motion to Dismiss Count II"). The Individual Defendants argue that the Supremacy Clause is "'not a source of any federal rights'; it 'secures federal rights by according them priority whenever they come in conflict with state law.'" Motion to Dismiss Count II at 6 (quoting Golden State Transit Corp v. Los Angeles, 493 U.S. 103, 107 (1989)). Thus, the Individual Defendants assert, "because the Supremacy Clause does not support a private right of action, Count II fails to state a claim as a matter of law and should be dismissed." Motion to Dismiss Count II at 6. The Individual Defendants contend that Count II fails, moreover, because "no federal law prevents the State of New Mexico from exercising its authority to enforce its gaming laws in the manner alleged in Plaintiffs' Complaint." Motion to Dismiss Count II at 7. In support of this contention, the Individual Defendants advance the same arguments that they make elsewhere regarding the exercise of New Mexico's police powers, the lack of federal preemption of those powers under IGRA, and the immateriality of the indirect impacts of the Gaming Board's regulations on Pojoaque Pueblo's gaming operations. See Motion to Dismiss Count II at 7-11.

In response, Pojoaque Pueblo concedes that the Supremacy Clause does not create a private right of action. See Response in Opposition to State Defendants' Motion to Dismiss Count II of the Plaintiffs [sic] Complaint at 2, filed January 25, 2016 (Doc. 86)("Motion to Dismiss Count II Response"). Pojoaque Pueblo contends, however, that the "Supreme Court has recently affirmed and recognized the existence of the cause of action set forth in Count II in Armstrong v. Exceptional

Child Ctr., Inc.[, 135 S. Ct. 1378 (2015)]."  Motion to Dismiss Count II Response at 2.  Pojoaque Pueblo argues that the Supreme Court held that, "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted."  Motion to Dismiss Count II Response at 3 (quoting Armstrong v. Exceptional Child Ctr., Inc., 135 S. Ct. at 1384 (citing Ex Parte Young, 209 U.S. 123, 155-56 (1908))(internal quotation marks omitted).  Pojoaque Pueblo appeals to the Court to apply this analysis and conclude that Count II presents a cognizable claim pursuant to the Court's equitable power.  See Motion to Dismiss Count II Response at 4.  Pojoaque Pueblo also advances the same arguments that it makes in its earlier briefings regarding IGRA's preemption of the Gaming Board's actions.  See Motion to Dismiss Count II Response at 5 (referencing and incorporating Pojoaque Pueblo's preemption arguments from its Motion to Reconsider Response).

### h.   The Motion to Dismiss Count V.

On December 22, 2015, the Defendants moved to dismiss the Complaint's Count V, which seeks unspecified relief for the Defendants' alleged tortious interference with Pojoaque Pueblo's existing contract relations as "recognized by the courts of the State of New Mexico."  Complaint ¶ 153, at 37.  See Defendants' Motion to Dismiss Count V of Plaintiffs' Complaint, filed December 22, 2015 (Doc. 73)("Motion to Dismiss Count V").  The Defendants argue, first, that New Mexico is "immune from suit in federal court pursuant to the Eleventh Amendment" and that New Mexico has not waived this immunity.  Motion to Dismiss Count V at 1-3.  Second, the Defendants contend that, pursuant to the New Mexico Tort Claims Act, N.M.S.A. §§ 41-4-1 to -30 (the "NMTCA"), New Mexico and its employees are "immune from liability under state tort liability."  Motion to Dismiss Count V at 1.

Pojoaque Pueblo, in response, agrees to the dismissal of Count V "by reason of the State's

assertion of Eleventh Amendment immunity." Response to State Defendants' Motion to Dismiss Count V of Plaintiffs [sic] Complaint at 2, filed January 25, 2016 (Doc. 89)("Motion to Dismiss Count V Response"). Pojoaque Pueblo "concurs with the Defendants that under these circumstances, this Court lacks jurisdiction to hear Count V." Motion to Dismiss Count V Response at 2.

<p style="text-align:center"><strong>i.      <u>The Motion to Stay Proceedings.</u></strong></p>

On February 17, 2016, Pojoaque Pueblo moved to stay proceedings pending the Defendants' interlocutory appeal of Judge Brack's PI. <u>See</u> Pueblo's Motion to Stay Proceedings Pending Defendants' Interlocutory Appeal of Order Issuing Preliminary Injunction at 1, filed February 17, 2016 (Doc. 93)("Motion to Stay Proceedings"). Pojoaque Pueblo contends that "[t]he crux of the instant dispute is whether the preemptive effect of the Indian Gaming Regulatory Act . . . prevents the Defendants from taking actions which interfere with the Pueblo's exercise of its federal statutory, common law, and sovereign rights to engage in gaming activities." Motion to Stay Proceedings at 1-2. Granting a stay of proceedings is "prudent, efficient, and fair," Pojoaque Pueblo argues, because the Tenth Circuit's ruling on the Defendants' interlocutory appeal "will likely resolve that issue or provide great clarity as to the scope of IGRA's preemptive effect." Motion to Stay Proceedings at 2. Pojoaque Pueblo argues, moreover, that the Defendants' interlocutory appeal divests the Court of its jurisdiction over the matter, because the Court has not certified the appeal as frivolous. <u>See</u> Motion to Stay Proceedings at 3 (citing <u>Stewart v. Donges</u>, 915 F.2d 572, 575-78 (10th Cir. 1990)).

In any event, Pojoaque Pueblo asserts, the Court should stay proceedings, because Pojoaque Pueblo has "establishe[d] the four criteria considered in deliberation of motions to stay proceedings pending appeals." Motion to Stay Proceedings at 9. Pojoaque Pueblo contends that, first, Judge Brack's PI MOO established the likelihood of Pojoaque Pueblo's success on appeal. <u>See</u> Motion to

Stay Proceedings at 10.  Second, Pojoaque Pueblo argues that "the irreparable harm to the Pueblo if the stay is denied is the otherwise unnecessary legal fees and costs of litigation proceeding in this Court . . . ."  Motion to Stay Proceedings at 10-11.  Third, Pojoaque Pueblo avers that "the balance of hardships tips heavily in the Pueblo's favor."  Motion to Stay Proceedings at 11.  Last, Pojoaque Pueblo argues that "the requested stay would promote the public interest in accuracy of judicial proceedings and in efficient use of government resources."  Motion to Stay Proceedings at 11.

The Defendants responded on March 7, 2016.  See Defendants' Response to Pueblo's Motion to Stay Proceedings Pending Defendants' Interlocutory Appeal of Order Issuing Preliminary Injunction at 1, filed March 7, 2016 (Doc. 106)("Motion to Stay Proceedings Response").  The Defendants argue that the "complete divestiture rule" articulated in Stewart v. Donges "stems from, and its scope is limited by, the nature of the defense that is the subject of the appeal."  Motion to Stay Proceedings Response at 2.  The Defendants note, however, that "there are 'exception[s] to this general rule.'"  Motion to Stay Proceedings Response at 3 (quoting Anderson Living Trust v. WPX Energy Prod., LLC, 308 F.R.D 410, 436 n.15 (D.N.M. 2015)(Browning, J.))(alteration in Motion to Stay Proceedings Response).  "One well-established exception," the Defendants argue, "exists for interlocutory appeals of preliminary injunctions."  Motion to Stay Proceedings Response at 3 (citing 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3921.2, at 58 (3d ed. 2012)("Wright & Miller")).  The Defendants cite Free Speech v. Fed. Election Comm'n, 720 F.3d 788 (10th Cir. 2013)("Free Speech"), where the Tenth Circuit stated that, "[a]lthough the filing of a notice of appeal ordinarily divests the district court of jurisdiction, in an appeal from an order granting or denying a preliminary injunction, a district court may nevertheless proceed to determine the action on the merits."  Motion to Stay Proceedings Response at 3-4 (quoting Free Speech, 720 F.3d at 791-92)(internal quotation marks omitted).  Accordingly, the Defendants assert, "this Court

has jurisdiction to rule on Defendants' motions and to dismiss Plaintiffs' complaint in its entirety for failure to state a claim."  Motion to Stay Proceedings at 5.

Regarding Pojoaque Pueblo's prudential arguments, the Defendants assert that "stay requests are judged by the fundamental principle that '[t]he right to proceed in court should not be denied except under the most extreme circumstances.'"  Motion to Stay Proceedings Response at 6 (quoting Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC, 545 F. Supp. 2d 1188, 1189 (D. Kan. 2008)(Lungstrum, J.)(citation omitted))(alteration in Motion to Stay Proceedings Response).  The Defendants aver, moreover, that Pojoaque Pueblo cannot satisfy its burden of establishing a stay's propriety.  See Motion to Stay Proceedings Response at 7.  First, with respect to judicial economy, the Defendants argue that "[t]his litigation is not at an early stage, a stay will not simplify the issues and streamline the trial, nor will it reduce the burden of the litigation of the parties and on the Court." Motion to Stay Proceedings Response at 7.  Second, regarding the balance of hardships, the Defendants assert that Pojoaque Pueblo "will suffer no material hardship or prejudice . . . , because [it] already [has] a preliminary injunction that effectively grants them . . . all of the relief that they seek in this litigation."  Motion to Stay Proceedings Response at 10.  By contrast, the Defendants contend, the Gaming Board is "currently blocked from enforcing New Mexico gaming law -- that is, the preliminary injunction operates to impair the State's sovereignty and obstruct the exercise of its police power."  Motion to Stay Proceedings Response at 10.  Accordingly, the Defendants argue, the Court should "deny the Motion and rule on Defendants' pending motions."  Motion to Stay Proceedings Response at 11.

**j.      The Court's Stay MOO.**

The Court issued its Stay MOO disposing of the nine aforementioned motions on September 30, 2016.  See Stay MOO at 1.  The Court began its analysis by concluding that, notwithstanding the

Defendants' interlocutory appeal of Judge Brack's PI, the Court had "jurisdiction to 'proceed to determine the action on the merits.'"  Stay MOO at 97 (quoting <u>Free Speech</u>, 720 F.3d at 791).  The Court relied on the Tenth Circuit's reasoning in <u>Free Speech</u> that, "in the context of 'an appeal from an order granting or denying a preliminary injunction, a district court may [] proceed to determine the action on the merits.'"  Stay MOO at 96 (quoting <u>Free Speech</u>, 720 F.3d at 791).  Accordingly, the Court denied Pojoaque Pueblo's Motion to Stay Proceedings.  <u>See</u> Stay MOO at 97.

Having established its jurisdiction, the Court turned to the merits of the Defendants' motions, concluding that the Defendants did not violate Pojoaque Pueblo's federal rights by taking regulatory enforcement actions against Pojoaque Pueblo's gaming vendors.  <u>See</u> Stay MOO at 98-126.  First addressing the litigation's central preemption issue, the Court held that IGRA "does not preempt New Mexico's regulatory actions with respect to non-Indian, state-licensed vendors doing business with non-Indian gaming operators."  MOO at 120.  The Court reasoned that IGRA does not evince any "clear and manifest" Congressional intent to preempt the exercise of regulatory actions outside tribal lands, because IGRA concerns only regulation of "gaming <u>on</u> Indian lands, and nowhere else."  Stay MOO at 106 (quoting <u>Bay Mills</u>, 134 S. Ct. at 2034)(emphasis added)(internal quotation marks omitted).  Accordingly, the Court concluded, IGRA expressly preempts "only on-reservation gaming regulations."  Stay MOO at 115.  Applying similar reasoning, the Court also concluded that IGRA does not impliedly preempt the Defendants' actions.  <u>See</u> Stay MOO at 116.  First, with respect to field preemption, the Court held that "IGRA is not 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'"  Stay MOO at 118 (quoting <u>Gade v. Nat'l Solid Wastes Mgmt. Assoc.</u>, 505 U.S. 88, 98 (1992)).  To the contrary, the Court reasoned, "IGRA appears to anticipate a regulatory scheme where 'complimentary state regulation is []permissible.'"  Stay MOO at 118 (quoting <u>Arizona v. United States</u>, 132 S. Ct. 2492, 2502 (2012)).

Second, regarding "conflict preemption," the Court held that "it is not a 'physical impossibility' for third-party state licensees to comply with both IGRA and New Mexico law," because "[t]here are no conflicting obligations under both sets of laws."   Stay MOO at 119 (quoting Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963)).  Nor do New Mexico's gaming laws "pose an obstacle to the accomplishment of IGRA's objectives," the Court stated, because "Congress did not intend for Indian tribes to conduct Class III gaming operations without a compact in the first place."  Stay MOO at 119 (citing 25 U.S.C. § 2710(d)(1)).  Thus, the Court concluded that, to the extent that New Mexico's actions impact Pojoaque Pueblo's operations, those actions do not stand in conflict with IGRA's objectives and are therefore not preempted.  See Stay MOO at 119.

The Court then held that the Defendants' actions do not otherwise violate Pojoaque Pueblo's federal rights under the Supremacy Clause or under 42 U.S.C. §§ 1983 and 1985.  See MOO at 121-126.  First, with respect to Pojoaque Pueblo's allegation that the Gaming Board's actions "constitute a violation of the Supremacy Clause," Complaint ¶ 8, at 4, the Court held that the Complaint fails to state a claim, because "the Supremacy Clause 'is not a source of any federal rights,'" Stay MOO at 121 (quoting Golden State Transit Corp. v. Los Angeles, 493 U.S. at 107)(citation omitted), and thus it "certainly does not create a cause of action," Stay MOO at 121 (quoting Armstrong v. Exceptional Child Ctr., Inc., 135 S. Ct. at 1383)(internal quotation marks omitted).  The Court therefore granted the Motion to Dismiss Count II.  See Stay MOO at 123.  Second, regarding Pojoaque Pueblo's claim that the Individual Defendants "wrongfully assert[ed] State jurisdiction over gaming activities on the Pueblo's Indian lands . . . in violation of 42 U.S.C. §§ 1983 and 1985," Complaint ¶¶ 138-142, at 35; id. ¶¶ 143-151, at 35-37, the Court held that the Complaint identifies no federal or constitutional rights that the Individual Defendants violated that are cognizable under § 1983, see Stay MOO at 124, and that the Complaint fails to "allege . . . any 'invidiously discriminatory animus' motivating

the Individual Defendants' actions" or a "'commingling of racial and political motives,' as the Tenth

Circuit requires" for a § 1985 claim, Stay MOO at 126 (quoting O'Connor v. St. John's Coll., 290 F.

App'x at 141 n.4).  Accordingly, the Court granted the Motion to Dismiss Counts III and IV for

failure to state a claim.  See Stay MOO at 126.

      Turning to the QI Motion, the Court concluded that the Individual Defendants are entitled to

qualified immunity with respect to the Complaint's Count IV.  See Stay MOO at 127.  The Court

first extended its previous analysis regarding IGRA's preemptive scope, holding that "the Individual

Defendants' regulatory actions towards third-party vendor licensees did not violate Pojoaque

Pueblo's federal rights under IGRA."  Stay MOO at 128.  The Court likewise held that the Individual

Defendants did not "violate Pojoaque Pueblo's rights under the Supremacy Clause, or under 42

U.S.C. §§ 1983 or 1985."  Stay MOO at 128.  Thus, the Court concluded that "no 'constitutional

right would have been violated on the facts alleged.'" Stay MOO at 128 (quoting Saucier v. Katz,

533 U.S. 194, 201 (2001)).  With respect to qualified immunity analysis' second inquiry, the Court

concluded that, "[e]ven if . . . the Individual Defendants violated Pojoaque Pueblo's constitutional

rights, the Court is not persuaded that those rights were 'clearly established' at the time of the

Individual Defendants' actions."  Stay MOO at 128 (quoting Saucier v. Katz, 533 U.S. at 201).  The

Court reasoned that, "[a]t a minimum, the law was not clearly established, because the distinction

between on- and off-reservation actions 'might make a constitutional difference.'"  Stay MOO at 131

(quoting Kerns v. Bader, 663 F.3d 1173, 1188 (10th Cir. 2011)).  Accordingly, the Court granted the

QI Motion and dismissed Count IV.  See Stay MOO at 132.

      The Court declined, however, to grant a stay of discovery pending the Court's ruling on the

QI Motion.  See Stay MOO at 132. The Court acknowledged that "it is true that discovery should

normally be stayed pending the resolution of a qualified immunity defense."  Stay MOO at 133

(citing <u>Harlow v. Fitzgerald</u>, 457 U.S. at 818-19).  The Court noted, however, that, in this case, "the point is moot, because the Court granted the Qualified Immunity Motion at the QI hearing."  Stay MOO at 133.  The Court concluded that, "[t]hus, there is no reason to stay the case pending the Court's ruling, because the Court has already granted the Qualified Immunity Motion."  Stay MOO at 133.  Accordingly, the Court exercised "its 'broad discretion' with respect to discovery rulings" and denied the Motion to Stay Discovery.  Stay MOO at 134 (quoting <u>Cole v. Ruidoso Mun. Sch.</u>, 43 F.3d 1373, 1386 (10th Cir. 1994)).

The Court next addressed New Mexico's assertion of sovereign immunity from suit.  <u>See</u> Stay MOO at 134.  The Court first concluded that New Mexico is entitled to sovereign immunity with respect to Pojoaque Pueblo's bad-faith compact negotiation claim asserted pursuant to IGRA § 2710(d)(7), because "§ 2710(d)(7) cannot grant jurisdiction over a State that does not consent to be sued."  Stay MOO at 135 (quoting <u>Seminole Tribe I</u>, 517 U.S. at 47)(internal quotation marks omitted).  The Court then concluded that "New Mexico is also entitled to sovereign immunity from the remainder of the claims in the Plaintiffs' Complaint," because "Congress has not validly abrogated, and New Mexico has not waived, its Eleventh Amendment immunity from these claims."  Stay MOO at 135 (citing <u>Port Auth. Trans-Hudson Corp. v. Feeney</u>, 495 U.S. 299, 304 (1990)).  Finally, the Court indicated that it would "modify the October 7, 2015, preliminary injunction and remove New Mexico as an enjoined party, if New Mexico dismisses its appeal and/or the preliminary injunction is remanded to the Court."  Stay MOO at 136.  Accordingly, the Court granted the Sovereign Immunity Motion and dismissed all claims against New Mexico.  <u>See</u> Stay MOO at 136.

The Court then turned to the Individual Defendants' Motion to Dismiss Count V on the grounds of immunity under the NMTCA, § 41-4-1 to -30.  <u>See</u> Stay MOO at 137.  The Court noted

- 42 -

that, because "[t]he NMTCA does not waive liability for intentional torts, . . . New Mexico officials cannot be held liable for tortious interference with contractual relations." Stay MOO at 138 (citing El Dorado Utils., Inc. v. Eldorado Area Water and Sanitation Dist., 2005-NMCA-036, ¶ 251, 109 P.3d 305). The Court therefore granted the Motion to Dismiss Count V. See Stay MOO at 138.

The Court's analysis then turned to the Defendants' motions concerning Judge Brack's PI. See Stay MOO at 138. First, with respect to the Motion to Stay PI, the Court invoked its authority pursuant to rule 62(c) and stayed the PI. See Stay MOO at 138-144. The Court reasoned that rule 62(c) empowers a district court to "suspend, modify, restore, or grant an injunction" during the pendency of an appeal "from an interlocutory order or final judgment that grants, dissolves, or denies an injunction." Stay MOO at 139 (quoting Fed. R. Civ. P. 62(c))(internal quotation marks omitted). The Court noted that "the same legal standards that govern stays of injunctions under Rule 62(c) also govern grants of injunctions pursuant to Rule 65," and that a stay should be granted absent a robust probability of success on the merits where a "preliminary injunction seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme . . . ." Stay MOO at 140 (quoting Heideman v. S. Salt Lake City, 348 F.3d 1182, 1189 (10th Cir. 2003))(internal quotation marks omitted). Given the Court's earlier conclusion that the Gaming Board's regulatory actions did not violate Pojoaque Pueblo's federal rights, the Court held that Pojoaque Pueblo failed to make the requisite "strong showing" that it was likely to succeed on the merits of its claim underlying the preliminary injunction. MOO at 141 (quoting Hilton v. Braunskill, 481 U.S. at 776). Accordingly, the Court granted the Motion to Stay PI and stayed the preliminary injunction. See Stay MOO at 144.

The Court left the preliminary injunction intact, however. See Stay MOO at 144-145. The Court reasoned that "[a] district court [] has no jurisdiction to vacate or dissolve a preliminary

injunction that has been appealed." Stay MOO at 145 (citing <u>Coastal Corp. v. Tex. E. Corp.</u>, 869 F.2d at 819-20). Thus, in light of the Defendants' interlocutory appeal of Judge Brack's PI to the Tenth Circuit, the Court acknowledged that it was powerless to vacate or dissolve the PI at that stage of the litigation. <u>See</u> Stay MOO at 145. The Court accordingly denied the Motion to Reconsider PI. <u>See</u> Stay MOO at 145. At the same time, however, the Court indicated, pursuant to rule 62.1, that it "would dissolve or vacate the preliminary injunction if the Defendants dismiss the appeal and/or the Tenth Circuit remands the case for the Court's consideration." MOO at 145.

Having dismissed all claims against all parties, the Court entered Final Judgment concomitantly with its Stay MOO on September 30, 2016. <u>See</u> Final Judgment at 1, filed September 30, 2016 (Doc. 119). In the Final Judgment, the Court "dismissed Defendant State of New Mexico without prejudice, and all other Defendants with prejudice." Final Judgment at 1.

### k.  <u>Pojoaque Pueblo's Appeal of the Court's Stay MOO.</u>

Pojoaque Pueblo promptly appealed the Court's Stay MOO to the Tenth Circuit on October 3, 2016. <u>See</u> <u>Pueblo of Pojoaque v. State of New Mexico</u>, No. 16-2228, Notice of Appeal at 1, filed October 3, 2016 (Doc. 120). On October 17, 2016, the Tenth Circuit panel assigned to review the matter sua sponte issued an order indicating that "[i]t appears that the district court's September 30, 2016 judgment is not yet final." United States Court of Appeals for the Tenth Circuit's Order at 1, filed October 17, 2016 (Doc. 128)("Tenth Circuit FJ Order"). The Tenth Circuit noted that Pojoaque Pueblo, in response to the docketing statement question, "Does the judgment or order to be reviewed dispose of all claims by and against all parties?" answered "Yes, with the caveat that the District Court represents that the Order being appealed from is a Final Judgment while simultaneously indicating that it would take future action on the Preliminary Injunction in effect." Tenth Circuit FJ Order at 1 (internal quotation marks and emphases omitted). Based on that statement, the Tenth

Circuit expressed that the Court's Stay MOO appeared to reserve jurisdiction to "dissolve or vacate the preliminary injunction if the Defendants dismiss the appeal [in Pueblo of Pojoaque v. State of New Mexico, 15-2187] and/or the Tenth Circuit remands the case for the Court's consideration." Tenth Circuit FJ Order at 2 (quoting MOO at 145)(alterations added)(internal quotation marks omitted).  Accordingly, the Tenth Circuit directed Pojoaque Pueblo to "file a written response discussing the basis of this court's exercise of appellate jurisdiction at this time over the district court's September 30, 2016 order."  Tenth Circuit FJ Order at 2.  Failure to file a timely response, the Tenth Circuit cautioned, may result in dismissal of the appeal pursuant to Tenth Circuit Rule 42.1.  See Tenth Circuit FJ Order at 2.  The Tenth Circuit did not request a response of any kind from the Defendants.  See Tenth Circuit FJ Order at 2.

On October 26, 2016, Pojoaque Pueblo indicated that, "[u]nless this Court provides an explanation that would correct or explain the error, the Pueblo intends to notify the Tenth Circuit that it is correct and that the appeal should be dismissed."  Plaintiffs' Reply to Defendants' Response to Motion to Stay Order and Restore the Preliminary Injunction Pending Appeal at 1 n.2, filed October 26, 2016 (Doc. 131)("Motion to Stay MOO Reply").

The Court held a hearing on October 27, 2016.  See Transcript of Motion Hearing at 6:6-22 (taken October 27, 2016), filed December 30, 2016 (Doc. 147)(Crowell)("FJ Tr."). The Court first explained that it entered Final Judgment in part to assist Pojoaque Pueblo in its ability to quickly appeal the Court's Stay MOO to the Tenth Circuit.  See FJ Tr. at 7:7-20 (Court).  The Court noted that, in its view, the "purpose of an indicative ruling is to tell [the Tenth Circuit] that if they will divest themselves of their jurisdiction, this is what I will do," and that, in the circumstances of this case, there is no way "to give an indicative ruling without a final judgment."  FJ Tr. at 7:21-8:2 (Court).  Indeed, the "whole purpose of an indicative ruling," the Court reasoned, "is when the court

- 45 -

doesn't have jurisdiction." FJ Tr. at 18:2-4 (Court). If the Court had jurisdiction, the Court continued, it could just vacate or dissolve the PI. See FJ Tr. at 8:1-4 (Court). It follows, the Court explained, that the Court did not reserve any jurisdiction that would defeat the finality of its Final Judgment, because it had no jurisdiction to reserve. See FJ Tr. at 8:1-4 (Court). The Court emphasized that it was careful in its MOO "not [to] touch [the] preliminary injunction," because it perceived that it was divested of jurisdiction because of the Defendants' interlocutory appeal to the Tenth Circuit. FJ Tr. at 31:10-18 (Court). Accordingly, the Court noted that it stayed the PI pursuant to rule 62(c), but that it left the injunction itself intact and simply issued an indicative ruling under rule 62.1. See FJ Tr. at 31:10-18 (Court). The Court concluded that it could think of nothing further that it could do in the case, because the Court had "resolve[d] all parties and all claims." Tr. at 19: 10-14 (Court).

The Defendants opened their argument by stating that, if given the opportunity, they "would defend the finality of the judgment" before the Tenth Circuit. FJ Tr. at 18:19-21 (Bohnhoff). The Defendants noted, however, that the Tenth Circuit FJ Order "required input only from the Pueblo, not from the State." FJ Tr. at 18:22-23 (Bohnhoff). Thus, the Defendants indicated that they would likely file a motion with a Tenth Circuit "asking for an opportunity to be heard." FJ Tr. at 18:24-19:4 (Bohnhoff). The Defendants averred that, in their view, the Court had "jurisdiction to enter the final judgment." FJ Tr. at 21:22-23 (Bohnhoff).

The Court queried why it is in Pojoaque Pueblo's interest to argue that the Court committed error in entering Final Judgment, which "makes it difficult for them to appeal" the Court's opinion. FJ Tr. at 20:14-25 (Court). The Court asked specifically whether, in the Defendants' view, Pojoaque Pueblo is motivated by "delay." FJ Tr. at 20:25-21:2 (Court). The Defendants noted their agreement with the Court's suggestion, arguing that "[t]his is simply a play for delay" and that "the only way

the Pueblo san salvage something from this dispute is by dragging [it out]."  FJ Tr. at 21:3-10 (Bohnhoff).

In rejoinder, Pojoaque Pueblo disputed that it was "motivated by delay," clarifying that it desires to "avoid [] going through all the expense and time of an appeal, to possibly have the court say, well, we didn't have jurisdiction in the first place." FJ Tr. at 42:13-21 (Crowell).  Accordingly, Pojoaque Pueblo explained that it simply "want[s] a final judgment that [it] can take to the court of appeals, and where the court of appeals clearly has jurisdiction to resolve the issues."  FJ Tr. at 44:14-17 (Crowell).  As it stands, however, Pojoaque Pueblo indicated that it planned to confess error by the Court in entering Final Judgment, because the Court's Final Judgment appears to leave certain issues unresolved.  See FJ Tr. at 44:6-11 (Crowell).  Based on this alleged error, Pojoaque Pueblo proposed that the Court vacate the Final Judgment pending the Tenth Circuit's resolution of the Defendants' interlocutory appeal of the preliminary injunction, at which time the Court could enter a judgment that is indisputably final.  See FJ Tr. at 44:21-25 (Crowell).

In light of the Court's clarifications at the hearing regarding the finality of the Final Judgment, Pojoaque Pueblo subsequently filed a brief at the Tenth Circuit in which it argued that, contrary to its earlier assertion that the Stay MOO did not reach a final decision, the Stay MOO "'ends the litigation on the merits and leaves nothing for the court to do but execute judgment.'" Appellants Pueblo of Pojoaque and Governor Joseph M. Talachy Response to October 17, 2016 Court Order at 2, filed November 1, 2016 (Doc. 138-1)("FJ Response")(quoting Cunningham v. Hamilton Cnty., 527 U.S. 198, 204 (1999)).  Consequently, Pojoaque Pueblo asserted that "[t]he present appeal should not be dismissed at this juncture," because it would "place[] the Pueblo in the untenable position of losing its right to appeal [the Stay MOO.]"  FJ Response at 2.

The Court issued an opinion denying Pojoaque Pueblo's request to vacate the Final Judgment

on November 2, 2016.  See Memorandum Opinion and Order at 2, filed November 2, 2016 (Doc. 139)("FJ MOO").  The Court explained that the Stay MOO reached a final decision on the merits, because it dismissed all claims against all parties.  See FJ MOO at 15 (noting that the Stay MOO dismissed all claims against the Individual Defendants with prejudice and dismissed all claims against New Mexico without prejudice).  The Court reasoned, further, that its statement in the Stay MOO that the Court would "dissolve or vacate the preliminary injunction if the Defendants dismiss the appeal and/or the Tenth Circuit remands the case for the Court's consideration" was an indicative ruling that did not reserve any jurisdiction that would defeat the finality of the Final Judgment.  FJ MOO at 17 (quoting Stay MOO at 145).  The Court explained that it "did not by operation of its indicative ruling carve out a reservation of jurisdiction to vacate the preliminary injunction in the future; rather, it merely signaled what course of action it will take if it reacquires jurisdiction on remand."  FJ MOO at 17 (citing Fed. R. Civ. P. 62.1).  The Court concluded that, "[p]lainly, the Court has not reserved jurisdiction, because it has no jurisdiction to reserve."  FJ MOO at 17-18.

### 4.    Pojoaque Pueblo's Motion to Stay MOO and Restore the PI.

On October 4, 2016, Pojoaque Pueblo moved, pursuant to rule 62(c) of the Federal Rules of Civil Procedure, and rule 8(a)(1)(A) and (C) of the Federal Rules of Appellate Procedure, to stay the Court's order in its Stay MOO staying the effects of Judge Brack's PI and to restore the PI pending the resolution of Pojoaque Pueblo's appeal of the Stay MOO to the Tenth Circuit.  See Motion to Stay MOO at 1.  Pojoaque Pueblo moved, in the alternative, for a sixty-day temporary stay of the Court's order to allow time for the Tenth Circuit to consider and rule on a motion for a stay that Pojoaque Pueblo will assert pursuant to rule 8(a)(1)(A) and (C) of the Federal Rules of Appellate Procedure.  See Motion to Stay MOO at 1.  The Court will discuss Pojoaque Pueblo's Motion to Stay MOO and its responsive pleadings in turn.

a.    **The Motion to Stay MOO.**

Pojoaque Pueblo's Motion to Stay MOO largely recasts the arguments that it advanced in its earlier motions.  See Motion to Stay MOO at 1-27.  Pojoaque Pueblo contends that the Court should grant a stay for two primary reasons: (i) "because the Court never had jurisdiction to rule on the pleadings, as Defendants' interlocutory appeal of the Order granting preliminary injunction divested the Court of jurisdiction"; and (ii) "because even if the Court did have jurisdiction to rule on the pleadings, the elements for granting a stay pending appeal have been met."  Motion to Stay MOO at 2.  The Court reviews these arguments in turn.

i.    **Jurisdictional Arguments.**

Pojoaque Pueblo contends that, first, the Court in its Stay MOO "wrongly concluded that the Defendants' interlocutory appeal of Judge Brack's preliminary injunction does not divest the Court of jurisdiction to 'proceed to determine the action on the merits.'"  Motion to Stay MOO at 9 (quoting Stay MOO at 97).  Pojoaque Pueblo asserts that the Court failed to "apply the bright line rule established by the Tenth Circuit in *Stewart v. Donges*" that, "[o]nce a party has filed an appeal from an interlocutory order, . . . the District Court is divested of jurisdiction pending the appeal, except in very limited circumstances . . . , or unless the District Court certifies that the appeal is frivolous."  Motion to Stay MOO at 9 (citing Stewart v. Donges, 915 F.2d at 576).  Pojoaque Pueblo argues that the complete divestiture rule "'provides a bright-line jurisdictional rule to prevent duplicative waste of resources, to reduce uncertainty and unnecessary litigation and to avoid inconsistent determinations' in multiple fora."  Motion to Stay MOO at 10 (quoting McCauley v. Halliburton Energy Servs., 413 F.3d 1158, 1162 (10th Cir. 2005)).  To regain jurisdiction, Pojoaque Pueblo contends, the district court must "take the affirmative step of certifying the appeal as frivolous or forfeited, and until that step is taken it simply lacks jurisdiction to proceed with trial."

Motion to Stay MOO at 10 (quoting Stewart v. Donges, 915 F.2d at 577-78).  Here, Pojoaque Pueblo

asserts, "no party has sought this Court's certification that Defendants' appeal is frivolous."  Motion

to Stay MOO at 10.

       Pojoaque Pueblo contends that, rather than "embrac[e] the bright line rule" in Stewart v.

Donges, the Court "incorrectly applies" Free Speech.  Motion to Stay MOO at 10-11.  Pojoaque

Pueblo stresses the importance of Free Speech's procedural posture.  See Motion to Stay MOO at 10.

Pojoaque Pueblo notes that "[t]he plaintiffs in *Free Speech* filed an interlocutory appeal from a

denial of their motion for preliminary injunction, and while that appeal was technically pending, the

District Court granted the federal defendants' motion to dismiss."  Motion to Stay MOO at 10.

Pojoaque Pueblo contends that "*Free Speech* does not even address *Donges*, much less overrule

*Donges*."  Motion to Stay MOO at 10.  Pojoaque Pueblo asserts that, moreover, "a review of the

briefs filed by the parties in that litigation indicates that the issue was never presented by either of

the parties."  Motion to Stay MOO at 10 (citing Declaration of Scott D. Crowell ¶ 5, at 2 (executed

March 21, 2016), filed March 21, 2016 (Doc. 109-1)[3]).  Pojoaque Pueblo notes that the parties in

Free Speech stipulated to dismiss the appeal of the denial of the PI "four days after the plaintiffs

filed a notice of appeal from the order granting federal defendants' motion to dismiss."  Motion to

Stay MOO at 11.  Accordingly, Pojoaque Pueblo contends, "[t]o the extent that *Donges* may have

been at issue in *Free Speech*, the issue was mooted by the expeditious termination of the earlier

appeal."  Motion to Stay MOO at 11.

       Finally with regard to the Court's jurisdiction, Pojoaque Pueblo asserts that the Tenth Circuit

---

[3]Pojoaque Pueblo's Motion to Stay MOO cites the Declaration of Scott D. Crowell (executed March 29, 2016), filed March 29, 2016 (Doc. 111-1), in support of this argument.  The Court's review of that Declaration, however, reveals nothing related to Free Speech.  Instead, it appears that Pojoaque Pueblo intends to cite to the Declaration that the Court cites in the text, which discusses the briefings in Free Speech.  See Declaration of Scott D. Crowell ¶ 5, at 2 (executed March 21, 2016), filed March 21, 2016 (Doc. 109-1).

has "affirmatively cited *Donges* and its progeny, after the June 25, 2013 issuance of the *Free Speech* decision, as valid law."  Motion to Stay MOO at 11 (citing Martinez v. Mares, 613 F. App'x 731, 735 (10th Cir. 2015)).  Pojoaque Pueblo contends that district courts, including the Court, have likewise "affirmatively cited *Donges* and its progeny as the correct rule of law[.]"  Motion to Stay MOO at 11 (citing Anderson Living Trust v. WPX Energy Prod., LLC, 308 F.R.D. at 436 n.15).  Pojoaque Pueblo asserts, accordingly, that "*Free Speech* is an anomaly, with a peculiar procedural posture, and does not provide this Court with any guidance or authority to disregard the rigid rule set forth in *Donges* and its progeny."  Motion to Stay MOO at 12.

### ii.     Arguments Regarding the Standard for Granting a Stay.

Turning to its argument regarding the propriety of a stay, Pojoaque Pueblo argues that, "[i]f the Court continues to assert that it maintains jurisdiction to rule on the pleadings, a stay should still be ordered because the four elements required to issue a stay pending appeal have been met."  Motion to Stay MOO at 12.  Pojoaque Pueblo contends that Tenth Circuit Rule 8.1 requires that a plaintiff seeking a stay pending appeal demonstrate: (i) likelihood of success on appeal; (ii) the threat of irreparable harm if the stay or injunction is not granted; (iii) the absence of harm to opposing parties if the stay or injunction is granted; and (iv) any risk of harm to the public interest.  See Motion to Stay MOO at 2 (citing McClendon v. City of Albuquerque, 79 F.3d 1014, 1020 (10th Cir. 1996)).  Pojoaque Pueblo argues that it "can establish each element and has already established these elements as evidenced by the findings in the preliminary injunction."  Motion to Stay MOO at 2-3 (referencing PI MOO).

First, Pojoaque Pueblo contends that there is a substantial likelihood that it will prevail on the merits of its appeal.  See Motion to Stay MOO at 12.  Pojoaque Pueblo argues that IGRA preempts the Gaming Board's regulatory actions, because those actions "directly target and have an impact on

the Pueblo and its gaming operations."  Motion to Stay MOO at 12.  Pojoaque Pueblo cites California v. Cabazon Band of Mission Indians, 480 U.S. 202 (1987)("Cabazon"), for the proposition that "State regulation of on-reservation gaming activity [is] pre-empted."  Motion to Stay MOO at 13 (citing Cabazon, 480 U.S. at 222).  Indeed, Pojoaque Pueblo asserts, "State jurisdiction is pre-empted . . . if it interferes or is incompatible with federal and tribal interests reflected in federal law . . . ."  Motion to Stay MOO at 14 (quoting Cabazon, 480 U.S. at 216)(citation and internal quotation marks omitted).  In Pojoaque Pueblo's view, IGRA does not "extinguish[]" or diminish "the pre-emptive force of federal and tribal interests."  Motion to Stay MOO at 12 (quoting Cabazon, 480 U.S. at 221)(internal quotation marks omitted).  Accordingly, Pojoaque Pueblo argues that the Gaming Board may regulate activity on Pojoaque Pueblo's lands only if it first "negotiate[s] a tribal-state compact in good faith."  Motion to Stay MOO at 13.

As in its earlier briefings, Pojoaque Pueblo argues that Judge Brack's PI MOO "established that the Defendants are 'interfering with the Pueblo's federal protected right to tribal sovereignty and the ability to conduct their gaming activities.'"  Motion to Stay MOO at 13 (quoting PI MOO at 15).  Pojoaque Pueblo isolates several "assumptions the Court made in direct contradiction to Judge Brack's conclusions."  Motion to Stay MOO at 14.  First, Pojoaque Pueblo argues that "the Court assumes that the State is relying on the United States Attorney's statement that the Pueblo is gaming illegally."  Motion to Stay MOO at 14.  Second, Pojoaque Pueblo contends that "the Court assumes that the Pueblo is gaming illegally."  Motion to Stay MOO at 14.  Pojoaque Pueblo contends that the Court's "determination that the Pueblo is operating illegally" ignores "the Defendants' actions which led the Pueblo to operate without a compact," namely, the "Defendants' bad faith negotiations," New Mexico's assertion of Eleventh Amendment sovereign immunity from suit, and the "Defendants' actions to sue the federal government when the Pueblo attempted to go through the Secretarial

Procedures process."  Motion to Stay MOO at 14.

Pojoaque Pueblo also asserts that "the Court assumes that any actions taken by the State off-reservation do not affect the Pueblo's gaming on-reservation."  Motion to Stay MOO at 14.  Judge Brack, Pojoaque Pueblo contends, "previously recognized that 'Defendants' protestations that the regulation of vendors doing business with the Pueblo does not constitute regulation of the Pueblo's gaming activities are disingenuous and inconsistent with the record.'"  Motion to Stay MOO at 14-15 (quoting PI MOO at 20).  Indeed, Pojoaque Pueblo argues that Judge Brack concluded that "the Pueblo will lose significant revenue and its Casinos may be shut down due to Defendants' intimidation of the Pueblo vendors."  Motion to Stay MOO at 15 (quoting PI MOO at 20)(internal quotation marks omitted).  Pojoaque Pueblo contends that the Court's Stay MOO, by contrast, holds that "the Defendants' actions do not prohibit the Pueblo from continuing its gaming operations, nor do they prevent vendors from supplying equipment to the Pueblo for such operations."  Motion to Stay MOO at 15 (citing Stay MOO at 107).  This analysis, Pojoaque Pueblo asserts, "would support the State building a barrier around the Reservation . . . so long as the barriers are placed just outside the Pueblo boundary."  Motion to Stay MOO at 15.  Pojoaque Pueblo adds that, "if the State's motive was to starve the Tribe into extinction, that would be fine so long as the State's actions occur off-reservation."  Motion to Stay MOO at 15.  In short, Pojoaque Pueblo asserts that the Court's distinction between "on" and "off-reservation" regulatory actions is inapposite, because the issue is the "assertion of state civil or criminal jurisdiction over Indian gaming" in the absence of a gaming compact.  Motion to Stay MOO at 15 (quoting United Keetoowah Band of Cherokee v. Oklahoma, 927 F.2d at 1178).

Pojoaque Pueblo also contends that the Court erred in its conclusion that the Gaming Board did not violate Pojoaque Pueblo's federal rights under the Supremacy Clause or under 42 U.S.C. §§

1983 and 1985.  See Motion to Stay MOO at 16-17.  First, Pojoaque Pueblo argues that the

Complaint's Count II is based on the Court's inherent equitable jurisdiction and not the Supremacy

Clause, and that, therefore, it states a cognizable claim.  See Motion to Stay MOO at 16-17 (relying

on Armstrong v. Exceptional Child Ctr., Inc. and Tohono O'odham Nation v. Ducey, 130 F. Supp.

3d 1301 (D. Ariz. 2015)(Campbell, J.)).  Second, Pojoaque Pueblo argues that the Court improperly

dismissed its claims asserted pursuant to 42 U.S.C. §§ 1983 and 1985 in Counts III and IV based on

the Court's conclusion that "the Complaint does not allege class-based discriminatory animus."

Motion to Stay MOO at 17.  Pojoaque Pueblo argues that, contrary to the Court's conclusion, "[t]he

entirety of this lawsuit is about the Defendants' deprival of the Pueblo's rights flowing from their

status as an Indian Tribe and individual Indians."  Motion to Stay MOO at 17.

Finally, Pojoaque Pueblo argues that the Court committed "[c]lear error" when it determined

"that it need not conduct severance analysis to determine that the Pueblo is operating illegally."

Motion to Stay MOO at 17 (citing Stay MOO at 142-44).  Pojoaque Pueblo asserts that the Court's

"ruling rewards the State for negotiating with impunity" and "leaves the Pueblo without any viable

remedy."  Motion to Stay MOO at 17-18.  In Pojoaque Pueblo's view, although the Court "seeks to

avoid rewriting IGRA," redrafting is "precisely what [the Court] has done with this decision."

Motion to Stay MOO at 18.

All the above notwithstanding, Pojoaque Pueblo argues that "it is actually not necessary for

this Court to agree that the Pueblo will prevail on the merits because this Court's Order is in direct

contradiction to [the PI MOO] . . . as well as established tenets of federal Indian law."  Motion to

Stay MOO at 18.  Pojoaque Pueblo asserts that the "Court's decision has created 'questions going to

the merits so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and

deserving of more deliberative investigation.'"  Motion to Stay MOO at 18 (quoting Chanute v. Kan.

Gas & Elec. Co., 754 F.2d 310, 314 (10th Cir. 1985)).  Accordingly, Pojoaque Pueblo argues that it

"need only show that the other elements of a stay have been met."  Motion to Stay MOO at 18.

Turning to irreparable harm, Pojoaque Pueblo argues that "significant interference with tribal

self-governance satisfies the irreparable harm criteria for preliminary injunctive relief and should

similarly satisfy the same criteria for stay pending appeal."  Motion to Stay MOO at 19.  Pojoaque

Pueblo asserts, moreover, that "the inability to recover monetary damages because of state Eleventh

Amendment immunity renders the harm to be irreparable for purposes of preliminary injunctive

relief."  Motion to Stay MOO at 19 (citing Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d

1234, 1251 (10th Cir. 2001); Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs., 31 F.3d

1536, 1543 (10th Cir. 1994); Sac & Fox Nation v. LaFaver, 905 F. Supp. 904, 907 (D. Kan.

1995)(Saffels, J.)).  Pojoaque Pueblo also appeals to Judge Brack's finding of irreparable harm and

argues that, since Judge Brack issued the PI, "the Defendants have not taken any formal action on

licensees doing business with the Pueblo."  Motion to Stay MOO at 21.  Should the Court vacate the

PI, Pojoaque Pueblo insists, "[i]t is extremely likely that the Defendants will take action against the

licensees."  Motion to Stay MOO at 21.  Pojoaque Pueblo contends that such action "may come in

the form of citations or other adverse proceedings or decisions," which "would likely cause vendors

to cease business with the Pueblo."  Motion to Stay Proceedings at 21.  Pojoaque Pueblo avers that,

"[a]bsent the continued business of its contracted vendors, the Pueblo would be forced to cease

operations."  Motion to Stay MOO at 21.

With respect to whether a stay would cause irreparable harm to the Defendants, Pojoaque

Pueblo contends that "[a]ny harm caused to the Defendants by granting the stay pending appeal is

substantially outweighed by the harm that the Pueblo will suffer if the Court does not grant the stay."

Motion to Stay MOO at 25.  Indeed, in Pojoaque Pueblo's view, "[t]here is no harm . . . that the State

will suffer if the requested relief is granted."  Motion to Stay MOO at 26.  Pojoaque Pueblo notes

that its gaming operations have continued since the June 30, 2015, expiration of its compact with

New Mexico "in exactly the same manner that they occurred prior to June 30, 2015."  Motion to

Stay MOO at 26.

Finally, Pojoaque Pueblo argues that the public interest in "issuing a stay pending appeal

weighs heavily in favor of the Pueblo."  Motion to Stay MOO at 26.  Pojoaque Pueblo contends that

there are "significant" public interests in tribal economic development and employment, social and

education programs and benefits, and "life and public safety services that are funded by gaming

revenue generated on Indian lands."  Motion to Stay MOO at 27.  Pojoaque Pueblo argues, further,

that the public "has a genuine interest in helping to assure tribal self-government, self-sufficiency

and self-determination."  Motion to Stay MOO at 27.  This goal, Pojoaque Pueblo asserts, "is the

'paramount federal policy.'"  Motion to Stay MOO at 27 (quoting PI MOO (citing Seneca-Cayuga

Tribe v. Oklahoma, 874 F.2d 709, 716 (10th Cir. 1989))).

### b.    The Motion to Stay MOO Response.

The Defendants responded to Pojoaque Pueblo's Motion to Stay MOO on October 21, 2016.

See Defendants' Response to Pueblo's Motion to Stay the Order and Restore the Preliminary

Injunction Pending Appeal, filed October 21, 2016 (Doc. 129)("Motion to Stay MOO Response").

The Defendants advance two primary arguments.  See Motion to Stay MOO Response at 1-14.  First,

the Defendants argue that, notwithstanding the interlocutory appeal of the PI, the Court had

jurisdiction to determine the action on the merits in the Stay MOO.  See Motion to Stay MOO

Response at 2.  Second, the Defendants assert that prudential concerns do not support a stay pending

appeal.  See Motion to Stay MOO Response at 3.  The Court discusses these arguments in turn.

### i.      **Jurisdictional Arguments.**

The Defendants argue that the Court properly exercised jurisdiction to rule on the merits in the Stay MOO.  See Motion to Stay MOO Response at 2.  Pojoaque Pueblo, the Defendants assert, improperly relies on Stewart v. Donges for the proposition that "a court is divested of jurisdiction during the pendency of an interlocutory appeal . . . ."  Motion to Stay MOO Response at 2.  Pojoaque Pueblo's reliance on this general rule is misplaced, the Defendants contend, because an interlocutory appeal from a preliminary injunction is "one of the 'exception[s] to this general rule.'"  Motion to Stay MOO Response at 2 (quoting Anderson Living Trust v. WPX Energy Prod., LLC, 308 F.R.D at 410 n.15).  The Defendants argue that the Court properly relied on the Tenth Circuit's decision in Free Speech, which articulates the preliminary injunction exception.  See Motion to Stay MOO Response at 3 ("Although the filing of a notice of appeal ordinarily divests the district court of jurisdiction, in an appeal from an order granting or denying a preliminary injunction, a district court may nevertheless proceed to determine the action on the merits.")(quoting Free Speech, 720 F.3d at 791-92)(alterations omitted).  The Defendants assert that Pojoaque Pueblo fails to "address the rationale of this exception to the general rule" or "cite to any case that has held that an interlocutory appeal of a preliminary injunction deprives the district of jurisdiction to decide the underlying merits of the case."  Motion to Stay MOO Response at 3 (citing Motion to Stay MOO at 9-12).  Accordingly, in the Defendants' view, "[t]he only binding authority on point -- *Free Speech* -- confirms that this Court had jurisdiction to enter the MOO."  Motion to Stay MOO Response at 3 (citing Free Speech, 720 F.3d at 791-92).

### ii.      **Prudential Arguments.**

The Defendants argue that the factors required for a stay pending appeal under rule 62(c) of the Federal Rules of Civil Procedure and rule 8(a) of the Federal Rules of Appellate Procedure do

not support a stay in this case.  See Motion to Stay MOO Response at 3.  As in their earlier briefings, the Defendants focus substantially on the likelihood-of-success-on-the-merits factor.  See Motion to Stay MOO Response at 4-9.  The Defendants assert that, contrary to Pojoaque Pueblo's portrayal of the governing standard, the likelihood-of-success-on-the-merits factor is not diminished when the other factors are met, nor is Pojoaque Pueblo required to show only "questions going to the merits so serious, substantial difficult and doubtful as to make the issues ripe for litigation and deserving of more deliberative investigation."  Motion to Stay MOO Response at 4 (quoting Motion to Stay MOO at 3 (quoting Chanute v. Kan. Gas & Elec. Co., 754 F.2d at 314))(internal quotation marks omitted). In this context, the Defendants explain, where Pojoaque Pueblo seeks "to enjoin governmental action taken in the public interest pursuant to a statutory or regulatory scheme through the restoration of a preliminary injunction," it must meet a "high burden" of showing "a strong likelihood of success on the merits."  Motion to Stay MOO Response at 4 (citing Heideman v. S. Salt Lake City, 348 F.3d at 1189).  The Defendants add that, "when a claim for injunctive relief fails on the merits, the court may 'short-circuit the factor-weighing process' and deny the motion."  Motion to Stay MOO Response at 5 (quoting Soskin v. Reinertson, 353 F.3d at 1257).  Accordingly, the Defendants argue that, "when the Court reaches the conclusion that Plaintiffs are not likely to succeed on the merits of their claim on appeal, that factor alone is fatal to their motion."  Motion to Stay MOO Response at 5 (citing Soskin v. Reinertson, 353 F.3d at 1257).

The Defendants assert that Pojoaque Pueblo's continued reliance on Judge Brack's PI MOO as establishing likelihood of success is "misplaced," because the PI "was by no means determinative, and was not even 'a preliminary adjudication on the merits but rather a device for preserving the status quo . . . .'"  Motion to Stay MOO Response at 6 (quoting Sierra On-Line, Inc. v. Phx. Software, Inc., 739 F.2d 1415, 1422 (9th Cir. 1984)).  Judge Brack's likelihood-of-success-analysis,

the Defendants contend, is "superseded by this Court's thoroughly researched determination that Plaintiffs cannot succeed on the merits." Motion to Stay MOO Response at 6. The Defendants argue, moreover, that Judge Brack did not have the benefit of "developed briefing and argument" regarding the case's central preemption issue, which "fundamentally impact[s]" the analysis. Motion to Stay MOO Response at 6.

The Defendants contend that Pojoaque Pueblo's arguments regarding IGRA's preemptive scope "are the same arguments that this Court thoroughly considered and rejected" in the Stay MOO. Motion to Stay MOO Response at 7. The Defendants assert that Pojoaque Pueblo continues to "fail to appreciate the difference between regulation of gaming on Indian lands and gaming off Indian lands, and erroneously conflate[s] impact with regulation." Motion to Stay MOO Response at 7. The Defendants cite with approval the Court's statement that IGRA "'is intended to expressly preempt the field in the governance of gaming activities on Indian lands,' leaving 'fully intact a State's regulatory power over tribal gaming outside Indian territory -- which is capacious.'" Motion to Stay MOO Response at 7 (quoting Stay MOO at 101).

With respect to Pojoaque Pueblo's severance arguments, the Defendants assert that severance "misses the point," because likelihood of success "turns on whether the Defendants' regulatory actions violated the Plaintiffs' rights at the time they occurred." Motion to Stay MOO Response at 8 (quoting Stay MOO at 142-43 (citing Hilton v. Braunskill, 481 U.S. at 776))(emphasis in Stay MOO)(internal quotation marks omitted). The Defendants cite the Court's statement that "severing the allegedly offending language in the statute does nothing to demonstrate the Plaintiffs' likelihood of success on the merits at trial -- it would merely sanction Pojoaque Pueblo's present Class III gaming operations." Motion to Stay MOO Response at 8 (quoting Stay MOO at 142-43)(internal quotation marks omitted).

Finally, with regard to Pojoaque Pueblo's contestation of the Court's dismissal of its claims asserted pursuant to the Supremacy Clause and 42 U.S.C. §§ 1983 and 1985, the Defendants assert that Pojoaque Pueblo fails to "identify a federal right that Defendants have violated." Motion to Stay MOO Response at 9. The Defendants contend that they did not violate Pojoaque Pueblo's federal rights under IGRA and that "invidious discrimination," which § 1985 requires, did not motivate the Gaming Board's regulatory enforcement actions against Pojoaque Pueblo. Motion to Stay MOO Response at 9 n.5. Indeed, the Defendants assert, Pojoaque Pueblo "cannot colorably claim that Defendants' actions were taken because of their race or national origin when Defendants have entered into compacts with all of the other Pueblos and Tribes in New Mexico and have taken no action against other Tribes' vendors." Motion to Stay MOO Response at 9 n.5.

Turning to the irreparable injury factor, the Defendants assert that Pojoaque Pueblo's alleged injury lacks support in admissible evidence. See Motion to Stay MOO Response at 10. Pojoaque Pueblo's alleged injury, the Defendants argue, would occur only if its vendors "cease to do business with the Pueblo," yet Pojoaque Pueblo has not submitted evidence from its vendors that this injury would occur if the Court does not enjoin the Defendants from taking enforcement action against them. Motion to Stay MOO Response at 10. The Defendants argue, moreover, that Pojoaque Pueblo's alleged harm is "outdated and vastly overstated." Motion to Stay MOO Response at 11. The Defendants note that, since Judge Brack entered the PI, Pojoaque Pueblo has upgraded its casino management system, and, thus, the principal harm that Pojoaque Pueblo asserted before Judge Brack is now moot. See Motion to Stay MOO Response at 11. The Defendants further note that the Gaming Board's actions and this litigation have not affected Pojoaque Pueblo's Class II gaming

rights, and that Pojoaque Pueblo currently does business with at least three of the ten[4] Class II

gaming vendors.  See Motion to Stay MOO Response at 11 (citing Declaration of Jeffrey S. Landers

¶¶ 3-7, at 1-2 (executed October 18, 2016), filed October 21, 2016 (Doc. 129-2)("Landers Decl.").

Moreover, the Defendants argue that Pojoaque Pueblo's Class III gaming would not be jeopardized

without the reinstatement of the PI, because "there are in excess of thirty manufacturers of Class III

gaming machines that are not licensed by NMGCB and which thus would be available for use by the

Pueblo of Pojoaque, should those gaming machine manufacturers licensed by the NMGCB decide to

stop doing business with the Pueblo of Pojoaque."  Motion to Stay MOO Response at 11 (quoting

Landers Decl. ¶ 8, at 2)(internal quotation marks omitted).  In any event, the Defendants assert, "any

such harm can be avoided upon the entry of a compact."  Motion to Stay MOO Response at 12.

    With respect to the balance-of-hardships factor, the Defendants contend that New Mexico's

"sovereign interests [] are suffering irreparable injury in this case," because the PI "has barred the

State for almost a year from exercising its legitimate police power."  Motion to Stay MOO Response

at 12 (citing Mashantucket Pequot Tribe v. Town of Ledyard, 722 F.3d at 476-77; Kansas v. United

States, 249 F.3d at 1227-28).  The Defendants note that the Tenth Circuit has held that "the ability of

[government] to enact and enforce measures it deems to be in the public interest is . . . an equity to

be considered in balancing hardships."  Motion to Stay MOO Response at 13 (citing Crowe &

Dunlevy, P.C. v. Stidham, 640 F.3d 1140, 1158 (10th Cir. 2011)).  According to the Defendants,

---

[4]The Defendants originally argued that Pojoaque Pueblo is doing business with all ten Class II gaming vendors.  See Motion to Stay MOO Response at 11 (citing Declaration of Jeffrey S. Landers ¶¶ 3-7, at 1-2 (executed October 18, 2016), filed October 21, 2016 (Doc. 129-2)("Landers Decl.").  The Defendants subsequently filed an Amended Response, however, clarifying that Pojoaque Pueblo is "currently doing business with three of the ten manufacturers for Class II gaming machines."  Defendants' Amended Response to Pueblo's Motion to Stay the Order and Restore the Preliminary Injunction Pending Appeal at 11, filed October 21, 2016 (Doc. 130)(citing Landers Decl. ¶¶ 3-7, at 1-2).

New Mexico's interest in exercising its police power over state vendor licensees "outweighs Plaintiffs' claimed harm."  Motion to Stay MOO Response at 13.

Turning finally to the public-interest factor, the Defendants argue that "the 'public interest' prong . . . is nothing more than a restatement of the 'balance of hardships' prong," because both Pojoaque Pueblo's and the Defendants' "claim of the public interest is largely a restatement of their own . . . interest[.]"  Motion to Stay MOO Response at 13.  Thus, the Defendants posit, the public interest weighs in their favor, because the balance of hardships "favors Defendants."  Motion to Stay MOO Response at 13.  The Defendants note, moreover, that "other Indian Tribes in New Mexico vigorously dispute the suggestion that the Pueblo of Pojoaque's continued operation of its casinos in violation of federal law is in the public interest."  Motion to Stay MOO Response at 13 (citing Declaration of Jeremiah L. Ritchie ¶ 9, at 2 (executed October 19, 2016), filed October 21, 2016 (Doc. 129-1)("Ritchie Decl.").

<p style="text-align:center;"><b>c.        The Motion to Stay MOO Reply.</b></p>

Pojoaque Pueblo filed a Reply on October 26, 2016.  <u>See</u> Reply to Defendants' Response to Motion to Stay Order and Restore the Preliminary Injunction Pending Appeal at 1, filed October 26, 2016 (Doc. 131)("Motion to Stay MOO Reply").  Pojoaque Pueblo largely reiterates the arguments from its original Motion regarding the Court's jurisdiction and the standard for granting a stay.  <u>See</u> Motion to Stay MOO Reply at 1-12.

First, with respect to the Court's jurisdiction to determine the action on the merits, Pojoaque Pueblo insists that the rule that the Tenth Circuit articulated in <u>Stewart v. Donges</u> unambiguously divests a district court of jurisdiction once a party has filed an appeal from an interlocutory order.  <u>See</u> Motion to Stay MOO Reply at 1-2 (citing <u>Stewart v. Donges</u>, 915 F.2d at 576).  Pojoaque Pueblo contends that <u>Anderson Living Trust v. WPX Energy Production, LLC</u>, upon which the

Defendants rely, stands for the proposition that "interlocutory appeals of class certification rulings,"

and not interlocutory appeals of preliminary injunctions, are the "exception to the rule." Motion to

Stay MOO Reply at 2 (citing Anderson Living Trust v. WPX Energy Prod., LLC, 308 F.R.D. at 436

n.15). Pojoaque Pueblo asserts, further, that the Defendants, as well as the Court, wrongly interpret

Free Speech "as creating a 'preliminary injunction' exception to *Donges*." Motion to Stay MOO

Reply at 3. Pojoaque Pueblo contends, however, that, "[e]ven if the Tenth Circuit abandoned

*Donges* and its progeny, the issues remaining before the District Court were inextricably bound with

the issues in the interlocutory appeal, such that Defendants' interlocutory appeal divested the District

Court of jurisdiction." Motion to Stay MOO Reply at 3. Here, Pojoaque Pueblo argues, that the

Court's "order repeatedly takes issue with the analysis in Judge Brack's order demonstrates that the

issues presented in the appeal of the preliminary injunction and on the merits are inextricably bound

up." Motion to Stay MOO Reply at 4.

Second, Pojoaque Pueblo argues that the four requirements for a stay pending appeal are all

present. See Motion to Stay MOO Reply at 4. With respect to likelihood of success, Pojoaque

Pueblo contends that it need meet only the "fair ground for litigation" standard. Motion to Stay

MOO Reply at 4. Thus, Pojoaque Pueblo asserts that likelihood of success requires a showing that

there are "questions going to the merits so serious, substantial, difficult and doubtful, as to make the

issues ripe for litigation and deserving of more deliberative investigation." Motion to Stay MOO

Reply at 4 (quoting Chanute v. Kan. Gas & Elec. Co., 754 F.2d at 278-79)(internal quotation marks

omitted). Pojoaque Pueblo argues that the Defendants' articulation of the standard as requiring a

robust showing of success in cases involving "governmental action in the public interest, pursuant to

a regulatory scheme," is inapposite, because this case involves "competing regulatory schemes by

different sovereign governments." Motion to Stay MOO Reply at 5. Pojoaque Pueblo further posits

that "the Defendants are not acting pursuant to regulatory scheme when they regulate tribal gaming

in the absence of a tribal-state compact."  Motion to Stay MOO Reply at 5.  In any event, Pojoaque

Pueblo asserts, application of the heightened standard for public interest cases still counsels a finding

that Pojoaque Pueblo has a likelihood of success on appeal.  See Motion to Stay MOO Reply at 5.  In

support of this contention, Pojoaque Pueblo references its earlier arguments that (i) the Court did not

have jurisdiction to continue adjudicating the case; (ii) Judge Brack and the Court came to different

conclusions on the same issues; and (iii) the Defendants falsely assumed that Pojoaque Pueblo's

gaming operations were unlawful.  See Motion to Stay MOO Reply at 5-6.

> Turning to irreparable harm, Pojoaque Pueblo contends that
>
> dismissal of the Preliminary Injunction could result in a fatal blow to the Pueblo's gaming operations, cause essential governmental services to be eliminated, put thousands out of work, and result in the cancellation of lucrative contracts with local businesses, thereby harming the entire region and seriously crippling the Pueblo and its members.

Motion to Stay MOO Reply at 7.  Pojoaque Pueblo asserts that it is immaterial whether it upgraded

its casino management system, because, "as with most technologies, further and continuous upgrades

are always required."  Motion to Stay MOO Reply at 7.  Regarding the Defendants' contention that

the PI's existence does not affect Pojoaque Pueblo's ability to conduct Class II gaming, Pojoaque

Pueblo asserts that most of its gaming machines are Class III machines, and that Class II gaming

"would generate far less revenue than Class III gaming."  Motion to Stay MOO Reply at 7-8 (citing

Allgeier Decl. ¶¶ 34-40, at 11-12).  Pojoaque Pueblo also avers that its "current financial agreements

require that the Pueblo offer Class III gaming or risk default."  Motion to Stay MOO Reply at 7-8

(citing Allgeier Decl. ¶ 40, at 12).  Finally, with respect to the Defendants' argument that Pojoaque

Pueblo can avoid any harm by signing a compact with New Mexico, Pojoaque Pueblo contends that

New Mexico has negotiated in bad faith and that it "has always been open to negotiating a fair

compact as mandated by IGRA[.]"  Motion to Stay MOO Reply at 8.  "That compacts have been entered in the wake of *Seminole Tribe* [I]," Pojoaque Pueblo reasons, "does not mean that the terms were fair, or legal, or even 'negotiated.'"  Motion to Stay MOO Reply at 9.

Pojoaque Pueblo next addresses the Defendants' balance-of-hardships arguments.  See Motion to Stay MOO Reply at 9.  Pojoaque Pueblo contends that the Defendants "all but ignore[] the equally sovereign interests of the Pueblo."  Motion to Stay MOO Reply at 9 (citing Motion to Stay MOO Response at 12).  Pojoaque Pueblo asserts that "any claimed and temporary hardship on the part of the State must be balanced against the Pueblo's hardship in losing its sovereign right to conduct gaming within the boundaries of the Pueblo."  Motion to Stay MOO Reply at 10.  In Pojoaque Pueblo's view, any harm to New Mexico "is minimal at best, and the Defendants have consistently failed to show how not being able to target the Pueblo's vendors creates an irreparable harm to the State."  Motion to Stay MOO Reply at 10.  Pojoaque Pueblo notes, moreover, that Mashantucket Pequot Tribe v. Town of Ledyard, upon which the Defendants rely, holds that a state's sovereign "interest is diminished where, as here, the sole application of the state law at issue is on the Tribe's reservation, which occupies a unique status within the state."  Motion to Stay MOO Reply at 10 (quoting Mashantucket Pequot Tribe v. Town of Ledyard, 722 F.3d at 476)(internal quotation marks omitted).  Thus, Pojoaque Pueblo contends that here, where New Mexico has a "diminished" sovereign interest, the balance of hardships tips decidedly in its favor.  Motion to Stay MOO Reply at 11.

Turning finally to the public interest, Pojoaque Pueblo notes that IGRA is expressly intended to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."  Motion to Stay MOO Reply at 11 (quoting 25 U.S.C. § 2702(1))(internal quotation marks omitted).  The public

interest in assuring these goals, Pojoaque Pueblo asserts, is "significant."  Motion to Stay MOO Reply at 11.  Pojoaque Pueblo further presses that the public "has a genuine interest in helping to ensure tribal self-government, self-sufficiency and self-determination."  Motion to Stay MOO Reply at 11-12 (citing Sac & Fox Nation v. LaFaver, 905 F. Supp. at 908-09; Winnebago Tribe v. Stovall, 216 F. Supp. 2d 1226, 1233-34 (D. Kan. 2002)(Marten, J.)).  According to Pojoaque Pueblo, these interests outweigh the Defendants' asserted public interests.  See Motion to Stay MOO Reply at 12.

> ### d.      **The Hearing.**

The Court held a hearing on the Motion to Stay MOO on October 27, 2016.  See Transcript of Motion Hearing at 1 (taken October 27, 2016), filed December 30, 2016 (Doc. 147)("Motion to Stay MOO Tr.").  At the hearing, the parties mostly stuck to the arguments in their briefings.  See Motion to Stay MOO Tr. at 46:14-144:22.  Pojoaque Pueblo opened by addressing the Court's jurisdiction to enter the Stay MOO, arguing that the Court "improperly carved out a preliminary injunction exception to the Donges Rule, when there is no such exception recognized by the Tenth Circuit."  Motion to Stay MOO Tr. at 47:24-48:2 (Crowell).  Pojoaque Pueblo insisted that "[t]he Free Speech case that this Court relied upon, that the State relied upon, did not even address the jurisdictional issues, did not even address Donges."  Motion to Stay MOO Tr. at 48:3-8 (Crowell).  Regardless, Pojoaque Pueblo contended that, even if the Court is not divested of jurisdiction under Stewart v. Donges, the Court still lacks jurisdiction, because "the issues on appeal are inextricably bound to the issues remaining at the district court."  Motion to Stay MOO Tr. at 48:12-17 (Crowell).

Assuming that the Court had jurisdiction, however, Pojoaque Pueblo turned to the factors for granting a stay pending appeal.  See Motion to Stay MOO Tr. at 48:22 (Crowell).  Pojoaque Pueblo asserted that it was likely to prevail on the merits under the "typical" standard, but that the "question is whether the appeal raises serious questions of law," which, in Pojoaque Pueblo's view, it "clearly"

does.  Motion to Stay MOO Tr. at 49:7-13 (Crowell).  Pojoaque Pueblo stressed that Judge Brack and the Court reached divergent conclusions "on the same issues."  Motion to Stay MOO Tr. at 50:5-6 (Crowell).  As to IGRA's preemptive scope, Pojoaque Pueblo criticized the Stay MOO's distinction between on-/off-reservation actions, arguing that "the State can't exercise its jurisdiction in a way that directly interferes with the Tribe's governance of its gaming activities."  Motion to Stay MOO Tr. at 50:6-23 (Crowell).  Pojoaque Pueblo asserted that "there is no doubt" that New Mexico's actions are "specifically directed at regulating or interfering with the Tribe's governance of its gaming activities," and that the Defendants are attempting to "coerce the Pueblo into signing a bad compact, with illegal terms not negotiated in good faith[.]"  Motion to Stay MOO Tr. at 50:23-51:7 (Crowell).

Turning to irreparable harm, Pojoaque Pueblo asserted that "it's not even a close issue."  Motion to Stay MOO Tr. at 52:1-2 (Crowell).  Pojoaque Pueblo argued that its business will be "crippled," that "thousands of people" will lose employment, and that governmental programs will be cut.  Motion to Stay MOO Tr. at 52:2-14 (Crowell).  Pojoaque Pueblo noted that "the Tribe is a government, too," and that "the Tribe has police powers, too."  Motion to Stay MOO Tr. at 52:15-16 (Crowell).  Failure to stay the Court's Stay MOO, Pojoaque Pueblo asserted, would thus interfere with "the Tribe's ability to govern its gaming activities on its lands."  Motion to Stay MOO Tr. at 52:24-53:2 (Crowell).

The public interest likewise favors granting a stay, Pojoaque Pueblo contended.  See Motion to Stay MOO Tr. at 53:3-12 (Crowell).  Pojoaque Pueblo stressed that IGRA expressly seeks to empower "tribes to become strong tribal governments, economically self-sufficient."  Motion to Stay MOO Tr. at 53:3-10 (Crowell).  Pojoaque Pueblo asserted that it "is being deprived of its ability to do that, because of the State's actions here."  Motion to Stay MOO Tr. at 53:10-12 (Crowell).  Judge

Brack, Pojoaque Pueblo added, concluded that "the public interest is advanced by granting the preliminary injunction . . . ." Motion to Stay MOO Tr. at 53:24-25 (Crowell). Moreover, Pojoaque Pueblo asserted that, other than its intervening casino management system update, "[e]very [] aspect that we established in front of Judge Brack remains true . . . ." Motion to Stay MOO Tr. at 55:7-20 (Crowell).

The Court interjected, stating that, since Judge Brack issued the PI, Pojoaque Pueblo's situation has greatly improved, because it has acquired the software update that it desired which will enable it to "continue to do what it's doing for a very lengthy period of time, and certainly during the period of time that it would take the Tenth Circuit" to rule on Pojoaque Pueblo's appeal of the Stay MOO. Motion to Stay MOO Tr. at 56:24-57:22 (Court). In response, Pojoaque Pueblo noted its "strong disagreement" with the Court's portrayal of events. Motion to Stay MOO Tr. at 57:24-25 (Crowell). Pojoaque Pueblo asserted that the Gaming Board's actions are "squeezing out 98 percent of the primary Class 3 gaming product providers in the industry" and that "it won't be a long period of time that the games could remain operational." Motion to Stay MOO Tr. at 58:1-5 (Crowell). In addition, Pojoaque Pueblo contended that "[a]ll of the Tribe's vendors would be impacted by the State's moves" and not only Scientific Games, Inc. Motion to Stay MOO Tr. at 59:7-8 (Crowell).

After a short break, the Court informed the parties that the Tenth Circuit had just issued an opinion in Dine Citizens Against Ruining Our Environment v. Jewell, 839 F.3d 1276 (10th Cir. 2016)("Dine"), regarding an interlocutory appeal of a preliminary injunction. See Motion to Stay MOO Tr. at 62:22-63:15 (Court). The Court suggested that the parties review Dine, because it may impact their argument with respect to the governing standard for granting a stay pending an appeal. See Motion to Stay MOO Tr. at 63:10-15 (Court).

Pojoaque Pueblo then proffered testimony of Michael Allgeier, CEO of the Buffalo Thunder

Development Authority, which includes Pojoaque Pueblo's Buffalo Thunder Resort & Casino and Cities of Gold Hotel & Casino.  See Motion to Stay MOO Tr. at 64:18-20 (Allgeier).  Asked to comment on the implications of gaming vendors ceasing doing business with Pojoaque Pueblo, Allgeier stated that Pojoaque Pueblo would be unable able to fix software glitches and would be forced to shut down its casinos.  See Motion to Stay MOO Tr. at 64:21-65:11 (Frias, Allgeier).  Allgeier stated that this problem "could happen at any time" and that, "periodically, it does happen." Motion to Stay MOO Tr. at 65:12-16 (Frias, Allgeier).  Allgeier further stated that, to his knowledge, vendors supplying ninety percent of Pojoaque Pueblo's gaming equipment have received citations from the Gaming Board.  See Motion to Stay MOO Tr. at 67:2-12 (Frias, Allgeier).  Pojoaque Pueblo's casinos "would have to close down" if it was unable to do business with those vendors, Allgeier asserted.  Motion to Stay MOO Tr. at 67:13-16 (Frias, Allgeier).

On cross-examination, the Defendants queried only whether Pojoaque Pueblo has "done any contingency planning as to what it would do if Scientific Gaming terminates its contract with the Pueblo."  Motion to Stay MOO Tr. at 68:4-7 (Bohnhoff).  Allgeier responded that Pojoaque Pueblo has not conducted such planning.  See Motion to Stay MOO Tr. at 68:8 (Allgeier).

The Court took up examination, asking when Pojoaque Pueblo last had a software problem that required assistance from its gaming vendors.  See Motion to Stay MOO Tr. at 68:20-23 (Court). Allgeier stated that such problems arise periodically, sometimes "four or five or 10" times a month, others only once every few months.  Motion to Stay MOO Tr. at 69:6-9 (Allgeier).  The Court asked whether Pojoaque Pueblo would immediately cease its gaming operations in the event that Scientific Games refuses to offer software assistance because of the Gaming Board's "threat[s]."  Motion to Stay MOO Tr. at 69:19-24 (Court).  Allgeier replied that Pojoaque Pueblo "would probably continue to offer gaming until . . . the system went down."  Motion to Stay MOO Tr. at 69:25-70:2 (Allgeier).

The Court expressed skepticism that software troubles would shut down the entire system, asking why Pojoaque Pueblo could not continue to use its software for "a long time." Motion to Stay MOO Tr. at 70:9-24 (Court). In response, Allgeier clarified that every gaming machine is linked to servers which perform accounting functions and that, if the accounting software has issues, the entire system shuts down, because the casino would be unable to "accurately calculate our win/loss." Motion to Stay MOO Tr. at 71:3-18 (Allgeier).

The Court turned to Pojoaque Pueblo's counsel, Scott Crowell, and asked whether Pojoaque Pueblo is "holding up its end of the bargain with Mr. Martinez" in terms of placing suspended payments to New Mexico in trust. Motion to Stay MOO Tr. at 72:8-21 (Court). Mr. Crowell responded that Pojoaque Pueblo has "established an independent fund" which Thomas F. Gede, the former Director of the Western Conference of Attorneys General, monitors and that an outside accounting firm is also providing "monthly reports and quarterly reports to ensure compliance" with Pojoaque Pueblo's obligations to pay into the fund. Motion to Stay MOO Tr. at 72:24-73:7 (Crowell). Mr. Crowell added that Pojoaque Pueblo is also working with the National Indian Gaming Commission, which has supplied reports showing that Pojoaque Pueblo is in compliance with the obligations of its agreement with Mr. Martinez. See Motion to Stay MOO Tr. at 73:7-17 (Crowell). Mr. Crowell indicated that he "would be happy to supplement the pleadings with a declaration attaching all of those reports." Motion to Stay MOO Tr. at 73:20-22 (Crowell).

Turning back to Allgeier, the Court queried whether Pojoaque Pueblo requires the accounting software that Scientific Games provided and maintains to calculate what it has paid in the past to New Mexico. See Motion to Stay MOO Tr. at 73:23-74:3 (Court). Allgeier replied affirmatively, explaining that the software calculates Pojoaque Pueblo's payments. See Motion to Stay MOO Tr. at 74:4-10 (Allgeier). Without the software, Allgeier asserted, and without upgrades to "make sure

that the hardware is intact and working," Pojoaque Pueblo would not be able to calculate what it is currently putting into the trust fund.  Motion to Stay MOO Tr. at 74:7-10 (Allgeier).

The Defendants again took up cross-examination of Allgeier.  See Motion to Stay MOO Tr. at 78:13 (Bohnhoff).  The Defendants inquired whether Pojoaque Pueblo has a tribal ordinance that establishes rules for Class III gaming and whether that ordinance requires that Pojoaque Pueblo have a compact with New Mexico to engage in such gaming.  See Motion to Stay MOO Tr. at 78:13-23 (Bohnhoff).  Allgeier responded that Pojoaque Pueblo has such an ordinance.  See Motion to Stay MOO Tr. at 78:24 (Allgeier).

The Defendants then took up argument on the Motion to Stay MOO.  See Motion to Stay MOO Tr. at 80:19 (Bohnhoff).  The Defendants argued, first, that the Motion to Stay MOO is "really a thinly disguised motion to reconsider the Court's September 30 ruling."  Motion to Stay MOO Tr. at 81:20-22 (Bohnhoff).  Pojoaque Pueblo, the Defendants averred, "reiterates the same arguments that the Pueblo has previously advanced and which this Court has expressly rejected."  Motion to Stay MOO Tr. at 81:22-25 (Bohnhoff).  The Defendants noted, for example, that Pojoaque Pueblo rehashes the jurisdictional arguments from its earlier briefings and ignores the Stay MOO's analysis regarding the inapplicability of Stewart v. Donges to this case.  See Motion to Stay MOO Tr. at 82:25-23:13 (Bohnhoff).  The Defendants asserted that the Stay MOO properly applied the exception to the complete divestiture rule that the Tenth Circuit articulated in Free Speech and that Pojoaque Pueblo proffers no new reason why the Court should diverge from that analysis.  See Motion to Stay MOO Tr. at 83:14-20 (Bohnhoff).

With respect to the standard for granting a stay, the Defendants argued that the "fair grounds for litigation" test is inapplicable, because Judge Brack's PI enjoins governmental action taken in the public interest.  Motion to Stay MOO Tr. at 84:22-85:8 (Bohnhoff).  The Defendants contended that

Pojoaque Pueblo's assertion that the governmental-action-in-the-public-interest standard does not apply where two sovereigns are involved lacks support in the cases upon which Pojoaque Pueblo relies. See Motion to Stay MOO Tr. at 85:11-23 (Bohnhoff). Moreover, the Defendants argued that Pojoaque Pueblo "is missing the point" by contending that "New Mexico is not acting pursuant to a regulatory scheme because there is no more compact in effect." Motion to Stay MOO Tr. at 86:13-17 (Bohnhoff). The Defendants noted that New Mexico is enforcing its Gaming Control Act and not the compact with Pojoaque Pueblo. See Motion to Stay MOO Tr. at 86:17-20 (Bohnhoff).

Rather than reexamine the same arguments that the Court already resolved in the Stay MOO, the Defendants appealed to the Court to affirm its earlier conclusion that Pojoaque Pueblo is not likely to succeed on the merits. See Motion to Stay MOO Tr. at 87:6-21 (Bohnhoff). The Defendants asserted that the Court concluded, "after exhaustive analysis," that the Defendants did not violate Pojoaque Pueblo's federal rights under IGRA. Motion to Stay MOO Tr. at 87:18-21 (Bohnhoff). Essentially, the Defendants reasoned, the Court "ruled that the Pueblo has no federal right to bar the State from taking enforcement action against non-Indian vendors' off-reservation activities based upon their participation in what is unquestionably illegal gambling activity at the Pueblo's casino." Motion to Stay MOO Tr. at 87:21-88:1 (Bohnhoff). Indeed, the Defendants asserted, in light of the Court's "comprehensive analysis, . . . [Pojoaque Pueblo] can no longer show that the question of whether or not it has a cause of action is even serious or doubtful." Motion to Stay MOO Tr. at 88:2-8 (Bohnhoff). The Defendants added that Pojoaque Pueblo's heavy reliance on Judge Brack's analysis is unavailing, because that analysis did not benefit from briefing regarding preemption under IGRA. See Motion to Stay MOO Tr. at 88:9-21 (Bohnhoff).

Putting aside Pojoaque Pueblo's likelihood of success, the Defendants argued that Pojoaque Pueblo cannot establish the remaining three elements required for a stay. See Motion to Stay MOO

Tr. at 89:6-9 (Bohnhoff).  The Defendants averred, first, that Pojoaque Pueblo cannot demonstrate irreparable harm, because the harms that Pojoaque Pueblo isolates are not "imminent, certain, and great."  Motion to Stay MOO Tr. at 89:11-13 (Bohnhoff).  The Defendants explained that Pojoaque Pueblo does not face an imminent threat, because it has already installed new gambling equipment. See Motion to Stay MOO Tr. at 89:19-22 (Bohnhoff).  The Defendants contended that, despite that Pojoaque Pueblo has "apparently been dealing with glitches in the accounting portion of the software since February [2016] . . . , they have still managed to continue to stay in business."  Motion to Stay MOO Tr. at 89:25-90:5 (Bohnhoff).  This viability suggests, the Defendants concluded, that Pojoaque Pueblo "could continue under the current regime of wrinkles, of lack of updates and further corrections."  Motion to Stay MOO Tr. at 90:23-25 (Bohnhoff).  The Defendants added that, "even if the Pueblo's existing vendors terminated their relationship with the Pueblo . . . [,] the Pueblo still has over 20 other vendors of gaming equipment which don't do business elsewhere in New Mexico, from which it could buy Class 3 gaming equipment."  Motion to Stay MOO Tr. at 94:22-95:4 (Bohnhoff).  The threat of Gaming Board enforcement actions, the Defendants explained, would not deter those vendors dealing with Pojoaque Pueblo, because they do not have New Mexico licenses.  See Motion to Stay MOO Tr. at 96:12-23 (Bohnhoff).

The Court interjected, querying why those vendors would "dare try to do business with Pojoaque, if they don't even have a license in New Mexico[.]"  Motion to Stay MOO Tr. at 96:24-97:1 (Court).  The Court commented "that would be highly risky for them to do that."  Motion to Stay MOO Tr. at 97:2 (Court).  In response, the Defendants explained that "[t]here is no New Mexico law that requires a vendor doing business with a pueblo, with an Indian tribe, to have a New Mexico license."  Motion to Stay MOO Tr. at 97:4-6 (Bohnhoff).  Rather, the Defendants stated, a vendor "needs a New Mexico license only to do business with non-Indian gaming operators outside

of Indian tribal boundaries."  Motion to Stay MOO Tr. at 97:6-8 (Bohnhoff).  Regardless, the

Defendants contended, a stay should not be granted based on "speculation" what Pojoaque Pueblo's

vendors might do.  Motion to Stay MOO Tr. at 98:1-2 (Bohnhoff).

       Finally with respect to irreparable harm, the Defendants argued that the dispute is devolving

into a question of damages, which disproves that the harm is irreparable.  See Motion to Stay MOO

Tr. at 98:10-12 (Bohnhoff).  The Defendants noted that Pojoaque Pueblo disputes the suggestion that

it conduct Class II gaming instead of Class III gaming, because Class II gaming is less profitable.

See Motion to Stay MOO Tr. at 98:7-9 (Bohnhoff).  The Defendants elaborated that, even if the

Gaming Board's actions violated Pojoaque Pueblo's federal rights, Pojoaque Pueblo "would have a

damages remedy."  Motion to Stay MOO Tr. at 98:14-15 (Bohnhoff).  If Pojoaque Pueblo has such a

remedy, the Defendants concluded, "there is no irreparable harm, and there is no right to a stay."

Motion to Stay MOO Tr. at 98:16-17 (Bohnhoff).  Moreover, the Defendants argued that Pojoaque

Pueblo could sign the 2015 Form Compact, as all other Indian tribes in New Mexico have done.  See

Motion to Stay MOO Tr. at 98:19-21 (Bohnhoff).  Because the other tribes have found that compact

acceptable, the Defendants reasoned, "it's hard for the Pueblo to make a credible claim that it would

suffer irreparable harm by itself signing the document."  Motion to Stay MOO Tr. at 98:21-24

(Bohnhoff).  Ultimately, the Defendants averred, Pojoaque Pueblo opposes the 2015 Form Compact,

only because it "doesn't think it can make as much money . . . as it thinks it can make with the

compact that it would prefer to have in place."  Motion to Stay MOO Tr. at 99:17-20 (Bohnhoff).

"That's not irreparable harm," the Defendants argued.  Motion to Stay MOO Tr. at 106:1

(Bohnhoff).  The Defendants concluded that Pojoaque Pueblo "can't claim irreparable harm when

they have the alternative available of the 2015 compact that all of the other Indian tribes in New

Mexico think is acceptable."  Motion to Stay MOO Tr. at 106:7-10 (Bohnhoff).

Turning to the harm-to-the-opposing-party factor, the Defendants argued that the factor does not call for a balance of hardships analysis; rather, the Court must inquire only whether New Mexico will be harmed.  See Motion to Stay MOO Tr. at 106:13-14 (Bohnhoff).  The Defendants contended that New Mexico will "suffer injury to its sovereign right to enforce its laws, that the Court has now found do not violate federal law."  Motion to Stay MOO Tr. at 106:15-18 (Bohnhoff).  Pojoaque Pueblo's sovereign rights, the Defendants added, do not "somehow trump[] the State's interest in protecting its sovereignty."  Motion to Stay MOO Tr. at 106:20-23 (Bohnhoff).

The Defendants turned finally to the public interest factor.  See Motion to Stay MOO Tr. at 106:24 (Bohnhoff).  The Defendants contended that "it's a debatable point whether it's in the public interest[] to permit Pojoaque to continue to conduct gaming activities without a compact."  Motion to Stay MOO Tr. at 107:3-5 (Bohnhoff).  More "dispositive of the public interest [inquiry]," the Defendants argued, is that Pojoaque Pueblo "is currently engaged in illegal -- in fact, criminal, under federal law -- activity" by conducting Class III gaming without a compact.  Motion to Stay MOO Tr. at 107:17-23 (Bohnhoff).  The Defendants asserted that "the public interest is not advanced by condoning or enabling . . . illegal activity."  Motion to Stay MOO Tr. at 107:25-108:2 (Bohnhoff).

The Court interposed and asked the Defendants "[h]ow far is the State going to go," namely, whether Pojoaque Pueblo's contention that New Mexico might "try to put a wall around the Pueblo" is justifiable.  Motion to Stay MOO Tr. at 109:11-19 (Court).  The Defendants responded that New Mexico "has no intention at all of building a wall around Pojoaque Pueblo, of arresting people as they go into the Pueblo."  Motion to Stay MOO Tr. at 110:5-8 (Bohnhoff).  Rather, the Defendants argued, "New Mexico intends to enforce state law," the parameter of which is "non-Indian vendors' transactions with non-Indian gaming operators."  Motion to Stay MOO Tr. at 110:12-15 (Bohnhoff).  Pojoaque Pueblo objected to this characterization of New Mexico's intentions.  See Motion to Stay

MOO Tr. at 111:6-8 (Crowell).  Pojoaque Pueblo contended that New Mexico has publicly warned that "anybody having anything to do with the Pueblo are at risk."  Motion to Stay MOO Tr. at 111:9-12 (Crowell).  Accordingly, Pojoaque Pueblo argued that "there is no reason to believe that the State won't go further" than issuing citations to state-licensed gaming vendors.  Motion to Stay MOO Tr. at 111:17-21 (Crowell).  Pojoaque Pueblo postulated, for example, that New Mexico could prosecute customers of Pojoaque Pueblo's casinos for "conspiring to engage in illegal gambling."  Motion to Stay MOO Tr. at 111:21-112:6 (Court, Crowell).  Pojoaque Pueblo added that such actions would be proper in light of the Court's Stay MOO, because nothing in the Stay MOO "suggests . . . that there is a line to be crossed off reservation that would be illegal interference on reservation."  Motion to Stay MOO Tr. at 113:6-9 (Crowell).

Pojoaque Pueblo pivoted to address the Defendants' remaining arguments.  See Motion to Stay MOO Tr. at 113:13 (Crowell).  First, Pojoaque Pueblo disputed that its Motion to Stay MOO is a "disguised motion to reconsider," arguing that Pojoaque Pueblo is only "looking for this Court to stay [the Stay MOO]."  Motion to Stay MOO Tr. at 113:14-18 (Crowell).  Second, Pojoaque Pueblo disagreed that "the 2015 form compact is, quote, 'acceptable to all of New Mexico's tribes,'" stating that those tribes "were confronted with the same . . . dilemma [with which] Pojoaque is confronted."  Motion to Stay MOO Tr. at 113:18-114:4 (Crowell).  Pojoaque Pueblo explained that the Interior Secretary did not affirmatively approve all of the 2015 Form Compacts submitted to it, but that the Compacts were "deemed approved" by operation of law.  Motion to Stay MOO Tr. at 115:18-116:3 (Crowell).  The Interior Secretary's letters conveying that approval, Pojoaque Pueblo asserted, expressed "serious concerns regarding the legality and viability of the terms of the compact."  Motion to Stay MOO Tr. at 116:4-10 (Crowell).  Yet, Pojoaque Pueblo argued, "[d]espite those letters, the State has not budged in its position regarding . . . the substantive provisions in the

compact."  Motion to Stay MOO Tr. at 116:11-13 (Crowell).  Indeed, Pojoaque Pueblo averred, "the

only reason we have this dispute" is that New Mexico refuses to negotiate a compact in good faith.

Motion to Stay MOO Tr. at 116:21-117:2 (Crowell).  Pojoaque Pueblo maintained that the only

compact that New Mexico is willing to negotiate includes revenue sharing provisions of "between 9

and 10 and a half percent," which is "illegal under IGRA."  Motion to Stay MOO Tr. at 117:12-17

(Crowell).

Regarding the robustness of the showing required for the likelihood-of-success factor in this

context, Pojoaque Pueblo argued that the Defendants "fail to understand that the Tribe, too, is a

sovereign government; that the Tribe, too, has its interests in seeing that its laws are enforced on its

Indian lands[.]"  Motion to Stay MOO Tr. at 119:13-20 (Crowell).  Thus, Pojoaque Pueblo argued,

the "stricter standard" does not apply, because New Mexico's actions interfere with and "diminish[ ]

the Tribe's ability to protect its public interests, as reflected in its laws, and as reflected in [IGRA]."

Motion to Stay MOO Tr. at 119:24-120:6 (Crowell).  Pojoaque Pueblo added, however, that, even if

the stricter standard applies, Pojoaque Pueblo has established a likelihood of prevailing on the

merits.  See Motion to Stay MOO Tr. at 120:18-24 (Crowell).

Pojoaque Pueblo next addressed the Defendants' argument that there are thirty out-of-state

vendors of Class III gaming equipment with whom Pojoaque Pueblo can do business, in the event its

current vendors cut business ties with Pojoaque Pueblo.  See Motion to Stay MOO Tr. at 122:14-20

(Crowell).  Pojoaque Pueblo asserted that it is unclear whether those vendors could supply the same

products as its current vendors, and that, regardless, those vendors' existence does not "defeat the

evidence" that, if Pojoaque Pueblo is "not allowed to operate, pending appeal, without the vendors

being threatened by the State, [it is] likely to have to close down or be seriously crippled as a result."

Motion to Stay MOO Tr. at 123:18-124:1 (Crowell).  Indeed, Pojoaque Pueblo contended, "a modest

drop in revenue will put the Tribe in default, and that itself could cause the Tribe to shut down . . . ." Motion to Stay MOO Tr. at 124:5-8 (Crowell).

Pivoting to the Defendants' argument that the current dispute is ultimately about damages, Pojoaque Pueblo asserted that "[t]he argument is to protect the Tribe's governance and sovereignty and gaming on its lands." Motion to Stay MOO Tr. at 125:7-12 (Crowell). Pojoaque Pueblo noted, however, that, even if the dispute is about damages, there is still irreparable harm, because Eleventh Amendment immunity protects New Mexico, and, thus, any action against New Mexico for damages would be frivolous. See Motion to Stay MOO Tr. at 125:13-20 (Crowell).

The Court interjected, noting that Pojoaque Pueblo could sue the Individual Defendants in their individual capacity for damages pursuant to 42 U.S.C § 1983. See Motion to Stay MOO Tr. at 126:19-127:5 (Court). In response, Pojoaque Pueblo insisted that the Individual Defendants could ultimately assert qualified immunity as an affirmative defense, especially in light of the Court's holding in the Stay MOO granting the Individual Defendants' assertion of qualified immunity. See Motion to Stay MOO Tr. at 127:6-23 (Crowell).

Pojoaque Pueblo asserted, further, that, contrary to the Defendants' portrayal of events, it is not "undisputed that the Pueblo is engaged in criminal activity[.]" Motion to Stay MOO Tr. at 130:3-5 (Crowell). Rather, Pojoaque Pueblo contended, "[t]he only thing that is real clear is [] the State's defiance of the Indian Gaming Regulatory Act . . . and the State's refusal to abide by the process of what congress intended . . . ." Motion to Stay MOO Tr. at 130:5-11 (Crowell). Pojoaque Pueblo insisted that, should New Mexico "get[] away with this," it will "set a precedent that [] says, States, you can negotiate with Indian tribes with impunity." Motion to Stay MOO Tr. at 130:12-20 (Crowell).

5.      **The Defendants' Motion to Dismiss Appeal.**

The Defendants moved to dismiss their interlocutory appeal of Judge Brack's PI on October

6, 2016.  See Appellants' Motion to Dismiss Appeal at 1, filed October 10, 2016 (Doc. 125-2)(Doc.

01019701539 in Pueblo of Pojoaque v. State of New Mexico, 15-2187)("Motion to Dismiss

Appeal").  In support of their Motion, the Defendants note that the Stay MOO (i) stays the PI; (ii)

includes an indicative ruling pursuant to rule 62.1(b) that the Court will dissolve or vacate the PI if

the Defendants dismiss the appeal and/or the Tenth Circuit remands the case; and (iii) dismisses all

claims against the Defendants.  See Motion to Dismiss Appeal ¶ 2, at 2.  The Defendants assert that

these actions "justify dismissal of the appeal" for several reasons.  Motion to Dismiss Appeal ¶ 4, at

2.  First, the Defendants argue that an appellate court, "upon receipt of a ruling indicating that the

district court would grant relief from a judgment or order but for the jurisdictional barrier presented

by a pending appeal, . . . may 'remand for further proceedings but retain[ ] jurisdiction' or 'expressly

dismiss[ ] the appeal.'"  Motion to Dismiss Appeal ¶ 4.a, at 2 (alterations in Motion)(quoting Fed. R.

App. P. 12.1).  Second, the Defendants assert that the Tenth Circuit "need not retain jurisdiction but

should dismiss the appeal and allow the district court to take any further action necessary to dispose

of the preliminary injunction."  Motion to Dismiss Appeal ¶ 4.b, at 2-3 (citing United States ex rel.

Bergen v. Lawrence, 848 F.2d 1502, 1512 (10th Cir. 1988)).  Third, the Defendants contend that the

Court's "dismissal of the underlying action . . . renders the present appeal moot."  Motion to Dismiss

Appeal ¶ 4.c, at 3.  Finally, the Defendants argue that Pojoaque Pueblo's appeal of the Stay MOO

and its Motion to Stay MOO "are the appropriate vehicles to determine the rights of the parties . . .

following the district court's entry of final judgment.  The present appeal of the preliminary relief

serves no continuing purpose."  Motion to Dismiss Appeal ¶ 4.d, at 4.

Pojoaque Pueblo responded on October 20, 2016.  See Plaintiffs-Appellees Pueblo of

Pojoaque and Joseph M. Talachy Opposition to Defendants-Appellants Motion to Dismiss Appeal at 1, filed October 28, 2016 (Doc. 136-1)(Doc. 01019708472 in Pueblo of Pojoaque v. State of New Mexico, 15-2187)("Motion to Dismiss Appeal Response").  Pojoaque Pueblo advances three primary arguments in opposition to the Defendants' Motion to Dismiss Appeal.  First, Pojoaque Pueblo contends that the Defendants' interlocutory appeal should continue to be abated pending the Tenth Circuit's resolution of the consolidated appeals in New Mexico v. Department of Interior, 14-2219 and 14-2222, because the resolution of those appeals "will likely impact the outcome of this matter." Motion to Dismiss Appeal Response at 7.  Second, Pojoaque Pueblo argues that the Tenth Circuit should deny the Motion to Dismiss Appeal, because the Stay MOO did not reach a final decision on the merits, and, thus, it does "not negate the Preliminary Injunction in effect."  Motion to Dismiss Appeal Response at 11.  Third, and finally, Pojoaque Pueblo argues that the interlocutory appeal divested the Court of jurisdiction to dispose of the case in the Stay MOO.  See Motion to Dismiss Appeal Response at 11 (relying on Stewart v. Donges).

The Tenth Circuit granted the Motion to Dismiss Appeal on November 30, 2016.  See Order at 1, filed November 30, 2016 (Doc. 143-1)(Doc. 01019728817 in Pueblo of Pojoaque v. State of New Mexico, 15-2187).

### 6. Pojoaque Pueblo's Supplemental Brief Motion.

On November 2, 2016, Pojoaque Pueblo moved to file a supplemental brief to address issues that arose at the October 27, 2016, hearing on the Motion to Stay MOO.  See Suppl. Brief Motion at 1.  Pojoaque Pueblo attached to its Motion a proposed Supplemental Brief.  See Suppl. Brief at 1. The Defendants responded to the Supplemental Brief Motion on November 21, 2016, and attached a proposed Supplemental Brief Response.  See Suppl. Brief Motion Response at 1; Defendants' Proposed Response to Plaintiffs' "Proposed" Supplemental Brief in Support of their Motion to Stay

the Order and Restore the Preliminary Injunction Pending Appeal at 1, filed November 21, 2016 (Doc. 141-1)("Suppl. Brief Response"). Pojoaque Pueblo filed a Reply on December 5, 2016. See Plaintiffs' Reply in Support of Plaintiffs' Motion to File Supplemental Brief on Motion to Stay Order at 1, filed December 5, 2016 (Doc. 145)("Suppl. Brief Reply"). The Court discusses these briefings in turn and then reviews the hearing on the Supplemental Brief Motion that the Court held on December 9, 2016.

### a.    The Supplemental Brief Motion and Proposed Supplemental Brief.

Pojoaque Pueblo moves to "file a supplemental brief to address several questions and issues that arose during the hearing" on the Motion to Stay MOO. Suppl. Brief Motion at 1. Pojoaque Pueblo notes that, pursuant to rule 15(d) of the Federal Rules of Civil Procedure, "the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Suppl. Brief Motion at 1 (quoting Fed. R. Civ. P. 15(d))(internal quotation marks omitted). Pojoaque Pueblo requests leave to provide information on five issues. See Suppl. Brief Motion at 1-2. First, Pojoaque Pueblo requests to discuss the relevance of Dine, which Pojoaque Pueblo "did not have an earlier opportunity to address," because the Tenth Circuit decided the case on the day of the October 27, 2016, hearing. Suppl. Brief Motion at 1-2. Second, Pojoaque Pueblo seeks to analyze "two preliminary injunction cases cited by Defendants for the first time during [the] October 27, 2016 hearing such that the Pueblo was given no chance to reply in a response motion." Suppl. Brief Motion at 2 (referring to Baker v. Bray, 701 F.2d 119 (10th Cir. 1983); Debardeleben v. Pugh, 56 F. App'x 464 (10th Cir. 2003)). Third, Pojoaque Pueblo desires to discuss a letter regarding its consolidated appeals in New Mexico v. Department of Interior, 14-2219 and 14-2222, which the United States filed at the Tenth Circuit after the hearing "such that [the] Pueblo did not have prior opportunity to inform this Court."

Suppl. Brief Motion at 2 (referring to Letter from David Gunter to Elisabeth A. Shumaker Regarding New Mexico v. Dep't of Interior, 14-2219 and 14-2222 (dated October 28, 2016), filed November 2, 2016 (Doc. 140-20)("U.S. Letter Re: Stay MOO")).   Fourth, Pojoaque Pueblo seeks to address a letter from the State of New Mexico Indian Affairs Department "cutting the Pueblo's Tribal Infrastructure Funding that was received by the Pueblo."   Suppl. Brief Motion at 2 (referring to Letter from Kelly K. Zunie to Joseph Talachy Regarding Rejection of Project Proposals and Reversion of Funds for the 2016 TIF Project Award (dated October 20, 2016), filed November 2, 2016 (Doc. 140-21)("TIF Letter")).   And fifth, Pojoaque Pueblo desires to address questions by the Court "at the Hearing as to the 'deemed approved' letters from the Department of the Interior, the Pueblo's compliance with the USAO agreement to pay funds into a trust account, and New Mexico's regulations on the transportation of gaming devices."   Suppl. Brief Motion at 2 (referencing, e.g., Mescalero Apache Letter; Taos Pueblo Letter; Sandia Pueblo Letter).

Pojoaque Pueblo's proposed Supplemental Brief opens by explaining the significance of the "deemed approved" letters that the Interior Secretary sent to the Pueblos and Tribes that signed the 2015 Form Compact with New Mexico.   Suppl. Brief at 2 (referencing, e.g., Mescalero Apache Letter; Taos Pueblo Letter; Sandia Pueblo Letter).   Pojoaque Pueblo notes that, pursuant to IGRA § 2710(d)(8), a proposed compact is deemed approved by operation of law when the Interior Secretary neither approves or disapproves the compact within forty-five days of its submission.   See Suppl. Brief at 2.   In such cases, Pojoaque Pueblo contends, "the Secretary only approves those provisions of the compact that are consistent with IGRA."   Suppl. Brief at 2.   Pojoaque Pueblo notes that the Interior Secretary deemed approved the 2015 Form Compacts that fifteen New Mexico Pueblos and Tribes signed.   See Suppl. Brief at 3.   Pojoaque Pueblo asserts that each letter explaining the Interior Secretary's decision to deem the compacts approved indicated that revenue sharing requirements are

viewed with "great scrutiny."  Suppl. Brief at 3 (referencing, e.g., Mescalero Apache Letter at 2;

Taos Pueblo Letter at 2; Sandia Pueblo Letter at 2).  Pojoaque Pueblo stresses that, while the letters

state that New Mexico "has conceded partial exclusivity over slot machines and full exclusivity over

other forms of Class III gaming," the letters also convey "skeptic[ism] about the overall value of the

2015 Compacts' additional claimed concessions."  Suppl. Brief at 3 (quoting Sandia Pueblo Letter at

2)(internal quotation marks omitted)).

Pojoaque Pueblo's Supplemental Brief next analyzes the "preliminary injunction cases" that

the Defendants cited at the Motion to Stay MOO hearing.  Suppl. Brief at 3.  Pojoaque Pueblo argues

that the Defendants proffered two cases at the hearing that, in their view, demonstrate that the PI "is

moot due to the dismissal of the underlying case, even though they previously filed an interlocutory

appeal asking the Tenth Circuit to reconsider the [PI]."  Suppl. Brief at 3.  Pojoaque Pueblo asserts

that these cases are distinguishable, because "neither case has the identical procedural posture to this

case as Defendants claimed in the October 27, 2016 hearing."  Suppl. Brief at 4.  Pojoaque Pueblo

contends first that, in Baker v. Bray, the Tenth Circuit held that "an appeal from an order was moot

because the preliminary injunction, the subject of an interlocutory appeal, only applied to an election

that had since passed."  Suppl. Brief at 4 (citing Baker v. Bray, 701 F.2d at 122).  Pojoaque Pueblo

argues that Baker v. Bray is distinguishable, "because it deals with a third-party claim, and a

preliminary injunction made by third-party defendants."  Suppl. Brief at 4 (citing Baker v. Bray, 701

F.2d at 122).  Pojoaque Pueblo posits that here, unlike in Baker v. Bray, the "Defendants sought

simultaneously a motion to modify and a motion to reconsider before this Court, and an interlocutory

appeal of the preliminary injunction."  Suppl. Brief at 4.  As to Debardeleben v. Pugh, Pojoaque

Pueblo contends that the Tenth Circuit held that a district court's dismissal of an action based on the

plaintiff's failure to exhaust all administrative remedies rendered an appeal from a denial of a PI --

an appeal "not related to the reasons for dismissal of the case" -- moot.  Suppl. Brief at 5 (citing

Debardeleben v. Pugh, 56 F. App'x at 464-65).  Debardeleben v. Pugh is distinguishable, Pojoaque

Pueblo argues, because here the interlocutory appeal is from a grant of a PI, and because the appeal

"is very much related to the merits of the case."  Suppl. Brief at 5.  Indeed, Pojoaque Pueblo asserts,

"[t]he interlocutory appeal involves preliminary relief wherein Defendants are enjoined from taking

the very actions that prompted the filing of the complaint."  Suppl. Brief at 5.  Moreover, Pojoaque

Pueblo stresses that, here, the Tenth Circuit "abated Defendant's [sic] interlocutory appeal pending

disposition of the Two Consolidated Appeals, making the conscious determination that the

Preliminary Injunction remain in effect until disposition of the Two Consolidated Appeals."  Suppl.

Brief at 5.  In Pojoaque Pueblo's view, "entry of final judgment frustrates and directly interferes with

the Tenth Circuit's Order of abatement."  Suppl. Brief at 5.

       Turning to Dine, Pojoaque Pueblo asserts that the case "likely does not apply" here, because

"[t]here has been no indication by any court that the ruling in *Diné* extends to motions to stay[.]"

Suppl. Brief at 6.  Pojoaque Pueblo notes that the Tenth Circuit concluded in Dine that a relaxed

likelihood-of-success test is not appropriate where the other three prongs for preliminary injunctive

relief are met.  See Suppl. Brief at 6-7 (referring to Dine's cite to Winter v. NRDC, Inc., 555 U.S. 7,

22 (2008)).  Pojoaque Pueblo argues that this holding is inapposite, "because the Pueblo is asking for

a motion to stay this Court's order, not asking for the issuance of a preliminary injunction."  Suppl.

Brief at 7.  Indeed, Pojoaque Pueblo contends, the issue whether a case's "'questions going to the

merits are so serious, substantial, difficult, and doubtful' that the case requires more deliberate

investigation" is "more applicable to a motion to stay pending appeal than to the issuance of a [PI]."

Suppl. Brief at 7 (citing McClendon v. City of Albuquerque, 79 F.3d at 1020-21).  Pojoaque Pueblo

further contends that the Tenth Circuit's holding in McClendon v. City of Albuquerque that the

"substantial questions test is appropriate for motions to stay when movants have satisfied the other three requirements . . . has not been affected by the decision in *Diné*." Suppl. Brief at 7.

Pojoaque Pueblo next discusses the Defendants' argument at the hearing that "there would be no harm to the Pueblo without a stay of this Court's order . . . [,] because the Pueblo could simply use out-of-state vendors who do not require licensing by the New Mexico Gaming Control Board." Suppl. Brief at 7. Pojoaque Pueblo demurs, noting that New Mexico law prohibits transportation of gaming devices into the state by an unlicensed manufacturer or distributor. See Suppl. Brief at 7-8 (citing N.M.A.C. § 15.1.16.9(A) (2016)). Accordingly, Pojoaque Pueblo argues that it "would be unable to do business with vendors who are unlicensed by the NMGCB as those vendors would be breaking state law by transporting the gaming devices from other states into New Mexico." Suppl. Brief at 8.

Pivoting to the issue raised at the hearing whether Pojoaque Pueblo has complied with its obligation to place in trust suspended payments to New Mexico, Pojoaque Pueblo asserts that it can verify that it has made the required payments. See Suppl. Brief at 8. Pojoaque Pueblo notes that it has "retained independent outside accounting [sic[5]] firm Morgan, Lewis and Bokus [sic], LLP, which has conducted the required audits" of Pojoaque Pueblo's payments into a trust account that Morgan Lewis counsel Thomas F. Gede established and maintains. Suppl. Brief at 8. Pojoaque Pueblo further notes that it has attached redacted documentation of these audits. See Suppl. Brief at 8 (citing The Pueblo of Pojoaque Gaming Funds Trust, Thomas F. Gede, Trustee, Monthly Accounts for April 2016, May 2016, June 2016, July 2016, August 2016, and September 2016, filed November 2, 2016 (Doc. 140-19)("Trust Account Audits")).

---

[5]Morgan, Lewis & Bockius is a law firm and not an accounting firm. See Morgan Lewis, About Us (last visited January 13, 2017), https://www.morganlewis.com/our-firm/about-us.

Pojoaque Pueblo next reviews a letter regarding the Stay MOO that the United States filed at the Tenth Circuit in New Mexico v. Department of Interior, 14-2219 and 14-2222, on October 28, 2016.  See Suppl. Brief at 9.  Pojoaque Pueblo notes that the letter informs the Tenth Circuit that the Court's reasoning in the Stay MOO "illustrates what is at stake in this appeal."  Suppl. Brief at 9 (quoting U.S. Letter Re: Stay MOO at 1).  Pojoaque Pueblo quotes the letter at length:

> The district court sought to avoid "upsetting the careful balance" of bargaining power between the parties "that Congress has created."  *Id.* at 121.  But Congress did not design this "balance;" it attempted to create a process in which both parties had a duty and an incentive to negotiate in good faith.  *See* U.S. Br. At 33-37; U.S. Reply at 16.  The Supreme Court's *Seminole Tribe* decision eliminated that incentive for the State.  The district court in *Pojoaque* was reluctant to "put a thumb on the scale" for the Pueblo, Opinion at 121, but the scale is already unbalanced.

Suppl. Brief at 9 (quoting U.S. Letter Re: Stay MOO at 2).[6]

Finally, Pojoaque Pueblo argues that New Mexico has cut its Tribal Infrastructure Funds ("TIF") "in direct response to litigation."  Suppl. Brief at 9.  Pojoaque Pueblo notes that, on October 28, 2016, it received a letter from Kelly Zunie, Cabinet Secretary of the New Mexico Indian Affairs Department, "informing the Pueblo that the State was rejecting proposals and reverting funds allocated to the Pueblo from the [TIF]."  Suppl. Brief at 9 (citing TIF Letter at 1).  Pojoaque Pueblo notes that the TIF Letter "claims there is a conflict of interest due to this litigation and cites an irrelevant provision of New Mexico statute regarding the State's procurement policy as support of this position."  Suppl. Brief at 9-10 (citing TIF Letter at 1).  Pojoaque Pueblo asserts that this action is evidence of the Defendants' "continued bad faith negotiation and coercion of the Pueblo with regards to an illegal gaming compact."  Suppl. Brief at 10.

---

[6]The letter opens by stating that "[t]he United States does not take any position here on whether the court's preemption analysis was correct, but its reasoning illustrates what is at stake in this appeal."  U.S. Letter Re: Stay MOO at 1.  Pojoaque Pueblo notably omits this portion of the letter.  See Suppl. Brief at 9.

b.     **The Supplemental Brief Motion Response and Proposed Supplemental Brief Response.**

The Defendants' Supplemental Brief Motion Response contends that Pojoaque Pueblo's Supplemental Brief "goes far beyond addressing issues that arose during the October 27, 2016, hearing, and, in so doing, raises a number of tangential issues that are not dispositive of the Motion to Stay." Suppl. Brief Motion Response at 1. The Defendants request, however, that, should the Court grant the Supplemental Brief Motion or consider Pojoaque Pueblo's Supplemental Brief, the Court "similarly consider Defendants' proposed supplemental response." Suppl. Brief Motion Response at 1-2.

The Defendants' Supplemental Brief Response begins by addressing Pojoaque Pueblo's attempt to distinguish this case from Baker v. Bray and Debardeleben v. Pugh. See Suppl. Brief Response at 2. The Defendants argue that those cases "stand for the proposition that a preliminary injunction is dissolved by operation of law upon dismissal of the underlying cause of action or entry of final judgment, even if there is a pending interlocutory appeal of the preliminary injunction." Suppl. Brief Response at 2. Pojoaque Pueblo's "attempts to distinguish these cases are unavailing," the Defendants assert, because, "in both cases, there was an appeal of a preliminary injunction that was pending at the time the final judgment was entered, and the courts in each case recognized that the appeal was mooted by the entry of final judgment, which extinguished the preliminary injunction by operation of law." Suppl. Brief Response at 2 (citing Baker v. Bray, 701 F.2d at 122; Debardeleben v. Pugh, 56 F. App'x at 465). The Defendants contend that, accordingly, the PI in this case "was dissolved by operation of law upon the entry of final judgment, and it is therefore not necessary to enter a separate order confirming that fact." Suppl. Brief Response at 3 (citing Nat'l Post Office Mail Handlers, Watchmen, Messengers & Grp. Leaders Div. of Laborers' Int'l Union of N. Am., AFL-CIO v. United States Postal Serv., 1978 U.S. Dist. LEXIS 19412, at *12-13 (D. Neb.

1978)(Schatz, J.)).

Turning to the issue of <u>Dine</u>'s relevance to this case, the Defendants contend that the case is instructive, because the standards for granting a preliminary injunction and for granting a stay "are the same."  Suppl. Brief Response at 4 (citing <u>Homans v. City of Albuquerque</u>, 264 F.3d 1240, 1243 (10th Cir. 2001)).  The Defendants posit, moreover, that, regardless, in this context, Pojoaque Pueblo must demonstrate a "substantial likelihood of success on the merits, not a lesser standard," because the PI enjoins "governmental action taken in the public interest pursuant to a statutory or regulatory scheme."  Suppl. Brief Response at 5 (citing Motion to Stay MOO Response at 4-5 (citing <u>Heideman v. S. Salt Lake City</u>, 348 F.3d at 1189)).  The Defendants further argue that "the Tenth Circuit has considered and rejected the proposition that competing governmental regulatory schemes affect the moving party's high burden to demonstrate a substantial likelihood of success on the merits."  Suppl. Brief Response at 5 (referring to <u>Hobby Lobby Stores, Inc. v. Sebelius</u>, 2012 U.S. App. LEXIS 26741 (10th Cir. 2012), <u>aff'd</u>, 133 S. Ct. 641 (2012)).

Next, the Defendants contend that the Interior Secretary "did not disapprove the 2015 form compact."  Suppl. Brief Response at 6.  The Defendants contend that Pojoaque Pueblo "selectively quote[s] from the Secretary's letters to suggest that the compacts' legality is in question or they otherwise are somehow improper."  Suppl. Brief Response at 6.  The Defendants note that the Sandia Pueblo Letter, upon which Pojoaque Pueblo specifically relies, states that New Mexico "has granted some meaningful concessions to the tribe," including partial exclusivity over slot machines and full exclusivity over all other forms of Class III gaming in the state.  Suppl. Brief Response at 6 (quoting Sandia Pueblo Letter at 2)(internal quotation marks omitted).  The Defendants assert that, despite the "skepticism" that the Interior Secretary expressed over the 2015 Form Compact's non-exclusivity concessions, the Interior Secretary nonetheless "concluded that, 'given the Tribe's response *showing*

that it will receive economic benefits compared to the 2007 Compact, we take no action within the 45-day time limit on this issue.'"   Suppl. Brief Response at 6 (quoting Sandia Pueblo Letter at 2)(emphasis added in Suppl. Brief Response).  The Defendants note that the Interior Secretary has "repeatedly" disapproved compacts with revenue sharing provisions that violate IGRA and also severed provisions that violate IGRA.  Suppl. Brief Response at 6 (citing Letter from Kevin K. Washburn to Gary Besaw Regarding Disapproval of Amendment to 2015 Compact between State of Wisconsin and the Menominee Indian Tribe at 1 (dated March 12, 2015), filed November 21, 2016 (Doc. 141-1.A); Letter from Larry Echo Hawk to Tiger Hobia Regarding Approval of Compact Between the State of New Mexico and the Kialegee Tribal Town at 1 (dated July 8, 2011), filed November 21, 2016 (Doc. 141-1.B).  The Defendants concluded that, because the Interior Secretary did not disapprove the 2015 Form Compact's revenue sharing provisions, "any suggestion that the Secretary believed that the compacts reached between the State and the other Tribes and Pueblos in New Mexico violated IGRA is unfounded."  Suppl. Brief Response at 7.

With respect to Pojoaque Pueblo's contention that out-of-state gaming vendors would violate N.M.A.C. § 15.1.16.9(A) if they supplied gaming devices to Pojoaque Pueblo, the Defendants argue that "[t]his is not the case."  Suppl. Brief Response at 7.  The Defendants assert that the restrictions codified in N.M.A.C. § 15.1.16.9(A) "apply only to 'persons licensed by the Gaming Control Board to sell, supply, ship, transport, distribute, or receive gaming devices.'"  Suppl. Brief Response at 7 (quoting N.M.A.C. § 15.1.16.2).  Thus, the Defendants contend, "if the Pueblo contracted with vendors who are not licensed by the New Mexico Gaming Control Board . . . , the New Mexico Gaming Control Board would have no jurisdiction over these vendors to enforce any such provision (which it would not intend to do in any event)."  Suppl. Brief Response at 7.

Turning to the U.S. Letter Regarding the Stay MOO, the Defendants note that New Mexico

responded to the letter, "explaining that the State's good faith negotiation is confirmed by the fact that fifteen Tribes and Pueblos have signed on to the 2015 compact, preferring that compact to the existing 2001 and 2007 compacts that previously governed tribal gaming in New Mexico." Suppl. Brief Response at 7-8 (citing Letter from Eric D. Miller to Elisabeth A. Shumaker Regarding New Mexico v. Dep't of Interior, 14-2219 and 14-2222 at 1 (dated October 31, 2016), filed November 21, 2016 (Doc. 141-1.C)("N.M. Letter Re: Stay MOO")). The Defendants note that that the U.S. Letter Regarding the Stay MOO states that "the current impasse between the State and the Pueblo of Pojoaque stems from 'the Pueblo's insistence on significantly more favorable compact terms,' and that the Pueblo is attempting 'to resolve that impasse by making the unilateral choice to continue gaming unlawfully . . . .'" Suppl. Brief Response at 8 (quoting N.M. Letter Re: Stay MOO at 1).

The Defendants next address the TIF Letter. See Suppl. Brief Response at 8. The TIF Letter is irrelevant, the Defendants assert, because it "came from the Secretary of the New Mexico Indian Affairs Department ('IAD') -- who has no participation in gaming compact negotiations -- without the advice or direction of either Defendants or the Governor's office." Suppl. Brief Response at 8 (citing Declaration of Kelly K. Zunie ¶¶ 2-4, at 1 (executed November 17, 2016), filed November 21, 2016 (Doc. 141-1.D)("Zuni Decl.")). The Defendants note that, "[w]hen the Governor's office became aware of the letter, the Governor's office requested that the IAD rescind it," which it did on November 4, 2016. Suppl. Brief Response at 8 (citing Zuni Decl. ¶¶ 5-6, at 1).

Last, the Defendants address the issue of software failure at Pojoaque Pueblo's casinos. See Suppl. Brief Response at 9. The Defendants note that, at the hearing on the Motion to Stay MOO, Allgeier testified that, if Pojoaque Pueblo's software or server failed, "the casinos would have to be completely shut down because the software contains critical accounting functions." Suppl. Brief Response at 9 (citing Motion to Stay MOO Tr. at 68:20-71:25 (Court, Allgeier)). The Defendants

contend that this testimony is inconsistent with accounts provided by "the Downs at Albuquerque (the 'Downs')," which uses the same casino management system as Pojoaque Pueblo to "monitor its gaming floor and perform accounting functions."  Suppl. Brief Response at 9 (citing Declaration of Eric Roybal ¶¶ 2-4, at 1 (executed November 16, 2016), filed November 21, 2016 (Doc. 141-1.E)("Roybal Decl.")).  The Defendants note that, "[i]n the more than three years that the Downs has utilized this software, there have been only four patches/updates to improve functionality, and without these patches the Downs would nonetheless have been able to continue to operate its entire gambling floor."  Suppl. Brief Response at 10 (citing Roybal Decl. ¶ 4, at 1).  The Defendants posit, moreover, that, in the event of a "catastrophic failure" of the Downs' casino management system, the "Downs would still be able to operate its gaming floor because the Downs would simply utilize the meters within its slot machines to determine the amount of coin-in and jackpots paid out by each machine."  Suppl. Brief Response at 10 (citing Roybal Decl. ¶¶ 5-6, at 1-2).  This experience, the Defendants assert, illustrates that Pojoaque Pueblo is unlikely to "suffer any failure over the next three years that would prevent it from using its casino management system," and that, even if such a failure occurred, "there is no reason why the Pueblo could not manually account for the coin-in and jackpots paid out by each machine . . . ."  Suppl. Brief Response at 10.

### c.     The Supplemental Brief Reply.

Pojoaque Pueblo replied to the Defendants' proposed Supplemental Brief Response on December 5, 2016.  See Suppl. Brief Reply at 1.  Beginning with the "deemed approved" letters, Pojoaque Pueblo argues that the Interior Secretary's skepticism about the value of the 2015 Form Compacts' concessions "demonstrates the harm here if the stay is not granted and the Pueblo is forced to sign the 2015 Compact."  Suppl. Brief Reply at 2 (citing Motion to Stay MOO Reply at 8-9; id. at 9 n.4).  Pojoaque Pueblo argues that, contrary to the Defendants' assertion that the Interior

Secretary could sever one of the 2015 Form Compact's provisions if it violates IGRA, the "Compact provides that its revenue-sharing provision is not severable." Suppl. Brief Reply at 2 (citing 2015 Form Compact § 11, at 24; id. § 19, at 29). Pojoaque Pueblo contends, moreover, that it "has not sought any meaningful concession by the State in the form of 'exclusivity' or otherwise, and has objected to the State's position that it will not execute a compact without a State tax on the Pueblo's gaming revenue." Suppl. Brief Reply at 3 (citing Complaint ¶ 4, at 1).

Turning to Dine, Pojoaque Pueblo objects to the Defendants' depiction of the standards for granting and staying a PI as "the same." Suppl. Brief Reply at 5 (citing Suppl. Brief Response at 4-5). Pojoaque Pueblo contends that, "while '[t]here is substantial overlap between these [factors for granting a stay] and the factors governing preliminary injunctions,' it is 'not because the two are one and the same[.]'" Suppl. Brief Reply at 5 (quoting Nken v. Holder, 556 U.S. 418, 434 (2009)) (alterations in Suppl. Brief Reply). Pojoaque Pueblo posits that "[n]o Court within the Tenth Circuit has eliminated or restricted the more liberal standard for stays pending appeal, as opposed to preliminary injunctions[.]" Suppl. Brief Reply at 5. Pojoaque Pueblo contends, moreover, that, "[t]o apply the same standard to motions to stay pending appeal, as is applied to preliminary injunctions, would result in every such motion to stay being denied simply as a matter of course . . . ." Suppl. Brief Reply at 6. Finally, Pojoaque Pueblo renews its contention that the heightened standard for "governmental action taken in the public interest" does not apply, because multiple governments are involved in the present dispute with "legitimate interests in implementing their laws." Suppl. Brief Reply at 7. Accordingly, Pojoaque Pueblo asserts that the Defendants' reliance on Hobby Lobby Stores, Inc. v. Sebelius is inapposite, because that case did not involve multiple governments seeking to implement conflicting regulatory schemes. See Suppl. Brief Reply at 7 (citing Hobby Lobby Stores, Inc. v. Sebelius, 2012 U.S. App. LEXIS 26741 at *2).

With respect to the Defendants' argument that unlicensed, out-of-state gaming vendors can lawfully transport gaming devices into New Mexico, Pojoaque Pueblo asserts that "[s]uch a position contravenes the plain language of the regulation." Suppl. Brief Reply at 8. The regulation's plain language, Pojoaque Pueblo stresses, provides that "[n]o person shall initiate transport of any gaming device into the state other than a licensed manufacturer or distributor." Suppl. Brief Reply at 8 (quoting N.M.A.C. § 15.1.16.9(A))(internal quotation marks omitted). Pojoaque Pueblo asserts that this regulation "does not provide that it 'only' applies to licensed vendors." Suppl. Brief Reply at 8.

Pojoaque Pueblo responds finally to the Defendants' arguments concerning Allgeier's testimony at the Motion to Stay MOO hearing, namely, that Pojoaque Pueblo's gaming enterprises could still operate if its casino management system failed. See Suppl. Brief Reply at 10. Pojoaque Pueblo asserts that it is a violation of New Mexico regulations for a gaming enterprise to "operate a gaming machine that is not connected and communicated to an approved central monitoring system, which is what the [casino management system] is." Suppl. Brief Reply at 11 (citing Declaration of Michael Allgeier ¶ 6, at 3 (executed December 5, 2016), filed December 5, 2016 (Doc. 140-3)("Allgeier Decl.")). Pojoaque Pueblo further argues that "it is a violation of Pueblo of Pojoaque Gaming Ordinance Rule 12 for a slot machine's software to be expired or revoked." Suppl. Brief Reply at 10 (citing Allgeier Decl. ¶ 14, at 4). Accordingly, Pojoaque Pueblo asserts that it could not operate its gaming machines absent an up-to-date casino management system, because that "would violate the applicable regulations." Suppl. Brief Reply at 11. Regardless of such operations' legality, Pojoaque Pueblo contends that its gaming enterprises "could not practically operate" without a functioning casino management system. Suppl. Brief Reply at 11-12.

### d.   **The Hearing.**

The Court held a hearing on the Supplemental Brief Motion on December 9, 2016. See Draft

Transcript of Motion Hearing held on December 9, 2016 ("Suppl. Brief Tr.").[7]  The Court opened

the hearing by indicating that it was inclined to grant the Supplemental Brief Motion.  See Suppl.

Brief Tr. at 2:3-4 (Court).  The Defendants objected, arguing that the Motion goes "far beyond the

limited area of addressing" the issues raised for the first time at the October 27, 2016, hearing.

Suppl. Brief Tr. at 2:17-3:3 (Bohnhoff).  The Defendants contended that, regardless whether the

Court grants the Supplemental Brief, the argument concerning the standard for granting a motion to

stay is the dispositive issue.  See Suppl. Brief Tr. at 3:10-15 (Bohnhoff).  The Defendants averred

that the Court is "bound by" the Tenth Circuit's ruling in Homans v. City of Albuquerque, "which

equates stays to preliminary injunctions."  Suppl. Brief Tr. at 4:18-20 (Bohnhoff).  Moreover, the

Defendants argued that, in 2009, in Nken v. Holder, the Supreme Court stated that "the two

standards are quote substantially the same."  Suppl. Brief Tr. at 4:20-24 (Bohnhoff).

  With respect to the applicable standard for the likelihood-of-success factor, the Defendants

argued that Pojoaque Pueblo offers no support for the proposition that the governmental-action-in-

the-public-interest standard does not apply where there are government entities on both sides of the

dispute.  See Suppl. Brief Tr. at 5:12-15 (Bohnhoff).  The Defendants asserted, moreover, that the

Tenth Circuit "expressly rejects that proposition" in Hobby Lobby Stores, Inc. v. Sebelius.  Suppl.

Brief Tr. at 5:15-17 (Bohnhoff).  Additionally, the Defendants contended that the Tenth Circuit in

Dine "moots that distinction."  Suppl. Brief Tr. at 5:18-20 (Bohnhoff).  Pojoaque Pueblo asks the

Court to ignore this binding Tenth Circuit precedent, the Defendants assert.  See Suppl. Brief Tr. at

6:10-17 (Bohnhoff).

  Even assuming, the Defendants contended, that the standard for granting a PI is different than

---

[7]The Court's citations to the hearing's transcript refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

that for granting a stay, the Court should apply the standard for granting a PI in this context.  See Suppl. Brief Tr. at 7:19-8:5 (Bohnhoff).  The Defendants reasoned that, rather than requesting a stay of the Stay MOO, Pojoaque Pueblo is effectively requesting a re-imposition of the PI that the Court "dissolved by entry of final judgment."  Suppl. Brief Tr. at 7:21-24 (Bohnhoff).  The Defendants argued, moreover, that the Court's "exhaustive" preemption analysis in the Stay MOO indicates that there is no "substantial difficult question" for appeal.  Suppl. Brief Tr. at 8:5-15 (Bohnhoff).  Accordingly, the Defendants argued that, even applying the lesser standard, Pojoaque Pueblo cannot demonstrate likelihood of success on appeal.  See Suppl. Brief Tr. at 8:13-15 (Bohnhoff).  Finally, the Defendants answered Pojoaque Pueblo's assertion that the more liberal standard applies, because an appealing party could never win a stay if the court required the same rigorous showing as it did when it first rejected that party's arguments.  See Suppl. Brief Tr. at 8:25-9:3 (Bohnhoff).  This logic is "backwards," the Defendants contended, because, "if a court has rejected a plaintiff's case on the merits with a final judgment, [] that plaintiff properly should be required to make an even more compelling case for relie[f] pending appeal than it had to make at the beginning of the case for a preliminary injunction."  Suppl. Brief Tr. at 9:3-10 (Bohnhoff).

The Court interposed, asking whether the Court should be reassured by the United States' statement in the U.S. Letter Regarding the Stay MOO that the United States does not disagree with the Court's preemption analysis.  See Suppl. Brief Tr. at 11:6-15 (Court).  The Defendants responded that, "in the abstract . . . [the Court can] draw comfort from the fact that the United States, which has a trust responsibility for the pueblo doesn't argue with the result in this case."  Suppl. Brief Tr. at 11:23-12:2 (Bohnhoff).

Pojoaque Pueblo maintained that the cases cited by the Defendants do not change that the lesser "serious question standard" for likelihood-of-success still applies where the other three factors

are established.  Suppl. Brief Tr. at 12:8-22 (Crowell).  Pojoaque Pueblo further argued that it does not "make sense to require a tribe or a plaintiff to go to the district court to seek a stay if it's futile to pursue the likelihood of success [on the] merits."  Suppl. Brief Tr. at 12:22-25 (Crowell).  Pojoaque Pueblo argued, moreover, that, "although Dine may be persuasive on the question, it's not dispositive of the question . . . ."  Suppl. Brief Tr. at 13:13-14 (Crowell).  Pojoaque Pueblo advanced that, until the Tenth Circuit rules that Dine equally applies to motions to stay, "it is not precedent and it is not binding on how the Court deals with the current motion to stay."  Suppl. Brief Tr. at 14:23-15:2 (Crowell).  Additionally, Pojoaque Pueblo stressed its view that it "has done everything that IGRA requires" and that "the pueblo acted in good faith . . . ."  Suppl. Brief Tr. at 14:9-13 (Crowell).  Should the Court leave the Stay MOO's effects intact, Pojoaque Pueblo averred, Pojoaque Pueblo will be irreparably harmed by New Mexico "basically either extorting [the] pueblo into an illegal compact or forcing the pueblo to shutter a good part of its gaming facilities . . . ."  Suppl. Brief Tr. at 14:3-9 (Crowell).

With respect to the United States' letter to the Tenth Circuit regarding the Stay MOO, Pojoaque Pueblo disagreed that the letter conveys that the United States "agrees with this Court's preemption analysis."  Suppl. Brief Tr. at 16:5-8 (Crowell).  Rather, Pojoaque Pueblo asserted, the letter's purpose is to "point out the [Stay MOO's] disruption of the balance of federal, state and Tribal interests that . . . Congress intended when they passed [IGRA]."  Suppl. Brief Tr. at 16:8-14 (Crowell).  Pojoaque Pueblo contended that, although the Court expressed concern with "putting its thumb on the scales," the Stay MOO "has totally tipped those scales by basically endorsing a policy that allows a state like New Mexico to negotiate with impunity."  Suppl. Brief Tr. at 16:13-17 (Crowell).  Highlighting this disruption of Congress' carefully wrought balance, Pojoaque Pueblo averred, was the point of the United States' letter.  See Suppl. Brief Tr. at 16:21-17:2 (Crowell).

Having heard both sides' argument, the Court granted the Supplemental Brief Motion.  See Suppl. Brief Tr. at 17:11-13 (Court).  The Court also granted the Defendants' request to file a response brief to Pojoaque Pueblo's proposed Supplemental Brief.  See Suppl. Brief Tr. at 17:13-15 (Court).

## LAW REGARDING A DISTRICT COURT'S JURISDICTION DURING THE PENDANCY OF AN INTERLOCUTORY APPEAL

The filing of an interlocutory appeal generally divests the district court of jurisdiction over matters involved in the appeal.  See Stewart v. Donges, 915 F.2d at 574.  Conversely, the district court retains jurisdiction over "matters not involved in the appeal." Garcia v. Burlington N.R.R. Co., 818 F.2d 713, 721 (10th Cir. 1987).  See Stewart v. Donges, 915 F.2d at 576 (stating that, during the pendency of an interlocutory appeal, the district court retains jurisdiction over "peripheral matters unrelated to the disputed right").  The district court, for example, "retains jurisdiction over tangential matters such as determining 'the propriety and amount of attorney's fees.'" Stewart v. Donges, 915 F.2d at 575 n.3 (quoting Garcia v. Burlington N.R.R. Co., 818 F.2d at 721).  The district court may also "perform[] 'certain ministerial functions in aid of the appeal, such as correcting clerical mistakes in the record, approving appeal bonds, and issuing stays or injunctions pending the appeal.'" Stewart v. Donges, 915 F.2d at 575 n.3 (quoting Wright & Miller § 3949, at 359).  To regain jurisdiction over matters involved in the appeal, the district court must take the "affirmative step of certifying the appeal as frivolous or forfeited, and until that step is taken it simply lacks jurisdiction to proceed with the trial." Stewart v. Donges, 915 F.2d at 577-78.  This requirement avoids "confusion or waste of time resulting from having the same issues before two courts at the same time." Stewart v. Donges, 915 F.2d at 578 (quoting United States v. Salerno, 868 F.2d 524, 540 (2d Cir. 1989)).  See Bradford-Scott Data Corp. v. Physician Comput. Network, 128 F.3d 504, 505 (7th Cir. 1997)("Continuation of proceedings in the district court largely defeats the point of the

appeal and creates a risk of inconsistent handling of the case by two tribunals.").

Because the district court retains jurisdiction over "peripheral matters unrelated to the disputed right," application of the divestiture rule turns on the nature of the defense that is the subject of the appeal. Stewart v. Donges, 915 F.2d at 576. In Stewart v. Donges, the Tenth Circuit discussed the divestiture rule in the context of an interlocutory appeal from the district court's denial of a motion for summary judgment based on qualified immunity. See 915 F.2d at 573. The Tenth Circuit distinguished between interlocutory appeals challenging discrete issues and those that relate to the entire action:

> In contrast to some interlocutory appeals under 28 U.S.C. § 1292(b) that challenge discrete orders that can be carved out and isolated from the remainder of the case, a motion to dismiss the entire proceeding based on a defense of double jeopardy or qualified immunity cannot be so isolated. If the defense is valid, then no part of the action should proceed against the defendant. In that regard, an interlocutory appeal from an order refusing to dismiss on double jeopardy or qualified immunity grounds relates to the entire action and, therefore, it divests the district court of jurisdiction to proceed with any part of the action against an appealing defendant.

915 F.2d at 576 (citing Apostol v. Gallion, 870 F.2d 1335, 1338 (7th Cir. 1989)). Applying the divestiture rule, the Tenth Circuit vacated a trial on the merits that the district court held during the pendency of the interlocutory appeal of the court's denial of summary judgment based on qualified immunity, reasoning that the district court "made no certification that the defendants' appeal . . . was frivolous or forfeited." Stewart v. Donges, 915 F.2d at 579.

The divestiture rule articulated in Stewart v. Donges is "virtually complete," 915 F.2d at 576, but "appellate courts have carved out [] exceptions to the general rule that allow district courts to address certain matters when judicial efficiency is thereby enhanced," see United States v. Madrid, 633 F.3d 1222, 1226 (10th Cir. 2011). One well-established exception exists for interlocutory appeals from denials or grants of injunctions. See Wright & Miller § 3921.2, at 58 ("Ordinarily an interlocutory injunction appeal . . . does not defeat the power of the trial court to proceed further with

the case.").  Professors Wright and Miller explain that this exception rests on key distinctions between interlocutory appeals and final judgments:

> Interlocutory injunction appeals would come at high cost if the trial court were required to suspend proceedings pending disposition of the appeal.  The delay and disruption alone would be costly.  As importantly, cases involving injunctive relief are apt to present an urgent need for action.  An injunction can seriously disrupt the affairs of those bound by it.  Denial of an injunction can destroy the capacity to grant effective relief after trial.  Continuing trial court proceedings, moreover, often pose little threat to orderly disposition of the appeal; ordinarily the scope of the appeal will be limited to consideration of the preliminary injunction decision itself, despite the power to reach out to other matters

Wright & Miller § 3921.2, at 58 (footnote omitted).  Wright and Miller further distinguish preliminary injunction orders from permanent injunction orders, noting that "interlocutory appeals from permanent injunction orders come closer to final judgment appeals" which divest the district court of jurisdiction over the matter.  Wright & Miller § 3921.2, at 58-59.

Because of the unique nature of interlocutory injunction appeals, the exception to divestiture for such appeals allows the district court to address matters that are involved in the appeal.  Cf. Stewart v. Donges, 915 F.2d at 574 (noting that district courts are generally divested of jurisdiction over matters involved in the appeal).  Wright & Miller explain that "[t]he desirability of prompt trial-court action in injunction cases justifies trial-court consideration even of issues that may be open in the court of appeals."  Wright & Miller § 3921.2, at 60.  Wright and Miller note, for example, that, in the context of a motion to dismiss for failure to state a claim, "[t]he court of appeals may determine whether a claim has been stated as part of the interlocutory appeal.  District courts, however, have exercised the power to dismiss for failure to state a claim pending appeal," even where the dismissed claim is related to the interlocutory appeal.  Wright & Miller § 3921.2, at 60 (footnotes omitted).  Such action is "desirable," Wright and Miller assert, "both in the interest of expeditious disposition

and in the face of uncertainty as to the extent to which the court of appeals will exercise its power." Wright & Miller § 3921.2, at 60.

The Tenth Circuit has recognized the exception for interlocutory injunction appeals in at least two circumstances. See Free Speech, 720 F.3d at 791; Colorado v. Idarado Mining Co., 916 F.2d 1486, 1490 n.2 (10th Cir. 1990). In Colorado v. Idarado Mining Co., the Tenth Circuit considered an appeal from a mandatory injunction directing the defendants to conduct extensive environmental cleanup pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9626. See 916 F.2d at 1489. Subsequent to issuing the injunction, the district court entered judgment in favor of the plaintiff for past response costs plus prejudgment interest. See 916 F.2d at 1488. The Tenth Circuit noted that the district court retained jurisdiction over the parties to insure compliance with its order, because that matter was "not involved in the appeal." 916 F.2d 1490 n.2 (citing 9 Moore's Federal Practice § 203.11 (2d ed. 1990); Garcia v. Burlington N.R.R. Co., 818 F.2d at 721). The Tenth Circuit further noted that, because the interlocutory appeal was "from the district court's grant of a mandatory injunction, [] 'the district court retains power to act on the case pending appeal.'" Colorado v. Idarado Mining Co., 916 F.2d at 1490 n.2 (quoting Wright & Miller § 3921, at 59-60). Accordingly, the Tenth Circuit stated that "[t]he district court [] retains jurisdiction [] to resolve the plaintiffs' pending claims for natural resource damage and defendants' third-party claims for contribution." Colorado v. Idarado Mining Co., 916 F.2d at 1490. Finally, the Tenth Circuit noted that "the district 'court, in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal.'" Colorado v. Idarado Mining Co., 916 F.2d at 1490 n.2 (quoting Fed. R. Civ. P. 62(c)).

More recently, in Free Speech, the Tenth Circuit considered whether to affirm the district court's grant of a motion to dismiss pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure

that the Defendants filed during the pendency of an interlocutory appeal from the district court's denial of a motion for a PI. See 720 F.3d at 791. The Tenth Circuit noted at the outset that "[o]rdinarily an interlocutory injunction appeal . . . does not defeat the power of the trial court to proceed further with the case." 720 F.3d at 791 (quoting Wright & Miller § 3921.2, at 58)(internal quotation marks omitted). The Tenth Circuit acknowledged that an interlocutory appeal normally "divests the district court of jurisdiction," but reasoned that, "in an appeal from an order granting or denying a preliminary injunction, a district court may nevertheless proceed to determine the action on the merits." 720 F.3d at 791 (citing United States v. Price, 688 F.2d 204, 215 (3d Cir. 1982))(internal quotation marks omitted). The Tenth Circuit elaborated that the "desirability of prompt trial-court action in injunction cases justifies trial-court consideration of issues that may be open in the court of appeals." Free Speech, 720 F.3d at 791-92 (quoting Wright & Miller § 3921.2, at 60). The Tenth Circuit highlighted a motion to dismiss for failure to state a claim as a "good illustration" of the exception for PI appeals:

> Although a court of appeals may determine whether a claim has been stated as part of the interlocutory appeal, a district court nonetheless retains jurisdiction to dismiss for failure to state a claim pending appeal. This power is desirable "both in the interest of expeditious disposition and in the face of uncertainty as to the extent to which the court of appeals will exercise its power."

Free Speech, 720 F.3d at 791 (quoting Wright & Miller § 3921.2, at 60)(internal citation omitted). Applying this exception, the Tenth Circuit affirmed the district court's grant of the motion to dismiss while the PI appeal was pending, despite that the issues in the motion and those in the PI ruling were "identical." Free Speech, 720 F.3d at 792.

## LAW REGARDING MOTIONS TO RECONSIDER INTERLOCUTORY ORDERS

Except where the Federal Rules of Civil Procedure specify, motions to reconsider fall into three categories:

> (i) a motion to reconsider filed within [twenty-eight] days of the entry of judgment is
> treated as a motion to alter or amend the judgment under rule 59(e); (ii) a motion to
> reconsider filed more than [twenty-eight] days after judgment is considered a motion
> for relief from judgment under rule 60(b); and (iii) a motion to reconsider any order
> that is not final is a general motion directed at the court's inherent power to reopen
> any interlocutory matter in its discretion.  See Price v. Philpot, 420 F.3d 1158, 1167
> & n.9 (10th Cir. 2005).

Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 435, 462 (D.N.M. 2009)(Browning, J.).  See Price v.

Philpot, 420 F.3d at 1167; Computerized Thermal Imaging, Inc. v. Bloomberg, L.P., 312 F.3d 1292,

1296 (10th Cir. 2002).

Considerable confusion exists among the bar regarding the proper standard for a district court

to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders,

i.e., an order that a district court issues while the case is ongoing, as distinguished from a final

judgment.  This confusion originates from the fact that the Federal Rules of Civil Procedure do not

mention motions to reconsider, let alone set forth a specific procedure for filing them or a standard

for analyzing them.  A loose conflation in terminology in Servants of the Paraclete v. Does, 204 F.3d

1005 (10th Cir. 2000), which refers to motions filed under rule 59(e) -- "motion[s] to alter or amend

a judgment" -- as "motions to reconsider," compounds that baseline confusion.  204 F.3d at 1005

(emphasis added).

While the Federal Rules of Civil Procedure do not explicitly address motions to reconsider

interlocutory orders, rule 54(b) makes the following open-ended proclamation about their mutability:

"[A]ny order or other decision that adjudicates fewer than all the claims . . . does not end the action

as to any of the claims or parties and may be revised at any time before the entry of final judgment . .

. ."  Rule 54(b) therefore (i) provides that a district court may freely reconsider its prior rulings; and

(ii) places no limit or governing standard on the district court's ability to do so, other than that

reconsideration must occur "before the entry of judgment."  Fed. R. Civ. P. 54(b).  Indeed, the

Supreme Court has stated that "every order short of final decree is subject to reopening at the discretion of the district judge." Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 12 (1983). The Tenth Circuit has likewise declined to cabin district courts' discretion beyond what rule 54(b) provides, concluding that "district courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., 495 F.3d 1217, 1225 (10th Cir. 2007). Accord Balla v. Idaho Bd. of Corrs., 869 F.2d 461, 465 (9th Cir. 1989)(stating that district courts have "inherent" authority to reconsider interlocutory orders "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities"). The Tenth Circuit has clarified, however, that "a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position or controlling law," and "to correct clear error." Servants of the Paraclete v. Does, 204 F.3d at 1012.

Courts of Appeals recognize that district courts have "inherent" discretionary authority to reconsider a preliminary injunction. Sierra Club v. United States Army Corps of Eng'rs, 732 F.2d 253, 256 (2d Cir. 1984). The Tenth Circuit has stated that "[t]he grant or denial of injunctive relief, as well as a refusal to dissolve or modify an existing injunction, is within the discretion of the district court . . . ." Cablevision of Tex. III, L.P. v. Okla. W. Tel. Co., 993 F.2d 208, 210 (10th Cir. 1993). The district court's decision to reconsider a preliminary injunction is reviewed for abuse of that discretion. See Cablevision of Tex. III, L.P. v. Okla. W. Tel. Co., 993 F.2d at 210. The decision should account for the fact that a preliminary injunction is often granted "under pressured time constraints, on limited evidence and expedited briefing schedules." Heideman v. South Salt Lake City, 348 F.3d at 1188 (internal quotation marks and citations omitted).

Notwithstanding these principles, the filing of a notice of appeal from an interlocutory order imposes jurisdictional constraints on a district court's authority to reconsider its prior rulings. The

Supreme Court has explained that "[t]he filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."  Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 (citing United States v. Hitchmon, 587 F.2d 1357, 1359 (5th Cir. 1979)).  Accord Garcia v. Burlington N. R.R. Co., 818 F.2d at 721 ("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals.  The district court is thus divested of jurisdiction.")(citations omitted).  The rationale for this limitation is that "a federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," because doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment."  Griggs v. Provident Consumer Discount Co., 459 U.S. at 58-59.

Nonetheless, the filing of a notice of appeal does not completely divest a district court of jurisdiction to modify its interlocutory rulings.   Under rule 62(c) of the Federal Rules of Civil Procedure, a district court, during the pendency of an appeal from an interlocutory order that "grants, dissolves, or denies an injunction," is authorized to "suspend, modify, restore, or grant an injunction . . . ."  This authorization is narrowly construed, however.  See Griggs v. Provident Consumer Discount Co., 459 U.S. at 58.  Once an appeal from a PI has been filed, the district court may generally "not alter the injunction . . . except to maintain the status quo of the parties pending the appeal."  Coastal Corp. v. Tex. E. Corp., 869 F.2d at 819-20.  Thus, the court is prohibited from granting relief regarding the PI that divests the appellate court of its jurisdiction by eliminating or materially altering the controversy.  See, e.g., Ortho Pharm. Corp. v. Amgen, Inc., 887 F.2d 460, 463-464 (3d Cir. 1989).  It follows that the pendency of an interlocutory appeal from a PI divests the district court of its jurisdiction to vacate or dissolve the injunction.  See Coastal Corp. v. Tex. E.

Corp., 869 F.2d at 821 (holding that "the district court lacked authority to dissolve the injunction" because of a pending appeal).

## LAW REGARDING STAYS PENDING APPEAL

Although different rules of procedure govern district courts' and courts of appeals' authority to stay an order pending appeal, see Fed. R. Civ. P. 62(c); Fed. R. App. P. 8(a), the factors regulating the issuance of a stay are "generally the same," Hilton v. Braunskill, 481 U.S. 776. The "traditional" standard, according to the Supreme Court, requires that a reviewing court consider

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Nken v. Holder, 556 U.S. at 426 (quoting Hilton v. Braunskill, 481 U.S. at 776). The first two factors are the "most critical" in the determination whether to grant a stay pending appeal. Nken v. Holder, 556 U.S. at 434; KSTU, LLC v. Aereo, Inc., 2014 U.S. App. LEXIS 7802, at *3 (10th Cir. 2014. With respect to first factor, the Supreme Court has stated that "[i]t is not enough that the chance of success on the merits be 'better than negligible'" or that success be a "mere possibility." Nken v. Holder, 556 U.S. at 434 (quoting Sofinet v. INS, 188 F.3d 703, 707 (7th Cir. 1999)). Likewise, "simply showing some 'possibility of irreparable injury,' Abbassi v. INS, 143 F.3d 513, 514 (9th Cir. 1998), fails to satisfy the second factor." Nken v. Holder, 556 U.S. at 434-35.

Although the factors required for a stay pending appeal are not identical to those required for granting an injunction, there is "substantial overlap" between both standards. Nken v. Holder, 556 U.S. at 434 (citing Winter v. NRDC, 555 U.S. at 24). The Supreme Court has noted that "similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." Nken v. Holder, 556 U.S. at 434 (citing Winter v. NRDC, 555 U.S. at 24). A stay pending appeal also has functional overlap with an injunction, as

both remedies have the "practical effect of preventing some action before the legality of that action has been conclusively determined."  Nken v. Holder, 556 U.S. at 428.  A stay, however, "achieves this result by temporarily suspending the source of authority to act -- the order or judgment in question -- not by directing an actor's conduct."  Nken v. Holder, 556 U.S. at 428-29.  In light of these similarities, the Supreme Court has applied largely the same standards for stays pending appeal as it has applied for injunctions.  Compare Winter v. NRDC, 555 U.S. at 374, with Nken v. Holder, 556 U.S. at 426.

Until recently, the Tenth Circuit has applied a modified likelihood-of-success standard where an applicant meets the other three requirements for an injunction or a stay pending appeal.  See Walmer v. United States Dep't of Defense, 52 F.3d 851, 854 (10th Cir. 1995)(injunction context), cert. denied, 116 S. Ct. 474 (1995); McClendon v. City of Albuquerque, 79 F.3d at 1020 (stays context).  In such cases, the Tenth Circuit has deemed the likelihood-of-success element satisfied if the applicant shows "questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation."  McClendon v. City of Albuquerque, 79 F.3d at 1020 (quoting Walmer v. United States Dep't of Defense, 52 F.3d at 854)(citations and internal quotation marks omitted).  In 2016, however, the Tenth Circuit abrogated this relaxed test in the injunction context.  See Dine, 839 F.3d at 1282.  In Dine, the Tenth Circuit held that the relaxed test is "inconsistent with the Supreme Court's recent decision in *Winter v. Natural Resources Defense Council*," which "overruled the [United States Court of Appeals for the] Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs . . . could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm."  Dine, 839 F.3d at 1282 (citing Winter v. NRDC, Inc., 555 U.S. at 22).  The Tenth Circuit concluded that, although the standard that Winter v. NRDC overruled dealt with the irreparable-harm

factor, "*Winter's* rationale seems to apply with equal force" to the likelihood-of-success factor. Dine, 839 F.3d at 1282.  Accordingly, the Tenth Circuit held that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." Dine, 839 F.3d at 1282.[8]

The Tenth Circuit's abrogation of the relaxed likelihood-of-success test in the injunction context likely applies with equal force to the stay-pending-appeal context.  See Nken v. Holder, 556 U.S. at 434 (noting that, while the standards for injunctions and stays pending appeal are not "one and the same," they have "substantial overlap").  In both contexts, relying on similar rationales, the Supreme Court has required a strong showing of likelihood of success and irreparable injury.  See Winter v. NRDC, 555 U.S. at 374 (injunction context); Nken v. Holder, 556 U.S. at 426 (stays context).  Indeed, in the stay-pending-appeal context, Justice Kennedy has stated that, "[w]hen considering success on the merits and irreparable harm, courts cannot dispense with the required showing of one simply because there is a strong likelihood of the other."  Nken v. Holder, 556 U.S.

---

[8]The Tenth Circuit in Dine affirmed the Court's conclusion in Diné Citizens Against Ruining Our Env't v. Jewell, 2015 U.S. Dist. LEXIS 109986 (D.N.M. 2015)(Browning, J.), that Winter v. NRDC "raises serious doubts about the continued vitality of the Tenth Circuit's relaxed substantial-likelihood-of-success standard." 2015 U.S. Dist. LEXIS 109986, at *115.  There, the Court reasoned that, "[a]lthough Winter dealt with the irreparable-harm prong, its rationale -- that relaxing the plaintiff's showing waters down what should be an extraordinary remedy -- could possibly carry over to the substantial-likelihood-of-success prong." Diné Citizens Against Ruining Our Env't v. Jewell, 2015 U.S. Dist. LEXIS 109986, at *115 (citations omitted).  Accordingly, the Court concluded that

> the proper standard applicable to the substantial-likelihood-of-success prong is that the movant must (i) carry the burden of production, i.e., he or she must present a prima facie case; and (ii) make it reasonably likely -- beyond just being 'not unreasonable' -- that the factfinder would actually find for the movant, i.e., that the movant would satisfy the burden of persuasion.

Diné Citizens Against Ruining Our Env't v. Jewell, 2015 U.S. Dist. LEXIS 109986, at *116 (citation omitted).  The showing required for likelihood-of-success, the Court added, "will vary depending on the movant's showing on the other prongs[.]"  Diné Citizens Against Ruining Our Env't v. Jewell, 2015 U.S. Dist. LEXIS 109986, at *118.

at 438 (Kennedy, J., concurring).  This observation is correct, because a "stay is not a matter of right, even if irreparable injury might otherwise result."  <u>Virginian R. Co. v. United States</u>, 272 U.S. 658, 672 (1926)(citation omitted).  Accordingly, because the Supreme Court has articulated largely the same requirements for stays pending appeal as for injunctions, the relaxed likelihood-of-success test is likely abrogated with respect to both injunctions and stays pending appeal.

## LAW REGARDING IGRA

As "'domestic dependent nations' that exercise 'inherent sovereign authority,'" <u>Bay Mills</u>, 134 S. Ct. at 2030 (citations omitted), "Indian tribes are subordinate only to the federal government," <u>Texas v. United States</u>, 497 F.3d 491, 493 (5th Cir. 2007)(citing <u>Cabazon</u>, 480 U.S. at 207).  <u>See</u> <u>Bay Mills</u>, 134 S. Ct. at 2030 (noting that Indian tribes are "separate sovereigns pre-existing the Constitution")(quoting <u>Santa Clara Pueblo v. Martinez</u>, 436 U.S. 49, 56 (1978))(internal quotation marks omitted).  State laws, however, "may be applied to tribal Indians on their reservations if Congress has expressly so provided."  <u>Cabazon</u>, 480 U.S. at 207.  Thus, "unless and 'until Congress acts, the tribes retain' their historic sovereign authority."  <u>Bay Mills</u>, 134 S. Ct. at 2030 (quoting <u>United States v. Wheeler</u>, 435 U.S. 313, 323 (1978)).

In <u>Cabazon</u>, the Supreme Court held that states lacked regulatory authority over gambling activities occurring on Indian lands, because Congress had not expressly provided for such authority. <u>See</u> 480 U.S. at 214, 221-22.  In response to this decision, Congress enacted IGRA to give state governments "a subordinate but significant role in regulating tribal gaming."  <u>Texas v. United States</u>, 497 F.3d at 494.  As the Supreme Court later noted in <u>Bay Mills</u>, because <u>Cabazon</u> "left fully intact a State's regulatory power over tribal gaming outside Indian territory -- which . . . is capacious," the "problem Congress set out to address in IGRA . . . arose in Indian lands alone."  <u>Bay Mills</u>, 134 S. Ct. at 2034.  Accordingly, the Supreme Court observed, "[e]verything -- literally everything -- in

IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, and nowhere else."  Bay Mills, 134 S. Ct. at 2034.

IGRA "divides gaming on Indian lands into three classes -- I, II, and III -- and provides a different regulatory scheme for each class."  Seminole Tribe I, 517 U.S. at 48.  Class I gaming -- "social games solely for prizes of minimal value" -- is subject to exclusive tribal jurisdiction.  25 U.S.C. §§ 2703(6), 2710(a)(1).  Class II gaming -- bingo and non-banked card games[9] -- is subject to the National Indian Gaming Commission's[10] regulatory oversight.  See 25 U.S.C. §§ 2703(7), 2706(b), 2710(a)-(c).  Class III gaming "encompasses all forms of gaming that are not Class I gaming or Class II gaming," 25 U.S.C. § 2710(a)(1), including "such things as slot machines, casino games, banked card games, dog racing, and lotteries," Seminole Tribe I, 517 U.S. at 48 (footnote omitted).  IGRA leaves Class III gaming to "the exclusive jurisdiction of the Indian tribes."  25 U.S.C. § 2710(a)(1).

Under IGRA, Class III gaming is "lawful on Indian lands only if such activities are . . . (C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect."  25 U.S.C. § 2703(8).  Absent a gaming compact, 18 U.S.C. § 1166(a) provides that, "for purposes of Federal law, all State laws pertaining to the licensing, regulation, or prohibition of gambling . . . shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State."  In other words, any Class III gaming on tribal lands that does not

---

[9]Non-banked card games are "games in which the participants play against only each other; the host facility (the 'house') has no stake in the outcome."  Fla. House of Representatives v. Crist, 990 So. 2d 1035, 1039 (Fla. 2008)(citing 25 U.S.C. § 2703(7)).

[10]IGRA established the National Indian Gaming Commission as an agency within the Department of the Interior.  See 25 U.S.C. § 2704(a).  The Commission has the authority to enforce the collection of civil fines, to investigate and audit Indian gaming, and to "promulgate such regulations and guidelines as it deems appropriate to implement [IGRA's] provisions."  25 U.S.C. § 2706.

comport with state law violates federal law unless it is conducted pursuant to a valid compact with the state under IGRA.  See 18 U.S.C. § 1166(a).  Plainly stated, "a tribe cannot conduct class III gaming on its lands without a compact . . . ."  Bay Mills, 134 S. Ct. at 2035 (citing 25 U.S.C. § 2710(d)(1)(C)).

Just because IGRA requires a state-tribal compact for Class III gaming activities to be lawful, however, "it does not follow that the states have any authority to regulate Class III gaming in the absence of a compact."  Wyandotte Nation v. Sebelius, 337 F. Supp. 2d 1253, 1257 (D. Kan. 2004)(Robinson, J.), vacated and remanded on other grounds, 443 F.3d 1247 (10th Cir. 2006).  Indeed, the "only enforcement provided for in [] IGRA is through the federal government" -- states are granted no authority to enforce IGRA's terms.  Wyandotte Nation v. Sebelius, 337 F. Supp. 2d at 1257.  See 18 U.S.C. § 1166(d) (vesting the United States with "exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable . . . to Indian country [by § 1166(a)]").  As the Tenth Circuit has observed, "the very structure of the IGRA permits assertion of state civil or criminal jurisdiction over Indian gaming *only* when a tribal-state compact has been reached to regulate class III gaming."  United Keetoowah Band of Cherokee Indians v. Oklahoma, 927 F.2d at 1177 (emphasis in original)(citation omitted).  IGRA "appears to leave no other direct role for such State gaming enforcement."  United Keetoowah Band of Cherokee Indians v. Oklahoma, 927 F.2d at 1177 (footnote omitted).

## LAW REGARDING PREEMPTION

Article VI, clause 2, of the Constitution provides that the laws of the United States "shall be the Supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Consistent with the Supremacy Clause, the Supreme Court has "long recognized that state laws that conflict with federal law are 'without effect.'"  Altria

Grp., Inc. v. Good, 555 U.S. 70, 75 (2008)(quoting Maryland v. Louisiana., 451 U.S. 725, 746

(1981)).   The Supreme Court has summarized the situations in which preemption is likely to be

found:

> Pre-emption may be either expressed or implied, and is compelled whether Congress'
> command is explicitly stated in the statute's language or implicitly contained in its
> structure and purpose.  Absent explicit pre-emptive language, we have recognized at
> least two types of implied pre-emption:  field pre-emption, where the scheme of
> federal regulation is so pervasive as to make reasonable the inference that Congress
> left no room for the States to supplement it, and conflict pre-emption, where
> compliance with both federal and state regulations is a physical impossibility, or
> where state law stands as an obstacle to the accomplishment and execution of the full
> purposes and objectives of Congress.

Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98 (citations omitted).

Preemption may be express or implied.  See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505

U.S. at 98.  When faced with express preemption -- where a statute expressly states that it preempts

certain areas of state law -- a court must determine the scope of the preemption that Congress

intended.  See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)(stating that "the purpose of

Congress is the ultimate touch-stone in every pre-emption case").  "Congress may indicate pre-

emptive intent through a statute's express language or through its structure and purpose."  Altria

Grp., Inc. v. Good, 555 U.S. at 77.  When the text of a preemption clause is susceptible to more than

one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption."  Bates v.

Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005).  Preemption arguments are analyzed under rule

12(b)(1).  See Cedars-Sinai Med. Center v. Nat'l League of Postmasters of U.S., 497 F.3d 972, 975

(9th Cir. 2007)(applying rule 12(b)(1) when reviewing motion to dismiss asserting preemption

defense).

Addressing express preemption requires a court to determine the preemption's scope. That

task entails scrutinizing the preempting words in light of two presumptions.  First,

> [i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

Medtronic, Inc. v. Lohr, 518 U.S. at 485 (citations and internal quotation marks omitted).  Second, "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case."  Medtronic, Inc. v. Lohr, 518 U.S. at 485 (citations and internal quotation marks omitted).

> Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it. Also relevant, however, is the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.

Medtronic, Inc. v. Lohr, 518 U.S. at 486 (citations and internal quotation marks omitted).

In a recent express preemption decision, see Bruesewitz v. Wyeth, LLC, 562 U.S. 223 (2011), the Supreme Court concluded that the National Childhood Vaccine Injury Act, 42 U.S.C.A. §§ 300aa-11(c)(1), 300aa-13(a)(1)(A), preempted all design-defect claims that the plaintiffs seeking compensation brought against vaccine manufacturers for injury or death that certain vaccine side effects caused.  See 562 U.S. at 230.  The Supreme Court noted that Congress passed this act to "stabilize the vaccine market and facilitate compensation."  Bruesewitz v. Wyeth, LLC, 562 U.S. at 228.  The Supreme Court noted that this federal statutory scheme provided for "[f]ast, informal adjudication," allowing "[c]laimants who show that a listed injury first manifested itself at the appropriate time are prima facie entitled to compensation."  Bruesewitz v. Wyeth, LLC, 562 U.S. at 228.  Additionally,

> [a] claimant may also recover for unlisted side effects, and for listed side effects that occur at times other than those specified in the Table, but for those the claimant must prove causation.  Unlike in tort suits, claimants under the Act are not required to show that the administered vaccine was defectively manufactured, labeled, or designed.

562 U.S. at 228-29 (footnote omitted).  The Supreme Court also noted that the statutory scheme had

relatively favorable remedy provisions.  See 562 U.S. at 229.  "The quid pro quo for this, designed to

stabilize the vaccine market, was the provision of significant tort-liability protections for vaccine

manufacturers," such as limiting the availability of punitive damages and expressly eliminating

liability for a vaccine's unavoidable, adverse side effects. 562 U.S. at 229.  The statutory text at issue

in Bruesewitz v. Wyeth, LLC was as follows:

> No vaccine manufacturer shall be liable in a civil action for damages arising from a
> vaccine-related injury or death associated with the administration of a vaccine after
> October 1, 1988, if the injury or death resulted from side effects that
> were unavoidable even though the vaccine was properly prepared and was accompanied
> by proper directions and warnings.

562 U.S. at 230 (quoting 42 U.S.C. § 300aa-22(b)(1)).  The Supreme Court emphasized the use of

the word "unavoidable" in reaching its conclusion that the statute preempted design defect claims

resulting from unavoidable side effects.  562 U.S. at 231-32.  The Supreme Court also found it

persuasive that the statutory text directly mentioned other aspects of product liability law.  See 562

U.S. at 232-33.

Implied conflict preemption exists when it is impossible for a private party to comply with

both state and federal requirements, see English v. General Elec. Co., 496 U.S. 72, 78-79 (1990), or

where state law "stands as an obstacle to the accomplishment and execution of the full purposes and

objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67 (1941).  "Pre-emptive intent may also

be inferred if the scope of the statute indicates that Congress intended federal law to occupy the

legislative field, or if there is an actual conflict between state and federal law." Hines v. Davidowitz,

312 U.S. at 67 (citing Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)).

The Supreme Court, in the past, found that implied preemption may take the form of

"obstacle" preemption.  Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000) (holding

that preemption is appropriate where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); Pharm. Research and Mfrs. of Am. v. Walsh, 538 U.S. 644, 679 (2003)(Thomas, J., concurring)("Obstacle preemption turns on whether the goals of the federal statute are frustrated by the effect of the state law."). The Supreme Court instructed that, in obstacle preemption cases, "there is no federal preemption in vacuo, without a constitutional text or a federal statute to assert it." P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 503 (1988). See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98. A reviewing court must still "examine the explicit statutory language and the structure and purpose of the statute." Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990). In 2000, the Supreme Court decided Geier v. Am. Honda Motor Co., 529 U.S. 861 (2000), which held, by a five-to-four vote, that a federal regulation which permitted, but did not require, airbags to be installed in passenger vehicles preempted claims that a car was defective because it lacked an airbag. See 529 U.S. at 874. The majority found: "The rule of state tort law for which petitioners argue would stand as an 'obstacle' to the accomplishment of [the federal regulation's] objective. And the statute foresees the application of ordinary principles of preemption in cases of actual conflict. Hence, the tort action is pre-empted." 529 U.S. at 886. Justice Stevens, in his dissenting opinion, expressed a desire to eliminate obstacle preemption. He argued that the presumption against preemption

> serves as a limiting principle that prevents federal judges from running amok with our potentially boundless (and perhaps inadequately considered) doctrine of implied conflict pre-emption based on frustration of purposes -- i.e., that state law is pre-empted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Geier v. Am. Honda Motor Co., 529 U.S. at 907-08 (Stevens, J., dissenting).

The Supreme Court has now begun to back away from finding implied preemption based on

an alleged conflict with the purposes underlying federal regulations.  In 2003, the Supreme Court

issued a unanimous decision in Sprietsma v. Mercury Marine, 537 U.S. 51 (2003), rejecting implied

conflict preemption of state law claims that a boat engine was defective because it lacked a propeller

guard.  In 2008, in Altria Group. Inc. v. Good, the Supreme Court rejected the plaintiffs' obstacle-

preemption claim that the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331-41,

preempted a similar state act, Maine's Unfair Practices Act, Me. Rev. Stat. Ann., Tit. 5, § 207

(2008), because it presented an obstacle to the Federal Trade Commission's longstanding policy of

encouraging consumers to rely on representations of tar and nicotine content based on an approved

methodology.  See Altria Group. Inc. v. Good, 555 U.S. at 90.  In 2009, in Wyeth v. Levine, 555

U.S. 555 (2009), six Justices of the Supreme Court, including Justices Breyer and Kennedy, who

joined in the majority decision in Geier v. Am. Honda Motor Co., rejected the plaintiff's two implied

preemption arguments -- impossibility preemption and obstacle preemption.  See Wyeth v. Levine,

555 U.S. at 581.  The Supreme Court held that

> it is not impossible for Wyeth to comply with its state and federal law obligations
> and that Levine's common-law claims do not stand as an obstacle to the
> accomplishment of Congress' purposes in the [Federal Food, Drug, and Cosmetic
> Act, 21 U.S.C.A. §§ 301, 321, 331-337, 341-350, 361-364, and 381-399; 21 C.F.R. §
> 201.80(e) ("FDCA")].

Wyeth v. Levine, 555 U.S. at 581.  In so ruling, Justice Stevens, writing for the majority, narrowly

limited Geier v. Am. Honda Motor Co. to its facts, finding that the decision in that case was based on

the "complex and extensive" history of the substantive regulation at issue.  555 U.S. at 566.  The

Supreme Court rejected obstacle preemption, stating: "If Congress thought state-law suits posed an

obstacle to its objectives, it surely would have enacted an express pre-emption provision at some

point during the FDCA's 70-year history."  555 U.S. at 609.  Justice Stevens quoted Justice

O'Connor's explanation in Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141 (1989):

"The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them." Wyeth v. Levine, 555 U.S. at 575 (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. at 166-67).

Of particular import for the current status of implied obstacle preemption is Justice Thomas' concurring opinion in Wyeth v. Levine, in which he wrote:

> I write separately, however, because I cannot join the majority's implicit endorsement of far-reaching implied pre-emption doctrines. In particular, I have become increasingly skeptical of this Court's "purposes and objectives" pre-emption jurisprudence. Under this approach, the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law. Because implied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution, I concur only in the judgment.

555 U.S. at 583 (Thomas, J., concurring in the judgment). Justice Thomas stressed his concern:

> Under the vague and potentially boundless doctrine of purposes and objectives pre-emption . . . the Court has pre-empted state law based on its interpretation of broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law . . . . Congressional and agency musings, however, do not satisfy the Art. I, § 7 requirements for enactment of federal law and, therefore, do not pre-empt state law under the Supremacy Clause.

Wyeth v. Levine, 555 U.S. at 587. Justice Thomas emphasized that, when analyzing federal statutes' or regulations' preemptive effect, "[e]vidence of pre-emptive purpose must be sought in the text and structure of the provision at issue" to comply with the Constitution. 555 U.S. at 588 (citing CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993)). Justice Thomas, writing for the five-to-four majority in PLIVA, Inc. v. Mensing, 564 U.S. 604 (2011), recently concluded, however, that conflict preemption required the preemption of inconsistent state laws on generic drug labeling that conflicted with the respective federal law, because it was impossible to comply with both. See 564 U.S. at 617-618. The Supreme Court sought to reconcile Wyeth v. Levine, however, recognizing

that the respective statutory schemes in each case was distinguishable.  See PLIVA, Inc. v. Mensing, 564 U.S. at 626 ("It is beyond dispute that the federal statutes and regulations that apply to brand-name drug manufacturers are meaningfully different than those that apply to generic drug manufacturers.").

Moreover, the Supreme Court has put renewed emphasis on the presumption against preemption.  See Wyeth v. Levine, 555 U.S. at 565 n.3.  "In areas of traditional state regulation, [the Supreme Court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest."  Bates v. Dow Agrosciences, LLC, 544 U.S. at 449 (internal quotation marks omitted).  If confronted with two plausible interpretations of a statute, the court has "a duty to accept the reading that disfavors pre-emption."  Bates v. Dow Agrosciences, LLC, 544 U.S. at 449.  See Wyeth v. Levine, 555 U.S. at 565; Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 518 (1992)(plurality opinion).

In Arizona v. United States, the Supreme Court once again emphasized the importance of clear Congressional intent when applying obstacle preemption.   The Supreme Court struck down provisions of an Arizona immigration law that would penalize aliens who sought, or engaged in, unauthorized employment, because it "would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens."  132 S. Ct. at 2505.  With Justice Kagan taking no part in the consideration or decision, Justice Kennedy, writing for a five-to-three majority, which included Chief Justice Roberts and Justices Ginsburg, Breyer, and Sotomayor, wrote: "The correct instruction to draw from the text, structure, and history of [the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1101] is that Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment."  Arizona v. United States, 132 S. Ct. at 2505.  The Supreme Court ruled that Congressional intent was clear; Congress had

considered and rejected penalizing aliens who sought unauthorized employment.  See 132 S. Ct. at 2504.  Federal immigration law therefore preempted the Arizona law that would have penalized aliens seeking unauthorized employment, because it would have created a penalty that Congress had clearly and intentionally omitted.  See 132 S. Ct. at 2505.

The Tenth Circuit has recognized federal preemption of state law in three categories: (i) when a federal statute expressly preempts state law ("express preemption"); (ii) where Congress intends to occupy a field ("field preemption"); and (iii) to the extent that a state law conflicts with a federal law ("conflict preemption").  Colo. Dep't of Pub. Health & Env't v. United States, 693 F.3d 1214, 1222 (10th Cir. 2012).  As the defendant in Colo. Dep't of Pub. Health & Env't v. United States, the United States invoked only conflict preemption to dismiss Colorado's claims against it; the Tenth Circuit therefore did not address field preemption in this area.  See 693 F.3d at 1222. "To avoid conflict preemption, 'it is not enough to say that the ultimate goal of both federal and state law is the same. A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal." Chamber of Commerce v. Edmondson, 594 F.3d 742, 769 (10th Cir. 2010)(quoting Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494 (1987)(alterations and citation omitted)).  In Colo. Dep't of Pub. Health & Env't v. United States, the state of Colorado created a schedule for the United States to follow in the destruction of hazardous waste stored in the state, in an attempt to prohibit the storage of hazardous waste within the state.  See 693 F.3d at 1223. The Tenth Circuit held that the state statute creating this schedule was in conflict with a statute which Congress passed, mandating a deadline for the destruction of the materials.  See 693 F.3d at 1224. The Tenth Circuit reasoned that allowing Colorado to set a deadline for the destruction of the materials would impede the flexibility which Congress had intended in its deadline.  See 693 F.3d at 1224. Because the Colorado deadline would interfere with the method that Congress had intended

for the disposal of the waste, the Tenth Circuit found that the state law was in conflict with the federal law and, therefore, that the federal law preempted Colorado's schedule.  See 693 F.3d at 1224.

## LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Section 1983 creates only the right of action, it does not create any substantive rights; substantive rights must come from the Constitution or federal statute.  See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 did create any substantive rights, but merely enforces existing constitutional and federal statutory rights . . . .")(internal quotation marks, alteration, and citation omitted).  Section 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights.  To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988). The Court has noted:

> [A] plaintiff must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a "person" (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Public School Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M. 2010)(Browning, J.)(quoting Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Supreme Court

has made clear that, in alleging a § 1983 action against a government agent in the agent's individual capacity, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. 662, 676 (2008).

## LAW REGARDING 42 U.S.C. § 1985(3)

Claims under 42 U.S.C. § 1985 are less common than claims under § 1983.  Section 1985 pertains to the prohibition of conspiracies which interfere with civil rights.  See 42 U.S.C. § 1985. The Supreme Court recognizes "five broad classes of conspiratorial activity" that § 1985 prohibits. Kush v. Rutledge, 460 U.S. 719, 724 (1983).  "Three of the five broad categories . . . relate to institutions and processes of the Federal Government."  Kush v. Rutledge, 460 U.S. at 724.  The fourth and fifth classes of § 1985 claims apply to conspiracies to "obstruct the course of justice in state courts," and conspiracies to "go in disguise on the highway or in the premises of another." Kush v. Rutledge, 460 U.S. at 724 (internal quotation marks omitted).  Both of these latter categories require an "intent to deprive their victims of the equal protections of the laws," which means that there must be some "racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspiratorial action."  Kush v. Rutledge, 460 U.S. at 724, 726 (internal quotation marks omitted). See Campbell v. Amax Coal Co., 610 F.2d 701, 702 (10th Cir. 1979)("[I]n the absence of allegations of class based or racial discriminatory animus, the complaint fails to state a claim under § 1985.").

To succeed on a § 1985 claim, a plaintiff must prove a conspiracy. See Dixon v. City of Lawton, Okla., 898 F.2d 1443, 1447 (10th Cir. 1990).  To state a valid claim for conspiracy, "a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants."  Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 533 (10th Cir. 1998)(discussing conspiracy under § 1983).  "[M]ere conclusory allegations with no supporting factual averments are

insufficient; the pleadings must specifically present facts tending to show agreement and concerted action." Sooner Prods. Co. v. McBride, 708 F.2d 510, 512 (10th Cir. 1983)(discussing conspiracy under § 1983).

The Tenth Circuit has held that it is error to "precondition consideration of a plaintiff's § 1985(3) claim upon the finding of § 1983 liability." Dixon v. City of Lawton, Okla., 898 F.2d at 1447 (10th Cir. 1990).

> Although neither § 1983 nor § 1985(3) create any substantive rights, a § 1983 claim generally describes a substantive violation of a right secured by the Constitution or laws, whereas a § 1985(3) claim generally describes a conspiracy of two or more persons for the purpose of depriving of another of equal protection of the laws or equal privileges and immunities under the laws.

Dixon v. City of Lawton, Okla., 898 F.2d at 1447.

To state a claim under § 1985(3), a plaintiff must show: (i) a conspiracy, motivated by racially discriminatory animus; (ii) to deprive the plaintiff of equal protection or equal protections of the laws; (iii) an act in furtherance of the conspiracy; and (iv) an injury or deprivation resulting therefrom. See Paris v. Sw. Bell Tel. Co., 94 F. App'x 810, 815 (10th Cir. 2004)(unpublished); Tilton v. Richardson, 6 F.3d 683, 686 (10th Cir. 1993). "Conclusory allegations that the defendants acted in concert or conspired, without specific factual allegations to support such assertions, are insufficient to state a claim under § 1985(3)." Martinez v. Martinez, 2010 U.S. Dist. LEXIS 38109, 2010 WL 1608884, at *12 (D.N.M. 2010)(Browning, J.)(citing Merritt v. Hawk, 153 F. Supp. 2d 1216, 1225 (D. Colo. 2001)(Weinshienk, J.)).

The Tenth Circuit has stated that § 1985(3) was intended "to provide redress for victims of conspiracies impelled by a commingling of racial and political motives." Brown v. Reardon, 770 F.2d 896, 907 (10th Cir. 1985). "[I]n the absence of allegations of class based or racial discriminatory animus, the complaint fails to state a claim under § 1985." Campbell v. Amax Coal

<u>Co.</u>, 610 F.2d at 702.  The Tenth Circuit has consistently dismissed § 1985(3) claims devoid of

racial, discriminatory animus.  For example, in <u>Paris v. Sw. Bell Tel. Co.</u>, the Tenth Circuit held that

the plaintiff's hostile-work-environment claim failed, because she did not show racial discriminatory

animus on the part of the alleged conspirators.  <u>See</u> 94 F. App'x at 815.

 In <u>Martinez v. Martinez</u>, the plaintiff alleged that M. Martinez, her ex-husband, Lynda Latta,

her ex-husband's attorney, and the Honorable Elizabeth Whitefield, the judge who presided over the

Martinezes' divorce in state court, conspired against her to deprive her of her rights guaranteed

under the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United

States of America.  <u>See</u> 2010 U.S. Dist. LEXIS 38109, at *1, *26.  The Court noted that the entirety

of the plaintiff's constitutional claims appeared to be the following:

> 14. In the Court's Defendant 4's [i.e., Judge Whitefield's] ruling to dismiss this case against Plaintiff first of all is a violation of Federal Rule 60(b)(4) because the Court lacked jurisdiction over the subject matter and that dismissal, for lack of prosecution, which conduct was done as a state actor under color of law by [Judge Whitefield] and in conspiracy with [Ms. Latta] on behalf of [M. Martinez], to achieve these ends. [Ms. Latta] is included in this legal process, entered into knowingly and fraudulently to achieve the illegitimate end of depriving Plaintiff of her due civil rights by [Judge Whitefield's] void ruling, which rights are afforded by 42 USC §§ 1983 and 1985(3) to a fair hearing of the property as she has attempted to litigate for these last years.

> 15. [Ms. Latta and Judge Whitefield] are participants with [M. Martinez] and have conspired to keep Plaintiff at bay in obtaining her rights to this undivided property by engaging improper courts and attempts to harass and exhaust Plaintiff of her financial resources . . . .

> 17. The Fourteenth Amendment states thus: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property without due process of law . . . And further in the Fifth Amendment "the Bill of Rights protects against abuse of government -- the 'double jeopardy' clause seems to be applied here, because Plaintiff's same former case 95-2963 was voluntarily dismissed by Plaintiff without prejudice in 2003, and resurrected from the dead improperly by [M. Martinez, Ms. Latta, and Judge Whitefield] on August 28, 2007 by Motion.

> . . . .

18. [Judge Whitefield] attempts to adjudicate a new dismissal of this same closed case by dismissing it again against Plaintiff for lack of prosecution and would attempt by doing so, to take away her right to adjudicate it elsewhere -- this would be a gross violation for Plaintiff from [Judge Whitefield] and finds into the double jeopardy type of thinking easily -- a double dismissal, one legitimate by Plaintiff and one illegitimate (reopened by Defendants by Motion) after this dismissal, and done (the second) with intention by [M. Martinez and Ms. Latta] and especially with the power of [Judge Whitefield], to attempt to deprive Plaintiff of her due process rights of hearing and eliminating her possibility to adjudicate her claim because [Judge Whitefield's] ruling would then be the second dismissal on the basis of lack of prosecution which then adjudicates a case and it could not be brought again by this Plaintiff.

Martinez v. Martinez, 2010 U.S. Dist. LEXIS 38109, at *24-25 (alterations in original). The Court dismissed the § 1985 claim, reasoning that the plaintiff "makes no allegation of discriminatory animus by [the defendants]" and that "there is nothing more than a conclusory allegation of conspiracy, lacking any underlying facts." Martinez v. Martinez, 2010 U.S. Dist. LEXIS 38109, at *27. The Court noted that "[n]o alleged facts touch on any individual's race, political or religious affiliation, or any other categorization against which the Defendants might hold a discriminate animus." 2010 U.S. Dist. LEXIS 38109, at *27.

## ANALYSIS

The Court's analysis proceeds as follows. The Court first reviews Pojoaque Pueblo's request to file a Supplemental Brief to address issues that arose during the October 27, 2016, hearing. The Court concludes that such supplementation is warranted and the Court thus grants the Supplemental Brief Motion. The Court likewise grants the Defendants' request to file a Response to Pojoaque Pueblo's proposed Supplemental Brief. The Court next considers whether the Defendants' interlocutory appeal of Judge Brack's PI divested the Court of jurisdiction to determine in the Stay MOO the action on the merits. Concluding that its jurisdiction was not completely divested, the Court holds that Pojoaque Pueblo has not made the requisite showing for a stay of the judgment entered pursuant to the Stay MOO -- particularly the order therein that suspends Judge Brack's PI --

pending Pojoaque Pueblo's appeal of that judgment to the Tenth Circuit.  Accordingly, the Court

denies the Motion to Stay MOO.

## I.    THE COURT GRANTS POJOAQUE PUEBLO'S SUPPLEMENTAL BRIEF MOTION AND GRANTS THE DEFENDANTS' REQUEST TO FILE A RESPONSE TO POJOAQUE PUEBLO'S SUPPLEMENTAL BRIEF.

Pojoaque Pueblo moves to file a Supplemental Brief to address issues that arose during the

hearing on the Motion to Stay MOO.  See Suppl. Brief Motion at 1.  The Defendants contend that

Pojoaque Pueblo's proposed Supplemental Brief "goes far beyond addressing issues that arose

during the October 27, 2016, hearing, and, in so doing, raises a number of tangential issues that are

not dispositive of the Motion to Stay." Suppl. Brief Motion Response at 1.  The Defendants request,

however, that, should the Court grant the Supplemental Brief Motion, the Court allow them to file a

Supplemental Brief Response.  See Suppl. Brief Motion Response at 1-2.

Pojoaque Pueblo asserts that supplementation is warranted under rule 15(d).  See Suppl. Brief

Motion at 1.  Rule 15(d), however, is inapposite.  Under rule 15(d), a district court has discretion to

"permit a party to serve a supplemental pleading setting forth . . . transactions, occurrences or

events" that occurred after the date of the pleading to be supplemented.  Walker v. UPS, 240 F.3d

1268, 1279 (10th Cir. 2001)(citing Gillihan v. Shillinger, 872 F.2d 935, 941 (10th Cir. 1989)).  "The

Federal Rules of Civil Procedure define 'pleadings' as a complaint or third-party complaint; an

answer to a complaint, a third-party complaint, a counterclaim, or a crossclaim; and, 'if the court

orders one, a reply to an answer.'" Ysais v. N.M. Judicial Standard Comm'n, 616 F. Supp. 2d 1176,

1184 (D.N.M. 2009)(Browning, J.)(quoting Fed. R. Civ. P. 7(a)).  See Pleading, Black's Law

Dictionary 1270 (9th ed. 2009)(defining "pleading" as a "formal document," usually a complaint or

answer, "in which a party to a legal proceeding . . . sets forth or responds to allegations, denials, or

defenses").  A supplemental brief is not a pleading under this definition.  See Fed. R. Civ. P. 7(a).

Accordingly, rule 15(d) does not govern the Court's resolution of Pojoaque Pueblo's Supplemental Brief Motion.

"Whether to allow supplemental briefing on a newly-raised issue is a 'supervision of litigation' question" that the Tenth Circuit reviews for abuse of discretion.  Geddes v. United Staffing All. Emple. Med. Plan, 469 F.3d 919, 928 (10th Cir. 2006)(articulating this standard in the summary judgment context)(quoting Pipping v. Burlington Res. Oil & Gas, 440 F.3d 1186, 1192 (10th Cir. 2006)).  "A district court abuses its discretion where it commits a legal error or relies on clearly erroneous factual findings, or where there is no rational basis in the evidence for its ruling." Nova Health Sys. v. Edmondson, 460 F.3d 1295, 1299 (10th Cir. 2006)(internal quotation marks omitted).  Having reviewed Pojoaque Pueblo's proposed Supplemental Brief, the Court concludes that supplementation regarding issues that arose after Pojoaque Pueblo filed the Motion to Stay MOO is warranted.

First, supplementation regarding the Interior Secretary's "deemed approved" letters is appropriate, because the Court stated at the hearing that it was unfamiliar with those letters.  Motion to Stay MOO Tr. at 121:25-122:2 (Court).  Second, supplementation regarding Baker v. Bray and Debardeleben v. Pugh is warranted, because the Defendants cited those cases for the first time at the hearing.  See Motion to Stay MOO Tr. at 23:13-23 (Bohnhoff).  Third, supplementation regarding Dine's relevance is proper, because the Tenth Circuit issued its opinion in that case on the day of and during the hearing.  See Motion to Stay MOO Tr. at 62:22-63:15 (Court).  Fourth, supplementation regarding New Mexico regulations on transportation of gaming devices into the state is appropriate, because the issue arose at the hearing whether Pojoaque Pueblo can legally use out-of-state gaming vendors to compensate for any decreased business with gaming vendors licensed by New Mexico. See Motion to Stay MOO Tr. at 122:14-20 (Crowell).  Fifth, supplementation regarding Pojoaque

Pueblo's compliance with its commitment to place in trust suspended payments to New Mexico is warranted, because the Court inquired at the hearing whether Pojoaque Pueblo is compliant with that commitment. See Motion to Stay MOO Tr. at 72:8-21 (Court). Sixth, supplementation regarding the U.S. Letter Re: Stay MOO is proper, because the United States filed that letter at the Tenth Circuit the day after the hearing. See U.S. Letter Re: Stay MOO at 1. Seventh, supplementation regarding New Mexico's threatened revocation of Pojoaque Pueblo's TIF money is appropriate, because New Mexico sent the TIF Letter after Pojoaque Pueblo filed the Motion to Stay MOO. See TIF Letter at 1. Eighth, supplementation regarding Allgeier's testimony at the hearing is warranted, because the Defendants dispute that testimony in their Supplemental Brief Response. See Suppl. Brief Response at 9.

In short, the Court concludes that Pojoaque Pueblo's Supplemental Brief properly addresses "newly-raised issues," Geddes v. United Staffing All. Emple. Med. Plan, 469 F.3d at 928, that arose after and relate to Pojoaque Pueblo's Motion to Stay MOO. The Defendants have not demonstrated why the proffered supplementation would be prejudicial or otherwise improper. The Court granted a full hearing on the matter on December 9, 2016. See Suppl. Brief Tr. at 1. The Court has, therefore, given everyone a full opportunity to be heard. Moreover, this case's procedural posture has changed since the Court's October 27, 2016, hearing on the Motion to Stay MOO, namely, the Tenth Circuit has dismissed the Defendants' interlocutory appeal of Judge Brack's PI. The issues are thus slightly different than those that the Court has already addressed. To pragmatically and realistically address these changing issues, the Court would benefit from knowing more about what the United States, the Tenth Circuit, the State of New Mexico, Pojoaque Pueblo, and other Pueblos and Tribes are doing, not doing, or saying.

Accordingly, because the Court concludes that there is no sound reason to deny leave for

Pojoaque Pueblo to file the Supplemental Brief, the Court grants the Supplemental Brief Motion. The Court likewise grants the Defendants' request to file a Supplemental Brief Response, which will provide the Court the benefit of adversarial analysis of the issues that Pojoaque Pueblo raises in its Supplemental Brief.

## II.     THE DEFENDANTS' INTERLOCUTORY APPEAL DID NOT COMPLETELY DIVEST THE COURT OF ITS JURISDICTION TO DETERMINE THE ACTION ON THE MERITS IN THE STAY MOO.

The Court begins its analysis of the Motion to Stay MOO by considering its jurisdiction to determine the action on the merits notwithstanding the pendency of the Defendants' interlocutory appeal of Judge Brack's PI to the Tenth Circuit.  Pojoaque Pueblo's primary contention is that the Court failed to "apply the bright line rule established by the Tenth Circuit in *Stewart v. Donges*" that, "[o]nce a party has filed an appeal from an interlocutory order, . . . the District Court is divested of jurisdiction pending the appeal, except in very limited circumstances . . . , or unless the District Court certifies that the appeal is frivolous."  Motion to Stay MOO at 9 (citing Stewart v. Donges, 915 F.2d at 576).  Pojoaque Pueblo argues, moreover, that Free Speech, upon which the Court relied in the Stay MOO to conclude that an interlocutory appeal of a denial or grant of a PI presents an exception to the divestiture rule, is inapposite, because of the case's unique procedural posture and because the case "does not even address *Donges*, much less overrule *Donges*."  Motion to Stay MOO at 10.  In response, the Defendants maintain that Pojoaque Pueblo's reliance on Stewart v. Donges is misplaced and that "[t]he only binding authority on point -- *Free Speech* -- confirms that this Court had jurisdiction to enter the MOO."  Motion to Stay MOO Response at 3 (citing Free Speech, 720 F.3d at 791-92).  After careful reconsideration of controlling case law, the Court agrees with the Defendants.

"Generally speaking, the filing of an interlocutory appeal divests the district court of

jurisdiction." Anderson Living Trust v. WPX Energy Prod., LLC, 308 F.R.D. at 437 n.15. In

Stewart v. Donges, the Tenth Circuit explained that "[t]he filing of a notice of appeal is an event of

jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district

court of its control over those aspects of the case involved in the appeal." 915 F.2d at 574 (quoting

Griggs v. Provident Consumer Discount Co., 459 U.S. at 58)(internal quotation marks omitted).

Accordingly, after the filing of an interlocutory appeal, the district court retains jurisdiction only

over "matters not involved in that appeal." Garcia v. Burlington N.R.R. Co., 818 F.2d at 721. The

district court can regain jurisdiction only by taking the "affirmative step of certifying the appeal as

frivolous or forfeited, and until that step is taken it simply lacks jurisdiction to proceed with the

trial." Stewart v. Donges, 915 F.2d at 577-78. This requirement avoids "confusion or waste of time

resulting from having the same issues before two courts at the same time." Stewart v. Donges, 915

F.2d at 578 (quoting United States v. Salerno, 868 F.2d at 540). See Bradford-Scott Data Corp. v.

Physician Comput. Network, 128 F.3d at 505 ("Continuation of proceedings in the district court

largely defeats the point of the appeal and creates a risk of inconsistent handling of the case by two

tribunals.").

     Although the divestiture rule articulated in Stewart v. Donges is "virtually complete," 915

F.2d at 576, it is not absolute. Rather, during the pendency of an interlocutory appeal, the district

court retains jurisdiction over "peripheral matters unrelated to the disputed right." Stewart v.

Donges, 915 F.2d at 576. Application of the divestiture rule therefore turns on the nature and the

significance of the issue that is the subject of the appeal. See Stewart v. Donges, 915 F.2d at 576. In

Stewart v. Donges, the Tenth Circuit discussed the divestiture rule in the context of an interlocutory

appeal from the district court's denial of summary judgment based on qualified immunity. See 915

F.2d at 573. The Tenth Circuit distinguished between interlocutory appeals challenging discrete

issues and those that relate to the entire action:

> In contrast to some interlocutory appeals under 28 U.S.C. § 1292(b) that challenge
> discrete orders that can be carved out and isolated from the remainder of the case, a
> motion to dismiss the entire proceeding based on a defense of double jeopardy or
> qualified immunity cannot be so isolated.  If the defense is valid, then no part of the
> action should proceed against the defendant.  In that regard, an interlocutory appeal
> from an order refusing to dismiss on double jeopardy or qualified immunity grounds
> relates to the entire action and, therefore, it divests the district court of jurisdiction to
> proceed with any part of the action against an appealing defendant.

915 F.2d at 576 (citing Apostol v. Gallion, 870 F.2d at 1338).  Applying the divestiture rule, the

Tenth Circuit vacated a trial on the merits that the district court held during the pendency of the

interlocutory appeal of the court's denial of summary judgment based on qualified immunity,

reasoning that the district court "made no certification that the defendants' appeal . . . was frivolous

or forfeited."  Stewart v. Donges, 915 F.2d at 579.

Pojoaque Pueblo contends that the "bright-line jurisdictional rule" articulated in Stewart v.

Donges is dispositive of the Court's jurisdiction to determine the action on the merits.  See Motion to

Stay MOO at 10 (quoting McCauley v. Halliburton Energy Servs., 413 F.3d at 1162 (quoting Dalton

v. First Ins. Bank of Denver, 863 F.2d 702, 704 (10th Cir. 1988)))(internal quotation marks omitted).

Pojoaque Pueblo asserts that, under Stewart v. Donges, the Defendants' appeal of Judge Brack's PI

automatically divested the Court of any jurisdiction over the case.  See Motion to Stay MOO at 9-10.

The Court never regained its jurisdiction, Pojoaque Pueblo contends, because it did not certify the

Defendants' appeal as "frivolous or forfeited."  Motion to Stay MOO at 10 (quoting Stewart v.

Donges, 915 F.2d at 577-78)(internal quotation marks omitted).

Pojoaque Pueblo is correct that the motions that the Court resolved in the Stay MOO did not

involve "peripheral matters unrelated to the disputed right" at issue in the interlocutory appeal of

Judge Brack's PI.  Stewart v. Donges, 915 F.2d at 576.  Indeed, the central question in Judge Brack's

PI and in all the motions before the Court is whether the Gaming Board's regulatory actions violate

Pojoaque Pueblo's federal and state rights.  Accordingly, the Stay MOO disposes of matters that are "inextricably tied" to the Defendants' interlocutory appeal of Judge Brack's PI.  Apostol v. Gallion, 870 F.2d at 1338.  Ordinarily, an appeal from an interlocutory ruling that "affects the litigation as a whole," such as Judge Brack's PI, divests the district court of its jurisdiction to proceed with the case.  Howard v. Mail-Well Envelope Co., 150 F.3d 1227, 1229 (10th Cir. 1998).  See Stewart v. Donges, 915 F.2d at 576 (noting that an interlocutory appeal challenging issues that relate to the entire action "divests the district court of jurisdiction to proceed with any part of the action against an appealing defendant").  Pojoaque Pueblo argues that this general rule resolves the issue whether the Court was divested of its jurisdiction to decide the action on the merits in the Stay MOO.  See Motion to Stay MOO at 10.  It does not resolve the issue.

The divestiture rule articulated in Stewart v. Donges is well-established, but there are limited exceptions to the rule.  See United States v. Madrid, 633 F.3d at 1226 (stating that "appellate courts have carved out [] exceptions to the general rule that allow district courts to address certain matters when judicial efficiency is thereby enhanced").  In Free Speech, for example, the Tenth Circuit considered whether to affirm the district court's grant of a motion to dismiss pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure that the Defendants filed during the pendency of an interlocutory appeal from the district court's denial of a motion for a PI.  See 720 F.3d at 791.  The Tenth Circuit noted at the outset that "[o]rdinarily an interlocutory injunction appeal . . . does not defeat the power of the trial court to proceed further with the case."  Free Speech, 720 F.3d at 791 (quoting Wright & Miller § 3921.2, at 58)[11](internal quotation marks omitted).  The Tenth Circuit

---

[11]The Tenth Circuit's articulation of the interlocutory injunction appeal exception to divestiture heavily relies upon Wright & Miller's discussion of that exception.  See Free Speech, 720 F.3d at 791-92; Colorado v. Idarado Mining Co., 916 F.2d at 1490 n.2. Wright & Miller explain that the exception rests on key distinctions between interlocutory appeals and final judgment appeals:

acknowledged that an interlocutory appeal normally "divests the district court of jurisdiction," but reasoned that, "in an appeal from an order granting or denying a preliminary injunction, a district court may nevertheless proceed to determine the action on the merits." Free Speech, 720 F.3d at 791 (citing United States v. Price, 688 F.2d at 215)(internal quotation marks omitted).  The Tenth Circuit elaborated that the "desirability of prompt trial-court action in injunction cases justifies trial-court consideration of issues that may be open in the court of appeals." Free Speech, 720 F.3d at 791-92 (quoting Wright & Miller § 3921.2, at 60).  The Tenth Circuit highlighted a motion to dismiss for failure to state a claim as a "good illustration" of the exception for PI appeals:

> Although a court of appeals may determine whether a claim has been stated as part of the interlocutory appeal, a district court nonetheless retains jurisdiction to dismiss for failure to state a claim pending appeal.  This power is desirable "both in the interest of expeditious disposition and in the face of uncertainty as to the extent to which the court of appeals will exercise its power."

Free Speech, 720 F.3d at 791 (quoting Wright & Miller § 3921.2, at 60)(internal citation omitted).

---

Interlocutory injunction appeals would come at high cost if the trial court were required to suspend proceedings pending disposition of the appeal.  The delay and disruption alone would be costly.  As importantly, cases involving injunctive relief are apt to present an urgent need for action.  An injunction can seriously disrupt the affairs of those bound by it.  Denial of an injunction can destroy the capacity to grant effective relief after trial.  Continuing trial court proceedings, moreover, often pose little threat to orderly disposition of the appeal; ordinarily the scope of the appeal will be limited to consideration of the preliminary injunction decision itself, despite the power to reach out to other matters

Wright & Miller § 3921.2, at 58 (footnote omitted).  Wright & Miller further distinguish PI orders from permanent injunction orders, noting that "interlocutory appeals from permanent injunction orders come closer to final judgment appeals."  Wright & Miller § 3921.2, at 58-59.

Wright & Miller note that "[t]he desirability of prompt trial-court action in injunction cases justifies trial-court consideration even of issues that may be open in the court of appeals."  Wright & Miller § 3921.2, at 60.  Wright & Miller note, for example, that, in the context of a motion to dismiss for failure to state a claim, "[t]he court of appeals may determine whether a claim has been stated as part of the interlocutory appeal.  District courts, however, have exercised the power to dismiss for failure to state a claim pending appeal."  Wright & Miller § 3921.2, at 60 (footnotes omitted).  Such action is "desirable," Wright & Miller assert, "both in the interest of expeditious disposition and in the face of uncertainty as to the extent to which the court of appeals will exercise its power."  Wright & Miller § 3921.2, at 60.

Applying this exception, the Tenth Circuit affirmed the district court's grant of the motion to dismiss while the PI appeal was pending, despite that the issues in the motion and those in the PI ruling were "identical." Free Speech, 720 F.3d at 792.

The Tenth Circuit's analysis in Free Speech is on point. Here, as in Free Speech, the Defendants moved to dismiss the Complaint while an interlocutory appeal from Judge Brack's PI was pending at the Tenth Circuit. Cf. Free Speech 720 F.3d at 791 (defendants moved to dismiss during the pendency of an interlocutory appeal from the district court's denial of a motion for a PI). The Tenth Circuit stated in Free Speech that, in the context of "an appeal from an order granting or denying a preliminary injunction, a district court may [] proceed to determine the action on the merits." 720 F.3d at 791 (citing United States v. Price, 688 F.2d at 215). The Tenth Circuit, moreover, specifically couched its analysis in terms of a district court's retention of "jurisdiction to dismiss for failure to state a claim pending appeal." Free Speech, 720 F.3d at 791-92 (quoting Wright & Miller § 3921.2, at 60)(internal quotation marks omitted). The district court retains such jurisdiction, the Tenth Circuit concluded, despite that the issues in the motion to dismiss and in the appeal are "identical." Free Speech, 720 F.3d at 792. Thus, although the issues in the Defendants' interlocutory appeal of Judge Brack's PI are "inextricably tied," Apostol v. Gallion, 870 F.2d at 1338 -- i.e., "identical" -- to the motions that the Court resolved in the Stay MOO, the Court had jurisdiction to "proceed to determine the action on the merits," Free Speech, 720 F.3d at 791.

Pojoaque Pueblo summarily dismisses Free Speech as inapposite, arguing that the case is "an anomaly, with a peculiar procedural posture[.]" Motion to Stay MOO at 12. Pojoaque Pueblo avers that, although the district court in Free Speech granted the motion to dismiss while the interlocutory appeal from the court's denial of the PI was "technically pending," the parties stipulated to dismiss the PI appeal four days after the plaintiffs appealed the district court's order granting the motion to

dismiss.  Motion to Stay MOO at 10-11.  Accordingly, Pojoaque Pueblo contends, to the extent that

the <u>Stewart v. Donges</u> divestiture rule "may have been at issue in *Free Speech*, the issue was mooted

by the expeditions termination of the earlier appeal."  Motion to Stay MOO at 11.

       Pojoaque Pueblo's attempts to distinguish <u>Free Speech</u> are inventive, yet unpersuasive.  First,

<u>Free Speech</u> is not anomalous within the Tenth Circuit, as Pojoaque Pueblo insists.  <u>See</u> Motion to

Stay MOO at 12.[12]  In <u>Colorado v. Idarado Mining Co.</u>, for example, the Tenth Circuit noted the

divestiture rule in <u>Stewart v. Donges</u>, but concluded that, in the context of an interlocutory appeal

---

[12]The Tenth Circuit's decision in <u>Free Speech</u> is also not anomalous in light of Supreme
Court precedent and prevailing case law in other Circuits.  Wright & Miller note that the Supreme
Court "clearly established" a district court's authority to proceed toward a decision on the merits
notwithstanding an interlocutory injunction appeal in 1906.  Wright & Miller § 3921, at 59 (citing
<u>Ex parte Nat'l Enameling & Stamping Co.</u>, 201 U.S. 156, 161 (1906)(stating, in the context of an
appeal from an "interlocutory order or decree granting or continuing an injunction," that "[t]he case .
. . is to proceed in the lower court as though no such appeal had been taken . . . .").  Today, "it is
accepted that the district court retains power to act on the case pending appeal."  Wright & Miller §
3921, at 59-60 (footnote omitted).  <u>See</u>, <u>e.g.</u>, <u>Marrese v. American Academy of Orthopaedic
Surgeons</u>, 470 U.S. 373, 379 (1985)(holding that an appeal from an interlocutory order does not
"transfer[] jurisdiction over the entire case to the court of appeals")(citation omitted); <u>Zundel v.
Holder</u>, 687 F.3d 271, 282 (6th Cir. 2012)("[A]n appeal from an order granting or denying a
preliminary injunction does not divest the district court of jurisdiction to proceed with the action on
the merits.")(citations and internal quotation marks omitted); <u>Ry. Labor Execs.' Ass'n v. Galveston</u>,
898 F.2d 481, 481 (5th Cir. 1990)("[T]he pendency of the interlocutory appeal from the district
court's judgment denying the preliminary injunction did not divest the district court of jurisdiction to
proceed with other aspects of the case[.]")(footnote omitted); <u>W. Pub. Co. v. Mead Data Cent., Inc.</u>,
799 F.2d 1219, 1229 (8th Cir. 1986)("[T]he pendency of an interlocutory appeal . . . does not wholly
divest the District Court of jurisdiction over the entire case."); <u>United States v. Price</u>, 688 F.2d 204,
215 (3d Cir. 1982)("[I]n an appeal from an order granting or denying a preliminary injunction, a
district court may nevertheless proceed to determine the action on the merits."); <u>Oliver v. Kalamazoo
Bd. of Educ.</u>, 640 F.2d 782, 788 (6th Cir. 1980)(concluding that an appeal from orders requiring the
defendant to pay salaries of the staff appointed by the court's experts "did not remove jurisdiction
from the district court" to proceed with the underlying proceeding)(citing 9 <u>Moore's Federal Practice</u>
§ 203.11); <u>Thomas v. Bd. of Educ.</u>, 607 F.2d 1043, 1047 (2d Cir. 1979)("[A]n appeal from an
interlocutory order granting or denying preliminary injunctive relief does not strip the district court
of jurisdiction to proceed with the action on the merits.").  Indeed, Courts of Appeals "occasionally
remind trial courts of the need to continue toward judgment."  Wright & Miller § 3921, at 60 (citing
<u>Society for Animal Rights, Inc. v. Schlesinger</u>, 512 F.2d 915, 918 (D.C. Cir. 1975)("We assume that
the case will proceed forward expeditiously in the district court despite the pendency of the §
1292(a) appeal in this court."))(citations omitted).

"from the district court's grant of a mandatory injunction, . . . 'the district court retains power to act in the case pending appeal.'"  Colorado v. Idarado Mining Co., 916 F.2d at 1490 n.2 (quoting Wright & Miller § 3921, at 59-60).  Indeed, the Tenth Circuit stated that an "appeal from the grant or denial of a preliminary injunction does not 'divest the district court of jurisdiction to proceed with the action on the merits.'"  Colorado v. Idarado Mining Co., 916 F.2d at 1490 n.2 (quoting 9 Moore's Federal Practice § 203.11 (2d ed. 1990)[13]).

Second, Pojoaque Pueblo's arguments regarding Free Speech's "peculiar procedural posture" are not persuasive.  Motion to Stay MOO at 12.  Nothing in the Tenth Circuit's analysis regarding the district court's jurisdiction to "proceed to determine the action on the merits," Free Speech, 720 F.3d at 791 (citation and internal quotation marks omitted), is expressly or impliedly conditioned on the parties' "expeditious termination of the earlier appeal," as Pojoaque Pueblo suggests, Motion to Stay MOO at 11.  The Tenth Circuit does not, for example, state that the district court is not divested of jurisdiction because the parties stipulated to dismiss the PI appeal.  See Free Speech, 720 F.3d at 791-92.  Rather, the Tenth Circuit simply concludes -- in broad terms -- that, "in an appeal from an order granting or denying a preliminary injunction, a district court may nevertheless proceed to determine the action on the merits."  Free Speech, 720 F.3d at 791 (citation and internal quotation

---

[13]The third edition of Moore's Federal Practice provides:

> If an appeal is taken from a judgment that does not finally determine the entire action, the appeal does not prevent the district court from proceeding with matters not involved in the appeal.  The filing of a timely and effective notice of appeal divests the district court of jurisdiction only with respect to the judgment brought up for review by the appeal.  As an example, an appeal from an order granting or denying a preliminary injunction does not divest the district court of jurisdiction to proceed with the action on the merits.  Similarly, an appeal from an order that is appealable by virtue of certification under Rule 54(b) does not prevent the district court from proceeding with the remaining claims.

20 Moore's Federal Practice § 303.32[2][b][v] (3d ed. 2016)(emphasis added)(footnotes omitted).

marks omitted).

Pojoaque Pueblo presses, however, that Stewart v. Donges remains good law, because Free Speech "does not even address *Donges*, much less overrule *Donges*." Motion to Stay MOO at 10. See Motion to Stay MOO at 11 (noting that the Tenth Circuit has "affirmatively cited *Donges* and its progeny, after the June 25, 2013 issuance of the *Free Speech* decision, as valid law")(citing Martinez v. Mares, 613 F. App'x at 735). This argument, too, is immaterial. That Free Speech does not address Stewart v. Donges does not somehow vitiate the legitimacy of the PI exception to the divestiture rule upon which Free Speech relies. The Tenth Circuit articulated the same exception in Colorado v. Idarado Mining Co. immediately after citing Stewart v. Donges for the general rule that an interlocutory appeal divests the district court of jurisdiction over matters that are involved in the appeal. See Colorado v. Idarado Mining Co., 916 F.2d at 1490 n.2 (citing Stewart v. Donges, 915 F.2d at 576-77). If mentioning Stewart v. Donges is a necessary condition for the PI exception to divestiture to be legitimate, then Pojoaque Pueblo must grapple with the Tenth Circuit's analysis in Colorado v. Idarado Mining Co., which contextualizes the PI exception against the backdrop of the general rule in Stewart v. Donges. See Colorado v. Idarado Mining Co., 916 F.2d at 1490 n.2.

The argument that Free Speech "does not . . . overrule *Donges*," Motion to Stay MOO at 10, moreover, misses the point. Free Speech enshrines an exception to the well-established rule in Stewart v. Donges -- it is not inconsistent with Stewart v. Donges. See Free Speech, 720 F.3d at 791-92. See also United States v. Madrid, 633 F.3d at 1226 (recognizing "exceptions to the general rule that allow district courts to address certain matters when judicial efficiency is thereby enhanced"). The PI exception coexists with the broader divestiture rule, because it rests on unique considerations that most interlocutory orders do not implicate. In Stewart v. Donges, the Tenth Circuit reasoned that an interlocutory appeal from the rejection of a QI defense divests the district

- 135 -

court of jurisdiction, because the defense "relates to the entire action" and thus "cannot be so isolated" from the remainder of the case.  915 F.2d at 576 (citation omitted).  In Free Speech, by contrast, the Tenth Circuit reasoned that "[t]he desirability of prompt trial-court action in injunction cases justifies trial-court consideration of issues that may be open in the court of appeals."  720 F.3d at 791-92 (citation and internal quotation marks omitted).  Accordingly, in Free Speech the Tenth Circuit recognized an exception to divestiture by taking into account injunctions' unique nature, even where the injunction in question "relates to the entire action."  915 F.2d at 576 (citation omitted).  Whether Stewart v. Donges is good law -- which it is -- is immaterial, because the Tenth Circuit's reasoning in that case is based on entirely different considerations.[14]   Further, if the measure of Stewart v. Donges' legitimacy is whether the case is "good law," it is noteworthy that the Tenth Circuit has not subsequently cited Free Speech with disapproval.  In short, both cases can be good law; Stewart v. Donges is simply inapplicable to the present case.

It is worth mentioning that several Tenth Circuit cases -- including Stewart v. Donges -- expressly acknowledge a district court's jurisdiction under rule 62(c) to "suspend, modify, restore, or grant an injunction during the pendency of the appeal."  Colorado v. Idarado Mining Co., 916 F.2d at

---

[14]The Court has no quarrel with Stewart v. Donges.  It is well-established that qualified immunity gives "government officials a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery."  Behrens v. Pelletier, 516 U.S. at 308.  This principle would be undermined if a district court denied a motion for qualified immunity and then proceeded with the merits of the case during the pendency of an appeal from that ruling.  The Tenth Circuit's opinion in Stewart v. Donges enshrines this logic, noting that, in the context of an interlocutory appeal from a denial of a qualified immunity defense, "the central issue in the appeal is the defendant's asserted right not to have to proceed to trial."  915 F.2d at 575-76.  The Tenth Circuit elaborates that "[t]he interruption of the trial proceedings is the central reason and justification for authorizing such an interlocutory appeal in the first place."  Stewart v. Donges, 915 F.2d at 576.  Accordingly, Stewart v. Donges holds that the divestiture of jurisdiction brought about by the filing of a notice of appeal from a denial of qualified immunity is "virtually complete, leaving the district court with jurisdiction only over peripheral matters unrelated to the disputed right not to have [to] defend the prosecution or action at trial."  915 F.2d at 576.  The Court fully understands that its jurisdiction is divested in such circumstances.

1490 n.2 (internal quotation marks omitted).  See Stewart v. Donges, 915 F.2d at 575 n.3 (stating

that the district court retains jurisdiction to "issu[e] stays or injunctions pending the appeal")(quoting

Wright & Miller § 3949, at 359)(internal quotation marks omitted).  See also Wright & Miller §

3921.2, at 65-69 (arguing that there are "powerful reasons" to recognize a district court's authority

pursuant to rule 62(c) to "modify or dissolve a preliminary injunction pending appeal").  A district

court's power to stay or suspend a PI pending appeal is especially instructive here, given that

Pojoaque Pueblo's principal objection to the Stay MOO is that the Court improperly stayed the

effects of Judge Brack's PI.  See Motion to Stay MOO at 1 (requesting that the Court restore the PI's

effects).  Pojoaque Pueblo does not dispute the Court's authority to stay the PI's effects under rule

62(c); instead, Pojoaque Pueblo generically asserts that the Court is completely divested of

jurisdiction under Stewart v. Donges.  See Motion to Stay MOO at 9-12.  This analysis not only fails

to account for rule 62(c)'s specific provisions, but it stands in contravention to the maxim that

"[r]estrictions on the power of the district court that are grounded in nothing more than the technical

consideration that jurisdiction 'passes' from it upon the filing of the notice of appeal are impractical

and unwise."  Ormsbee Dev. Co. v. Grace, 668 F.2d 1140, 1152 (10th Cir. 1982)(quoting

Silverthorne v. Laird, 460 F.2d 1175, 1178-79 (5th Cir. 1972)(quoting 9 Moore's Federal Practice §

203.11 n.2))(internal quotation marks omitted).

         Having reconsidered controlling Tenth Circuit precedent and this case's procedural posture,

the Court concludes that the Defendants' interlocutory appeal of Judge Brack's PI did not divest the

Court of jurisdiction to "proceed to determine the action on the merits" in the Stay MOO.  Free

Speech, 720 F.3d at 791 (citation and internal quotation marks omitted).  Accordingly, the Court

turns to the merits of Pojoaque Pueblo's Motion to Stay MOO.

III.   **POJOAQUE PUEBLO IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS APPEAL, BECAUSE THE DEFENDANTS' REGULATION OF NON-INDIAN, STATE-LICENSED GAMING VENDORS DOES NOT VIOLATE POJOAQUE PUEBLO'S FEDERAL RIGHTS.**

This litigation's central issue remains whether the Defendants violated Pojoaque Pueblo's federal rights by taking regulatory enforcement actions against non-Indian, state-licensed gaming vendors -- thus potentially impacting Pojoaque Pueblo's ability to do business with those vendors -- based on a determination that the vendors violated New Mexico law by supplying equipment to or receiving proceeds from Pojoaque Pueblo's Class III gaming enterprises operating in the absence of a gaming compact with New Mexico.  Pojoaque Pueblo's primary argument is that the Gaming Board's regulation of these third-party vendors amounts to an "assert[ion] of jurisdiction . . . over conduct occurring on Pueblo Indian lands" in violation of Pojoaque Pueblo's "federal right to engage in conduct free from the jurisdiction of the State" under IGRA.  Complaint ¶ 145, at 36.  Pojoaque Pueblo contends, in short, that IGRA preempts the Gaming Board's actions.  Pojoaque Pueblo also argues that the Gaming Board's alleged assertion of jurisdiction over its Class III gaming activities "constitute[s] a violation of the Supremacy Clause" and civil rights statutes, including 42 U.S.C. §§ 1983 and 1985.  Complaint ¶ 8, at 4.  The Court will discuss these allegations in turn.

Before reaching the merits of Pojoaque Pueblo's allegations, however, the Court must first determine the robustness of the likelihood of success showing required for a stay pending appeal.  In Pojoaque Pueblo's view, a stay is warranted if "the other elements of a stay have been met," Motion to Say MOO at 18, i.e., (i) irreparable harm absent a stay; (ii) lack of injury to opposing parties if the stay is granted; and (iii) absence of harm to the public interest, see Hilton v. Braunskill, 481 U.S. at 776 (citations omitted).  Under this relaxed "fair ground for litigation" test, Pojoaque Pueblo asserts, a party is deemed to have satisfied the likelihood-of-success element if it shows "questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and

deserving of more deliberative investigation."  Motion to Stay MOO Reply at 4 (quoting Chanute v. Kan. Gas & Elec. Co., 754 F.2d at 278-79)(internal quotation marks omitted).  The Defendants, by contrast, assert that a party seeking to "enjoin governmental action taken in the public interest pursuant to a statutory or regulatory scheme through the restoration of a preliminary injunction" must meet a "high burden" of showing "a strong likelihood of success on the merits."  Motion to Stay MOO Response at 4 (citing Heideman v. S. Salt Lake City, 348 F.3d at 1189).

The Supreme Court has characterized the standard for a stay pending appeal as requiring a "strong showing" that the applicant is likely to succeed on the merits.  Hilton v. Braunskill, 481 U.S. at 776 (citations omitted).  Accord Nken v. Holder, 556 U.S. at 434 (requiring a "strong showing" of likelihood of success).  This factor, along with the irreparable harm factor, is "the most critical" in the determination whether to grant a stay pending appeal.  Nken v. Holder, 556 U.S. at 434.  Indeed, the Supreme Court has stated that "[i]t is not enough that the chance of success on the merits be 'better than negligible'" or that success be a "mere possibility."  Nken v. Holder, 556 U.S. at 434 (quoting Sofinet v. INS, 188 F.3d 703, 707 (7th Cir. 1999))(citations and internal quotation marks omitted).  The Tenth Circuit, for its part, also requires a "strong showing" of likelihood of success for a stay pending appeal, which it recognizes is the "most critical" factor in the analysis.  KSTU, LLC v. Aereo, Inc., 2014 U.S. App. LEXIS 7802, at *3 (10th Cir. 2014)(quoting Nken v. Holder, 556 U.S. at 434)(internal quotation marks omitted).

The Tenth Circuit has, however, applied a modified likelihood-of-success standard where an applicant meets the other three requirements for a stay pending appeal.  See McClendon v. City of Albuquerque, 79 F.3d at 1020.  In such circumstances, the Tenth Circuit has held that the likelihood-of-success element is deemed satisfied if the applicant shows "questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of

more deliberate investigation." McClendon v. City of Albuquerque, 79 F.3d at 1020 (quoting Walmer v. United States Dep't of Defense, 52 F.3d at 854 (citations and internal quotation marks omitted). Pojoaque Pueblo insists that this standard governs the Court's analysis of the Motion to Stay MOO.

Pojoaque Pueblo's appeal to the Tenth Circuit's earlier precedent notwithstanding, the Tenth Circuit has recently abrogated the relaxed likelihood-of-success test. See Dine, 839 F.3d at 1282. In Dine, the Tenth Circuit concluded that the relaxed test is "inconsistent with the Supreme Court's recent decision in Winter v. Natural Resources Defense Council," which "overruled the [United States Court of Appeals for the] Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs . . . could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm." Dine, 839 F.3d at 1282 (citing Winter v. NRDC, Inc., 555 U.S. at 22). The Tenth Circuit concluded that, although the standard overruled in Winter v. NRDC dealt with the irreparable-harm factor, "Winter's rationale seems to apply with equal force" to the likelihood-of-success factor. Dine, 839 F.3d at 1282. Accordingly, the Tenth Circuit held that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." Dine, 839 F.3d at 1282.

Pojoaque Pueblo asserts that Dine is inapposite, because it involves the standard for issuance of a PI and not the standard for a stay pending appeal. See Suppl. Brief at 7. In Pojoaque Pueblo's view, the standards for granting a PI and staying an order are not "the same." Suppl. Brief Reply at 5 (citing Suppl. Brief Response at 4-5). Pojoaque Pueblo contends that, accordingly, Dine does not overrule the relaxed test for stays pending appeal that the Tenth Circuit articulated in McClendon v. City of Albuquerque. See Suppl. Brief at 7.

Pojoaque Pueblo is correct that the standards for granting PIs and stays pending appeal are

not identical. See Nken v. Holder, 556 U.S. at 434 (noting that the two standards are not "one and the same").   There is "substantial overlap" between these standards, however, "because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." Nken v. Holder, 556 U.S. at 434 (citing Winter v. NRDC, 555 U.S. at 24).   The Supreme Court has noted that a stay pending appeal also has functional overlap with an injunction, "particularly a preliminary one." Nken v. Holder, 556 U.S. at 428.   This overlap stems from both remedies' "practical effect of preventing some action before the legality of that action has been conclusively determined." Nken v. Holder, 556 U.S. at 428.   A stay, however, "achieves this result by temporarily suspending the source of authority to act -- the order or judgment in question -- not by directing an actor's conduct." Nken v. Holder, 556 U.S. at 428-29. Thus, taking into account these similar rationales, the Supreme Court has articulated substantially the same factors for granting PIs and stays pending appeal. Compare Winter v. NRDC, 555 U.S. at 374 (stating that a PI requires (i) likelihood of success on the merits; (ii) likelihood of irreparable harm absent a PI; (iii) that the balance of equities favors a PI; and (iv) that a PI is in the public interest), with Nken v. Holder, 556 U.S. at 426 (stating that a stay pending appeal requires (i) a "strong" likelihood of success on the merits; (ii) irreparable injury to the applicant absent a stay; (iii) absence of substantial injury to other parties; and (iv) that a stay is in the public interest)(citing Hilton v. Braunskill, 481 U.S. at 776).   These standards differ primarily in the sense that a PI requires that the "balance of equities" favor the moving party, Winter v. NRDC, 555 U.S. at 374, whereas a stay pending appeal requires no such balancing, see Nken v. Holder, 556 U.S. at 426.

Both standards, however, require that the moving party make a strong showing of likelihood of success as well as irreparable injury. See Winter v. NRDC, 555 U.S. at 374; Nken v. Holder, 556 U.S. at 426. As the Court has already discussed, the Supreme Court's decision in Winter v. NRDC

clarifies that preliminary relief may be awarded only upon a strong showing of likelihood of success and irreparable harm.  See Dine, 839 F.3d at 1282 ("[A]ny modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible.")(relying on Winter v. NRDC, 555 U.S. at 22).  A relaxation of either prong is "inconsistent" with the Supreme Court's characterization of a PI as "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. NRDC, Inc., 555 U.S. at 22 (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)(per curiam).  Likewise, in the stay-pending-appeal context, Justice Kennedy has stated that, "[w]hen considering success on the merits and irreparable harm, courts cannot dispense with the required showing of one simply because there is a strong likelihood of the other."  Nken v. Holder, 556 U.S. at 438 (Kennedy, J., concurring).  This observation is correct, because a "stay is not a matter of right, even if irreparable injury might otherwise result."  Virginian R. Co. v. United States, 272 U.S. at 672 (citation omitted).  Thus, an applicant for a stay pending appeal "must meet a heavy burden of showing not only that the judgment of the lower court was erroneous on the merits, but also that the applicant will suffer irreparable injury if the judgment is not stayed pending his appeal."  Nken v. Holder, 556 U.S. at 439 (Kennedy, J., concurring)(citing Williams v. Zbaraz, 442 U.S. 1309, 1311 (1979)(Stevens, J., in chambers)(quoting Whalen v. Roe, 423 U.S. 1313, 1316 (1975)(Marshall, J., in chambers))).

This analysis counsels that the Supreme Court's condemnation of the relaxed likelihood-of-success-on-the-merits standard in the PI context applies with equal force to stays pending appeal.  In both contexts, relying on similar rationales, the Supreme Court has required a strong showing of likelihood-of-success and irreparable injury.  See Winter v. NRDC, 555 U.S. at 374; Nken v. Holder, 556 U.S. at 426.  Indeed, Justice Kennedy has stated in the stay-pending-appeal context that even a strong likelihood of one factor does not "dispense with the required showing of . . . the other."  Nken

v. Holder, 556 U.S. at 438 (Kennedy, J., concurring).   Accordingly, the Tenth Circuit's earlier reliance on a relaxed likelihood-of-success test is likely abrogated or undermined with respect to grants of PIs as well as stays pending appeal.

Lest the Court's analysis be read to gloss over important characteristics that distinguish PIs from stays pending appeal, the Court notes that the Tenth Circuit's formulation of the relaxed likelihood-of-success test acknowledges that substantially the same standards govern PIs and stays pending appeal.  The Tenth Circuit originally formulated the modified test in the PI context, holding that, when the other requirements for a PI are met, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." Cont'l Oil Co. v. Frontier Ref. Co., 338 F.2d 780, 782 (10th Cir. 1964)(citing Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953))(internal quotation marks omitted).  The Tenth Circuit later applied the modified test in the stay-pending-appeal context by quoting the "substantial, difficult, and doubtful" questions language from its earlier PI cases. McClendon v. City of Albuquerque, 79 F.3d at 1020 (quoting Walmer v. United States Dep't of Defense, 52 F.3d at 854 (PI case); Lundgrin v. Claytor, 619 F.2d 61, 63 (10th Cir. 1980)(same)).  It is noteworthy that, in applying the modified test in this context, the Tenth Circuit did not distinguish the test's application from the PI context.  See McClendon v. City of Albuquerque, 79 F.3d at 1020-21.

Here, Pojoaque Pueblo relies primarily on McClendon v. City of Albuquerque's recitation of the modified test in the stay-pending-appeal context while ignoring that the Tenth Circuit uncritically transposed that test from the PI context. See Suppl. Brief at 7.  Pojoaque Pueblo, moreover, even quotes the "substantial, difficult and doubtful" questions language from a PI case when arguing that the Court should apply that test to the Motion to Stay MOO.  Motion to Stay MOO at 18 (quoting

Chanute v. Kan. Gas & Elec. Co., 754 F.2d at 314 (PI context)).  Thus, Pojoaque Pueblo's assertion that the relaxed test remains valid after <u>Dine</u> with respect to stays pending appeal is not persuasive, because the cases upon which Pojoaque Pueblo relies either derive their formulation of the modified test from cases involving PIs or are PI cases themselves.  See <u>McClendon v. City of Albuquerque</u>, 79 F.3d at 1020 (deriving its formulation of the modified test from cases involving PIs); <u>Chanute v. Kan. Gas & Elec. Co.</u>, 754 F.2d at 314 (PI case).  At the very least, <u>Dine</u> casts serious doubt on the relaxed standard's continued viability, because it abrogates that standard in the PI context and because, as the Court has detailed at length, the standards and rationales for PIs and stays-pending-appeal are substantially the same.

Having concluded that the relaxed fair-ground-for-litigation test is no longer viable, the Court can dispose of the parties' remaining arguments regarding the likelihood-of-success factor.  First, the Defendants' argument that restoration of a PI which "seeks to enjoin governmental action taken in the public interest pursuant to a statutory or regulatory scheme" requires a "strong showing" of likelihood of success on the merits, Motion to Stay MOO Response at 4 (citing <u>Heideman v. S. Salt Lake City</u>, 348 F.3d at 1189)(internal quotation marks omitted), lacks force, because likelihood-of-success requires such a showing regardless whether the case involves governmental action taken in the public interest, <u>see</u> <u>Hilton v. Braunskill</u>, 481 U.S. at 776.  If the <u>Heideman v. S. Salt Lake City</u> rule has any continued relevance, it is that the likelihood-of-success showing is heightened above the "strong showing" minimum where "governmental action taken in the public interest" is involved. 348 F.3d at 1189.  Second, and relatedly, Pojoaque Pueblo's contention that the governmental-action-in-the-public-interest standard is inapplicable where "competing regulatory schemes by different sovereign governments" are involved, Motion to Stay MOO Reply at 5, also lacks force.  Even if (i) the "governmental action" standard applies to heighten the success showing; and (ii) the

existence of a competing regulatory scheme cancels out that heightened showing, the result would still be a required "strong showing" of success, because, post-Dine, a "strong showing" is the minimum requirement regardless of the case's circumstances.  Hilton v. Braunskill, 481 U.S. at 776 (citations omitted).  Moreover, the Tenth Circuit has rejected the argument that the governmental-action-in-the-public-interest standard does not apply when enforcement of a competing scheme is involved.  See Hobby Lobby Stores, Inc. v. Sebelius, 2012 U.S. App. LEXIS 26741, at *7 (rejecting this argument and applying the "substantial-likelihood-of-success standard").

Third, Pojoaque Pueblo's contention that the Court should apply a relaxed likelihood-of-success standard, because applying the same level of scrutiny to motions to stay as to PI motions "would result in every such motion to stay being denied simply as a matter of course," Suppl. Brief Reply at 6, inverts the logic of stays pending appeal.  As the Court has previously explained, the four requirements of a stay pending appeal are "arguably even more rigorous[] than they are for a motion for a preliminary injunction."  Dine Citizens Against Ruining Our Env't v. Jewell, 2015 U.S. Dist. LEXIS 143519, at *3 (D.N.M. 2015)(Browning, J.)(citing In re Lang, 414 F.3d 1191, 1201 (10th Cir. 2005); Fed. R. Civ. P. 62(c)), aff'd, 839 F.3d 1276 (10th Cir. 2016).  Because Pojoaque Pueblo is, in essence, requesting that the Court grant it the relief, pending appeal, that the Court recently decided it was not entitled to receive, the burden of demonstrating likelihood of success "is a heavy one."  Wright & Miller § 2904.  See Fullmer v. Mich. Dep't of State Police, 207 F. Supp. 2d 663, 664 (E.D. Mich. 2002)(Roberts, J.)(stating that, although the factors considered for granting a PI and issuing a stay "are the same," it is more difficult to establish likelihood of success for a stay, because of the difference in procedural posture, i.e., a party seeking a stay must show likelihood of reversal, not just a possibility of success on the merits); Millennium Pipeline Co., LLC v. Certain Permanent & Temp. Easements, 812 F. Supp. 2d 273, 275 (W.D.N.Y. 2011)(Larimer, J.)("[L]ogic dictates that

a court will seldom issue an order and then turn around and grant a stay pending appeal, finding, in part, that the party seeking the stay is likely to prevail on appeal, *i.e.*, that it is likely that the court erred in issuing the underlying order.")(alterations omitted)(quoting Dayton Christian Sch. V. Ohio Civil Rights Comm'n, 604 F. Supp. 101, 103 (S.D. Ohio 1984)(Rice, J.)).

In short, to establish likelihood of success, Pojoaque Pueblo must meet a "heavy burden" of showing that the Court's Stay MOO was "erroneous on the merits[.]" Nken v. Holder, 556 U.S. at 439 (citations omitted). See Wright & Miller § 2904 (noting that a party seeking to stay a judgment pursuant to rule 62(c) has a "heavy burden"). The strength of Pojoaque Pueblo's showing of the other factors required for a stay, see Nken v. Holder, 556 U.S. at 438, does not diminish this required "strong showing" of success, Hilton v. Braunskill, 481 U.S. at 776 (citations omitted). Yet, as the Court will discuss infra, even if Pojoaque Pueblo is correct that proof of the other factors diminishes the required showing for likelihood of success, the Court nonetheless concludes that those factors do not entitle Pojoaque Pueblo to a stay pending appeal. With these conclusions in mind, the Court turns to the merits of Pojoaque Pueblo's allegations regarding the Defendants' federal rights violations under IGRA, the Supremacy Clause, and 42 U.S.C. §§ 1983 and 1985.

### A.   THE DEFENDANTS DID NOT VIOLATE POJOAQUE PUEBLO'S RIGHTS UNDER IGRA.

The Court's analysis of Pojoaque Pueblo's arguments concerning the legality of the Defendants' actions under IGRA proceeds as follows. First, the Court will consider whether IGRA preempts the Defendants' regulatory enforcement actions against non-Indian, state-licensed gaming vendors doing business with Pojoaque Pueblo. Concluding that IGRA does not preempt the Defendants' actions, the Court will consider Pojoaque Pueblo's request that the Court conduct severance analysis to fix IGRA's allegedly broken remedial scheme while also sanctioning Pojoaque Pueblo's Class III gaming operations in the absence of a gaming compact with New Mexico.

### 1.    IGRA Does Not Preempt the Defendants' Actions.

Pojoaque Pueblo advances substantially the same arguments regarding IGRA's preemption of the Defendants' actions that the Court considered and declined to adopt in the Stay MOO.  See Motion to Stay MOO at 12-15.  Pojoaque Pueblo's central thesis remains that the Gaming Board's regulatory enforcement actions against gaming vendors dealing with Pojoaque Pueblo after the June 30, 2015, expiration of its Class III compact with New Mexico amount to "wrongful[] assert[ion of] State jurisdiction over gaming activities on the Pueblo's Indian lands."  Complaint ¶ 8, at 4.  IGRA preempts these actions, Pojoaque Pueblo asserts, because they "directly target and have an impact on the Pueblo and its gaming operations."  Motion to Stay MOO at 12.  The Defendants counter that the Gaming Board's actions are outside IGRA's preemptive scope and that Pojoaque Pueblo continues to "fail to appreciate the difference between regulation of gaming on Indian lands and gaming off Indian lands, and erroneously conflate[s] impact with regulation."  Motion to Stay MOO Response at 7.  As in the Stay MOO, therefore, the measure of IGRA's preemptive scope is the dispositive issue.

The Court begins its preemption analysis with the "assumption that the historic police powers of the States [are] not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress."  Medtronic, Inc. v. Lohr, 518 U.S. at 485 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. at  230; Hillsborough Cnty. v. Automated Med. Labs., Inc., 471 U.S. 707, 715-16 (1985))(internal quotation marks omitted).  See Bates v. Dow Agrosciences, LLC, 544 U.S. at 449 ("In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'")(citations omitted).   As the Supreme Court has repeatedly stated, Congress' intent is preemption analysis' "ultimate touchstone." Medtronic, Inc. v. Lohr, 518 U.S. at 485 (citations omitted).  The Court is mindful, moreover, that, where there are two plausible interpretations of a statute, the Court has "a duty to accept the reading

that disfavors pre-emption." Bates v. Dow Agrosciences, LLC, 544 U.S. at 449.

It is incontrovertible that New Mexico's regulation of gambling activities is an exercise of the state's historic police powers. "The police power of a state 'extends to all matters affecting the public health or the public morals.'" Stone v. Mississippi, 101 U.S. 814, 818 (1880)). States have "great latitude" pursuant to their police powers to legislate as to the protection of these matters. Metro. Life Ins. Co. v. Mass., 471 U.S. 724, 756 (1985), overruled on other grounds by Ky. Ass'n of Health Plans v. Miller, 538 U.S. 329 (2003). Moreover, "a State has a [] sovereign interest in being in control of, and able to apply, its laws throughout its territory." Mashantucket Pequot Tribe v. Town of Ledyard, 722 F.3d at 476-77. Here, New Mexico has enacted laws that "strictly regulate[]" gaming in the state "to ensure honest and competitive gaming that is free from criminal and corruptive elements and influences." N.M.S.A. § 60-2E-2(A). The Gaming Board's actions are consistent with its statutory mandate to ensure that gaming activities in New Mexico are conducted in accordance with these laws. See, e.g., N.M.S.A. § 60-2E-10(D)(3) (empowering the Gaming Board to issue administrative citations to state licensees who violate the Gaming Control Act or the Gaming Board's regulations). Thus, because this case implicates New Mexico's historic police powers, the Court assumes that IGRA does not supplant the application of New Mexico laws to non-Indian gaming vendors unless Congress has evinced a "clear and manifest" intent to preempt those laws. Bates v. Dow Agrosciences, LLC, 544 U.S. at 449.

The Tenth Circuit has indicated that congressional intent to preempt state law is "clear and manifest" in three circumstances: (i) when a federal statute expressly preempts state law ("express preemption"); (ii) when Congress intends to occupy a field ("field preemption"); and (iii) when state law conflicts with a federal law ("conflict preemption"). Colo. Dep't of Pub. Health & Env't v. United States, 693 F.3d at 1222. Here, IGRA's legislative history clearly and manifestly evinces

congressional intent to "expressly preempt the field in the governance of gaming activities on Indian lands." S. Rep. No. 100-446, at 6-7 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3076. Whether this express statement of preemptive intent encompasses off-reservation regulatory actions targeted at non-Indian gaming vendors dealing with non-Indian gaming operators is in dispute. Accordingly, the Court must determine the precise scope of the preemption that Congress intended in IGRA. See Medtronic, Inc. v. Lohr, 518 U.S. at 485 (stating that, where a statute expressly provides that it preempts certain areas of state law, a court must determine the scope of the preemption that Congress intended). In conducting this analysis, the Court is mindful that even express commands of preemption should be narrowly interpreted in light of the "presumption against the pre-emption of state police power regulations." Medtronic, Inc. v. Lohr, 518 U.S. at 485 (quoting Cipollone v. Liggett Grp., 505 U.S. at 518, 523). This approach is "consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety." Medtronic, Inc. v. Lohr, 518 U.S. at 485.

The context in which Congress enacted IGRA provides a useful analytical starting point. Congress enacted IGRA in response to the Supreme Court's decision in Cabazon, which held that states lacked authority over gambling activities occurring on Indian lands, because Congress had not expressly provided for such authority. See 480 U.S. at 214, 221-22. With IGRA, Congress provided the authority that Cabazon determined was absent, giving states "a subordinate but significant role in regulating tribal gaming." Texas v. United States, 497 F.3d at 494. By allowing states a subordinate role in this regulatory scheme, Congress acknowledged Indian tribes' "inherent sovereign authority" to self-govern, Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 509 (1991)(citation omitted), subject to "plenary control by Congress" and state statutory limitations where Congress so allows, Bay Mills, 134 S. Ct. at 2030. As the Supreme Court later observed in

Bay Mills, however, Cabazon "left fully intact a State's regulatory power over tribal gaming outside Indian territory -- which . . . is capacious." Bay Mills, 134 S. Ct. at 2034. "[T]he problem Congress set out to address in IGRA (Cabazon's ouster of state authority)," therefore, "arose in Indian lands alone." Bay Mills, 134 S. Ct. at 2034. Indeed, "[e]verything -- literally everything -- in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, and nowhere else." Bay Mills, 134 S. Ct. at 2034. Accordingly, while IGRA's "extraordinary preemptive power" with respect to gaming on Indian lands is clear and manifest, Gaming Corp. of America v. Dorsey & Whitney, 88 F.3d 536, 545 (8th Cir. 1966), the context of IGRA's enactment suggests that Congress did not intend to preempt state regulation of off-reservation gaming activities, see Bay Mills, 134 S. Ct. at 2034. Rather, IGRA's enactment enshrines a Congressional purpose to preserve Indian tribes' sovereign authority over gaming on Indian lands, see Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. at 509, while also preserving states' "capacious" authority over off-reservation gaming activity, Bay Mills, 134 S. Ct. at 2034.

In light of this background, the Court concludes that Congress' "clear and manifest" intent, Medtronic, Inc. v. Lohr, 518 U.S. at 485, is that IGRA expressly preempt only direct regulations of on-reservation gaming activities. Pojoaque Pueblo cannot isolate any contrary Congressional intent in IGRA, because clear manifestation of such intent does not exist. See 25 U.S.C. §§ 2701-2721. As Justice Kagan wrote for the majority in Bay Mills, "literally everything" in IGRA affords tools "to regulate gaming on Indian lands, and nowhere else." 134 S. Ct. at 2034 (emphasis added). See Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n, 327 F.3d 1019, 1032 (10th Cir. 2003)("[T]hrough IGRA, Congress spoke specifically to the federal government's regulatory scheme over certain forms of authorized gambling within Indian country.")(emphasis in original). Indeed, IGRA's text is littered with explicit references to regulation of gaming on Indian lands. See, e.g., 25

U.S.C. § 2701(5) ("Indian tribes have the exclusive right to regulate gaming activity on Indian lands . . . ."); 25 U.S.C. § 2702(3) (stating that IGRA's purpose is "the establishment of Federal regulatory authority for gaming on Indian lands[] [and] the establishment of Federal standards for gaming on Indian lands"); 25 U.S.C. § 2710(d)(1) ("Class III gaming activities shall be lawful on Indian lands only if . . . (C) conducted in conformance with a Tribal-State compact . . . .").  Absent any similar language referencing off-reservation gaming activities, the Court concludes that Congress did not intend to preempt state regulations of such activities.  *Expressio unius est excusio alterius*.  See Chevron USA Inc. v. Echazabal, 536 U.S. 74, 80 (2002)("[E]xpressing one item of [an] associated group or series excludes another left unmentioned.")(quoting United States v. Vonn, 535 U.S. 55, 65 (2002))(internal quotation marks omitted).  Nothing in IGRA, moreover, suggests that the Court should give IGRA's explicit references to gaming on Indian lands anything but their plain meaning --literally, regulation of gaming activity that occurs within Indian territory's boundaries.  See United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 242 (1989)("[T]he plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.")(citation and internal quotation marks omitted).  Indeed, IGRA expressly defines "Indian lands" as "all lands within the limits of any Indian reservation."  25 U.S.C. § 2703(4)(B).

Applying this statutory construction, the Court concluded in the Stay MOO that IGRA does not preempt the Gaming Board's actions, because it has not taken any regulatory action on Pojoaque Pueblo's tribal lands.  See Stay MOO at 107.  Rather, the Court reasoned, the Gaming Board's regulation of "non-Indian manufacturers' sales of gaming equipment to non-Indian operators off tribal lands" is outside IGRA's preemptive scope.  Stay MOO at 107 (quoting Motion to Reconsider PI)(internal quotation marks omitted).  The Court stressed that these regulatory actions "do not

prohibit Pojoaque Pueblo from continuing its gaming operations, nor do they prevent vendors from supplying equipment to Pojoaque Pueblo for such operations." Stay MOO at 107 (citing Motion to Reconsider PI at 5). Indeed, the Court noted, notwithstanding the Gaming Board's actions, Pojoaque Pueblo remains free to conduct Class III gaming activities as long as the United States Attorney forbears from enforcing IGRA. See U.S. Attorney's Letter at 1.

Pojoaque Pueblo objects to this reasoning, asserting that the Court's logic "would support the State building a barrier around the Reservation . . . so long as the barriers are placed just outside the Pueblo boundary." Motion to Stay MOO at 115. This argument is flawed for several reasons. First, the hypothetical is inapposite, because New Mexico is not erecting any barriers -- intangible or otherwise -- between vendors and Pojoaque Pueblo. Vendors remain free to transact with Pojoaque Pueblo if they wish; the threat of license revocation may act as a deterrent, but New Mexico is not directly intervening in vendor-tribe transactions, as the hypothetical suggests. Rather, New Mexico is regulating non-Indian third parties alone -- the regulated parties are neither tribal entities nor are they prohibited from dealing with tribal entities. Second, Pojoaque Pueblo's logic would result in paralysis -- New Mexico would never be able to enforce its gaming laws and regulations within its jurisdiction, because any effects of that enforcement on Pojoaque Pueblo's gaming operations would be preempted. As discussed supra, New Mexico has a "sovereign interest in being in control of, and able to apply, its laws throughout its territory." Mashantucket Pequot Tribe v. Town of Ledyard, 722 F.3d at 476-77. New Mexico, moreover, has "great latitude" pursuant to its police powers to enforce its laws. Metro. Life Ins. Co. v. Mass., 471 U.S. at 756. Pojoaque Pueblo's logic would effectively prohibit -- or at least significantly stifle -- that latitude, because any enforcement action might have some impact on Pojoaque Pueblo's operations.

Third, Pojoaque Pueblo's hypothetical is inapt, because the laws and regulations pursuant to

which the Gaming Board is acting are generally applicable and do not target Pojoaque Pueblo, as a barrier presumably would.  Specifically, New Mexico gambling law provides that "[m]anufacturers and distributors shall not ship gaming devices to <u>any</u> destination where possession of gaming devices is illegal."  N.M.A.C. § 15.1.16.12(B) (emphasis added).  While it is true that, in this instance, the allegedly illegal gaming operation is being conducted on Pojoaque Pueblo's tribal lands, the Gaming Board would be obligated to take the same enforcement actions against licensees supplying gaming equipment to an illegal operation in a different state.  <u>See</u> N.M.A.C. § 15.1.16.12(B).  As discussed above, New Mexico has a sovereign interest in taking such actions to enforce its generally applicable laws, <u>see</u> <u>Mashantucket Pequot Tribe v. Town of Ledyard</u>, 722 F.3d at 476-77, even against "Indians going beyond reservation boundaries," <u>Bay Mills</u>, 134 S. Ct. at 2034 (citations and internal quotation marks omitted).  The Court's logic, therefore, does not justify erecting a barrier around Pojoaque Pueblo; rather, it justifies New Mexico's enforcement of its generally applicable gaming laws within its jurisdiction.

In response to this latter contention, Pojoaque Pueblo asserts that the Gaming Board's actions were motivated solely by the "violation of gaming laws occurring <u>on</u> the Pueblo's Indian lands, not outside of the reservation."  Motion to Reconsider PI Response at 11-12 (emphasis added).  Motive, however, is not the test.  IGRA does not preempt "motives" or intentions, but rather the "assertion of state civil or criminal jurisdiction over Indian gaming."  <u>United Keetoowah Band of Cherokee Indians v. Oklahoma</u>, 927 F.2d at 1177 (citing <u>Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin</u>, 743 F. Supp. 645, 646 (W.D. Wis. 1990)).  Pojoaque Pueblo demurs, arguing that, under this logic, "if the State's motive was to starve the Tribe into extinction, that would be fine so long as the State's actions occur off-reservation."  Motion to Stay MOO at 15.  This argument misses the point.  If New Mexico took any actions to "starve" Pojoaque Pueblo, those actions would

likely be unlawful for non-preemption reasons.  IGRA would not preempt those actions, however, unless they amounted to an "assertion of state civil or criminal jurisdiction" over Pojoaque Pueblo's gaming enterprises.  United Keetoowah Band of Cherokee Indians v. Oklahoma, 927 F.2d at 1177 (citation omitted).  In short, motive notwithstanding, the necessary predicate for regulatory actions to fall within IGRA's preemptive scope is that those actions regulate tribal gaming.  Here, New Mexico has regulated only non-Indian vendors operating outside of Pojoaque Pueblo's lands -- the motivation behind those regulations does not itself establish an assertion of jurisdiction over Pojoaque Pueblo.

Pojoaque Pueblo presses, however, that the Gaming Board's determination as to the illegality of Pojoaque Pueblo's gaming activities is itself an assertion of jurisdiction that IGRA preempts.  See Motion to Stay MOO at 13-14; Motion to Stay MOO Reply at 6 (citing Judge Brack's admonition that the Gaming Board is "without jurisdiction or authority" to make this determination)(quoting PI MOO at 20).  Indeed the Court, Pojoaque Pueblo contends, improperly "assumes that the Pueblo is gaming illegally."  Motion to Stay MOO at 14.  This assertion is flawed for several reasons.  First, while it is true that IGRA "place[s] 'limits on the application of state laws . . . to tribal lands,'" Alabama v. PCI Gaming Auth., 801 F.3d 1278, 1300 (11th Cir. 2015)(quoting Florida v. Seminole Tribe, 181 F.3d 1237, 1247 (11th Cir. 1999)(citation omitted)), New Mexico is not applying state law to determine the legality of Pojoaque Pueblo's Class III gaming activities.  Rather, New Mexico is applying state law to state licensees in response to Pojoaque Pueblo's violation of federal law.  Under N.M.A.C. § 15.1.10.9(f), state vendor licensees must comply with all "laws and regulations governing the operations of a gaming establishment," and must not "further[], or profit[] from any illegal activity or practice . . . ."  Here, vendors dealing with Pojoaque Pueblo's gaming enterprises after the expiration of its Class III gaming compact with New Mexico are "furthering, or profiting,"

N.M.A.C. § 15.1.10.9(f), from Pojoaque Pueblo's illegal practice.  Accordingly, the predicate for the application of New Mexico law to non-Indian vendors is not Pojoaque Pueblo's violation of New Mexico law, but rather the vendors' dealings with Pojoaque Pueblo, which is operating in violation of federal law.

Second, in any event, IGRA does not abrogate a state's authority to decide whether, or to assume, that a tribal gaming operation is unlawful -- it simply preempts states' ability to enforce state law against such an operation.  See 18 U.S.C. § 1166(d).  Under 18 U.S.C. § 1166(d), the United States has "exclusive jurisdiction over criminal prosecutions of violations of State gambling laws," unless a tribe consents to state jurisdiction over such matters pursuant to a gaming compact.  Here, New Mexico is not criminally prosecuting Pojoaque Pueblo, nor is it criminally prosecuting state vendor licensees.  See Motion to Reconsider PI at 20.  Indeed, New Mexican officials have not even entered Pojoaque Pueblo's tribal lands.  See Motion to Reconsider PI at 20.  Rather, New Mexico has simply assessed that Pojoaque Pueblo is violating federal law and has accordingly taken actions to enforce its own laws within its own jurisdiction.

Third, New Mexico has not, as Pojoaque Pueblo asserts, made a "unilateral determination regarding the legality of gaming on Indian lands."  Complaint ¶ 133, at 34.  The Gaming Board expressly based its determination that Pojoaque Pueblo is operating illegally on Mr. Martinez' letter to Talachy, which stated that, upon the expiration of Pojoaque Pueblo's compact with New Mexico, "[c]ontinued gaming operations by the Pueblo . . . would violate federal law."  U.S. Attorney's Letter at 1.  The Gaming Board's Vendor Letter, for example, stated that Mr. Martinez informed Talachy "that continued gaming operations by the Pueblo of Pojoaque after midnight on June 30, 2015, in the absence of a Tribal-State compact or Secretarial prescribed procedures, would violate federal law."  See Vendor Letter at 1.  Pojoaque Pueblo summarily dismisses this evidence and

asserts that "the Court assumes that the State is relying on the United States Attorney's statement that the Pueblo is gaming illegally." Motion to Stay MOO at 14. Pojoaque Pueblo offers no contrary evidence, however, that would suggest an alternative basis for the Gaming Board's determination. Moreover, the Court has determined that Pojoaque Pueblo is operating illegally; New Mexico, accordingly, does not have to make that determination.

Fourth, regardless of the basis of the Gaming Board's determination of illegality, IGRA's text and binding Supreme Court and Tenth Circuit precedent leave no ambiguity as to the illegality of Class III gaming without a compact. IGRA provides, in no uncertain terms, that "Class III gaming activities shall be lawful on Indian lands only if . . . (C) conducted in conformance with a Tribal-State compact . . . ." 25 U.S.C. § 2710(d)(1)(C). The Supreme Court has likewise stated that "a tribe cannot conduct class III gaming on its lands without a compact . . . ." Bay Mills, 134 S. Ct. at 2035 (citing 25 U.S.C. § 2710(d)(1)(C)). The Tenth Circuit, for its part, has held that "Class III gaming [] is allowed only where a tribal-state compact is entered." United States v. 162 Megamania Gambling Devices, 231 F.3d 713, 718 (10th Cir. 2000)(citing 25 U.S.C. §§ 2703(8), 2710(d)). In light of this precedent, Pojoaque Pueblo's continued Class III gaming operations in the absence of a compact with New Mexico are unquestionably unlawful under IGRA. Indeed, this precedent binds the Court -- the Court does not improperly "assume[] that the Pueblo is gaming illegally," Motion to Stay MOO at 14, because that conclusion is inescapable under Supreme Court and Tenth Circuit precedent.

Pojoaque Pueblo attempts to circumvent all this analysis by arguing that its Class III gaming operations are not unlawful, because the Gaming Board's actions "led the Pueblo to operate without a compact." Motion to Stay MOO at 14. In support of this contention, Pojoaque Pueblo highlights New Mexico's "bad faith negotiations" and assertion of Eleventh Amendment sovereign immunity

from suit as well as the "Defendants' actions to sue the federal government when the Pueblo attempted to go through the Secretarial Procedures process."  Motion to Stay MOO at 14.  Pojoaque Pueblo's portrayal of events may be accurate, but wrongdoing on the part of New Mexico does not nullify IGRA's unqualified provision that Class III gaming activities are "lawful on Indian lands only if . . . conducted in conformance with a Tribal-State compact . . . ."  25 U.S.C. § 2710(d)(1)(C).  IGRA does not provide, as Pojoaque Pueblo implies, that a gaming compact is not required where a state takes the actions that New Mexico has taken.  See 25 U.S.C. §§ 2701-2721.  It is noteworthy, moreover, that Pojoaque Pueblo has an ordinance -- independent from IGRA -- that requires that a gaming compact be in effect for Class III gaming to be legal.  See Motion to Stay MOO Tr. at 78:13-24 (Bohnhoff, Allgeier).   The existence of this ordinance illustrates that Pojoaque Pueblo understands the requisite conditions under which Class III gaming may be conducted.  New Mexico's actions do not exempt Pojoaque Pueblo from complying with those conditions.

Pojoaque Pueblo asserts that, ultimately, regardless of its gaming operations' legality, IGRA preempts New Mexico's off-reservation regulatory enforcement actions.  See Motion to Stay MOO at 13.  Pojoaque Pueblo posits that the extent of IGRA's preemptive scope does not turn on whether a state regulates non-Indian entities outside of tribal lands.  See Motion to Stay MOO at 13.  Rather, Pojoaque Pueblo argues, "State jurisdiction is pre-empted . . . if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority."  Motion to Stay MOO at 14 (quoting Cabazon, 480 U.S. at 216)(citation and internal quotation marks omitted).  Pojoaque Pueblo contends that Bay Mills, upon which the Court and the Defendants extensively rely, does not alter this standard; Bay Mills does not, Pojoaque Pueblo reasons, "condone[] or permit[] state off-reservation activities directed at interfering with a tribe's on-reservation gaming activities."  Motion to Stay MOO Reply at 6.

Preliminarily, Pojoaque Pueblo's reliance on Cabazon as articulating the test for preemption under IGRA is misplaced, because Cabazon pre-dates IGRA.  Indeed, the Supreme Court's holding in Cabazon that states lacked authority to regulate gaming on Indian lands was the direct impetus for Congress' enactment of IGRA, which grants states a measure of the authority that Cabazon held was absent.  See Texas v. United States, 497 F.3d at 494.  Thus, Cabazon is inapposite, because IGRA abrogates it.  See Bay Mills, 134 S. Ct. at 2034.  In contrast with Cabazon, the test for preemption of state jurisdiction under IGRA is not whether that jurisdiction "interferes or is incompatible with federal and tribal interests," Cabazon, 480 U.S. at 216)(citation and internal quotation marks omitted); rather, state jurisdiction over tribal gaming operations is preempted if it is not exercised in accordance with a Class III gaming compact, see United Keetoowah Band of Cherokee Indians v. Oklahoma, 927 F.2d at 1177 ("[T]he very structure of the IGRA permits assertion of state civil or criminal jurisdiction over Indian gaming *only* when a tribal-state compact has been reached to regulate class III gaming.")(emphasis in original)(citation omitted).  The former test from Cabazon is thus inapposite to post-IGRA preemption questions, because, regardless whether state jurisdiction interferes with tribal interests, that jurisdiction is not preempted if it accords with a compact.  One can imagine, for example, that a state action which comports with a compact's original terms nonetheless contravenes tribal interests, if those interests materially change after the compact's execution.  Likewise, state jurisdiction over tribal gaming which is compatible with and even advances tribal interests is still preempted if it does not comport with a gaming compact.

Pojoaque Pueblo's argument, moreover, that Bay Mills does not draw the on-/off-reservation distinction upon which the Court relies, see Motion to Stay MOO Reply at 6, is unavailing.  The Supreme Court observed in Bay Mills that the "problem Congress set out to address in IGRA (*Cabazon's* ouster of state authority) arose in Indian lands alone," and that "literally everything" in

IGRA concerns the "regulat[ion of] gaming on Indian lands, and nowhere else."  Bay Mills, 134 S. Ct. at 2034 (internal citation omitted).  Against this backdrop, the Supreme Court noted that Cabazon "left fully intact a State's regulatory power over tribal gaming outside Indian territory -- which . . . is capacious."  Bay Mills, 134 S. Ct. at 2034.  Two important conclusions follow from this statement.  First, the Supreme Court expressly distinguished a state's limited authority over gaming on Indian lands and its "capacious" authority outside Indian territory.  Bay Mills, 134 S. Ct. at 2034.  Pojoaque Pueblo is incorrect, therefore, that the Supreme Court did not draw this distinction.  See Motion to Stay MOO Reply at 6.  Second, the Supreme Court recognized that states have "capacious" authority over "tribal gaming outside Indian territory" and not over non-Indian entities alone.  Bay Mills, 134 S. Ct. at 2034 (emphasis added).  Indeed, the Supreme Court said that, "[u]nless federal law provides differently, 'Indians going beyond reservation boundaries' are subject to any generally applicable state law."  Bay Mills, 134 S. Ct. at 2034 (quoting Wagnon v. Prairie Band Potawatomi Nation, 546 U.S. 95, 113 (2005)(quoting Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148 (1973)).  The Supreme Court advanced, for example, that a state could lawfully exercise power over tribal gaming by denying a license to a tribe for an "off-reservation casino."  Bay Mills, 134 S. Ct. at 2035.  Accordingly, Bay Mills holds that states have substantial latitude to regulate tribal gaming when such regulation occurs off the reservation.

This reading of Bay Mills notwithstanding, Pojoaque Pueblo maintains that IGRA preempts both direct and indirect assertions of jurisdiction over tribal gaming operations in the absence of a compact.  See Motion to Stay MOO at 3.  Accordingly, in Pojoaque Pueblo's view, New Mexico's off-reservation regulatory actions are preempted, because they "directly target and have an impact on the Pueblo and its gaming operations."  Motion to Stay MOO at 12.  This argument is inconsistent with IGRA's text and with controlling case law.

First, textually, IGRA preempts only <u>direct</u> regulation of Indian gaming activity.  <u>See</u> 25 U.S.C. §§ 2701-2721.  Section 2710(d)(3)(C) provides that Class III gaming compacts "may include provisions relating to -- (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are <u>directly</u> related to, and necessary for, the licensing and regulation of such activity."  25 U.S.C. § 2710(d)(3)(C)(i) (emphasis added).  Hence, absent a compact, a state cannot directly enforce its gaming laws on Indian lands.  <u>See</u> 25 U.S.C. § 2710(d)(3)(C)(i).  Because IGRA has no similar provision authorizing or proscribing enforcement of state law that is only <u>indirectly</u> related to the licensing and regulation of gaming on Indian lands, it follows that Congress did not intend to preempt such laws.  *Expressio unius est excusio alterius.*

Second, Pojoaque Pueblo's argument is inconsistent with the Supreme Court's opinion in <u>Bay Mills</u>, which recognized states' "capacious" authority over "tribal gaming outside Indian territory." 134 S. Ct. at 2034.  Indeed, the Supreme Court noted that, "[u]nless federal law provides differently, 'Indians going beyond reservation boundaries' are subject to any generally applicable state law." <u>Bay Mills</u>, 134 S. Ct. at 2034 (quoting <u>Wagnon v. Prairie Band Potawatomi Nation</u>, 546 U.S. at 113(quoting <u>Mescalero Apache Tribe v. Jones</u>, 411 U.S. at 148)).  The Supreme Court did not specify that states' "capacious" off-reservation authority over tribal gaming is somehow limited by any indirect impacts that exercise of such authority may have on a tribe's on-reservation gaming operations.  <u>Bay Mills</u>, 134 S. Ct. at 2034.  Rather, the Supreme Court concluded that states have authority to subject Indians to "<u>any</u> generally applicable state law."  <u>Bay Mills</u>, 134 S. Ct. at 2034 (emphasis added)(citations omitted).  Thus, if a state's authority to enforce its laws against <u>Indians</u> off-reservation is not limited by such enforcement's indirect impacts on tribal lands, it follows that a state's enforcement of its gaming laws against <u>non-Indian</u> entities is not preempted because of any indirect impacts that such enforcement may have on tribal lands.  As the Court has discussed, the

Gaming Board is enforcing generally applicable laws against non-Indian, state-licensed gaming

vendors.  See, e.g., N.M.A.C. § 15.1.16.12(B).  Whether that enforcement has indirect impacts on

Pojoaque Pueblo's gaming operations does not limit the Gaming Board's authority.

    The foregoing analysis indicates that Congress' "clear and manifest intent," Medtronic, Inc.

v. Lohr, 518 U.S. at 485, is that IGRA expressly preempt only direct regulations of on-reservation

gaming activities.  The context of IGRA's enactment supports this reading, as does IGRA's text,

legislative history, and interpreting case law.  Beginning with context, Congress enacted IGRA to

give states a measure of authority in the regulation of gaming on tribal lands.  See Texas v. United

States, 497 F.3d at 494.  IGRA, however, "left fully intact a State's regulatory power over tribal

gaming outside Indian territory -- which . . . is capacious."  Bay Mills, 134 S. Ct. at 2034.  Turning

to the text, IGRA refers explicitly only to gaming activities on Indian lands, not outside such lands'

boundaries.  See, e.g., 25 U.S.C § 2701(5) ("Indian tribes have the exclusive right to regulate gaming

activity on Indian lands . . . .").  Indeed, "literally everything" in IGRA affords tools "to regulate

gaming on Indian lands, and nowhere else."  Bay Mills, 134 S. Ct. at 2034 (emphasis added).  The

Court concludes that, absent any provision concerning a state's regulation of gaming within its own

jurisdiction, Congress did not intend to preempt such regulation.  As to legislative history, IGRA is

intended to "expressly preempt the field in the governance of gaming activities on Indian lands." S.

Rep. No. 100-446, at 6-7 (emphasis added).  There is no similar expression of legislative intent to

prohibit off-reservation regulations of non-Indian state vendor licensees.  Finally, the Supreme

Court's statement in Bay Mills that states have "capacious" authority to regulate "tribal gaming

outside Indian territory," Bay Mills, 134 S. Ct. at 2034 (emphasis added), confirms that states have

substantial latitude not only to enforce state laws against non-Indian entities within their jurisdiction,

but that states may enforce such laws against Indians, notwithstanding the ancillary impacts of

enforcement on tribal gaming operations.

Similar reasoning guides the Court's analysis of the remaining inquiry -- whether IGRA impliedly preempts the Gaming Board's actions.  See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98.  The Supreme Court recognizes two forms of implied preemption: (i) field preemption, "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it"; and (ii) conflict preemption, "where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98.  The Court will review these two forms of preemption in turn.

The Supreme Court recently stated in Arizona v. United States that, "[w]here Congress occupies an entire field, . . . even complimentary state regulation is impermissible."  132 S. Ct. at 2502 (citing Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 249 (1984)).  "[T]he basic premise of field preemption," therefore, is "that States may not enter, in any respect, an area the Federal Government has reserved for itself . . . ."  Arizona v. United States, 132 S. Ct. at 2502.  In Arizona v. United States, the Supreme Court considered whether the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1101, preempted an Arizona immigration law that would penalize aliens who sought, or engaged in, unauthorized employment.  See 132 S. Ct. at 2505.  The Supreme Court held that the law was preempted, because Congress had specifically considered and rejected penalizing aliens who sought unauthorized employment.  See Arizona v. United States, 132 S. Ct. at 2504.  Accordingly, the Supreme Court held that Congress clearly "intended to preclude States from 'compliment[ing] the federal law, or enforc[ing] additional or auxiliary regulations.'"  Arizona v. United States, 132 S. Ct. at 2503 (quoting Hines v. Davidowitz, 312 U.S. at 66-67).

Unlike the Immigration Reform and Control Act, IGRA does not evince Congressional intent to "preclude States from compliment[ing] the federal law, or enforc[ing] additional or auxiliary regulations." Arizona v. United States, 132 S. Ct. at 2503 (citation and internal quotation marks omitted). IGRA regulates gaming that occurs on "Indian lands," which IGRA defines as "all lands within the limits of any Indian reservation," and "any lands title to which is [] held in trust by the United States for the benefit of any Indian tribe . . . and over which an Indian tribe exercises governmental power." 25 U.S.C. § 2703(4)(B). IGRA's preemptive scope does not reach gaming regulation that occurs outside Indian territory; a state's authority over such gaming is "capacious." Bay Mills, 134 S. Ct. at 2034. Further, IGRA does not circumscribe the validity of state laws and regulations that pertain to gaming -- even as applied to tribal lands. Under 18 U.S.C. § 1166(a), in the absence of a gaming compact, "all State laws pertaining to the licensing, regulation, or prohibition of gambling, . . . shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State." Had Congress intended to completely preempt the field, it would have abrogated states' ability to promulgate their own gaming laws and regulations, and not left them intact. Congress certainly would not have expressly provided for the application of state laws to Indian territory in the absence of a compact. Additionally, while the United States is vested with "exclusive jurisdiction over criminal prosecutions of violations of State gambling laws," 18 U.S.C. § 1166(d), IGRA says nothing about civil enforcement of such laws, see 25 U.S.C. §§ 2701-2721. Had Congress intended to preempt such enforcement -- particularly against non-Indian state licensees -- it would have so provided.

If anything, IGRA's authorization of gaming activities on Indian lands is dependent on the state within which the tribe is located legally sanctioning those activities. See 25 U.S.C. § 2701(5). Section 2701(5) provides that "Indian tribes have the exclusive right to regulate gaming activity on

Indian lands <u>if</u> the gaming activity is . . . conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity."  25 U.S.C. § 2701(5)(emphasis added).  If gaming activity on Indian lands is tied to state law, surely that same law binds third-party vendor licensees.  It is thus difficult to conclude that there is field preemption, because Congress clearly intended to leave intact much of state gaming law.  Accordingly, the Court concludes that IGRA is not "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." <u>Gade v. Nat'l Solid Wastes Mgmt. Assoc.</u>, 505 U.S. at 98.  To the contrary, IGRA anticipates and expressly provides for a regulatory scheme in which "complimentary state regulation is []permissible." <u>Arizona v. United States</u>, 132 S. Ct. at 2502.

The Court likewise concludes that there is no "conflict preemption." <u>Crosby v. Nat'l Foreign Trade Council</u>, 530 U.S. at 372.  Implied conflict preemption occurs where "compliance with both federal and state regulations is a physical impossibility," <u>Florida Lime & Avocado Growers, Inc. v. Paul</u>, 373 U.S. at 142-43, and where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of congress," <u>Hines v. Davidowitz</u>, 312 U.S. at 67.  The Supreme Court has stated that "[w]hat is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." <u>Crosby v. Nat'l Foreign Trade Council</u>, 530 U.S. at 373.  Neither impossibility preemption nor obstacle preemption are applicable here.

First, it is not a "physical impossibility," <u>Florida Lime & Avocado Growers, Inc. v. Paul</u>, 373 U.S. at 142-43, for third-party state licensees to comply with both IGRA and New Mexico law.  There are no conflicting obligations under both sets of laws; while state-licensed vendors may face state enforcement action for doing business with an illegal gaming operation, New Mexico does not prohibit them from continuing to do business with that operation if they so choose.  New Mexico

recognizes that, absent a state-tribal gaming compact, only the United States is authorized to prohibit such transactions.  See 18 U.S.C. § 1166.

Second, New Mexico's gaming regulations do not pose an obstacle to the accomplishment of IGRA's objectives.  See Hines v. Davidowitz, 312 U.S. at 67.  IGRA's purpose is to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1).  Any obstacle that a state's regulation of third-party vendor licensees within its jurisdiction poses to an Indian tribe's ability to achieve these ends is attenuated at best, especially where those licensees are permitted to continue doing business with the tribe.  More important, it is Pojoaque Pueblo's illegal operation of Class III gaming facilities in the absence of a gaming compact which triggered New Mexico's enforcement actions in the present case.  To the extent New Mexico's regulatory actions indirectly impact Pojoaque Pueblo's revenues, those impacts do not stand as an obstacle to IGRA's objectives, because Congress did not intend for Indian tribes to conduct Class III gaming operations without a compact in the first place.  See 25 U.S.C. § 2710(d)(1) ("Class III gaming activities shall be lawful on Indian lands only if . . . conducted in conformance with a Tribal-State compact . . . .").  Accordingly, New Mexico's regulation of third-party licensees does not pose an obstacle to IGRA's objectives in this context.

Finally, all the above notwithstanding, the Court is mindful that, where there are two plausible interpretations of a statute, the Court has a "duty to accept the reading that disfavors pre-emption." Bates v. Dow Agrosciences, LLC, 544 U.S. at 449.  It may well be plausible that IGRA preempts third-party regulations which have an indirect impact on tribal gaming operations.  It is, however, equally plausible -- more so, in the Court's opinion -- that IGRA's preemptive scope is limited to direct regulations of on-reservation Indian gaming.  The Court has a "duty to accept" the

second interpretation, as the law disfavors preemption.  Bates v. Dow Agrosciences, LLC, 544 U.S. at 449.  See Medtronic, Inc. v. Lohr, 518 U.S. at 485 (relying on the "'presumption against the pre-emption of state police power regulations' to support a narrow interpretation of [] an express command [of preemption]")(quoting Cipollone v. Liggett Grp., 505 U.S. at 518, 523).

In short, IGRA does not preempt -- expressly, by field, or conflict --  New Mexico's regulatory actions with respect to non-Indian, state-licensed vendors doing business with non-Indian gaming operators.  Consistent with the policies underlying IGRA's enactment, the Court is mindful of Pojoaque Pueblo's "inherent sovereign authority" and interests.  Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. at 509.  The Court is also mindful, however, of New Mexico's "sovereign interest in being in control of, and able to apply, its laws throughout its territory." Mashantucket Pequot Tribe v. Town of Ledyard, 722 F.3d at 476-77.  This case illustrates the task of balancing these competing interests.  Having considered the statutory text and the weight of authority interpreting IGRA, the Court holds that IGRA does not preempt the Gaming Board's off-reservation regulatory actions.  The Gaming Board has taken no direct action against Pojoaque Pueblo, nor has it asserted any authority on Pojoaque Pueblo's lands.  The Gaming Board has not regulated Pojoaque Pueblo; it has regulated only non-Indian state licensees.  IGRA does not preempt these actions.

### 2. The Court Declines Pojoaque Pueblo's Request to Invoke Severance Doctrine and Modify IGRA.

The Court's preemption analysis, supra, holds that the Gaming Board has permissibly taken enforcement actions against non-Indian vendors that are "furthering, or profiting," N.M.A.C. § 15.1.10.9(f), from Pojoaque Pueblo's illegal Class III gaming enterprises.  Pojoaque Pueblo disputes this analysis' premise -- i.e., that Pojoaque Pueblo's gaming enterprises are unlawful.  See Motion to Stay MOO at 14 ("[T]he Court assumes that the Pueblo is gaming illegally.").  In Pojoaque Pueblo's

view, its gaming operations are lawful despite the absence of a compact with New Mexico, because the Defendants' actions "led the Pueblo to operate without a compact."  Motion to Stay MOO at 14. Pojoaque Pueblo maintains that, in light of the Defendants' actions, the Court committed "[c]lear error" when it concluded in the Stay MOO "that it need not conduct severance analysis to determine that the Pueblo is operating illegally."  Motion to Stay MOO at 17 (citing Stay MOO at 142-44). According to Pojoaque Pueblo, the Stay MOO "rewards the State for negotiating with impunity" and "leaves the Pueblo without any viable remedy."  Motion to Stay MOO at 17-18.  Indeed, Pojoaque Pueblo avers, the Stay MOO "rewrit[es] IGRA" and "upset[s] the careful balance that Congress has created."  Motion to Stay MOO at 18.  These arguments fail to persuade the Court.

Preliminarily, as the Court has already detailed at length, _supra_, Pojoaque Pueblo's continued Class III gaming operations in the absence of a compact with New Mexico are unlawful.  IGRA explicitly provides that Class III gaming activities are "lawful on Indian lands only if . . . conducted in conformance with a Tribal-State compact . . . ."  25 U.S.C. § 2710(d)(1)(C).  Binding Supreme Court and Tenth Circuit precedent likewise require a valid state-tribal compact for Class III gaming to be lawful.  See Bay Mills, 134 S. Ct. at 2035 ("[A] tribe cannot conduct class III gaming on its lands without a compact . . . .")(citing 25 U.S.C. § 2710(d)(1)(C)); United States v. 162 Megamania Gambling Devices, 231 F.3d at 718 ("Class III gaming [] is allowed only where a tribal-state compact is entered.")(citing 25 U.S.C. §§ 2703(8), 2710(d)).  Pojoaque Pueblo's protestation that New Mexico's actions forced it to continue its gaming operations despite the absence of a compact are unpersuasive, because alleged wrongdoing by New Mexico does not somehow nullify IGRA's unqualified provision that Class III gaming activities require a valid state-tribal compact.  See 25 U.S.C. § 2710(d)(1)(C).

Severance doctrine, moreover, is unavailing in this context.  Pojoaque Pueblo argued in its

Response to the Defendants' Motion to Stay PI that it "has done everything IGRA requires it to do"

and that, in light of Seminole Tribe I's holding that Congress lacked authority to subject non-

consenting states to suit by Indian tribes under IGRA, IGRA's Class III gaming provisions should be

"re-evaluated."  Motion to Stay PI Response at 3.  According to Pojoaque Pueblo, Congress did not

intend to criminalize Class III gaming activities conducted without a compact if a tribe did not have

the ability to sue a state for negotiating a compact in bad faith.  See Motion to Stay PI Response at 3-

16.  Pojoaque Pueblo thus proposes several alterations to § 2710(d), IGRA's primary Class III

gaming provision.  Regarding the remedial procedures outlined in § 2710(d)(7), Pojoaque Pueblo

requests that the Court (i) sever IGRA's requirement that a court must first determine that a state

acted in bad faith before IGRA's remedial provisions apply; and (ii) modify IGRA's provision for a

court-appointed mediator to select one of two compacts that the tribe and the state propose, to allow

the mediator to consider only the compact that the tribe proposes.[15]  See Motion to Stay PI Response

---

[15]Pojoaque Pueblo's proposed alterations to the remedial provisions in § 2710(d)(7) are reflected in the following modified version of the statute.  The strikethrough text reflects the portions of the statute that Pojoaque Pueblo asks the Court to sever:

(A) The United States district courts shall have jurisdiction over --

(i) any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact under paragraph (3) or to conduct such negotiations in good faith,

(ii) any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact entered into under paragraph (3) that is in effect, and

(iii) any cause of action initiated by the Secretary to enforce the procedures prescribed under subparagraph (B)(vii).

(B)

~~(i) An Indian tribe may initiate a cause of action described in subparagraph (A)(i) only after the close of the 180-day period beginning on the date on which the Indian tribe requested the State to enter into negotiations under paragraph (3)(A).~~

~~(ii) In any action described in subparagraph (A)(i), upon the introduction of evidence by an Indian tribe that --~~

~~(I) a Tribal-State compact has not been entered into under paragraph (3), and~~

~~(II) the State did not respond to the request of the Indian tribe to negotiate such a compact or did not respond to such request in good faith,~~

~~the burden of proof shall be upon the State to prove that the State has negotiated with the Indian tribe in good faith to conclude a Tribal-State compact governing the conduct of gaming activities.~~

~~(iii) If, in any action described in subparagraph (A)(i), the court finds that the State has failed to negotiate in good faith with the Indian tribe to conclude a Tribal-State compact governing the conduct of gaming activities, the court shall order the State and the Indian Tribe to conclude such a compact within a 60-day period. In determining in such an action whether a State has negotiated in good faith, the court --~~

~~(I) may take into account the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities, and~~

~~(II) shall consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith.~~

(iv) If a State and an Indian tribe fail to conclude a Tribal-State compact governing the conduct of gaming activities on the Indian lands subject to the jurisdiction of such Indian tribe within the 60-day period provided in the order of a court ~~issued under clause (iii)~~, the Indian tribe ~~and the State~~ shall ~~each~~ submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact. ~~The mediator shall select from the two proposed compacts the one which best comports with the terms of~~

at 13-14.  Pojoaque Pueblo also requests that the Court sever IGRA's requirement that a Class III

gaming compact be in effect for such gaming to be lawful, see 25 U.S.C. § 2710(d)(7), thus making

such gaming lawful if conducted in a state in which gambling devices are legal,[16] see Motion to Stay

---

~~this chapter and any other applicable Federal law and with the findings and order of the court.~~

(v) The mediator appointed by the court under clause (iv) shall submit to the State and the Indian tribe the compact selected by the mediator under clause (iv).

(vi) If a State consents to a proposed compact during the 60-day period beginning on the date on which the proposed compact is submitted by the mediator to the State under clause (v), the proposed compact shall be treated as a Tribal-State compact entered into under paragraph (3).

(vii) If the State does not consent during the 60-day period described in clause (vi) to a proposed compact submitted by a mediator under clause (v), the mediator shall notify the Secretary and the Secretary shall prescribe, in consultation with the Indian tribe, procedures—

(I) which are consistent with the proposed compact selected by the mediator under clause (iv), the provisions of this chapter, and the relevant provisions of the laws of the State, and
(II) under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction.

Motion to Stay PI Response at 13-14 (quoting 25 U.S.C. § 2710(d)(7)).

[16]Pojoaque Pueblo's proposed alterations to § 2710(d)(6) are reflected in the following modified version of the statute.  The strikethrough text reflects the portions of the statute that Pojoaque Pueblo asks the Court to sever:

(6) The provisions of section 1175 of title 15 shall not apply to any gaming conducted ~~under a Tribal-State compact that—~~

~~(A) is entered~~ into ~~under paragraph (3) by~~ a State in which gambling devices are legal, and

(B) is in effect.

Motion to Stay PI Response at 15 (quoting 25 U.S.C. § 2710(d)(6)).

PI Response at 15.  Should these methods prove untenable, Pojoaque Pueblo requests that the Court sever IGRA's Class III provisions "in their entirety" and allow it "to govern gaming activities on its Indian lands without regard to IGRA, as was the legal landscape between the issuance of the *Cabazon* decision in 1987 and the passage of IGRA in 1988."  Motion to Stay PI Response at 16. The Court declines these requests, as it did in the Stay MOO.

Pojoaque Pueblo, in effect, asks the Court to sever IGRA to sanction its Class III gaming activities in the absence of a compact.  Altering IGRA as Pojoaque Pueblo requests, however, would not transform the Defendants' lawful regulatory actions into violations of Pojoaque Pueblo's IGRA rights, nor would it illustrate Pojoaque Pueblo's likelihood of success on its IGRA allegations. Whether the Court validates Pojoaque Pueblo's current gaming is immaterial -- likelihood of success turns on whether the Defendants' actions violated Pojoaque Pueblo's IGRA rights, and the Court has already concluded, supra, that no such violation has occurred.  Sanctioning Pojoaque Pueblo's on-reservation gaming activities would not change that conclusion; it would not somehow transform the Defendants' off-reservation regulation of non-Indian vendors into unlawful regulation of Pojoaque Pueblo.  It certainly is not a "strong showing" that Pojoaque Pueblo is likely to succeed on the merits of its IGRA allegations.  Hilton v. Braunskill, 481 U.S. at 776.

In any event, the Court declines to invoke severance doctrine in these circumstances.  IGRA contains an express severability clause.  See 25 U.S.C. § 2721.  Section 2721 provides: "In the event that any section or provision of this chapter . . . is held invalid, it is the intent of Congress that the remaining sections or provisions of this chapter . . . shall continue in full force and effect."  25 U.S.C. § 2721 (emphasis added).  The Supreme Court has stated that "the inclusion of such a clause creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision."  Alaska Airlines, Inc. v. Brock, 480 U.S.

678, 686 (1987)(citing INS v. Chadha, 462 U.S. 919, 932 (1983); Champlin Ref. Co. v. Corp. Com. of Okla., 286 U.S. 210, 235 (1932)).  "In such a case, unless there is strong evidence that Congress intended otherwise, the objectionable provision can be excised from the remainder of the statute." Alaska Airlines, Inc. v. Brock, 480 U.S. at 686.  Here, IGRA's severability clause is "unambiguous and gives rise to a presumption that Congress did not intend the validity of the Act as a whole, or of any part of the Act, to depend upon whether [IGRA's abrogation of state sovereign immunity] was invalid."  INS v. Chadha, 462 U.S. at 932.  Section 2710(d)(7), the abrogation provision which the Supreme Court invalidated in Seminole Tribe I, is a "section or provision" as IGRA's severability clause uses that language.  25 U.S.C. § 2721.  Congress' clear intent was that IGRA's "remaining sections or provisions" stand if "any section or provision" were held invalid.  25 U.S.C. § 2721. Thus, "Congress could not have more plainly authorized the presumption that the provision for [bad faith suits in § 2710(d)(7)] is severable from the remainder of [IGRA.]"  INS v. Chadha, 462 U.S. at 932 (citing Electric Bond & Share Co. v. SEC, 303 U.S. 419, 434 (1938)).

Relying on IGRA's severability clause, the United States Court of Appeals for the Eleventh Circuit, which decided the initial appeal before Seminole Tribe I, rejected the argument that IGRA's unconstitutional abrogation of state sovereign immunity rendered the statute as a whole invalid.  See Seminole Tribe v. Florida, 11 F.3d 1016, 1029 (11th Cir. 1994).  The Eleventh Circuit concluded that § 2710(d)(7) was severable from the remainder of the statute, "find[ing] no 'strong evidence' to ignore [IGRA's] plain congressional directive" of severability.  Seminole Tribe v. Florida, 11 F.3d at 1029 (quoting Alaska Airlines, Inc. v. Brock, 480 U.S. at 686).  The Eleventh Circuit also noted that, by empowering the Interior Secretary -- at a tribe's request in the event of failed Class III compact negotiations -- to prescribe regulations governing Class III gaming under § 2710(d)(7)(B)(vii), IGRA effectively mitigates any inequity resulting from a tribe's inability to sue a state for bad-faith

negotiations.  See Seminole Tribe v. Florida, 11 F.3d at 1029 ("This solution conforms with IGRA and serves to achieve Congress' goals, as delineated in §§ 2701-02.").  The Supreme Court, in Seminole Tribe I, left this analysis undisturbed.  See 517 U.S. at 76 n.18 ("We do not here consider, and express no opinion upon, that portion of the decision below that provides a substitute remedy for a tribe bringing suit.").

The presumption of validity that IGRA's severability provision creates, however, is not conclusive.  See Alaska Airlines, Inc. v. Brock, 480 U.S. at 686 (noting that "strong evidence" of contrary Congressional intent can overcome a presumption of severability).  The Ninth Circuit, for example, has inquired whether Congress would have "enacted IGRA had it known it could not give tribes the right to sue states that refuse to negotiate[.]"  United States v. Spokane Tribe of Indians, 139 F.3d 1297, 1299 (9th Cir. 1998)(citing Alaska Airlines, Inc. v. Brock, 480 U.S. at 686).  Citing IGRA's "carefully-crafted scheme balancing the interests of tribes and the states," the Ninth Circuit noted that it "seems highly unlikely" that Congress would have enacted IGRA without the ability of tribes to "sue recalcitrant states and [] forc[e] them to enter into a compact."  United States v. Spokane Tribe of Indians, 139 F.3d at 1300.  The Ninth Circuit explained that IGRA's legislative history emphasizes the importance of bad-faith suits in striking the balance between state and tribal interests.  See United States v. Spokane Tribe of Indians, 139 F.3d at 1300 (citing S. Rep. No. 100-446, at 1-2, 14).  The Ninth Circuit also cited post-enactment statements by Senator Daniel Inouye, then-chair of the Senate Committee on Indian Affairs and one of IGRA's authors, to the effect that "Congress would not have passed IGRA in the form it did, had it known that tribes wouldn't be able to sue the states[.]"  United States v. Spokane Tribe of Indians, 139 F.3d at 1300.  See, e.g., id. ("If the courts rule that the Eleventh Amendment would prohibit the tribal governments from suing State officials, then you've got a piece of paper as a law.")(citation omitted).  Still, despite its concern that

"nothing now protects the Tribe if the State refuses to bargain in good faith or at all," the Ninth Circuit concluded that "IGRA . . . remains valid and, under some circumstances, it may function close enough to what Congress had in mind . . . ." United States v. Spokane Tribe of Indians, 139 F.3d at 1300.  The Ninth Circuit noted, for example, that resort to the Secretarial procedures outlined in IGRA § 2710(d)(7)(B)(vii) may effectuate Congress' intent.  See United States v. Spokane Tribe of Indians, 139 F.3d at 1301-02 (citing Seminole Tribe v. Florida, 11 F.3d at 1029).

Having considered this authority, the Court declines to sever additional IGRA provisions. The Court agrees with the Eleventh Circuit's conclusion in Seminole Tribe v. Florida that IGRA's express severability clause, see 25 U.S.C. § 2721, plainly evinces Congressional intent that IGRA's remaining provisions stand if the jurisdiction-granting provision in § 2710(d)(7) were held invalid, see Seminole Tribe v. Florida, 11 F.3d at 1029.  See also INS v. Chadha, 462 U.S. at 932.  True, there is evidence that this provision was an important aspect of the balance between state and tribal interests that Congress sought to strike with IGRA.  See Spokane Tribe of Indians, 139 F.3d at 1300. IGRA's enactment, however, also enshrines a clear Congressional purpose to require a collaborative compacting process to govern Class III gaming on Indian lands.  See S. Rep No. 100-446, at 6 ("[IGRA] does not contemplate and does not provide for the conduct of class III gaming activities on Indian lands in the absence of a tribal-State compact.").  Accordingly, the Court is not convinced that there is sufficiently "strong evidence," Alaska Airlines, Inc. v. Brock, 480 U.S. at 686, to overcome the presumption of validity that IGRA's severability clause creates.

The Court concludes, further, that the Secretarial procedures in IGRA § 2710(d)(7)(B)(vii), which empower the Interior Secretary to promulgate Class III gaming procedures if a state refuses to agree to a compact, sufficiently effectuate Congress' intent.  See United States v. Spokane Tribe of Indians, 139 F.3d at 1301-02; Seminole Tribe v. Florida, 11 F.3d at 1029.  As the Court noted in its

discussion of this case's facts, <u>supra</u>, <u>Seminole Tribe I</u> complicates this remedial scheme, because IGRA's Secretarial procedures apply only after a bad-faith finding and court-ordered mediation. <u>See</u> 25 U.S.C. § 2710(d)(7)(B)(iv)-(v). To circumvent this issue, the Interior Secretary promulgated the regulations in 25 C.F.R. Part 291 to empower tribes to access IGRA's Secretarial procedures without a state's consent, should a state assert sovereign immunity from suit. Judge Parker recently held that this remedial workaround "run[s] contrary to Congress' clear intent," because IGRA unambiguously requires a bad faith finding before the Secretarial procedures in § 2710(d)(7)(B)(vii) apply. <u>New Mexico v. Dep't of Interior</u>, 2014 U.S. Dist. LEXIS 184655, at *40. The Court agrees with this reading of IGRA's plain language. The Court also agrees, however, with Judge Parker's conclusion that, "[e]ven without the Part 291 regulations in place, IGRA provides a way for a Tribe to obtain a compact: agreement with the State or Secretarial Procedures implemented after a finding of bad faith and court-ordered mediation." <u>New Mexico v. Dep't of Interior</u>, 2014 U.S. Dist. LEXIS 184655, at *41. Indeed, although a tribe is "effectively precluded from obtaining a ruling on its allegations of bad faith, it appears that nothing prevents the United States from doing so as the [tribe's] trustee." <u>New Mexico v. Dep't of Interior</u>, 2014 U.S. Dist. LEXIS 184655, at *42 (alteration added)(citing <u>United States v. Spokane Tribe of Indians</u>, 139 F.3d at 1302).[17] Accordingly, IGRA remains capable of functioning "close enough to what Congress had in mind . . . ." <u>United States v. Spokane Tribe of Indians</u>, 139 F.3d at 1300.

Even assuming, however, that tribes cannot effectively access IGRA's secretarial procedures, the Court concludes that IGRA "remains 'fully operative as a law'" that significantly comports with

---

[17]The United States has appealed Judge Parker's invalidation of the regulations in 25 C.F.R. Part 291, and that litigation is ongoing. <u>See</u> <u>New Mexico v. Dep't of Interior</u>, 14-2222. The Court anticipates that the Tenth Circuit will affirm Judge Parker's judgment in New Mexico's favor. The Court accordingly sees no sound reason to modify IGRA before the Tenth Circuit resolves that appeal and determines the legality of the regulations in 25 C.F.R. Part 291.

Congressional intent.  Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 509 (2010).  Although Seminole Tribe I limited the remedies available in the event of failed compact negotiations, it did not cripple the statute's operation.  With IGRA, Congress enacted a "carefully-crafted scheme balancing the interests of the tribes and the states."  United States v. Spokane Tribe of Indians, 139 F.3d at 1300.  IGRA grants states a measure of authority over tribal gaming that Cabazon held was absent, see Texas v. United States, 497 F.3d at 494; at the same time, IGRA seeks to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments," 25 U.S.C. § 2702(1).  Seminole Tribe I notwithstanding, IGRA has largely achieved these goals.  With the exception of Pojoaque Pueblo, for example, fifteen New Mexico pueblos and tribes have readily acceded to the 2015 Form Compact, see Suppl. Brief at 3, uniformly concluding "that they will receive substantial economic benefit from the 2015 Compact," Mescalero Apache Letter at 3.  See Taos Pueblo Letter at 3 (same); Sandia Pueblo Letter at 2 (same).  Indeed, under the 2015 Form Compact, Sandia Pueblo "estimates a cost savings of $400,000 per calendar quarter."  Sandia Pueblo Letter at 2 n.5 (citation omitted).  Thus, while IGRA is messy at the margins, it largely is achieving what Congress intended with respect to advancing tribal interests.  Because the statute continues to function largely as intended, the Court concludes that it should "sustain [IGRA's] remaining provisions."  Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. at 509.

All this notwithstanding, Pojoaque Pueblo's proposed alterations to the statute, detailed supra, are unreasonable.  For example, Pojoaque Pueblo's request that the Court modify IGRA's provision for a court-appointed mediator to select one of two compacts that the tribe and the state propose, to allow the mediator to consider only the compact that the tribe proposes, see Motion to Stay PI Response at 13-15, would tip the scales heavily in the tribe's favor.  In Pojoaque Pueblo's version of the statute, a tribe would be empowered to bypass the entire negotiation process and

require a mediator to review a compact that benefits only the tribe; the mediator would have no occasion to consider the state's legitimate interests. Such a scheme would contravene Congress' avowed desire that IGRA grant states "a subordinate but significant role in regulating tribal gaming." Texas v. United States, 497 F.3d at 494. Pojoaque Pueblo's request that the Court sever IGRA's requirement that a Class III gaming compact be in effect for such gaming to be lawful, see Motion to Stay PI Response at 13-15, is more problematic. Not only would such severance permit tribes to conduct Class III gaming without any respect for states' interests, it would fundamentally transform the statute. The Supreme Court has stated that "a court should refrain from invalidating more of the statute than is necessary." Alaska Airlines, Inc. v. Brock, 480 U.S. at 684 (quoting Regan v. Time, Inc., 468 U.S. 641, 652 (1984)(plurality opinion)(quoting El Paso & Northeastern R. Co. v. Gutierrez, 215 U.S. 87, 96 (1909)))(alterations and internal quotation marks omitted). Eliminating IGRA's compact requirement -- IGRA's foundational provision -- invalidates "more of the statute than is necessary." Alaska Airlines, Inc. v. Brock, 480 U.S. at 684 (citations omitted). Indeed, severing IGRA's Class III provisions "in their entirety" to permit tribes "to govern gaming activities on [] Indian lands without regard to IGRA," as Pojoaque Pueblo ultimately requests, Motion to Stay PI Response at 16, would eliminate substantial portions of IGRA and radically alter its functionality. The Court is not Congress or a legislature; it declines to draft a new statute.

In the end, IGRA is not perfect, because it is incapable of forcing states and tribes to agree on procedures to govern Class III gaming on tribal lands. The lucrative nature of the gaming business, however, means that "[t]here's a whole lot of [agree-in'] goin' on [out there]." Guys 'n' Dolls, There's a Whole Lot of Loving, Ariola Records 1975. Indeed, even without the ability to subject recalcitrant states to suit for bad faith negotiations, most tribes are reaching mutually beneficial state-tribal agreements. Pojoaque Pueblo, intent on reaching an agreement with more favorable terms

than those to which the other New Mexico Pueblos and Tribes have agreed, presents the lone exception in the state.  That Pojoaque Pueblo's "choices under IGRA are constrained to its detriment does not," however, "render the entirety of IGRA 'incapable of functioning independently' from its jurisdiction-granting clause."  New Mexico v. Dep't of Interior, 2014 U.S. Dist. LEXIS 184655, at *42 (quoting Alaska Airlines, Inc. v. Brock, 480 U.S. at 684 (citing Hill v. Wallace, 259 U.S. 44, 70-72 (1922)).  The Court accordingly declines Pojoaque Pueblo's request to invalidate additional IGRA provisions other than the provision that the Supreme Court invalidated in Seminole Tribe I.

### B.   THE DEFENDANTS DID NOT VIOLATE POJOAQUE PUEBLO'S RIGHTS UNDER THE SUPREMACY CLAUSE.

Pojoaque Pueblo contends that the Court erred in the Stay MOO in its conclusion that the Defendants did not violate Pojoaque Pueblo's rights under the Supremacy Clause.  See Motion to Stay MOO at 16-17.  The Court, Pojoaque Pueblo asserts, incorrectly reads the Complaint's Count II as being "based on the Supremacy Clause rather than on the Court's inherent equitable jurisdiction."  Motion to Stay MOO at 16-17 (citing Stay MOO at 121).  Pojoaque Pueblo argues that Count II, rather, is based on the Court's "inherent jurisdiction to hear claims for violation of the Supremacy Clause . . . ."  Motion to Stay MOO at 17 (quoting Complaint ¶ 10, at 5)(internal quotation marks omitted).  Pojoaque Pueblo further asserts that Count II requests "prospective *equitable* relief as may be just and equitable, including ancillary relief."  Motion to Stay MOO at 17 (quoting Complaint ¶ K, at 39)(emphasis in Motion)(internal quotation marks omitted).  Pojoaque Pueblo posits that these allegations state a cognizable claim under Armstrong v. Exceptional Child Ctr., Inc. and Tohono O'odham Nation v. Ducey.  See Motion to Stay MOO at 17.

The Supremacy Clause provides that the laws of the United States "shall be the Supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."  U.S. Const. Art. VI, cl. 2.  Thus, state laws that "'interfere with, or are contrary to,' federal law" are

invalid.  Hillsborough Cnty. v. Automated Med. Labs., Inc., 471 U.S. at 712 (quoting Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211 (1824)).  The Supreme Court has clarified that the Supremacy Clause "'is not a source of any federal rights'; it 'secure[s] federal rights by according them priority whenever they come in conflict with state law.'"  Golden State Transit Corp. v. Los Angeles, 493 U.S. at 107 (quoting Chapman v. Hous. Welfare Rights Org., 441 U.S. 600, 613 (1979))(alterations in original).  Indeed, the Supremacy Clause "certainly does not create a cause of action."  Armstrong v. Exceptional Child Ctr., Inc., 135 S. Ct. at 1383.

Despite this limitation, Pojoaque Pueblo contends that Count II states a cognizable claim under Armstrong v. Exceptional Child Ctr., Inc. and Tohono O'odham Nation v. Ducey.  See Motion to Stay MOO at 17.  In Armstrong v. Exceptional Child Ctr., Inc., the Supreme Court observed that, although the Supremacy Clause does not create a private right of action, "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted."  135 S. Ct. at 1384 (citing Ex Parte Young, 209 U.S. at 155-56).  The Supreme Court clarified that equity is a judge-made remedy that is not derived from an implied right of action in the Supremacy Clause.  See Armstrong v. Exceptional Child Ctr., Inc., 135 S. Ct. at 1384.  Relying on Armstrong v. Exceptional Child Ctr., Inc., Judge Campbell of the District of Arizona recently held in Tohono O'odham Nation v. Ducey that an equitable cause of action asserting IGRA preemption of state law pursuant to the Supremacy Clause was cognizable, because IGRA did not evince Congress' intent to exclude equitable remedies.  See 2015 U.S. Dist. LEXIS 124979, at *9-11.

Pojoaque Pueblo is correct that an equitable cause of action asserting preemption of state law states a cognizable claim.  See Armstrong v. Exceptional Child Ctr., Inc., 135 S. Ct. at 1384; Tohono O'odham Nation v. Ducey, 2015 U.S. Dist. LEXIS 124979, at *9-11.  In Shaw v. Delta Air Lines,

463 U.S. 85 (1983), the Supreme Court observed that a "plaintiff who seeks injunctive relief from

state regulation, on the ground that such regulation is pre-empted by a federal statute which, by

virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question

which the federal courts have jurisdiction . . . to resolve."  463 U.S. at 96 n.14 (citations omitted).

Nevertheless, Count II, as pled, fails to state a claim for two primary reasons.

      First, Count II is explicitly "<u>based on</u> the Supremacy Clause."  Complaint ¶ 133, at 34

(emphasis added).  Count II alleges that the Defendants violated Pojoaque Pueblo's "right, based on

the Supremacy Clause to engage in activity on the Pueblo's Indian lands in a manner that is free

from state interference . . . ."  Complaint ¶ 133, at 34.  Aside from being entitled "Declaratory and

Injunctive Relief," Count II never mentions the Court's equitable jurisdiction.  Complaint ¶¶ 132-34,

at 33-34.  Pojoaque Pueblo thus lacks a sound basis to assert that the Court is "incorrect" in reading

Count II as being "based on the Supremacy Clause rather than on the Court's inherent equitable

jurisdiction," Motion to Stay MOO at 16-17, when Count II expressly states that it is based on the

Supremacy Clause.  As explained, Count II fails to state a claim that the Defendants violated

Pojoaque Pueblo's federal rights "based on the Supremacy Clause," as no such right exists.  <u>Golden

State Transit Corp. v. Los Angeles</u>, 493 U.S. at 107 (stating that the Supremacy Clause "is not a

source of any federal rights")(citation and internal quotation marks omitted).

      Second, Count II fails regardless, because the Court concludes that IGRA does not preempt

the Gaming Board's regulatory enforcement actions.  <u>See</u> <u>Armstrong v. Exceptional Child Ctr., Inc.</u>,

135 S. Ct. at 1384 ("[I]f an individual claims federal law immunizes him from state regulation, the

court may issue an injunction <u>upon finding the state regulatory actions preempted</u>.")(emphasis

added)(citing <u>Ex Parte Young</u>, 209 U.S. at 155-56).  Having decided that IGRA does not preempt --

expressly, by field, or conflict -- the Gaming Board's actions, there is no federal/state law conflict,

and the Court need not determine whether federal law is supreme.  If there were preemption, federal

law would be supreme, and Count II could proceed.

### C. THE DEFENDANTS DID NOT VIOLATE POJOAQUE PUEBLO'S RIGHTS UNDER 42 U.S.C. §§ 1983 and 1985.

Pojoaque Pueblo asserts that the Court in the Stay MOO improperly dismissed Counts III and

IV, which allege violations of Pojoaque Pueblo's rights pursuant to 42 U.S.C. §§ 1983 and 1985, see

Complaint ¶¶ 138-40, at 35 (Count III); id. ¶ 143-51, at 35-37 (Count IV), based on a misperception

that "the Complaint does not allege class-based discriminatory animus," Motion to Stay MOO at 17.

Pojoaque Pueblo contends that "[t]he entirety of this lawsuit is about the Defendants' deprival of the

Pueblo's rights flowing from their status as an Indian Tribe and individual Indians."  Motion to Stay

MOO at 17.  These arguments, it appears, are directed at the Court's analysis of Pojoaque Pueblo's

allegations under § 1985, which, as the Court noted in the Stay MOO, requires evidence of racially

discriminatory animus.  See Stay MOO at 125-26.  Section 1983 does not require evidence of racial

animus.  See Stay MOO at 123-25.  The Court reviews the sufficiency of the Complaint's § 1983

allegations under and then reviews the Complaint's § 1985 allegations.

### 1. Pojoaque Pueblo's Allegations Under § 1983 Fail to State a Claim.

Section 1983 "imposes liability on anyone who, under color of state law, deprives a person of

any rights, privileges, or immunities secured by the Constitution and laws."  Blessing v. Freestone,

520 U.S. 329, 340 (1997)(internal quotation marks and citation omitted).  The Supreme Court has

held that this provision protects "certain rights conferred by federal statutes."  Blessing v. Freestone,

520 U.S. at 340 (citing Maine v. Thiboutot, 448 U.S. at 5).  Standing alone, however, § 1983 "does

not provide any substantive rights at all."  Chapman v. Hous. Welfare Rights Org., 441 U.S. at 618.

See Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)("[T]hat section is not itself a source of

substantive rights.").  Rather, § 1983 is "a method for vindicating federal rights elsewhere conferred

by those parts of the United States Constitution and federal statutes that it describes." <u>Baker v. McCollan</u>, 443 U.S. at 144 n.3.  To state a § 1983 claim upon which relief can be granted, a plaintiff must allege (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law.  <u>See</u> <u>West v. Atkins</u>, 487 U.S. at 48.

Here, Counts III and IV identify no cognizable federal statutory or constitutional rights that the Defendants violated.  <u>See</u> Complaint ¶¶ 138-51, at 35-37.  Count III alleges that the Defendants are "wrongfully asserting State jurisdiction over gaming activities on the Pueblo's Indian lands." Complaint ¶ 138, at 35.  Count IV alleges that the Defendants violated Pojoaque Pueblo's "federal right to engage in conduct free from the jurisdiction of the state."  Complaint ¶ 145, at 36.  To the extent that these claims can be read to assert a violation of a "right, based on the Supremacy Clause," Complaint ¶ 133, at 34, that argument is unavailing, because the Supremacy Clause "'is not a source of any federal rights,'" <u>Golden State Transit Corp. v. Los Angeles</u>, 493 U.S. at 107 (quoting <u>Chapman v. Hous. Welfare Rights Org.</u>, 441 U.S. at 613).  Reading Counts III and IV as asserting a violation of federal rights under IGRA is likewise unavailing, because, as discussed <u>supra</u>, IGRA does not preempt the Defendants' actions in this case.

Even assuming, however, that IGRA preempts the Defendants' actions, Pojoaque Pueblo does not identify a federal right that is cognizable under § 1983.  The Supreme Court has held that a plaintiff seeking redress pursuant to § 1983 "must assert a violation of a federal *right*, not merely a violation of federal *law*."  <u>Blessing v. Freestone</u>, 520 U.S. at 340 (citing <u>Golden State Transit Corp. v. Los Angeles</u>, 493 U.S. at 106)(emphasis in original).  This rule requires evidence of an "unambiguously conferred right . . . ."  <u>Gonzaga Univ. v. Doe</u>, 536 U.S. at 283.  Here, Pojoaque Pueblo has not identified, nor has the Court found, an unambiguous right that IGRA confers.  <u>See</u> Complaint ¶¶ 135-51, at 34-37.  Indeed, Pojoaque Pueblo's assertion that the "entirety of this lawsuit

is about the Defendants' deprival of the Pueblo's rights flowing from their status as an Indian Tribe and individual Indians," Motion to Stay MOO at 17 -- to the extent that this assertion applies to the Complaint's allegations under § 1983 -- does not identify where such a right is explicitly articulated in IGRA.  Thus, the Complaint's allegations pursuant to § 1983 fail to state a claim.

### 2. Pojoaque Pueblo's Allegations Under § 1985 Fail to State a Claim.

Section 1985(3)[18] "provides a remedy for a conspiracy to violate a person's civil rights." O'Connor v. St. John's Coll., 290 F. App'x at 141.  To state a valid claim for conspiracy, "a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants." Tonkovich v. Kan. Bd. of Regents, 159 F.3d at 533.  Section 1985(3), moreover, requires that a plaintiff show (i) "that 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action,'" Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 268 (1993)(alteration in original)(quoting Griffin v. Brackenridge, 403 U.S. 88, 102 (1971)); and (ii) "that the conspiracy 'aimed at interfering with rights' that are 'protected against private, as well as official, encroachment,'" Bray v. Alexandria Women's Health Clinic, 506 U.S. at 268 (quoting Carpenters v. Scott, 463 U.S. 825, 833 (1983)).  In the Tenth Circuit, a § 1985 claim "requires at least a 'commingling of racial and political motives.'" O'Connor v. St. John's Coll., 290 F. App'x at 141 n.4 (quoting Brown v. Reardon, 770 F.2d at 907).

Pojoaque Pueblo alleges that the Defendants conspired to "force the Pueblo to acquiesce to the [sic] Governor Martinez' demands that the Pueblo execute a compact that contains terms that are illegal and not the product of good faith negotiation under IGRA." Complaint ¶ 81, at 24.  Pojoaque

---

[18]The Complaint does not identify the subsection of § 1985 upon which Counts III and IV are based.  See Complaint ¶¶ 135-51, at 34-37.  Two subsections are plainly inapplicable, however. Subsection (1) prohibits conspiracies to interfere with federal officers' performance of their duties, while subsection (2) prohibits conspiracies to obstruct justice or intimidate a party, witness, or juror. See 42 U.S.C. § 1985(1), (2).

Pueblo does not allege, however, that the conspiracy involved any racial or class-based "invidiously discriminatory animus." Bray v. Alexandria Women's Health Clinic, 506 U.S. at 268 (citation omitted). Pojoaque Pueblo objects to this reading of the Complaint, asserting that "[t]he entirety of this lawsuit is about the Defendants' deprival of the Pueblo's rights flowing from their status as an Indian Tribe and individual Indians." Motion to Stay MOO at 17. Even assuming that Pojoaque Pueblo's tribal and individual rights were so deprived, such deprivation does not necessarily imply any "invidiously discriminatory animus." The Supreme Court has stated that invidious animus under § 1985(3) "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Bray v. Alexandria Women's Health Clinic, 506 U.S. at 271-72 (citation omitted). Nothing in the Complaint expressly alleges, much less implies, that such discriminatory purpose motivated the Defendants' actions. Nor does the Complaint allege or suggest that the Defendants' regulatory actions involved a "commingling of racial and political motives," as the Tenth Circuit requires. O'Connor v. St. John's Coll., 290 F. App'x at 141 n.4 (citation omitted). Thus, "in the absence of allegations of class based or racial discriminatory animus, the complaint fails to state a claim under § 1985." Campbell v. Amax Coal Co., 610 F.2d at 702 (citing Atkins v. Lanning, 556 F.2d 485 (10th Cir. 1977)).

## IV.   PRUDENTIAL FACTORS DO NOT SUPPORT A STAY PENDING APPEAL.

The Court's discussion, supra Part III, holds that the Defendants' regulatory enforcement actions against non-Indian, state-licensed gaming vendors do not violate Pojoaque Pueblo's federal rights. First, the Defendants' actions do not violate Pojoaque Pueblo's IGRA rights, because IGRA does not preempt states' off-reservation regulatory actions against non-Indian third parties. Second, the Defendants' actions do not violate Pojoaque Pueblo's rights pursuant to the Supremacy Clause,

because the Supremacy Clause is not a source of federal rights and because, regardless, there is no federal/state law conflict that requires the Court to determine whether federal law is supreme. Third, the Defendants' actions do not violate Pojoaque Pueblo's rights under 42 U.S.C. § 1983, because there is no identifiable unambiguous right -- pursuant to IGRA or otherwise -- that the Defendants violated. Fourth, and finally, the Defendants' actions do not violate Pojoaque Pueblo's rights under 42 U.S.C. § 1985(3), because there is no evidence that any racial or class-based invidiously discriminatory animus motivated the Defendants' actions. Accordingly, Pojoaque Pueblo has not made the requisite "strong showing" that it is likely to succeed on the merits of its appeal. Nken v. Holder, 556 U.S. at 426 (citing Hilton v. Braunskill, 481 U.S. at 776). See KSTU, LLC v. Aereo, Inc., 2014 U.S. App. LEXIS 7802, at *3 (requiring a "strong showing" of likelihood of success for a stay pending appeal)(citation omitted).

        "A stay is an 'intrusion into the ordinary processes of administration and judicial review,'" Nken v. Holder, 556 U.S. at 562 (quoting Va. Petroleum Jobbers Assoc. v. Fed. Power Com., 259 F.2d 921, 925 (1958)), that is justified only if there is a "substantial indication of probable success," Va. Petroleum Jobbers Assoc. v. Fed. Power Com., 259 F.2d at 925. A robust showing of the other three stay factors does not diminish this required strong showing. See Nken v. Holder, 556 U.S. at 438 (Kennedy, J., concurring); Dine, 839 F.3d at 1282 (holding, in the PI context, that a modified likelihood-of-success test is "impermissible," regardless of the showing of the other factors)(relying on Winter v. NRDC, 555 U.S. at 22). Indeed, a stay is "not a matter of right, even if irreparable injury might otherwise result to the appellant." Nken v. Holder, 556 U.S. at 562 (quoting Virginian R. Co. v. United States, 272 U.S. at 672)(internal quotation marks omitted). Thus, notwithstanding Pojoaque Puelbo's showing of the remaining three factors, Pojoaque Pueblo is not entitled to a stay, because it is not likely to succeed on the merits of its appeal. See Nken v. Holder, 556 U.S. at 434

(stating that the likelihood-of-success factor, along with the irreparable-harm factor, is "the most critical" in the determination whether to grant a stay pending appeal).  See also Soskin v. Reinertson, 353 F.3d at 1257 (stating, in the PI context, that, where a claim lacks merit, a court should "short-circuit" the remaining factors rather than "express [] personal policy views regarding the importance of the interests of the parties and the public").

Nevertheless, the Court will review Pojoaque Pueblo's arguments concerning the remaining prudential factors required for a stay pending appeal.  In addition to a "strong" likelihood of success on the merits, a stay pending appeal requires that a court consider (i) whether the applicant will be irreparably injured without a stay; (ii) whether a stay will "substantially injure the other parties interested in the proceeding"; and (iii) "where the public interest lies."  Nken v. Holder, 556 U.S. at 426 (citing Hilton v. Braunskill, 481 U.S. at 776).  The Court concludes that these factors do not counsel a stay pending appeal.  Accordingly, even assuming that the relaxed "substantial, difficult, and doubtful" questions standard, McClendon v. City of Albuquerque, 79 F.3d at 1020 (citations omitted), remains valid in the stay-pending-appeal context after Winter v. NRDC, Inc. and Dine, Pojoaque Pueblo is not entitled to a stay of the Stay MOO.

### A.   POJOAQUE PUEBLO HAS NOT DEMONSTRATED THAT IT WILL BE IRREPARABLY INJURED ABSENT A STAY.

An applicant for a stay pending appeal "must meet a heavy burden of showing not only that the judgment of the lower court was erroneous on the merits, but also that the applicant will suffer irreparable injury if the judgment is not stayed pending his appeal."  Nken v. Holder, 556 U.S. at 439 (Kennedy, J., concurring)(citations omitted).  The Supreme Court has stated that "simply showing some 'possibility of irreparable injury,' Abbassi v. INS, 143 F.3d 513, 514 (9th Cir. 1998), fails to satisfy the second factor."  Nken v. Holder, 556 U.S. at 434-35.  The "'possibility' standard is too lenient," Nken v. Holder, 556 U.S. at 435 (citing Winter v. NRDC, Inc., 555 U.S. at 22); irreparable

injury, rather, must be "*likely*," Winter v. NRDC, Inc., 555 U.S. at 22 (emphasis in original)(citing Los Angeles v. Lyons, 461 U.S. 95, 103 (1983); Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 441 (1973); O'Shea v. Littleton, 414 U.S. 488, 502 (1974)). Such injury, moreover, must be likely to occur before the matter is resolved on appeal. See Nken v. Holder, 556 U.S. at 432 (noting that stays pending appeal are based on the "perceived need 'to prevent irreparable injury to the parties or to the public' pending review")(quoting Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 10 (1942)). Aside from likelihood of success, likelihood of injury is the "most critical" factor, Nken v. Holder, 556 U.S. at 434, given that a stay pending appeal is an "extraordinary remedy that should not be granted" unless the applicant clearly is entitled to such relief, Nken v. Holder, 556 U.S. at 437 (Kennedy, J., concurring)(citing Virginian R. Co. v. United States, 272 U.S. at 672-73; Winter v. NRDC, Inc., 555 U.S. at 24). See Dine, 839 F.3d at 1282 (requiring a "clear showing that the plaintiff is entitled to such relief")(citing Winter v. NRDC, 555 U.S. at 22).

Pojoaque Pueblo's first argument is that "significant interference with tribal self-governance satisfies the irreparable harm criteria for preliminary injunctive relief and should similarly satisfy the same criteria for stay pending appeal." Motion to Stay MOO at 19. Pojoaque Pueblo cites several cases which, in its view, stand for the proposition that state regulation of activities on Indian lands irreparably harms tribal sovereignty and self-governance. See Motion to Stay MOO at 19-20. This argument is unpersuasive, however, because the Court has already concluded that the Defendants' off-reservation regulation of non-Indian third parties does not amount to a regulation of Pojoaque Pueblo, much less a "significant interference" with Pojoaque Pueblo's governance or sovereignty. Motion to Stay MOO at 19. Pojoaque Pueblo appeals, second, to Judge Brack's irreparable harm finding in the PI MOO, asserting that the Stay MOO does not disturb that finding. See Motion to Stay MOO at 20-21. This argument, too, is unpersuasive. "A preliminary injunction, of course, is

not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment." Sierra On-Line, Inc. v. Phx. Software, Inc., 739 F.2d at 1422 (citing Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 808-09 (9th Cir. 1963), cert. denied, 375 U.S. 821 (1963)). Initial findings of fact and conclusions of law that support a PI are thus not determinative of subsequent adjudications on the merits. See AG of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009)(citations omitted). Accordingly, Pojoaque Pueblo's appeal to Judge Brack's finding of irreparable injury in the PI MOO is misplaced, because that finding does not bind the Court.

Nevertheless, Pojoaque Pueblo avers that failure to reinstate the effects of Judge Brack's PI makes it "extremely likely that the Defendants will take action against the licensees," which, in turn "would likely cause vendors to cease business with the Pueblo." Motion to Stay MOO at 21. There is indeed evidence that the Gaming Board's past enforcement actions against state vendor licensees discouraged those vendors from doing business with Pojoaque Pueblo. See Allgeier Decl. ¶ 14, at 4. For example, Scientific Games, Inc. suspended the installation of a new casino management system for Pojoaque Pueblo in response to the Gaming Board's actions. See Allgeier Decl. ¶ 14, at 4. In light of this evidence, the Court agrees that, should the Gaming Board take unrestrained enforcement actions against Pojoaque Pueblo's vendors, those vendors would likely cease doing business with Pojoaque Pueblo. The Court concludes, however, that the harms which Pojoaque Pueblo asserts will arise in such a scenario are insufficiently "*likely*" to occur pending appeal. Winter v. NRDC, Inc., 555 U.S. at 22 (emphasis in original)(citations omitted).

Pojoaque Pueblo primarily argues that, should its vendors cut business ties in response to the Gaming Board's enforcement actions, it will be unable to enter into contracts for new games and machines, which, in turn, will (i) deter customers who perceive that Pojoaque Pueblo's games are

"old and outdated"; and (ii) cause Pojoaque Pueblo's operations to "immediately lose 17% of their current revenue from an inability to support existing games."   Motion to Stay MOO at 22. Ultimately, Pojoaque Pueblo asserts, "[a]bsent the continued business of its contracted vendors, the Pueblo would be forced to cease operations."  Motion to Stay MOO at 21.  These harms, although significant, are not likely to occur pending appeal for several reasons.

First, it is unclear how, in the months that may transpire before the Tenth Circuit resolves Pojoaque Pueblo's appeal of the Stay MOO, Pojoaque Pueblo's games will become so noticeably "old and outdated" that customers will choose to play at competing casinos.  Motion to Stay MOO at 22.  The evidence does not suggest that Pojoaque Pueblo updates and replaces its games with such frequency that customers, accustomed to a rapidly-changing gaming floor, would notice an absence of such updates and replacements after a few months.  Pojoaque Pueblo asserts that it operates "more than 1,800 gaming machines" at its casinos and obtains an average of "13 machines per month through the purchase, lease, conversion, or replacement of products and machines."  Allgeier Decl. ¶ 23, at 7.  Assuming, therefore, that Gaming Board actions would result in Pojoaque Pueblo losing thirteen machines each month, that loss would affect only 0.72 percent of Pojoaque Pueblo's gaming floor -- unlikely a noticeable loss to the average customer.  Extrapolating this calculation to account for the Tenth Circuit's resolution of Pojoaque Pueblo's appeal does not make the loss significantly more noticeable.  The Tenth Circuit's average is 6.7 months from the filing of a notice of appeal to the disposition of an appeal.  See Federal Court Management Statistics, U.S. Court of Appeals -- Judicial Caseload Profile: Tenth Circuit at 24 (reporting period: September 30, 2015, to September 30, 2016), available at http://www.uscourts.gov/statistics-reports/federal-court-management-statistics-september-2016. If Pojoaque Pueblo lost thirteen machines each month for 6.7 months, it would lose roughly 87 machines, or 4.8 percent of its total gaming floor.  Pojoaque Pueblo has not

introduced evidence -- such as customer surveys -- indicating that a 4.8 percent loss would be the tipping point for customer flight.  Regardless, even if customers noticed a lapse in updates, it is not likely that they will migrate en masse to competing casinos when Pojoaque Pueblo's machines are virtually up-to-date.  Again, Pojoaque Pueblo has not proffered evidence of customer preferences that would suggest that average customers would be deterred by somewhat dated gaming offerings.  Finally, a lack of machine/software updates would not deter customers who are attracted to Pojoaque Pueblo's casinos for their other Class III gaming offerings, such as banked card games and table games, and their Class II gaming offerings, such as bingo.

Second, the evidence does not support Pojoaque Pueblo's assertion that it will "immediately lose 17% of [its] current revenue from an inability to support existing games."  Motion to Stay MOO at 22.  Pojoaque Pueblo bases this assertion on Allgeier's September 25, 2015, Declaration, in which he states that, as Pojoaque Pueblo's contracts with vendors that "account for 6% of the games at the Pueblo Casinos and 11% of the Pueblo Casinos' revenue" expire, "the Pueblo Casinos will lose an estimated $7,000,000 in revenue from the loss of games that cannot be replaced with new games."[19]  Allgeier Decl. ¶ 28, at 9.  Assuming that these calculations are accurate, it is not likely that such loss would occur "immediately[.]"  Motion to Stay MOO at 22.  The functionality of Pojoaque Pueblo's

---

[19]The Allgeier Declaration asserts that Pojoaque Pueblo "will immediately lose 17% of [its] current revenue."  Allgeier Decl. ¶ 33, at 10.  Allgeier does not break down this calculation.  See Allgeier Decl. ¶ 33, at 10.  The Court's review of the evidence suggests that Allegeier must have reached this calculation by combining his estimate that Pojoaque Pueblo will lose "6% of the games" with his estimate that it will lose "11% of the . . . revenue."  Allgeier Decl. ¶ 28, at 9.  The Court notes that "6% of the games" is a different metric than "11% of the Pueblo Casinos' revenue"; these dissimilar metrics do not necessarily combine for a 17% revenue loss.  A more likely reading of these data is that the 6% of the games at Pojoaque Pueblo that would be affected generate "11% of the Pueblo Casinos' revenue."  Allgeier Decl. ¶ 33, at 10.  Thus, the expiration of these contracts would result in an 11% revenue loss and not a 17% loss, as Pojoaque Pueblo asserts.  Nevertheless, the Court will assume the validity of Pojoaque Pueblo's 17% assertion, because, in the Court's estimation, such loss is not likely to "immediately" occur.

games is not directly correlated with the Gaming Board's actions; if the Gaming Board revokes a vendor's license, for example, Pojoaque Pueblo's games will not abruptly suffer catastrophic failure as a direct result of that revocation.  Rather, as Pojoaque Pueblo's contracts expire and its machines fail over time, Pojoaque Pueblo will eventually lose revenue.  The Court grants that it is <u>possible</u> that these machines all fail before the Tenth Circuit resolves Pojoaque Pueblo's appeal; "simply showing some 'possibility of irreparable injury,'" however, "fails to satisfy the second factor."  <u>Nken v. Holder</u>, 556 U.S. at 434-35 (citing <u>Abbassi v. INS</u>, 143 F.3d at 514).  Pojoaque Pueblo does not give any evidence that would allow the Court to evaluate the probability of failure.  Accordingly, on these facts, the Court is not convinced that it is "*likely*," <u>Winter v. NRDC, Inc.</u>, 555 U.S. at 22 (emphasis in original)(citations omitted), that Pojoaque Pueblo's existing games will fail.  Moreover, to the extent that any revenue loss can be "compensated after the fact by monetary damages," there is no irreparable harm.  <u>RoDa Drilling Co. v. Siegal</u>, 552 F.3d 1203, 1210 (10th Cir. 2009)(citations omitted).

Pojoaque Pueblo's calculation regarding its expected seventeen percent revenue loss, further, has questionable utility, because it was made in 2015 before Judge Brack issued the PI.  <u>See</u> Allgeier Decl. at 15 (indicating a September 25, 2015, execution date).  Indeed, virtually all of Pojoaque Pueblo's irreparable harm arguments are based on evidence that pre-dates Judge Brack's PI.  <u>See</u> Motion to Stay MOO at 18-25 (relying primarily on Allgeier Decl. and on Declaration of Joseph M. Talachy (executed September 25, 2015), filed September 25, 2015 (Doc. 23-1)("Talachy Decl.")).  Intervening events -- such as the issuance of the PI and the Court's suspension of the PI in the Stay MOO -- suggest that the Court should treat these arguments with respectful skepticism, particularly because there is no evidence that Pojoaque Pueblo suffered any substantial loss of revenue when the Court stayed the PI's effects on September 30, 2015.

Pojoaque Pueblo's assertion that it will ultimately be "forced to cease operations," Motion to Stay MOO at 21, is unavailing for similar reasons. The Defendants aptly note that the primary harm upon which Pojoaque Pueblo relied when it moved for a PI -- an inability to upgrade its casino management system -- is moot, because Pojoaque Pueblo performed the necessary upgrade in March 2016. See Motion to Stay MOO Response at 11. Pojoaque Pueblo's proffered evidence in favor of a PI indeed rested, in large part, on the assertion that, when "the current CMS needs parts or service and cannot be maintained, the Pueblo Casinos would close." Allgeier Decl. ¶ 33, at 10. Pojoaque Pueblo reasoned that its system "is antiquated, manufacturers no longer provide needed support to the outdated software and hardware, and the marketing modules and player bonusing programs are ineffective." Allgeier Decl. ¶ 8, at 3. It follows, then, that Pojoaque Pueblo's March 2016 upgrade resolved this concern. Nevertheless, Pojoaque Pueblo maintains that system failure remains likely, because "further and continuous upgrades are always required." Motion to Stay MOO Reply at 7. Indeed, according to Pojoaque Pueblo, in the event that "the vendor providing the system [] cease[s] doing business with the Pueblo . . . , the system could quickly become outdated or inoperative, and the substantial resources invested in the system would be lost." Motion to Stay MOO Reply at 7 (citing Declaration of Michael Allgeier (executed October 25, 2016) ¶ 11, at 4, filed October 26, 2016 (Doc. 131-1)("Second Allgeier Decl.")).

Despite these assertions, the evidence does not suggest that system failure is likely to occur pending Pojoaque Pueblo's appeal. First, it is notable that Pojoaque Pueblo began negotiating with vendors for a new casino management system in May 2013, see Allgeier Decl. ¶ 7, at 3, and that it did not receive an upgrade until March 2016, see Second Allgeier Decl. ¶ 5, at 2. Thus, despite its "antiquated," "outdated," and "ineffective" system, Allgeier Decl. ¶ 8, at 3, Pojoaque Pueblo successfully maintained its operations for three years without suffering a catastrophic system failure.

It is unclear why Pojoaque Pueblo's newly-upgraded system would fail in a much shorter timeframe, especially when there is no evidence that the new system is deficient.  Indeed, other regional casinos' experience with the same management system contradicts the suggestion that Pojoaque Pueblo's system will rapidly fail.  The Downs casino in Albuquerque, New Mexico, for example, has had "only four patches/updates to improve functionality" in the more than three years that it has used that system.  Suppl. Brief Response at 9-10 (citing Roybal Decl. ¶¶ 2-4, at 1).  See Suppl. Brief Motion Reply at 10-12 (not disputing this assertion).  Accordingly, Pojoaque Pueblo's past experience, as well as that of other casinos, indicates that system failure is unlikely.

Second, Pojoaque Pueblo proffers no evidence that system failure is imminent -- only evidence that system failure might occur at some point.  In his Second Declaration, for example, Allgeier contends that, "[i]f Scientific Games stopped providing service and support to the new Bally CMS, the Pueblo Casinos would stop receiving necessary updates and the CMS would eventually become inoperative."  Second Allgeier Decl. ¶ 12, at 4 (emphasis added).  At the hearing, Allgeier added that total system failure "could happen at any time" and that, "periodically, it does happen." Motion to Stay MOO Tr. at 65:12-16 (Frias, Allgeier).  The Court does not dispute that total system failure is possible, or that such failure would have significant implications.  See, e.g., Second Allgeier Decl. ¶ 13, at 4 ("If the CMS ceases to operate, slot and table game activity would need to cease as ticketing functionality stops and table fills and credits are not able to be processed.  This will result in our inability to operate gaming . . . and closure of the Pueblo Casinos.").  Irreparable injury, however, cannot rest on a "possibility" of future harm; such harm must be "likely" to occur pending appeal. Winter v. NRDC, Inc., 555 U.S. at 22 (emphasis in original)(citations omitted). See RoDa Drilling Co. v. Siegal, 552 F.3d at 1210 ("Purely speculative harm will not suffice.").  Vague predictions of system failure are thus insufficient to support an irreparable harm finding.

It is unlikely, moreover, that software failure would cause Pojoaque Pueblo' casinos to shut down -- at least not immediately.  Partial software failure, first, would not cripple Pojoaque Pueblo's operations.  At the Motion to Stay MOO hearing, Allgeier stated that, in the event that individual games "go down[,] that would be fine, we could still operate the rest of them."  Motion to Stay MOO Tr. at 71:11-13 (Allgeier).  Indeed, Allgeier admitted that, although Pojoaque Pueblo's individual games have software problems "[s]ometimes . . . four or five or 10" times a month, Pojoaque Pueblo would "continue to offer gaming until officially it came up where we couldn't offer it because the [management] system went down."  Motion to Stay MOO Tr. at 69:6-9, 69:25-70:3 (Allgeier).  With respect to that system, the Court pressed Allgeier to explain why a lack of upgrades or a partial system failure would cause the entire system to be unusable and why Pojoaque Pueblo could not "go a long time with the software that [it] had."  Motion to Stay MOO Tr. at 70:9-24 (Court).  Allgeier responded that, in the event that the system's accounting functions fail, operations would shut down, because Pojoaque Pueblo would not be able to "accurately calculate [] win/loss."  Motion to Stay MOO Tr. at 71:3-7 (Allgeier).  This assertion is unpersuasive, however, because there are alternative methods to calculate win/loss.  For example, Pojoaque Pueblo could "utilize the meters within its slot machines to determine the amount of coin-in and jackpots paid out by each machine."  Suppl. Brief Response at 10 (citing Roybal Decl. ¶¶ 5-6, at 1-2)(explaining that the Downs would use this method if its system failed).  This solution is not, of course, a permanent one -- indeed, Pojoaque Pueblo notes that it would be inefficient and costly.  See Suppl. Brief Reply at 11-12.  Nevertheless, this method would mitigate the effects of accounting software failure.

Ultimately, Pojoaque Pueblo's irreparable-injury analysis glosses over the issue whether software failure is likely to occur and -- assuming it is -- focuses on the harms that would flow from such failure.  See Motion to Stay MOO at 18-25; Motion to Stay MOO Reply at 7-9.  Proceeding

from the assumption it would be "forced to cease operations," Pojoaque Pueblo asserts that

> [c]losure of the Pueblo's gaming operations would cause measurable, immediate and irreparable harm, including layoffs at both gaming and other commercial enterprises, as well as reductions in governmental services. *See* [Talachy Decl.] ¶ 4[, at 2]. The result would cripple the Pueblo's governmental operations and its economy. However, not only would the Pueblo be affected. The Pojoaque Valley's entire regional economy as well as greater northern New Mexico would be devastated.

Motion to Stay MOO at 22. These harms are substantial; yet, without evidence that it is likely that Pojoaque Pueblo will suffer software and mechanical failures that will force it to shut down in the first place, there is no compelling evidence that these harms will occur. Pojoaque Pueblo's harms are thus speculative, because it has not "show[n] a significant risk of irreparable harm . . . [that] is likely to occur before the [Tenth Circuit resolves the appeal]." RoDa Drilling Co. v. Siegal, 552 F.3d at 1210 (citations omitted). The Court is mindful that a stay should be granted only "'to prevent irreparable injury to the parties or to the public' pending review." Nken v. Holder, 556 U.S. at 432 (quoting Scripps-Howard Radio, Inc. v. FCC, 316 U.S. at 10). Accordingly, the Court cannot soundly conclude that there is a likelihood of irreparable harm.

### B.     THE HARM-TO-THE-OPPOSING-PARTY AND PUBLIC-INTEREST FACTORS WEIGH IN THE DEFENDANTS' FAVOR.

The final two factors -- the harm to the opposing party and the public interest -- generally "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. at 435. Despite that state actors are the "opposing party," however, there are compelling reasons to analyze these factors separately in this case. Whereas there is a clear public interest in New Mexico's ability to enforce its gambling laws, this case implicates additional public interests that arise in the IGRA context, that is, public interests in tribal economic development and self-sufficiency as well as in ensuring that tribal gaming is conducted in accordance with a compact. Accordingly, the Court will analyze separately the harm-to-the-opposing-party and public-interest factors. The Court's analysis is guided by the

Supreme Court's cautionary pronouncement that a reviewing court "cannot simply assume that '[o]rdinarily, the balance of hardships will weigh heavily in the applicant's favor.'" Nken v. Holder, 556 U.S. at 436 (citing Andreiu v. Ashcroft, 253 F.3d 477, 484 (9th Cir. 2001)). That state actors are opposing parties, moreover, "does not make the public interest . . . negligible[.]" Nken v. Holder, 556 U.S. at 435 (citations omitted). With these principles in mind, the Court addresses the final two factors in turn.

### 1.    New Mexico Will be Injured by a Stay.

The Defendants contend that a reinstatement of the PI's effects would harm New Mexico's sovereign interest in enforcing its gaming laws. See Motion to Stay MOO Response at 13. The Tenth Circuit has indeed held that a state's "ability . . . to enact and enforce measures it deems to be in the public interest is [] an equity to be considered in balancing hardships." Heideman v. S. Salt Lake City, 348 F.3d at 1191. Further, as the Court explained in its preemption analysis, supra, New Mexico has a "sovereign interest in being in control of, and able to apply, its laws throughout its territory." Mashantucket Pequot Tribe v. Town of Ledyard, 722 F.3d at 476-77. Accordingly, a stay would injure New Mexico's sovereign interest in enforcement of its laws.

Pojoaque Pueblo objects that this reasoning "all but ignores the equally sovereign interests of the Pueblo." Motion to Stay MOO Reply at 9. According to Pojoaque Pueblo, "any claimed and temporary hardship on the part of the State must be balanced against the Pueblo's hardship in losing its sovereign right to conduct gaming within the boundaries of the Pueblo." Motion to Stay MOO Reply at 10. Pojoaque Pueblo relies on Wyandotte Nation v. Sebelius, where the Tenth Circuit held that Kansas' interest in applying its laws to the Wyandotte Nation's Indian lands was "minimal at best whereas the harm to the Wyandotte's sovereignty and well-being caused by permitting the state to continue exercising jurisdiction is quite substantial." Motion to Stay MOO Reply at 10 (quoting

- 196 -

Wyandotte Nation v. Sebelius, 443 F.3d at 1256).  Pojoaque Pueblo contends that, as in Wyandotte Nation v. Sebelius, the harm to New Mexico is "minimal at best," Motion to Stay MOO Reply at 10, whereas the harm to Pojoaque Pueblo is "devastating and irreparable," Motion to Stay MOO at 26.

These arguments are unavailing in light of the Court's likelihood-of-success and irreparable-injury analysis, supra.  The Gaming Board's off-reservation regulatory actions do not yet interfere -- and certainly not directly -- with "the Pueblo's . . . sovereign right to conduct gaming within the boundaries of the Pueblo."  Motion to Stay MOO Reply at 10.  Rather, the Gaming Board's off-reservation regulation of third-party, non-Indian state licensees leaves intact Pojoaque Pueblo's sovereign authority over gaming on its tribal lands.  Wyandotte Nation v. Sebelius is thus inapposite, because this case does not involve the application of state law to Indian lands.  In Wyandotte Nation v. Sebelius, Kansas "bypass[ed] the federal court system" and sent armed officials to storm, and seize files and proceeds from, a casino that the Wyandotte Nation operated on its Indian lands, which Kansas believed was operating in violation of state laws.  See 443 F.3d at 1251-52.  The district court granted the Wyandotte Nation an injunction against Kansas' actions, holding that Kansas "intruded on the Wyandotte's sovereignty by enforcing state law on Indian land."  443 F.3d at 1255.  The Tenth Circuit affirmed, holding that "Kansas has no authority to enforce its gaming laws on the Shriner Tract."  443 F.3d at 1252 (emphasis added)(citation omitted).  Accordingly, in the context of a state's direct application of its laws through enforcement on tribal lands, the Tenth Circuit has held that tribal sovereignty outweighs a state's interest in enforcing its laws.  Here, however, the Court has concluded that New Mexico is not enforcing its laws on tribal lands.  Although the Court recognizes Pojoaque Pueblo's "inherent sovereign authority" to self-govern, Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. at 509 (citation omitted), the Gaming Board's off-reservation regulation of non-tribal entities does not implicate that authority.

The harm-to-the-opposing-party factor, moreover, does not turn on whether Pojoaque Pueblo will be injured absent a stay; it simply requires that the Court inquire "whether issuance of the stay will substantially injure the other parties interested in the proceeding." Nken v. Holder, 556 U.S. at 426 (quoting Hilton v. Braunskill, 481 U.S. at 776). It is clear that enjoining the Gaming Board's enforcement of state laws would substantially injure New Mexico's sovereign interests, as it would restrain the state's exercise of its historic police powers. See Metro. Life Ins. Co. v. Mass., 471 U.S. at 756 (providing that states have "great latitude" pursuant to their police powers to legislate as to the protection of the public health and morals). The Court thus concludes that a reinstatement of the PI's effects would substantially injure New Mexico's sovereign interest in enforcing its laws within its jurisdiction.

### 2. Granting a Stay is Not in the Public Interest.

The Court must inquire, finally, "where the public interest lies." Nken v. Holder, 556 U.S. at 426 (citing Hilton v. Braunskill, 481 U.S. at 776). The Tenth Circuit has said, in the PI context, that, where the applicant's "claim of the public interest is largely a restatement of their own constitutional interest, and the [government's] claim of public interest is largely a restatement of its own interest in regulating the conduct in question, the 'public interest' prong of the preliminary injunction inquiry is nothing more than a restatement of the 'balance of hardships' prong." Heideman v. South Salt Lake City, 348 F.3d 1182, 1191 (10th Cir. 2003). Here, the Defendants recast their harm-to-opposing-party argument, contending that the public interest is served by New Mexico's enforcement of its gambling laws. See Motion to Stay MOO Response at 13. That such enforcement serves the public interest, however, does not end the Court's analysis, as this case implicates additional public interests reflected by IGRA.

Pojoaque Pueblo correctly notes that IGRA's express purpose is to "provide a statutory basis

for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." Motion to Stay MOO Reply at 11 (quoting 25 U.S.C. § 2702(1))(internal quotation marks omitted). IGRA thus enshrines Congress' judgment that the public interest is served by tribes' lawful gaming operations -- it is their primary revenue source, and the public has an interest that tribal governments are sufficiently funded. See Sac & Fox Nation v. LaFaver, 905 F. Supp. at 907-08 (stating, in the context of a challenge to Kansas' imposition of a fuel tax, that the public "has a genuine interest in helping to assure Tribal self-government[] [and] self-sufficiency"). Accordingly, to the extent -- however attenuated -- that the Gaming Board's regulatory actions affect Pojoaque Pueblo's ability to generate revenue from its gaming operations, the public interest cuts against those actions, to that extent.

Nevertheless, while IGRA enshrines a public interest in tribes' ability to generate revenue via gaming operations, it also expressly requires that such operations be conducted in accordance with a state-tribal compact. See 25 U.S.C. § 2710(d)(1)(C) ("Class III gaming activities shall be lawful on Indian lands only if . . . (C) conducted in conformance with a Tribal-State compact . . . ."). Thus, with IGRA, Congress decided that the public interest in tribal gaming is best served by requiring a collaborative compacting process with the state. As the statute's legislative history provides, IGRA "does not contemplate and does not provide for the conduct of class III gaming activities on Indian lands in the absence of a tribal-State compact." S. Rep No. 100-446, at 6. Accordingly, to hold that the public interest favors Pojoaque Pueblo would ignore Congress' judgment that tribes' ability to generate revenue via Class III gaming is dependent upon the existence of a state-tribal compact, because the public also has an interest that gaming operations are compliant with all applicable regulations. In short, under IGRA, the public interest favors the Defendants, because Congress did not intend for Indian tribes to generate revenue from Class III gaming operations without first

negotiating a state-tribal compact.  See 25 U.S.C. § 2710(d)(1).

**IT IS ORDERED** that: (i) the Plaintiffs' Motion to Stay the Order and Restore the Preliminary Injunction Pending Appeal, filed October 4, 2016 (Doc. 123), is denied; (ii) the Plaintiffs' Motion for Leave to File Supplemental Brief, filed November 2, 2016 (Doc. 140), is granted; and (iii) the request in the Defendants' Response to Plaintiffs' Motion for Leave to File Supplemental Brief, filed November 21, 2016 (Doc. 141), that the Court allow the Defendants to file a response to Pojoaque Pueblo's Supplemental Brief, is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Carrie A. Frias
Pueblo of Pojoaque Legal Department
Santa Fe, New Mexico

-- and --

Scott Crowell
Steffani Ann Cochran
Crowell Law Office Tribal Advocacy Group, P.L.L.C.
Sedona, Arizona

  *Attorneys for the Plaintiffs*

Henry M. Bohnhoff
Edward Ricco
Krystle A. Thomas
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

  *Attorneys for the Defendants*